No. 26-5050

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

FRITZ EMMANUEL LESLY MIOT, *ET AL.*,
*Appellees,*

*v.*

DONALD J. TRUMP, *ET AL.*,
*Appellants.*

On Appeal from the U.S. District Court for the District of Columbia
No. 1:25-cv-2471 (Reyes, J.)

## APPELLEES' OPPOSITION TO APPELLANTS' EMERGENCY MOTION
## FOR A STAY PENDING APPEAL

Geoffrey M. Pipoly
Alexa Thein
Madisen Hursey
Bryan Cave Leighton Paisner, LLP
161 N. Clark Street, Ste. 4300
Chicago, IL 60601
(312) 602-5000
geoff.pipoly@bclplaw.com
alexa.thein@bclplaw.com
madisen.hursey@bclplaw.com

Matthew Stanford
Bryan Cave Leighton Paisner, LLP
2 N. Central Ave., Ste. 2100
Phoenix, AZ 85004
(602) 364-7000
matt.stanford@bclplaw.com

Jean-Claude André
Bryan Cave Leighton Paisner LLP
120 Broadway, Suite 300
Santa Monica, CA 90401-2386
(310) 576-2100
jc.andre@bclplaw.com

Andrew E. Tauber
Bryan Cave Leighton Paisner, LLP
1155 F Street N.W., Suite 700
Washington, DC 85004-4406
(202) 508-6111
andrew.tauber@bclplaw.com

*Attorneys for Appellees*
*(additional counsel listed inside)*

Ira J. Kurzban
Kevin Gregg
Kurzban, Kurzban, Tetzeli & Pratt, P.A.
131 Madeira Ave.
Coral Gables, FL 33134
(305) 444-0060
ira@kktplaw.com

Raymond Audain
Giskan Solotaroff & Anderson LLP
1 Rockefeller Plaza, 8th Floor
New York, NY 10020
(646) 290-6249
raudain@gslawny.com

Sejal Zota
Just Futures Law
1629 K Street N.W., Suite 300
Washington, DC 20006
(617) 812-2822
sejal@justfutureslaw.org

Daniel Paul Mach
Bryan Cave Leighton Paisner, LLP
1290 Avenue of the Americas
New York, NY 10104
(212) 541-1146
daniel.mach@bclplaw.com

# CERTIFICATES AS TO PARTIES, RULINGS, AND RELATED CASES

### A.      Parties and Amici

Except for amici Federation for American Immigration Reform, who submitted its amicus brief after the filing of Appellants' Emergency Motion for a Stay, all other parties, intervenors, and amici appearing before the district court and in this Court are listed in the Emergency Motion for a Stay filed by appellants Donald J. Trump, *et al.*, on February 6, 2026.

### B.      Rulings Under Review

References to the rulings at issue appear in the Emergency Motion for a Stay filed by appellants Donald J. Trump, *et al.*, on February 6, 2026.

### C.      Related Cases

This case has not previously been before this Court.

# TABLE OF CONTENTS

**Page**

CERTIFICATES AS TO PARTIES, RULINGS, AND RELATED CASES ........... i

TABLE OF CONTENTS ......................................................................... ii

INTRODUCTION ................................................................................1

STATEMENT ......................................................................................2

    A.    Background. .........................................................................2

        1.    Temporary Protected Status provides a haven to those who cannot return home in safety. ..........................................2

        2.    Haiti's TPS designation. ...........................................4

        3.    President Trump's attempts to end Haiti's TPS designation. ......4

    B.    Proceedings below .............................................................6

ARGUMENT .......................................................................................6

I.    The equities weigh heavily against a stay. ......................................6

    A.    A stay would irreparably harm Plaintiffs. .............................6

    B.    The government would not be harmed in the absence of a stay. ........11

    C.    A stay is against the public interest. ...................................12

II.    Plaintiffs are likely to succeed on the merits. ................................14

    A.    The Secretary's action is subject to judicial review. ...........................14

        1.    There is a strong presumption of judicial review. ...................14

        2.    § 1254a(b)(5)(A) does not bar Plaintiffs' claims. .....................14

        3.    The government's additional arguments are unavailing. ..........17

    B.    Plaintiffs are likely to prevail on their APA claims. ...........................19

C.      Plaintiffs are likely to prevail on their equal-protection claim. ..........21

CONCLUSION ..................................................................................................23

CERTIFICATE OF COMPLIANCE........................................................................25

CERTIFICATE OF SERVICE ...............................................................................26

**INTRODUCTION**

This appeal should be considered on the merits in the ordinary course and the Court should deny the emergency request for a stay. All the Government seeks is to deport Haitians *more quickly*. If a stay is granted, these lawful immigrants will face immediate deportation to a country aptly described as a "maelstrom of disease, poverty, violence (including sexual violence) and death."[1] When the balance of the equities is, on the one hand, faster government action and, on the other, imminent death, the only rational outcome is to deny the government's stay request.

