**No. 26-5050**

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

FRITZ EMMANUEL LESLY MIOT, et al.,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES OF AMERICA, et al.,

*Defendants-Appellants.*

———————————

On Appeal from the United States District Court for the District of Columbia,
No. 1:25-cv-02471 (Reyes, J.)

———————————

**BRIEF OF AMICI CURIAE THE COMMONWEALTH OF MASSACHUSETTS, THE STATES OF CALIFORNIA, NEW YORK, CONNECTICUT, DELAWARE, HAWAIʻI, ILLINOIS, MAINE, MARYLAND, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, OREGON, RHODE ISLAND, VERMONT, AND WASHINGTON, AND THE DISTRICT OF COLUMBIA, IN OPPOSITION TO EMERGENCY MOTION FOR STAY PENDING APPEAL**

ANDREA JOY CAMPBELL
  *Attorney General*
  *Commonwealth of Massachusetts*
Tasha J. Bahal
  *Deputy State Solicitor*
1 Ashburton Pl.
Boston, MA 02108

ROB BONTA
  *Attorney General*
  *State of California*
Michael L. Newman
  *Senior Assistant Attorney General*
Vilma Palma-Solana
  *Supervising Deputy Attorney General*

LETITIA JAMES
  *Attorney General*
  *State of New York*
Barbara D. Underwood
  *Solicitor General*
Judith N. Vale
  *Deputy Solicitor General*
Zoe Levine
  *Special Counsel for Immigrant Justice*
Cleland B. Welton II
  *Assistant Solicitor General*
28 Liberty Street
New York, NY 10005
(212) 416-6197

Annabelle Wilmott
  *Deputy Attorney General*
1515 Clay Street, 21st Floor
Oakland, CA 94612-1499

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

In accordance with Circuit Rule 28(a)(1), the undersigned certifies as follows:

All parties and amici appearing before the District Court and in this Court are listed in the Appellants' Emergency Motion For a Stay Pending Appeal or in the Brief of Amicus Curiae Federation for American Immigration Reform.

References to the ruling at issue appear in the Appellant's Emergency Motion For a Stay Pending Appeal.

Amici are unaware of any related cases pending before this Court.

By:  /s/*Cleland B. Welton II*
Cleland B. Welton II

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ............................................................... iii

INTEREST OF AMICI STATES .............................................................1

ARGUMENT ..........................................................................................2

    THE PUBLIC INTEREST FAVORS PLAINTIFFS BECAUSE A STAY
    WOULD INFLICT IRREPARABLE HARM ON FAMILIES AND
    AMICI STATES ..................................................................................2

        A.    Terminating Haiti's TPS Designation Would Separate Families,
              Devastate Children, and Fracture Amici States' Communities
              and Schools..................................................................................3

        B.    Terminating Haiti's TPS Designation Would Damage Amici
              States' Economies and Workforces.............................................5

        C.    Terminating Haiti's TPS Designation Would Compromise Public
              Health and Increase Health Care Costs.......................................8

        D.    Terminating Haiti's TPS Designation Would Harm Public
              Safety.........................................................................................11

CONCLUSION .....................................................................................12

# TABLE OF AUTHORITIES

**Cases**            **Page**

*Baillargeon v. CSX Transp. Corp.*,
   463 F. Supp. 3d 76 (D. Mass. 2020) ................................................................2

*City & Cnty. of S.F. v. Trump*,
   897 F.3d 1225 (9th Cir. 2018) .........................................................................3

*City & Cnty. of S.F. v. U.S. Citizenship & Immigr. Servs.*,
   981 F.3d 742 (9th Cir. 2020) ...........................................................................2

*City of Philadelphia v. Sessions*,
   280 F. Supp. 3d 579 (E.D. Pa. 2017) ..............................................................9

*Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*,
   512 F.3d 1112 (9th Cir. 2008) .........................................................................2

*Hernandez v. Sessions*,
   872 F.3d 976 (9th Cir. 2017) ...........................................................................2