The risk of death is not speculative. Just two weeks ago, the bodies of four Haitian women deported from the U.S. several months earlier were found decapitated and dumped in a river.[2] If the district court's order is stayed, many others will likely suffer a similar fate.

Plaintiffs are Haitians with Temporary Protected Status (TPS). On November 28, Secretary Noem purported to terminate Haiti's TPS designation. If the termination stands, Haitian TPS holders will be subject to immediate deportation to Haiti. Finding that the Secretary's action likely violated both the Administrative Procedure Act and the Fifth Amendment's equal-protection guarantee, and that the

---

[1]    George F. Will, *A federal judge schools chaotic Kristi Noem*, WASHINGTON POST (Feb. 6, 2026).

[2]    Héctor Ríos Morales, *Four Haitian Women Were Deported from Puerto Rico; They Have Now Been Found Decapitated*, LATIN TIMES (Feb. 4, 2026).

termination would cause Plaintiffs irreparable harm, the district court postponed the termination of Haiti's TPS designation pending a final resolution on the merits.

As described below, not only do the equities strongly favor Plaintiffs, but Plaintiffs are likely to prevail on the merits. Contrary to the government's argument, unexplained stays issued in other cases presenting different facts do not compel a stay here.

## STATEMENT

### A.    Background.

#### 1.    Temporary Protected Status provides a haven to those who cannot return home in safety.

"Before Congress passed the TPS Statute, the Executive Branch handled nationality-based temporary protection through an 'ad hoc framework'" that "led to haphazard regulations and procedures, resulting in discretionary temporary stays that left recipients uncertain of their immigration status." *Miot v. Trump*, 2026 WL 266413, at *2 (D.D.C. 2026) (citation omitted). "In 1990, Congress stepped in to replace chaos with structure by enacting the TPS statute" to create "a system of temporary status that was predictable, dependable, and insulated from electoral politics." *Id*.

The DHS Secretary may designate a country for TPS if she finds that "there exist extraordinary and temporary conditions in the" country "that prevent" its nationals "from returning … in safety, unless [she] finds that permitting the

[country's nationals] to remain temporarily in the United States is contrary to the national interest of the United States." § 1254a(b)(1)(C).[3]

Once a country is designated for TPS, that country's nationals present in the U.S. may register as TPS holders unless ineligible to do so. TPS holders may not be deported and are authorized to work in the U.S. so long as their home country's designation remains in place. § 1254a(a)(1).

An initial designation is for a "period … of not less than 6 months and not more than 18 months." § 1254a(b)(2).

A designation is subject to periodic review. At least 60 days before the designation is set to expire, the DHS Secretary, "after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state" and "determine whether the conditions for such designation … continue to be met." § 1254a(b)(3)(A). If the Secretary determines that the conditions continue to exist, the designation must be extended. *Id*. If the Secretary determines that the conditions are no longer met, the designation must be terminated. § 1254a(b)(3)(B). And if the Secretary fails to make the mandated determination within the statutorily prescribed period, the designation is automatically extended by six months. § 1254a(b)(3)(C). Thus, the only circumstance under which a TPS designation may be lawfully terminated is if, as a result of the statutorily mandated periodic review, the Secretary

---

[3]   All statutory references are to 8 U.S.C. unless otherwise indicated.

affirmatively determines that a foreign state "no longer continues to meet the conditions for designation." § 1254a(b)(3)(B).

### 2.     Haiti's TPS designation.

Haiti has been designated for TPS since 2010. Its designation was most recently extended in July 2024 by then-Secretary Mayorkas, who explained that Haitian TPS holders could not return in safety because "gang violence," which "killed or injured more than 2,500 people" in the first three months of 2024, "continue[d] to escalate and expand outside the capital and other major cities." 89 Fed. Reg. at 54488. He found that "an ongoing political impasse left Haiti without a functioning democratically elected national government and hindered Haiti's ability to respond to the gang-driven violence" while also observing that "Haiti has one of the highest levels of chronic food insecurity in the world" with "more than half of its total population chronically food insecure and 22 percent of children chronically malnourished." *Id*. at 54488-90.