*Jones v. D.C.*,
   177 F. Supp. 3d 542 (D.D.C. 2016) ................................................................2

*KalshiEX LLC v. Commodity Futures Trading Comm'n.*,
   119 F.4th 58 (D.C. Cir. 2024) .........................................................................2

*National Ass'n of Mfrs. v. U.S. Dep't of Homeland Sec.*,
   491 F. Supp. 3d 549 (N.D. Cal. 2020) ...........................................................2

*New York v. Trump*,
   No. 1:17-cv-5228 (E.D.N.Y. 2017) ................................................................8

*Nken v. Holder*,
   No. 556 U.S. 418 (2009) ..................................................................................2

*Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*,
   No. 3:17-cv-05211 (N.D. Cal. 2017) ..............................................................9

*World Gym, Inc. v. Baker*,
    474 F. Supp. 3d 426 (D. Mass. 2020) ..................................................2

**Regulations**                                                          **Page**

8 C.F.R.
§ 244.4 ..........................................................................................12
§ 244.14 ........................................................................................12

**Miscellaneous Authorities**                                            **Page**

Am. Coll. of Obstetricians & Gynecologists, Comm. Op. no. 627, *Health
    Care for Unauthorized Immigrants*, 125 Obstetrics & Gynecology 755
    (Mar. 2015) ................................................................................10

Am. Immigr. Council, *The Contributions of Temporary Protected Status
    Holders to the U.S. Economy* (Sept. 2023),
    https://www.americanimmigrationcouncil.org/sites/default/files/research/
    contributionstemporaryprotectedstatus_0923.pdf .................................6

Am. Immigr. Council, Fact Sheet, *U.S. Citizen Children Impacted by
    Immigration Enforcement* (June 24, 2021),
    https://www.americanimmigrationcouncil.org/research/us-citizen-
    children-impacted-immigration-enforcement........................................3

Am. Immigr. Council, *Immigrants in the United States* (data year 2023),
    https://map.americanimmigrationcouncil.org/locations/national/ .......................7

Ana Martinez-Donate et al., *Between the Lines: A Mixed-Methods Study on
    the Impacts of Parental Deportation on the Health and Well-Being of
    U.S. Citizen Children*, 9 J. Migration & Health 1 (2024)....................................4

Beatrice Dain & Jeanne Batalova, *Haitian Immigrants in the United States*,
    Migration Pol'y Inst. (Nov. 8, 2023),
    https://www.migrationpolicy.org/article/haitian-immigrants-united-states .....6, 8

Elizabeth M. McCormick, *Federal Anti-Sanctuary Law: A Failed Approach
    to Immigration Enforcement and a Poor Substitute for Real Reform*, 20
    Lewis & Clark L. Rev. 165 (2016) ................................................10

FWD.us, *Temporary Protected Status Protects Families While Also Boosting the U.S. Economy* (Feb. 2024), https://www.fwd.us/news/temporary-protected-status-report-2025/...............5, 6

Jacob S. Rugh & Matthew Hall, *Deporting the American Dream: Immigrant Enforcement and Latino Foreclosures*, Socio. Sci. 1053 (Dec. 2016)................7

James Queally, *Fearing Deportation, Many Domestic Violence Victims Are Steering Clear of Police and Courts*, L.A. Times (Oct. 9, 2017), https://www.latimes.com/local/lanow/la-me-ln-undocumented-crime-reporting-20171009-story.html........................................................11

Karen Aho, *Spotlight on the Economic Contributions of TPS Holders*, Immigr. Impact (Oct. 23, 2023), https://immigrationimpact.com/2023/10/23/economic-contributions-tps-holders/................................................................6, 7

Katherine Yun et al., *Parental Immigration Status Is Associated with Children's Health Care Utilization: Findings from the 2003 New Immigrant Survey of U.S. Legal Permanent Residents*, 17 Maternal & Child Health J. 1913 (2013) ..............................................10