### 3.     President Trump's attempts to end Haiti's TPS designation.

The November 28 termination of Haiti's TPS designation, the action at issue here, is the fourth unlawful attempt by a Trump administration to end Haiti's designation. Federal courts blocked the first Trump administration's attempt to terminate Haiti's TPS designation as "preordained and pretextual" in violation of both the APA and the Constitution. *Saget v. Trump*, 375 F. Supp. 3d 280, 346

(E.D.N.Y. 2019). When the current Trump administration tried to "partially vacate" Haiti's TPS designation in February 2025, that attempt was "set aside as unlawful under the APA." *Haitian Evangelical Clergy Ass'n v. Trump*, 789 F. Supp. 3d 255, 273 (E.D.N.Y. 2025) ("*HECA*"). Those attempts having failed, the administration issued a new termination notice in July, only to withdraw it after Plaintiffs challenged its legality in the district court. The administration then issued the November 28 termination notice challenged here.

The notice states that Secretary Noem "has determined that there are no extraordinary and temporary conditions in Haiti that prevent Haitian nationals … from returning in safety." 90 Fed. Reg. at 54735.

The notice further states that "even if … there existed conditions … that prevented Haitian nationals … from returning in safety, termination of Temporary Protected Status of Haiti is still required because it is contrary to the national interest of the United States to permit Haitian nationals … to remain temporarily in the United States." *Id.* Invoking President Trump's "determin[ation] to fully restrict and limit the entry of nationals from Haiti" (90 Fed. Reg. at 54736 (citing 90 Fed. Reg. 24497)), the notice states that Haiti's TPS designation is being terminated in "furtherance" of the President's directive "to rescind policies that led to increased or continued presence of illegal aliens in the United States." *Id.* (quoting 90 Fed. Reg. at 8446).

5

**B.     Proceedings below.**

Plaintiffs' initially challenged the July 1, 2025 termination notice. On November 28, the government issued a superseding termination notice. Plaintiffs then filed the now-operative Second Amended Complaint asserting claims under the APA and the Fifth Amendment. ECF 90.

On February 2, the district court denied the government's motion to dismiss and granted Plaintiffs' motion to postpone the termination under 5 U.S.C. § 705. ECF 124. The district court held, *inter alia*, that Plaintiffs were likely to prevail on their claims. *Miot*, 2026 WL 266413, at *20-34.

On February 12, the district court denied the government's motion to stay its ruling. Tr. 54:15-16, *Miot v. Trump*, No. 1:25-cv-2471 (D.D.C. Feb. 12, 2026) (Ex. A).

## ARGUMENT

### I.     The equities weigh heavily against a stay.

#### A.     A stay would irreparably harm Plaintiffs.

A principal benefit of TPS is the right to remain in the U.S. § 1254a(a)(1)(A). If the district court order is stayed, Haitian TPS holders would be subject to immediate deportation. The government concedes that if a stay is granted "nothing would prohibit DHS and ICE to show up," detain, and deport Haitian TPS holders. Ex. A at 7:5-6. Indeed, ICE told the district court that "if the termination had not

6

been stayed, DHS would have acted" to do just that. ECF 129 ¶ 4.

Deportation to Haiti would place TPS holders in mortal danger.

"Every document" in the administrative record "describing conditions in Haiti in 2025 describes the country as a nation deep in crisis." *Miot*, 2026 WL 266413, at *25. According to one, "Haiti's crisis has reached catastrophic levels, with allied criminal groups intensifying large-scale, coordinated attacks on the population and key state infrastructure, nearly paralyzing much of the country and worsening the already dire human rights and humanitarian situation." *Id.* (citation omitted). Another states that "[t]he people of Haiti are in a perfect storm of suffering,"; "[s]tate authority is crumbling"; "[c]ivilians are under siege with appalling reports of rape and sexual violence"; "[h]ospitals and schools are under repeated attack"; and "[t]he rule of law has collapsed." *Id.* (citation omitted). Yet another reports that "[e]scalating terrorist and insurgent gang violence is devastating Haiti: more than 1.3 million people—half of them children—are displaced, communities are under siege, and children are being forcibly recruited and subjected to sexual violence." *Id.* (citation omitted). Still another observes that "Haiti is one of only five countries worldwide with people in famine-like conditions." *Id.* (citation omitted). Noting that "[t]hreats of violence have forced essential services to shut down, including hospitals and roadways," a different document reports that "the humanitarian situation in Haiti is considered among the most dire in the world." *Id.* (citation omitted).

7

The September 2025 decision memo prepared by the U.S. Citizenship and Immigration Service for the Secretary states that "[r]ampant corruption and violence by armed criminal groups undermine basic services and contribute to pervasive physical insecurity." ECF 78-5 at 177. It reports that the gangs controlling nearly all of Haiti's capital Port-au-Prince "killed at least 5,601 people and kidnapped nearly 1,500 in 2024" and explains that this violence has "rapidly expanded into" other "key regions such as the Ouest and Artibonite departments, Haiti's agricultural hub." *Id*.