Kay Lazar, *Looming Deportations of Haitian Immigrants Could Cripple US Health care, Leaders Warn*, Bos. Globe (Jan. 22, 2026), https://www.bostonglobe.com/2026/01/22/metro/immigrants-deportation-haitians-nursing-homes/..................................................5, 8

Lila Flavin et al., *Medical Expenditures on and by Immigrant Populations in the United States: A Systematic Review*, 48 Int'l J. Health Servs. 601 (2018)......................................................................10

Maria Cramer et al., *'Migrant Crime Wave' Not Supported by Data, Despite High-Profile Cases*, N.Y. Times (Feb. 15, 2024), https://www.nytimes.com/2024/02/15/nyregion/migrants-crime-nyc.html.......12

Meredith L. King, *Immigrants in the U.S. Health Care System: Five Myths That Misinform the American Public*, Ctr. for Am. Progress (June 7, 2007), https://cdn.americanprogress.org/wp-content/uploads/issues/2007/06/pdf/immigrant_health_report.pdf...............9, 10

Miguel Pinedo & Christian Escobar, *Childhood Parental Deportations, Immigration Enforcement Experiences, and Posttraumatic Stress Disorder Among US-Born Latino Adults*, *2021,* 114 Am. J. Pub. Health S495 (2024).......................................................................................4, 5

Miriam Jordan, *Haitians Are Vital to U.S. Health Care. Many Are About to Lose Their Right to Work,* N.Y. Times (Jan. 29, 2026)*,* https://www.nytimes.com/2026/01/29/us/trump-tps-haitians-health-care-job-losses.html .........................................................................................5

Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement*, Dep't of Urb. Plan. & Pol'y, Univ. of Ill. at Chi. (May 2013), https://www.vawnet.org/sites/default/files/assets/files/2016-10/InsecureCommunities.pdf.............................................................11

Omar Martinez et al., *Evaluating the Impact of Immigration Policies on Health Status Among Undocumented Immigrants: A Systematic Review*, 17 J. Immigr. & Minority Health 947 (2015) ........................................9

Randy Capps et al., *Immigration Enforcement and the Mental Health of Latino High School Students*, Migration Pol'y Inst. (Sept. 2020), https://www.migrationpolicy.org/sites/default/files/publications/immigration-enforcement-mental-health-latino-students_final.pdf...................4

Sezer Kisa & Adnan Kisa, *"No Papers, No Treatment": A Scoping Review of Challenges Faced by Undocumented Immigrants in Accessing Emergency Healthcare*, 23 Int'l J. for Equity in Health, no. 184 (2024)............9

Ted Hesson & Mica Rosenberg, *Trump Says Migrants Are Fueling Violent Crime. Here Is What the Research Shows*, Reuters (July 16, 2024), https://www.reuters.com/world/us/trump-focuses-migrants-crime-here-is-what-research-shows-2024-04-11/ ................................................12

Tom K. Wong, *The Effects of Sanctuary Policies on Crime and the Economy*, Ctr. for Am. Progress (Jan. 26, 2017), https://www.americanprogress.org/article/the-effects-of-sanctuary-policies-on-crime-and-the-economy/................................................11

U.S. Cong. Budget Off., *The Impact of Unauthorized Immigrants on the Budgets of State and Local Governments* (Dec. 2007), https://www.cbo.gov/sites/default/files/110th-congress-2007-2008/reports/12-6-immigration.pdf ...................................................................8

Verónica Egui Brito & Syra Ortiz Blanes, *In a Few Weeks, Hundreds of Thousands of Venezuelans Will Lose TPS. What You Need to Know*, Miami Herald (Feb. 13, 2025), https://www.miamiherald.com/news/local/immigration/article300049004.html ........................................................................................................12

Victoria D. Ojeda et al., *Deported Men's and Father's Perspective: The Impacts of Family Separation on Children and Families in the U.S.*, 11 Frontiers in Psychiatry 1 (2020) ..........................................................................4