Unsurprisingly, the State Department has issued a Level 4 travel advisory warning against "travel[ing] to Haiti for any reason" because of "kidnapping, crime, terrorist activity, civil unrest, and limited health care." *Miot*, 2026 WL 266413, at *2. Contrary to Secretary Noem's assertion that "parts of the country are suitable to return to" (90 Fed. Reg. at 54735), the State Department has stated that the Level 4 advisory applies to "all … parts of Haiti." ECF 81-1 ¶ 20.

The danger afflicting all Haitians would be even greater for returning TPS holders, many of whom have "no meaningful ties to the country" because they were brought to the U.S. as young children. *Miot*, 2026 WL 266413, at *35. Many "cannot speak French or Creole, the official languages of Haiti." *Id.* And because they will have lived in the U.S., returning TPS holders will be "vulnerable target[s] for gangs." *Id.* The lives of some TPS holders would be at particular risk because they have

8

"ongoing medical conditions that require consistent treatment and prescription medication, which may be unavailable or difficult to access in Haiti." *Id.*

The government argued below that the risk of deportation is speculative because "Plaintiffs could seek relief from removal through the immigration process." *Miot*, 2026 WL 266413, at *36. But the prospect of such relief "is illusory." *Id.* As the district court explained:

> The theoretical availability of such relief provides no assurance that Plaintiffs' applications for relief would be processed, let alone granted, before removal. Indeed, the current administration is making it *more* difficult for those few Haitians who may have other immigration options. For example, USCIS has placed a hold on asylum applications and other immigration benefit requests filed by individuals from Haiti.

*Id.* Moreover, a TPS holder wrongfully removed from the U.S. generally has no avenue to return once deported "because TPS is a vehicle to remain in the country, not to enter it." *Id.* (citing *Sanchez v. Mayorkas*, 593 U.S. 409, 414 (2021)). Indeed, the government concedes that once removed from the U.S., Haitian TPS holders would have no right to return even if they prevail in this litigation. *See* Ex. A at 18:15-10, 19:11-17.

Even if not immediately deported, many TPS holders would be subject to indefinite detention pending removal. *See, e.g.*, *Matter of Yajure Hurtado*, 29 I.&N. Dec. 216, 220 (BIA 2025) ("aliens who are present in the United States without admission … must be detained for the duration of their removal proceeding"). "The harm from detention surely cannot be remediated after the fact" and is therefore "a

quintessential irreparable harm." *Make the Rd. New York v. Noem*, 805 F. Supp. 3d 139, 171 (D.D.C. 2025).

Whether immediately deported or detained pending deportation, Haitian TPS holders would suffer "irreparable harm through forced family separation" because many are spouses, parents, or siblings of U.S. citizens. *Miot*, 2026 WL 266413, at *35. "Such separations would inflict great and lasting harm on both Plaintiffs and their U.S.-based family members—harm that cannot be remedied by a later favorable ruling." *Id.*

Even if not detained or deported, Haitian TPS holders would immediately lose their work authorization, which would "result[] in immediate job loss, and attendant health insurance loss, that cannot be remedied retroactively." *Miot*, 2026 WL 266413, at *36.

According to the government, the harms that Plaintiffs would suffer if Haiti's TPS designation is terminated are "inherent in the temporary status Congress crafted." Mot. 28. But under § 1254a(b)(3), a country's TPS designation may not be terminated unless the Secretary conducts a good-faith, evidence-based, country-specific review of conditions in the designated country and then, based on that review, affirmatively determines that the conditions for designation no longer exist. If the Secretary fails to make such a determination, then the country's TPS designation is automatically extended. § 1254a(b)(3)(C). Thus, the statutory default

10

is extension, not termination. *Miot*, 2026 WL 266413, at \*3. The loss of TPS therefore is not inherent in the statutory scheme.

**B.    The government would not be harmed in the absence of a stay.**

The government claims that it would be irreparably harmed absent a stay because the district court order "requires the United States to continue to permit hundreds of thousands of foreign nationals to remain within its borders." Mot. 27. That is not an irreparable harm.

Haiti has been designated for TPS since 2010. When Haiti was first designated, there were as many as 200,000 TPS-eligible Haitians living in the U.S.. 75 Fed. Reg. at 3477. The number grew over the ensuing years as conditions in Haiti deteriorated. In November 2025, there were "approximately 352,959" Haitian TPS holders in the U.S. 90 Fed. Reg. at 54738. Simply put, hundreds of thousands of Haitian TPS holders have lived in our midst for nearly two decades without problem. There is no sudden emergency requiring their immediate expulsion.

The government's own conduct confirms as much.