## INTEREST OF AMICI STATES

Amici States submit this brief to explain why public interest considerations strongly counsel against a stay of the postponement order in *Lesly Miot v. Trump*, 1:25-cv-02471 (D.D.C. Feb. 2, 2026), ECF No. 124.[1] We have substantial interests in maintaining Haiti's TPS status and in preventing Defendants' unlawful action from taking effect before this Court addresses its legality. Haitian TPS holders are valued employees and residents of Amici States, and many provide important public services to Amici States' residents. They are homeowners and neighbors, coworkers, teachers and students, entrepreneurs and job-creators, caregivers, construction workers and union members, and parents. Stripping these individuals of legal status would harm our residents, economies, and public health and safety. The public interest weighs heavily in favor of denying Defendants' motion to stay the postponement order.

---

[1] Amici States include: the Commonwealth of Massachusetts, the states of California, New York, Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, Oregon, Rhode Island, Vermont, Washington, and the District of Columbia.

## ARGUMENT

## THE PUBLIC INTEREST FAVORS PLAINTIFFS BECAUSE A STAY WOULD INFLICT IRREPARABLE HARM ON FAMILIES AND AMICI STATES

Amici States support Plaintiffs' position that the stay motion should be denied. We write to highlight significant public interests and harms that the Court should consider in resolving this motion. *See Nken v. Holder*, 556 U.S. 418, 434–35 (2009); *KalshiEX LLC v. Commodity Futures Trading Comm'n*, 119 F.4th 58, 63 (D.C. Cir. 2024). In cases like this one, which affect many nonparties (including Amici States), hardship to third parties is integral to the public interest analysis. *See Jones v. District of Columbia*, 177 F. Supp. 3d 542, 546 n.3 (D.D.C. 2016). Relevant third-party harms include harms to family members;[2] economic harms;[3] increased public health care expenses;[4] public health harms;[5] public safety harms;[6] and

---

[2] *Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017).

[3] *National Ass'n of Mfrs. v. U.S. Dep't of Homeland Sec.*, 491 F. Supp. 3d 549, 571 (N.D. Cal. 2020).

[4] *Golden Gate Rest. Ass'n v. City & Cnty. of S.F.*, 512 F.3d 1112, 1126 (9th Cir. 2008).

[5] *World Gym, Inc. v. Baker*, 474 F. Supp. 3d 426, 434 (D. Mass. 2020); *see City & Cnty. of S.F. v. U.S. Citizenship & Immigr. Servs.*, 981 F.3d 742, 762 (9th Cir. 2020).

[6] *Baillargeon v. CSX Transp. Corp.*, 463 F. Supp. 3d 76, 86 (D. Mass. 2020).

2

impacts to public services.[7] All of these cognizable harms would affect Amici States and their residents if this Court stays the postponement order.

### A.    Terminating Haiti's TPS Designation Would Separate Families, Devastate Children, and Fracture Amici States' Communities and Schools.

If the termination of Haiti's TPS status is permitted to take effect, mixed-status households in Amici States will immediately be destabilized, forcing families into untenable choices. TPS-holder parents would be forced to choose between (1) returning to Haiti alone, leaving their U.S. citizen children behind; (2) taking their U.S. citizen children with them to a dangerous country that the children do not know; or (3) staying in the United States without authorization and living with fear and uncertainty, knowing they cannot work legally and could be forcibly removed to Haiti at any time. The court correctly found that each such outcome is unacceptable and would profoundly harm families. *See* ECF No. 124, at 81.

This dynamic would severely harm the mental health and well-being of countless U.S.-citizen children who reside in Amici States.[8] One study found that 30 percent of Latino student participants—including U.S.-born students—altered their

---

[7] *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018).