On February 24, 2025, Secretary Noem issued a "partial vacatur" that attempted to terminate Haiti's TPS designation effective August 2, 2025. That partial vacatur was set aside as "unlawful under the APA." *HECA*, 789 F. Supp. 3d at 273. The decision meant that Secretary Noem could not terminate Haiti's TPS designation "before February 3, 2026," *i.e.*, six months later than she had intended.

11

*Id*. Nevertheless, the government did not seek a stay pending appeal. Indeed, the government waited until the last day possible to file a notice of appeal and then selected the latest possible due date for its opening brief—February 12, 2026, nine days after Haiti's TPS designation was originally set to expire. *See* ECF 72, *HECA v. Trump*, No. 1:25-cv-1644 (E.D.N.Y. Sept. 25, 2025); ECF 10, *HECA v. Trump*, No. 25-2372 (2d Cir. Nov. 13, 2025).

And when the "partial vacatur" of Haiti's TPS designation was set aside once more by *National TPS Alliance v. Noem*, 798 F. Supp. 3d 1108 (N.D. Cal. 2025) ("*NTPSA*"), the government again chose not to seek a stay pending appeal. Its failure to do so is particularly noteworthy. Although that the government ***did*** seek to stay the *NTPSA* decision insofar as it also set aside Secretary Noem's termination of Venezuela's TPS designation, the government told the Supreme Court that it did "not seek to stay the portion of the district court's judgement related to Haiti." Stay App. 7 n.6, *Noem v. National TPS Alliance*, No. 25A336 (U.S. Sep. 19, 2025).

The government's failure to seek a stay in *HECA* and *NTPSA* undermines any claim that it will suffer irreparable harm absent a stay.

### C.    A stay is against the public interest.

The public interest favors the preservation of Plaintiffs' constitutional rights, the violation of which "is always contrary to the public interest." *Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F. Supp. 3d 105, 180 (D.D.C. 2025). The same is true of

enforcing administrative agencies' procedural obligations. "There is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (cleaned up). Indeed, "the government cannot suffer harm from a stay that," as here, "merely ends an unlawful practice or reads a statute as required." *Harris v. Bessent*, 775 F. Supp. 3d 86, 100 (D.D.C. 2025) (cleaned up).

All this aside, there also are tangible reasons why denying a stay and maintaining the status quo pending appeal "is in the public interest." *Miot*, 2026 WL 266413, at *37. Beyond TPS holders' contributions to the economy—which the district court explained in detail (*see id.*)—denying a stay and maintaining the status quo pending appeal will enhance both public safety and public health. "Individuals with lawful immigration status are more likely to report crimes, helping to keep communities safe." *Miot*, 2026 WL 266413, at *38. "Conversely, stripping TPS holders of their lawful status may discourage them from reporting crimes or seeking medical care due to fear of detention or deportation." *Id.*

And "the public has an interest 'in preventing [noncitizens] from being wrongfully removed, particularly to countries," such as Haiti, "where they are likely to face substantial harm.'" *Make the Road*, 805 F. Supp. 3d at 172.

13

## II.     Plaintiffs are likely to succeed on the merits.

### A.     The Secretary's action is subject to judicial review.

#### 1.     There is a strong presumption of judicial review.

The "'well-settled' and 'strong presumption' in favor of judicial review is so embedded in the law that it applies even when determining the scope of statutory provisions specifically designed to limit judicial review." *Make the Road New York v. Wolf*, 962 F.3d 612, 624 (D.C. Cir. 2020) (citation omitted). Courts "consistently" apply the presumption of reviewability "to legislation regarding immigration." *Kucana v. Holder*, 558 U.S. 233, 251 (2010).

"Because the presumption favoring interpretations of statutes to allow judicial review of administrative action is well-settled," courts "assume that Congress legislates with knowledge of the presumption" and thus require "clear and convincing evidence to dislodge the presumption." *Kucana*, 558 U.S. at 251-52 (cleaned up). "The maxim that congressional preclusion of judicial review must be clear and convincing applies in a particularly rigorous fashion … when," as here, "constitutional claims are at stake." *Griffith v. Fed. Lab. Rels. Auth.*, 842 F.2d 487, 494 (D.C. Cir. 1988) (cleaned up). Here, there is no "clear and convincing evidence" (*Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 64 (1993)) that Congress intended to foreclose judicial review of Plaintiffs' APA and equal-protection claims.