[8] *See* Am. Immigr. Council, Fact Sheet, *U.S. Citizen Children Impacted by Immigration Enforcement* (June 24, 2021).

routines due to deportation fears.[9] This included refraining from driving, seeking medical care, attending religious services, or participating in afterschool activities; taking a different route to school; and staying home more often.[10]

When families are forcibly separated, the consequences are even more severe. Parental deportation is deeply traumatic for children: it is linked to extreme psychological distress, anxiety, depression, post-traumatic stress disorder (PTSD), externalizing behaviors (such as aggression), and difficulties sleeping.[11] These children often face financial instability, housing and food insecurity, and education disruptions, such as increased school absences and lower academic engagement.[12] And the long-term effects extend into adulthood. Adults who experienced parental deportation during childhood are more than twice as likely to suffer from PTSD as

---

[9] Randy Capps et al., *Immigration Enforcement and the Mental Health of Latino High School Students*, Migration Pol'y Inst. 2–3 (Sept. 2020).

[10] *Id.*

[11] Miguel Pinedo & Christian Escobar*, Childhood Parental Deportations, Immigration Enforcement Experiences, and Posttraumatic Stress Disorder Among US-Born Latino Adults*, *2021*, 114 Am. J. Pub. Health S495, S496 (2024); *see* Victoria D. Ojeda et al., *Deported Men's and Father's Perspective: The Impacts of Family Separation on Children and Families in the U.S.*, 11 Frontiers in Psychiatry 1, 10 (2020).

[12] Ojeda et al., *supra* note 11, at 7, 9–10; Ana Martinez-Donate et al., *Between the Lines: A Mixed-Methods Study on the Impacts of Parental Deportation on the Health and Well-Being of U.S. Citizen Children*, 9 J. Migration & Health 1, 5 (2024).

those who did not endure separation.[13] The public interest strongly favors preserving family unity.

### B.    Terminating Haiti's TPS Designation Would Damage Amici States' Economies and Workforces.

As the court found, ECF No. 124, at 79–81, terminating Haiti's TPS designation would also substantially harm Amici States' economies by depleting their workforces and depriving them of tax revenue.

Amici States employ TPS holders to perform crucial public services. At least 50,000 migrants with TPS work in health care, an industry struggling to fill positions, including in small cities and rural areas.[14] For example, in Massachusetts, 40 percent of the front-line staff in nursing homes are foreign born, many from Haiti; they include nursing assistants, licensed nurses, and those working in housekeeping and dining services.[15]

TPS holders are also crucial contributors to Amici States' broader economies. TPS-eligible Haitians contribute $3.4 billion annually to the U.S. economy.[16] Sixty-

---

[13] Pinedo & Escobar, *supra* note 11, at S501.

[14] Miriam Jordan, *Haitians Are Vital to U.S. Health Care. Many Are About to Lose Their Right to Work,* N.Y. Times (Jan. 29, 2026).

[15] Kay Lazar, *Looming Deportations of Haitian Immigrants Could Cripple US Health care, Leaders Warn*, Bos. Globe (Jan. 22, 2026).

[16] FWD.us, *Temporary Protected Status Protects Families While Also Boosting the U.S. Economy* (Feb. 2024); *see id.* at 5 ("TPS-eligible" includes those who hold TPS and those who qualify for TPS but may not have applied).

nine percent of Haitian immigrants aged sixteen and older were in the civilian labor force in 2022, with high rates of participation in healthcare support and service industries.[17] A recent estimate found that 75,000 TPS-eligible Haitians work in labor-short industries, defined as those with openings for at least 4 percent of their workforce.[18]

TPS holders from all countries have shown high rates of entrepreneurship—14.5 percent of TPS holders are entrepreneurs, as compared with 9.3 percent of the U.S.-born workforce.[19] The 2021 TPS population included more than 38,100 entrepreneurs, or self-employed workers, who generated $1.5 billion in business income.[20] In California, 7,800 self-employed TPS holders generated $224.8 million in business income.[21] These workforce contributions generate substantial state and federal tax revenue. In 2023, TPS holders from all countries paid $3.1 billion in

---

[17] Beatrice Dain & Jeanne Batalova, *Haitian Immigrants in the United States*, Migration Pol'y Inst. (Nov. 8, 2023).

[18] FWD.us, *supra* note 16; *see* ECF No. 124, at 80 (Haitian TPS holders "play indispensable roles in hospitality, food service, education, and manufacturing—industries that already face labor shortages and would be further destabilized by the loss of this workforce").