#### 2.     § 1254a(b)(5)(A) does not bar Plaintiffs' claims.

The government's reliance on § 1254a(b)(5)(A) is misplaced. Like the court

14

below, each court to have reached the issue has concluded that § 1254a(b)(5)(A) does not bar procedural or constitutional challenges to the termination of a TPS designation. *See, e.g.*, *Afr. Communities Together v. Noem*, 2026 WL 395732, at *6 (D. Mass. 2026); *Doe v. Noem*, 2026 WL 184544, at *8 (N.D. Ill. 2026); *CASA, Inc. v. Noem*, 792 F. Supp. 3d 576, 591 (D. Md. 2025); *HECA*, 789 F. Supp. 3d at 269; *NTPSA*, 773 F. Supp. 3d at 831; *Saget v. Trump*, 375 F. Supp. 3d 280, 330-32 (E.D.N.Y. 2019); *CASA de Md., Inc. v. Trump*, 355 F. Supp. 3d 307, 317-21 (D. Md. 2018); *Centro Presente v. DHS*, 332 F. Supp. 3d 393, 408-09 (D. Mass. 2018). Simply put, § 1254a(b)(5)(A) "does not prevent courts from reviewing and setting aside agency action that is procedurally deficient." *HECA*, 789 F. Supp. 3d at 269.

This unbroken consensus is rooted in *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479 (1991), which interpreted a provision analogous to § 1254a(b)(5)(A). *McNary* involved § 1160, which established a procedure for foreign agricultural workers to apply for adjustment of immigration status. The statute directed the Attorney General to adjust an applicant's status if she determined that the applicant was eligible under specified criteria. Individuals whose applications were denied sued, claiming that the process she used "was conducted in an arbitrary fashion that deprived applicants of the due process guaranteed by the Fifth Amendment to the Constitution." 498 U.S. at 487. The question in *McNary* was whether the plaintiffs' claims were barred by § 1160(e), which declared that "[t]here shall be no

15

administrative or judicial review of a determination respecting an application for adjustment of status under this section." The government argued that courts lacked jurisdiction to hear the suit because it was "an action seeking 'judicial review of a determination respecting an application for adjustment of status'" and was "therefore barred by the plain language" of § 1160(e). 498 U.S. at 491.

The Court held that § 1160(e) did not preclude the plaintiffs' claims because the provision's "reference to 'a determination' describes a single act rather than a group of decisions or a practice or procedure employed in making decisions." *McNary*, 498 U.S. at 492. Thus, said the Court, § 1160(e)'s preclusion of claims arising from "a determination" did not bar "general collateral challenges to unconstitutional practices and policies used by the agency in processing applications." *Id.*

The Court's analysis of § 1160(e) in *McNary* applies equally here—and defeats the government's argument (Mot. 11-13) that § 1254a(b)(5)(A) precludes judicial review of the termination of Haiti's TPS designation. Using language that is materially indistinguishable from that found in § 1160(e), § 1254a(b)(5)(A) only bars judicial review of a "***determination*** of the [Secretary] with respect to the designation, or termination or extension of a [TPS] designation." Thus, § 1254a(b)(5)(A) "is best read as barring judicial review of the merits of the determination itself, but not whether the determination" was the result of unlawful

16

"practices and policies." *CASA*, 355 F. Supp. 3d at 320.

Plaintiffs' claims are procedural, not substantive. *Miot*, 2026 WL 266413, at *10. Plaintiffs do not contest the correctness of the Secretary's determinations with respect to country conditions or national interest—they challenge the process by which the Secretary made those determinations, alleging that it was "arbitrary [and] capricious"; "without observance of procedure required by law"; "contrary to constitutional right [and] power"; and animated by racial animus. ECF 90 ¶¶ 271-81. Although Plaintiffs identify flaws in the Secretary's determinations, they do so only as evidence of the procedural irregularities that they challenge.

That Plaintiffs' claims are procedural rather than substantive is evident from the relief sought. Plaintiffs "do not seek a substantive declaration from the Court they are entitled to a TPS determination in their favor" and their "success in this case would not compel Defendants to extend Haiti's TPS designation." *Saget*, 375 F. Supp. 3d at 332. "Plaintiffs' contention that the decision to [terminate] was arbitrary or capricious—and thus should be set aside—does not dictate how the Secretary should ultimately rule on a TPS designation, termination, or extension." *NTPSA*, 773 F. Supp. 3d at 832.

### 3.    The government's additional arguments are unavailing.

The government asserts that this Court must stay the district court's order because "the Supreme Court has now twice stayed district courts' attempts to prevent

the Executive Branch from terminating TPS designations." Mot. 2 (citing *NTPSA* stay orders). The government is mistaken. Those orders had nothing to do with the termination of Haiti's TPS designation; they arose from the factually distinct termination of Venezuela's designation. Moreover, the government's lead case, *Trump v. Boyle*, 145 S. Ct. 2653 (2025), is distinguishable. To be sure, *Boyle* instructs that the Supreme Court's interim stay orders "inform how a court should exercise its equitable discretion in like cases." *Id.* But the stay order in *Boyle*, unlike the *NTPSA* orders, explained the stay's rationale. *See id*. Because the *NTPSA* orders "do[] not identify the dispositive issue or issues" and "could have rested on several possible grounds," this Court "cannot determine how the Supreme Court would … resolve[] the issue" here. *League of United Latin Am. Citizens v. Exec. Office of the President*, 2026 WL 252420, at *52 (D.D.C. 2026) (distinguishing *Boyle*).