[19] Karen Aho, *Spotlight on the Economic Contributions of TPS Holders*, Immigr. Impact (Oct. 23, 2023).

[20] Am. Immigr. Council, *The Contributions of Temporary Protected Status Holders to the U.S. Economy* 4 (Sept. 2023).

[21] *Id.*

federal taxes, contributing to programs like Social Security and Medicare, and paid $2.1 billion in state and local taxes.[22]

Revoking Haiti's TPS designation would endanger these economic contributions. Many current TPS holders would have no choice but to return to Haiti, taking their economic contributions with them. Those who remain would be stripped of their work authorization, causing them to lose their current employment and forcing them to accept lower paying "off the books" jobs. Such lower-wage, unauthorized employment would lead to declines in Amici States' tax revenues.

Finally, at least 41 percent of TPS households are homeowners and pay taxes on property having a total value of approximately $19 billion.[23] Amici States would likely face a wave of mortgage foreclosures if current TPS holders are forced suddenly to leave the country or else accept lower-paid employment, thus harming property values and reducing property tax receipts.[24] Accordingly, terminating Haiti's TPS designations would substantially harm Amici States' economies, workforces, and tax revenue.

---

[22] *See* Am. Immigr. Council, *Immigrants in the United States* (data year 2023).

[23] Aho, *supra* note 19.

[24] *See* Jacob S. Rugh & Matthew Hall, *Deporting the American Dream: Immigrant Enforcement and Latino Foreclosures*, 3 Socio. Sci. 1053, 1055, 1067–68 (Dec. 2016).

C.    **Terminating Haiti's TPS Designation Would Compromise Public Health and Increase Health Care Costs.**

Terminating Haiti's TPS designations would also have significant negative effects on public health in Amici States and around the country. Haitians fill critical health care roles, and their imminent loss of work authorization and potential deportations could "cripple" health care in the United States.[25]

Moreover, 55 percent of Haitian immigrants are covered by private health insurance (often through employer-sponsored insurance programs).[26] Ending work authorization for hundreds of thousands of Haitian TPS holders would deprive many of those individuals and their families of their employer-sponsored health insurance. *See* ECF No. 124, at 81. The result would be to increase Amici States' heath care expenditures—by increasing the proportion of Haitian immigrants who are on public health insurance and by increasing public expenditures on emergency care provided to uninsured patients.[27]

---

[25] Kay Lazar, *supra* note 15.

[26] *See* Dain & Batalova, *supra* note 17.

[27] *See* U.S. Cong. Budget Off., *The Impact of Unauthorized Immigrants on the Budgets of State and Local Governments* 8 (Dec. 2007); Am. Compl., Ex. 83, Decl. of Jesse M. Caplan at 1–2, *New York v. Trump*, No. 1:17-cv-05228 (E.D.N.Y. Oct. 4, 2017), ECF No. 55-83 ("Caplan Decl.").

Moreover, stripping legal status from Haitian immigrants would risk serious negative consequences for public health.[28] As courts have noted in other contexts, the "[p]ublic health is served when individuals freely seek preventive care and do not stave off care until they need emergency room treatment in the midst of a health crisis." *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 609 (E.D. Pa. 2017). But as studies have consistently found, undocumented immigrants are often reluctant to seek medical treatment due to fear of detention and deportation.[29]

Against this well-understood backdrop, terminating Haiti's TPS protection would risk significant public health consequences. Many immigrants would lose employer-sponsored health care and be discouraged from seeking medical treatment due to fear of deportation. This would increase the broader community risk and would have many adverse results for immigrants and their families. For example, undocumented women are less likely to receive needed health care and preventive

---

[28] *See* App. in Supp. of Pls.' Mot. for Provisional Relief at 789–90, *Regents of Univ. of Cal. et al. v. U.S. Dep't of Homeland Sec.*, No. 3:17-cv-05211 (N.D. Cal. Nov. 1, 2017), ECF No. 118-1; Caplan Decl. at 1–2; Meredith L. King, *Immigrants in the U.S. Health Care System: Five Myths That Misinform the American Public*, Ctr. for Am. Progress 7 (June 7, 2007).