Citing a case predating the TPS statute, the government contends that judicial review of a TPS termination is inappropriate because "[t]he Executive had long exercised inherent authority to afford temporary immigration status based on its assessment of conditions in foreign states, even before there was any 'specific statutory authority' for such relief." Mot. 12 (citation omitted). That is immaterial. Congress enacted the TPS statute to eliminate that "ad hoc framework" and replace it with "a system … that was predictable, dependable, and insulated from electoral politics." *Miot*, 2026 WL 266413, at *2 (cleaned up). Thus, Secretary Noem "does

18

not have … inherent authority" to depart from the statutorily prescribed periodic review process. *HECA*, 789 F. Supp. 3d at 273.

The government next argues that § 1254a(b)(5)(A) precludes practice-and-policy claims because "[n]othing in the TPS statute distinguishes between substantive or procedural review." Mot. 13. Not so. When conducting the periodic review, the Secretary must "consult with appropriate agencies of government" and "review the conditions in the foreign state" *before* "determin[ing] whether the conditions" for designation "continue to be met." § 1254a(b)(3)(A). Thus, the statute distinguishes between the Secretary's ultimate determination and the process by which she makes it.

The government argues that § 1254a(b)(5)(A) also bars Plaintiffs' claims because they challenge an "individual" termination rather than the process by which terminations are made. Mot. 14. But unlawful policies and practices can infect a single termination, as they did here. *See Miot*, 2026 WL 266413, at *23-24; ECF 90 ¶¶ 56-248. While the other terminations corroborate Plaintiffs' allegations, Plaintiffs need not challenge each termination to state a policy-and-practice claim. *Miot*, 2026 WL 266413, at *23.

**B.    Plaintiffs are likely to prevail on their APA claims.**

An administrative action is arbitrary and capricious if the agency has "offered an explanation for its decision that runs counter to the evidence before the agency."

19

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Here, Secretary Noem's determination that "there are no extraordinary and temporary conditions in Haiti that prevent Haitian nationals … from returning in safety" 90 (Fed. Reg. at 54735) is contrary to all evidence in the administrative record.

Agency action is also unlawful if taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). The TPS statute requires that the Secretary "consult with appropriate agencies of government" before terminating a TPS designation. § 1254a(b)(3)(A). That consultation must be "meaningful," not perfunctory. *Friends of Animals v. U.S. Bureau of Land Mgmt.*, 728 F. Supp. 3d 45, 78 (D.D.C. 2024). Here, the purported "consultation"—a two-sentence email exchange—does not constitute consultation. *Miot*, 2026 WL 266413, at *21; *accord* Ex. A at 28:20–21.

Nevertheless, the government says that Plaintiffs' APA claims fail because the termination of Haiti's TPS designation rests on Secretary Noem's "assessment of the 'national interest,'" which it argues is committed to her unfettered discretion. Mot. 17. But even if one disregards the constitutional limits imposed by the Fifth Amendment and assumes that national interest may be considered during the periodic review process (*but see* ECF 108 at 8), the TPS statute limits the definition of the national interest that the Secretary may adopt.

First, the statute does not allow her to define the national interest in a way that would justify the termination of all TPS designations. The periodic review process is country-specific. *See* § 1254a(b)(3)(A). Terminating all TPS designations—as the Secretary has (*Miot*, 2026 WL 266413, at *23)—because she believes that TPS designations are contrary to the national interest would effectively repeal the TPS statute, something that lies beyond her authority.

Second, the statute does not allow the Secretary to determine, as she has with respect to Haiti, that a TPS designation is contrary to the national interest on the ground that some TPS holders have committed crimes. *Cf.* 90 Fed. Reg. at 54737. Congress created a specific mechanism to address the issue—the withdrawal of TPS from individuals convicted of a felony or two misdemeanors. *Cf.* § 1254a(c)(3). The Secretary may not define the national interest in a way that renders the statute's individualized withdrawal mechanism meaningless.

### C.    Plaintiffs are likely to prevail on their equal-protection claim.

According to the government, Plaintiffs' equal-protection claim must be reviewed under *Trump v. Hawaii*, 585 U.S. 678 (2018), rather than *Village of Arlington Heights v. Metropolitan Housing Development. Corp.*, 429 U.S. 252 (1977). Not so.