[29] *See* Sezer Kisa & Adnan Kisa, *"No Papers, No Treatment": A Scoping Review of Challenges Faced by Undocumented Immigrants in Accessing Emergency Healthcare*, 23 Int'l J. for Equity in Health, no. 184, at 2, 6, 8 (2024); Omar Martinez et al., *Evaluating the Impact of Immigration Policies on Health Status Among Undocumented Immigrants: A Systematic Review*, 17 J. Immigr. & Minority Health 947, 966 (2015).

screenings than the general U.S. population, leading to significantly higher rates of conditions like cervical cancer, birth complications, and neonatal morbidity.[30]

And newly undocumented former TPS holders may not seek treatment for their children or other family members—who may be U.S. citizens.[31] For example, studies show that children of undocumented immigrants are often sicker when seeking emergency room care and frequently miss preventive annual exams.[32] The results can be fatal; a child in Oklahoma died "when his parents delayed seeking medical treatment because they feared that hospital officials would report them to ICE."[33]

Because terminating Haiti's TPS designation would raise healthcare costs and pose public health risks, the public interest weighs against a stay.

---

[30] Am. Coll. of Obstetricians & Gynecologists, Comm. Op. no. 627, *Health Care for Unauthorized Immigrants*, 125 Obstetrics & Gynecology 755, 756 (Mar. 2015).

[31] *See* Lila Flavin et al., *Medical Expenditures on and by Immigrant Populations in the United States: A Systematic Review*, 48 Int'l J. Health Servs. 601, 617–18 (2018).

[32] *See* King, *supra* note 28; Katherine Yun et al., *Parental Immigration Status Is Associated with Children's Health Care Utilization: Findings from the 2003 New Immigrant Survey of U.S. Legal Permanent Residents*, 17 Maternal & Child Health J. 1913, 1916–19 (2013).

[33] Elizabeth M. McCormick, *Federal Anti-Sanctuary Law: A Failed Approach to Immigration Enforcement and a Poor Substitute for Real Reform*, 20 Lewis & Clark L. Rev. 165, 199 (2016).

### D.    Terminating Haiti's TPS Designation Would Harm Public Safety.

Amici States have strong interests in effective law enforcement and public safety at the state and local levels, both of which would be undermined by terminating Haiti's TPS designation. *See* ECF No. 124, at 81.

Because TPS holders and their families have built lives in the United States, some may try to stay in this country even if their TPS status is terminated. But individuals who lack legal status are less likely to report crime—even crimes in which they themselves are victims—due to fear of being removed.[34] Fear of removal, or of having a family or community member removed, makes victims and witnesses reluctant to come forward, to testify in court, and to seek safety in a domestic violence shelter.[35] When law enforcement is unable to obtain evidence of crimes and maintain witness cooperation at trial, public safety suffers.[36]

---

[34] Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement*, Dep't of Urb. Plan. & Pol'y, Univ. of Ill. at Chi. 14 (May 2013).

[35] *See* James Queally, *Fearing Deportation, Many Domestic Violence Victims Are Steering Clear of Police and Courts*, L.A. Times (Oct. 9, 2017).

[36] *See* Tom K. Wong, *The Effects of Sanctuary Policies on Crime and the Economy,* Ctr. for Am. Progress (Jan. 26, 2017) (sanctuary counties have lower crime rates than comparable nonsanctuary counties).

Contrary to unsubstantiated contentions, recent arrivals of immigrants (including Haitians) have not led to any "crime wave."[37] Moreover, TPS applicants must meet specified criteria to be granted that status, including screenings for criminal history and background checks.[38] And conviction for certain criminal offenses can trigger withdrawal of TPS status. *See* 8 C.F.R. §§ 244.14(a)(1), 244.4(a). Amici States' interests in maintaining public order weigh against a stay.