This case involves individuals with lawful status who are already in the U.S. *Hawaii* involved individuals outside the U.S. seeking entry. *Cf. Hawaii*, 585 U.S. at

675. The distinction is critical. Although "a circumscribed inquiry applies to any constitutional claim concerning the entry of foreign nationals" (*Hawaii*, 585 U.S. at 705 n.5), it does not apply to claims brought by foreign nationals already here, because "the Due Process Clause applies to all 'persons' within the United States, including aliens." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

Every court to consider a constitutional challenge to the termination of a TPS designation has applied *Arlington Heights*, not *Hawaii*. *See, e..g.*, *NTPSA*, 798 F. Supp. 3d at 1132; *NTPSA*, 773 F. Supp. 3d at 855-58; *Saget*, 375 F. Supp. 3d at 367-68; *Centro Presente,* 332 F. Supp 3d at 410-12; *NAACP v. DHS*, 364 F. Supp. 3d 568, 576 (D. Md. 2019).

Under *Arlington Heights*, Plaintiffs need only show that racial animus was "a motivating factor in the decision" to terminate Haiti's TPS designation. 429 U.S. at 264-65. Plaintiffs have presented ample evidence of racial animus on the part of both President Trump and Secretary Noem. *See Miot*, 2026 WL 266413, at *31-33. The government's assertion that President Trump's statements were "were "remote in time and made in unrelated contexts" is wrong. Just months before the administration's first attempt to terminate Haiti's TPS designation, he accused Haitian TPS holders of "eating the dogs" and "eating the cats" of native-born Americans and vowed that he would "absolutely … revoke" Haiti's TPS designation and "send [Haitian's] back to their country." *Id.* at 6. Inasmuch as Secretary Noem

promised to follow the President's directives and invoked them in the termination notice (*see* 90 Fed. Reg. at 54736), the President's animus can be imputed to her. Regardless, Secretary Noem too has evinced racial animus, describing "Haitians—and people from eighteen other nonwhite countries—as 'leeches,' 'entitlement junkies,' and 'foreign invaders.'" *Miot*, 2026 WL 266413, at *34.

## CONCLUSION

The motion to stay should be denied.

February 16, 2026

Geoffrey M. Pipoly
Alexa Thein
Madisen Hursey
Bryan Cave Leighton Paisner, LLP
161 N. Clark Street, Ste. 4300
Chicago, IL 60601
(312) 602-5000
geoff.pipoly@bclplaw.com
alexa.thein@bclplaw.com
madisen.hursey@bclplaw.com

Matthew Stanford
Bryan Cave Leighton Paisner, LLP
2 N. Central Ave., Ste. 2100
Phoenix, AZ 85004
(602) 364-7000
matt.stanford@bclplaw.com

Ira J. Kurzban
Kevin Gregg
Kurzban, Kurzban, Tetzeli & Pratt, P.A.
131 Madeira Ave.

Respectfully submitted,

/s/ *Jean-Claude André*

Jean-Claude André
Bryan Cave Leighton Paisner
LLP
120 Broadway, Suite 300
Santa Monica, CA 90401-2386
(310) 576-2100
jc.andre@bclplaw.com

Andrew E. Tauber
Bryan Cave Leighton Paisner,
LLP 1155 F Street N.W., Suite
700
Washington, DC 85004-4406
(202) 508-6111
andrew.tauber@bclplaw.com

Sejal Zota
Just Futures Law
1629 K Street N.W., Suite 300
Washington, DC 20006
(617) 812-2822
sejal@justfutureslaw.org

23

Coral Gables, FL 33134
(305) 444-0060
ira@kktplaw.com

Raymond Audain
Giskan Solotaroff & Anderson LLP
1 Rockefeller Plaza, 8th Floor
New York, NY 10020
(646) 290-6249
raudain@gslawny.com

Daniel Paul Mach
Bryan Cave Leighton Paisner, LLP
1290 Avenue of the Americas
New York, NY 10104
(212) 541-1146
daniel.mach@bclplaw.com

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 27(d)(1), I certify that the text of this motion is in double-spaced, proportionally spaced 14-point Times New Roman font, and that the motion contains 5,199 words in compliance with Federal Rule of Appellate Procedure 27(d)(2)(A).

Dated: February 16, 2026                 /s/ *Jean-Claude André*

## CERTIFICATE OF SERVICE

I hereby certify that on February 16, 2026, counsel for Appellees filed the foregoing with the Clerk of the United States Court of Appeals for the District of Columbia Ciruit using the ECF system and that service will be accomplished via the ECF system.

Dated: February 16, 2026                    */s/ Jean-Claude André*