<h2 style="text-align:center"><u>CONCLUSION</u></h2>

The stay motion should be denied.


Dated:    February 16, 2026


Respectfully submitted,


LETITIA JAMES
*Attorney General*
*State of New York*


By: /s/*Cleland B. Welton II*
Cleland B. Welton II
On behalf of Amici States

---

[37] *See* Ted Hesson & Mica Rosenberg, *Trump Says Migrants Are Fueling Violent Crime. Here Is What the Research Shows*, Reuters (July 16, 2024); Maria Cramer et al., *'Migrant Crime Wave' Not Supported by Data, Despite High-Profile Cases*, N.Y. Times (Feb. 15, 2024).

[38] *See* Verónica Egui Brito & Syra Ortiz Blanes, *In a Few Weeks, Hundreds of Thousands of Venezuelans Will Lose TPS. What You Need to Know*, Miami Herald (Feb. 13, 2025).

ANDREA JOY CAMPBELL
 *Attorney General*
 *Commonwealth of Massachusetts*
Tasha J. Bahal
 *Deputy State Solicitor*
1 Ashburton Pl.
Boston, MA 02108


ROB BONTA
 *Attorney General*
 *State of California*
Michael L. Newman
 *Senior Assistant Attorney General*
Vilma Palma-Solana
 *Supervising Deputy Attorney General*
Annabelle Wilmott
 *Deputy Attorney General*
1515 Clay Street, 21st Floor
Oakland, CA 94612-1499


WILLIAM TONG
 *Attorney General*
 *State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
 *Attorney General*
 *State of Delaware*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801

Barbara D. Underwood
 *Solicitor General*
Judith N. Vale
 *Deputy Solicitor General*
Zoe Levine
 *Special Counsel for Immigrant Justice*
Cleland B. Welton II
 *Assistant Solicitor General*
28 Liberty Street
New York, NY 10005
(212) 416-6197
cleland.welton@ag.ny.gov


DANA NESSEL
 *Attorney General*
 *State of Michigan*
P.O. Box 30212
Lansing, MI 48909

KEITH ELLISON
 *Attorney General*
 *State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Boulevard
St. Paul, MN 55155

BRIAN L. SCHWALB
  *Attorney General*
  *District of Columbia*
400 6th Street, NW, Suite 8100
Washington, DC 20001


ANNE E. LOPEZ
  *Attorney General*
  *State of Hawaiʻi*
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
  *Attorney General*
  *State of Illinois*
115 South LaSalle Street
Chicago, IL 60601

AARON M. FREY
  *Attorney General*
  *State of Maine*
6 State House Station
Augusta, ME 04333-0006

ANTHONY G. BROWN
  *Attorney General*
  *State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

AARON D. FORD
  *Attorney General*
  *State of Nevada*
100 North Carson Street
Carson City, NV 89701

JENNIFER DAVENPORT
  *Acting Attorney General*
  *State of New Jersey*
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625


DAN RAYFIELD
  *Attorney General*
  *State of Oregon*
1162 Court Street NE
Salem, OR 97301

PETER F. NERONHA
  *Attorney General*
  *State of Rhode Island*
150 South Main Street
Providence, RI 02903

CHARITY R. CLARK
  *Attorney General*
  *State of Vermont*
109 State Street
Montpelier, VT 05609

NICHOLAS W. BROWN
  *Attorney General*
  *State of Washington*
P.O. Box 40100
Olympia, WA 98504

## CERTIFICATE OF SERVICE

I certify that on February 16, 2026, this brief was electronically filed with the Clerk of the Court using CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished using the CM/ECF system.

By: /s/ *Cleland B. Welton II*
Cleland B. Welton II

## CERTIFICATE OF COMPLIANCE

This amicus curiae brief complies with the word limit of Fed. R. App. P. 29(a)(5) because it contains 2,600 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

This filing complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared using Microsoft Office Word in Times New Roman 14-point font.

By: /s/ *Cleland B. Welton II*
Cleland B. Welton II

15