No. 26-5050

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**FRITZ EMMANUEL LESLY MIOT; RUDOLPH CIVIL; MARLENE GAIL NOBLE; MARICA MERLINE LAGUERRE; and VILBRUN DORSAINVIL,**

*Plaintiffs-Appellees*,

v.

**DONALD J. TRUMP, President of the United States of America; UNITED STATES OF AMERICA; THE DEPARTMENT OF HOMELAND SECURITY; and KRISTI NOEM, Secretary of Homeland Security,**

*Defendants-Appellants.*

_____

*On Appeal from the United States District Court for the District of Columbia, No. 1:25-cv-2471 (Reyes, J.)*

_____

## BRIEF OF AMICI CURIAE AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS (AFL-CIO) AND TEN AFFILIATED LABOR UNIONS IN OPPOSITION TO MOTION FOR STAY PENDING APPEAL

_____

Matthew Ginsburg (DC Bar No. 1001159)
Andrew Lyubarsky* (DC Bar No. 888304116)
AFL-CIO
815 Sixteenth Street, N.W.
Washington, DC 20006
mginsburg@aflcio.org
(202) 637-5397
*application for admission to D.C. Circuit Bar pending
**Counsel for Amici Curiae**

# TABLE OF CONTENTS

Page

INTEREST OF AMICI CURIAE ................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................ 7

ARGUMENT ................................................................................................ 12

I.    DHS's Decision to Terminate Haiti's TPS Designation Will Harm, Not Help, U.S. Workers ................................................................... 12

   A.   The District Court correctly recognized that removing Haiti TPS holders from the workforce would severely harm U.S. workers and the economy. ................................................... 12

   B.   Insight from *amici* show that granting a stay pending appeal would cause significant harm to U.S. workers and the economy. ........................................................................... 17

CONCLUSION ............................................................................................ 37

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*District of Columbia v. Trump*,
  No. 25-5418, 2025 WL 3673674 (D.C. Cir. Dec. 17, 2025) ................ 14

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ............................................................................... 10

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................................ 14

**Statutes**

8 U.S.C. § 1254a(b)(1)(C) .................................................................... 8, 9

8 U.S.C. § 1254a(b)(3)(B) ....................................................................... 9

**Administrative Materials**

DHS, "Designation of Haiti for Temporary Protected Status," 75 Fed.
  Reg. 3476 (Jan. 21, 2010) ..................................................................... 7

DHS, "Extension and Redesignation of Haiti for Temporary Protected
  Status," 89 Fed. Reg. 54484 (July 1, 2024) ......................................... 8

DHS, "Partial Vacatur of 2024 Temporary Protected Status Decision for
  Haiti," 90 Fed. Reg. 10511 (Feb. 24, 2025) ...................................... 22

DHS, "Termination of the Designation of Haiti for Temporary Protected
  Status," 90 Fed. Reg. 54733 (Nov. 28, 2025) ......................... 8, 9, 11, 13

DHS, "Termination of Designation of Somalia for Temporary Protected
  Status," 91 Fed. Reg. 1547 (Jan. 14, 2026) .................................... 16

## Miscellaneous

Ariana Figueroa, "Trump canceled temporary legal status for more than
1.5 million immigrants in 2025," WLRN (Dec. 29, 2025),
https://www.wlrn.org/immigration/2025-12-29/trump-canceled-
temporary-legal-status-for-more-than-1-5-million-immigrants-in-
2025 ................................................................................................... 16

Beatrice Dain & Jeanne Batalova, "Haitian Immigrants in the United
States," Migration Policy Institute (Nov. 8, 2023),
https://www.migrationpolicy.org/article/haitian-immigrants-united-
states-2022 ........................................................................................ 18

Dee Gill, "Codifying the Nursing Home Industry's Elusive, Alarming
Turnover Rates," UCLA Anderson Rev. (2021), https://anderson-
review.ucla.edu/codifying-the-nursing-home-industrys-elusive-
alarming-turnover-rates ....................................................................... 9

DHS, "DHS Terminates Temporary Protected Status for Yemen" (Feb.
13, 2026), https://www.uscis.gov/newsroom/news-releases/dhs-
terminates-temporary-protected-status-for-
yemen .................................................................................................. 16

Donnelle Eller, "Beyond Ottumwa: Thousands of Iowa, US Meatpacking
Jobs at Risk in Migrant Crackdown," Des Moines Register (Aug. 11,
2025),
https://www.desmoinesregister.com/story/money/agriculture/2025/08/
11/trump-crackdown-on-immigrants-could-cost-meatpackers-20-of-
workers-ice/85441314007 ................................................................... 29

Elizabeth Trovall, "Trump administration's ending of TPS for Haitians
accelerates staffing crunch in elder care," Marketplace (Jan. 15,
2026), https://www.marketplace.org/story/2026/01/15/end-of-tps-for-
haitians-could-devastate-elder-care ............................................. 21, 24

Jesús Villero, Brendan Warshauer & Youran Wu, Brief: *550,000
Workers Lose Status By End of 2025: Potential Impact By State And
Industry*, Penn Wharton (Nov. 19, 2025),
https://budgetmodel.wharton.upenn.edu/issues/2025/11/19/demograp
hic-and-labor-market-profile-of-tps-beneficiaries. ........................... 35

Letter from Katie Smith Sloan, President & CEO of LeadingAge, to
    DHS Secretary Kristi Noem (Apr. 30, 2025), *available at*
    https://leadingage.org/wp-content/uploads/2025/04/LeadingAge-to-
    DHS-re-TPS-and-Parole-4.30.25.pdf ............................................. 22, 23

Miriam Jordan, "Haitians Are Vital to U.S. Health Care. Many Are
    About to Lose Their Right to Work," N.Y. Times (Jan. 29, 2026),
    https://www.nytimes.com/2026/01/29/us/trump-tps-haitians-health-
    care-job-losses.html ................................................................. 23

Sari M. Long & Helena Wasey Abebe, "Temporary Protected Status
    (TPS): Where Things Stand at the Close of 2025," Faegre Drinker
    (Dec. 17, 2025),
    https://www.faegredrinker.com/en/insights/publications/2025/12/tem
    porary-protected-status-where-things-stand-at-the-close-of-2025 .... 15

Simón Rios, "As Legal Status is Set to End for Many Haitians, Mass.
    Health Care Sector Braces for Staffing Shortages," WBUR (Aug. 7,
    2025), https://www.wbur.org/news/2025/08/07/haitians-tps-
    massachusetts-trump-health-care ........................................................ 24

Simón Rios, "In meeting with members of Congress, Haitians voice
    fears of losing legal status next month," WBUR (Jan. 21, 2026),
    https://www.wbur.org/news/2026/01/21/congress-haitians-pressley-
    boston-tps-trump ........................................................................... 23

Steve Eder, Danielle Ivory & Marcela Valdes, "The Hidden Truth
    Linking the Broken Border to Your Online Shopping Cart," N.Y.
    Times (Nov. 17, 2024),
    https://www.nytimes.com/2024/11/17/us/immigration-undocumented-
    migrants-jobs.html .......................................................................... 28

## INTEREST OF AMICI CURIAE[1]

The **American Federation of Labor & Congress of Industrial Organizations ("AFL-CIO")** is a federation of 64 national and international labor organizations with a total membership of over 15 million working men and women who are employed in every sector of this country.  All ten other *amici* are labor organizations affiliated with the AFL-CIO.

The **Service Employees International Union ("SEIU")** is a labor organization of approximately two million members who work in the healthcare industry, state and local government, and in property service industries, such as janitors, security officers, airport workers, retail, distribution, laundry, and fast food workers, and adjunct professors, throughout the United States, Canada, and Puerto Rico. SEIU is the largest health care union in the United States with 1 million members nationwide, with its members working in hospitals,

---

[1] *Amici* certify that no counsel for a party authored this brief in whole or in part; and that no person other than these *amici* made a monetary contribution to its preparation or submission.

1

ambulatory care centers, off-site provider-based clinics, nursing homes and home care settings. Insofar as thousands of Haitians with Temporary Protected Status ("TPS") are employed in the healthcare industry, the decision taken by the U.S. Department of Homeland Security ("DHS") to terminate the TPS designation for Haiti would harm SEIU by causing it to lose members and by deteriorating working conditions for other members.

The **American Federation of Teachers ("AFT")** is a labor union that represents approximately 1.8 million members across the United States who provide essential services in education, healthcare, and the public sector. Many AFT members are foreign-born, including those authorized to work in the U.S. through the TPS program for Haitian nationals. These workers are public servants. They teach in our classrooms, care for patients, and serve our communities. The AFT is greatly concerned about the harmful impact that ending Haitian TPS will have on its members with Haitian TPS, their families, colleagues, and the communities they serve.

The **American Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME")** is a union of 1.4 million members

in the United States and Puerto Rico who serve in a wide range of public-sector roles—from health care and veterans' home staff to nurses and corrections officers to transportation and infrastructure workers—that provide essential services to their communities.  AFSCME represents members who are lawfully present and authorized to work under TPS for Haiti and who are integral to the communities they serve. The continuation of TPS directly affects their ability to remain employed, support their families, and deliver the critical services our communities rely on.  AFSCME participates in this case to protect its members' rights and to support policies that ensure lawfully present workers can continue contributing to the public good.

The **United Food and Commercial Workers International Union ("UFCW")** is a labor union that represents over a million workers across the United States, Canada and Puerto Rico. UFCW is the largest purely private sector union in the United States, with the majority of its members working in the retail food, meatpacking and food processing industries. A significant number of Haitian TPS holders are among their ranks and play a vital role in feeding American families.

The **International Association of Machinists and Aerospace Workers ("IAM")** is a large and diverse international union representing nearly 600,000 active and retired members across aerospace, air transport, rail, manufacturing, public sector, health care, and more.  The IAM demands respect and dignity in the workplace and its communities, for all its members and their families, including members legally working in the United States through the Haiti TPS program.  These Haitian national members are vital contributors in the workplace, and integral to our communities.

The **Laborers' International Union of North America ("LIUNA")** is a union of over 530,000 workers who build and serve this country every day, including many authorized to work in the U.S. through the TPS program for Haitian nationals.  LIUNA was founded in 1903 by immigrant workers who believed that every worker that labors with dignity deserves fair treatment, safe conditions, and a voice on the job.  That promise still guides LIUNA today.

**UNITE HERE International Union ("UNITE HERE")** is a labor union with approximately 300,000 members in the United States,

4

Canada, and Puerto Rico that primarily represents workers in the hotel, casino gaming, and food service industries. Service jobs in the hospitality industry attract new immigrants as they arrive and seek work opportunities in the United States. As a result, UNITE HERE's membership includes many immigrants who are temporarily authorized to work in the United States, including through the TPS program. Haitian TPS holders make up a significant number of members in locals representing workers in Florida, New Orleans, Atlantic City, and New York City. Those members and the employees who work with them will be impacted by the termination of Haiti's TPS program.

**National Nurses United ("NNU")** is a labor union that represents 250,000 registered nurses ("RNs") in the United States. NNU's members work in acute-care hospitals and other health care facilities across the nation. NNU's RN members work side-by-side with a wide variety of ancillary health care workers including certified nursing assistants, licensed vocational nurses, technicians, and other support staff, among whom Haitian TPS holders are well represented. NNU will be harmed by DHS's termination decision because the abrupt departure of these valued coworkers will exacerbate the workload faced

5

by already understaffed and overworked RNs, particularly in geographies such as Florida and New York.

The **International Union of Bricklayers and Allied Craftworkers ("BAC")** represents 70,000 workers in the masonry trades across the United States and Canada. These skilled craftworkers include bricklayers, stone and marble masons, cement masons, plasterers, tilesetters, terrazzo and mosaic workers, and pointers/cleaners/caulkers. BAC's industry and membership include Haitian TPS holders.

The **International Union of Electrical Workers-Communications Workers of America ("IUE-CWA")** is the Industrial Division of the Communications Workers of America. The Union represents 40,000 workers across the country in a wide range of manufacturing industries. IUE-CWA represents employees in at least one factory in the Mid-Atlantic where a significant number of members are Haitian TPS holders. IUE-CWA's bargaining units across the nation have already been harmed by DHS's decision to abruptly terminate parole programs earlier this year, leading to sizable discharges in a field already facing a workforce shortage. This situation

will be exacerbated if Haitian TPS holders are also compelled to exit the workforce.

## INTRODUCTION AND SUMMARY OF ARGUMENT

*Amici* are the AFL-CIO, America's largest federation of labor unions, together with ten of the AFL-CIO's affiliated unions, collectively representing millions of workers across a wide spectrum of industries, including healthcare, education, manufacturing, food processing, hospitality, transportation infrastructure, and construction. In each of these sectors, our hardworking membership is comprised of American citizens and non-citizens alike, who work together to make this country run. Prominent among our non-citizen members are thousands of TPS holders from Haiti.

Some of these Haitian TPS holders have been employment-authorized incident to their status for 16 years, following Haiti's initial designation in the aftermath of the destructive 2010 earthquake that took over a hundred thousand lives. *See* DHS, "Designation of Haiti for Temporary Protected Status," 75 Fed. Reg. 3476 (Jan. 21, 2010). Others have arrived more recently as a result of what DHS in 2024 called "simultaneous economic, security, political, and health crises" following

the July 2021 assassination of President Jovenel Moise—crises that have left the country virtually ungovernable over the last four years. DHS, "Extension and Redesignation of Haiti for Temporary Protected Status," 89 Fed. Reg. 54484, 54487 (July 1, 2024).  All are valued members of our unions who have offered their considerable skills to professions that provide essential services to the public.  And—given the "extraordinary and temporary" conditions prevailing in Haiti today, where gangs have taken the place of the government, over half of the country suffers from food insecurity, and outbreaks of preventable diseases such as cholera have become commonplace—none can "return[] to [their home country] in safety." 8 U.S.C. § 1254a(b)(1)(C).

Although DHS has moved to terminate Haiti's TPS designation, it does not appear to disagree with this basic premise.  Indeed, the Department reaffirms that "gang violence in Haiti persists as armed groups operate with impunity, enabled by a weak or effectively absent central government," finds that Haiti's government "has not been able to effectively crack down on gang violence," and concludes—with marked understatement—that "the current situation in Haiti is concerning."  DHS, "Termination of the Designation of Haiti for

Temporary Protected Status," 90 Fed. Reg. 54733, 54737–38 (Nov. 28, 2025) ("Termination Notice").  Accordingly, DHS did not—and could not—find that Haiti "no longer continues to meet the conditions for designation" under the TPS statute, a threshold requirement for any termination decision.  8 U.S.C. § 1254a(b)(3)(B).

Instead, DHS hung its hat on statutory language stating that a country may not be *designated* on the grounds of "extraordinary and temporary conditions" if the Secretary of Homeland Security "finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States."  8 U.S.C. § 1254a(b)(1)(C); *see* 90 Fed. Reg. at 54735.  DHS then concluded that Haiti's TPS designation should be terminated on these "national interest" grounds alone, relying on anecdotal, cherry-picked evidence about Haitian nationals committing crimes in the United States (with no indication that they were ever TPS holders) and a smattering of unsupported commentary about TPS being a "pull factor" for additional migration.  90 Fed. Reg. at 54737–38, n.36.

As the District Court correctly held in its exhaustive opinion, this manner of proceeding is contrary to law and arbitrary and capricious.

The best reading of the TPS statute requires DHS to base any decisions concerning the termination or extension of TPS designations on a review of in-country conditions concerning the humanitarian situation in the designated foreign state, not solely on a malleable consideration of the "national interest."  That was not done here.  And, though the factors that could potentially be incorporated into a "national interest" analysis are indeed broad, DHS must nevertheless engage in reasoned decisionmaking under the Administrative Procedure Act.  It thus cannot "entirely fail[] to consider an important aspect of the problem, offer[] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  As the District Court so aptly demonstrated, the Termination Notice flunks this test.  *See* Op. at 48–58.

*Amici* write primarily to highlight one particular aspect of the Termination Notice that underscores its arbitrariness—its deficient treatment of the workforce impact of DHS's actions—and to emphasize that a stay of DHS's decision is in the public interest.  Though Secretary

Noem purported to consider—among other issues—"economic considerations" including "adverse effects on U.S. workers" in making her "national interest" determination, 90 Fed. Reg. at 54735, the Termination Notice lacks *any* real-world information on the workforce impact that removing hundreds of thousands of work-authorized Haitian TPS holders will have on industries that are core to our Nation's economic health.

Had the Secretary deigned to engage in any fact-finding to support her unreasoned conclusion, she would have discovered that, rather than protecting U.S. workers, mass layoffs of Haitian TPS holders will exacerbate labor shortages, undermine U.S. workers' terms and conditions of employment by requiring them to work more hours, and deteriorate the quality of services for patients, consumers, and the public. Thus, her apparent conclusion that terminating Haiti's TPS designation would serve the "national interest" because of its impact on the U.S. workforce bears all the hallmarks of arbitrariness set forth in *State Farm*. Instead, the public interest, including that of America's workers, weighs heavily in favor of a stay of agency action, which the District Court correctly granted. The same considerations apply here.

11

Accordingly, this Court should deny the Government's emergency

motion for a stay pending appeal.

## ARGUMENT

I.  **DHS's Decision to Terminate Haiti's TPS Designation Will Harm, Not Help, U.S. Workers**

A.  **The District Court correctly recognized that removing Haiti TPS holders from the workforce would severely harm U.S. workers and the economy.**

If allowed to take effect, DHS's decision to terminate Haiti's TPS

designation will push hundreds of thousands of workers out of the

formal labor market. In many sectors crucial to our economy and our

society, this will be disastrous for U.S. workers. The District Court

agreed, finding that termination of Haiti's TPS designation would

seriously harm U.S. workers and the overall economy. Op. at 79–80.

Indeed, many employers will predictably seek to fill this artificial and

deliberately-generated labor shortage by requiring remaining workers

to work mandatory overtime to meet their staffing needs, diminishing

U.S. workers' quality of life, and leading to increased occupational

injuries. Other employers will simply be unable to maintain a

necessary level of production or services. They will thus be compelled to

lay off U.S. workers—or even to close down.

The Termination Notice does not consider any of these real-world consequences of expelling hundreds of thousands of people from their jobs overnight.  Instead, it references purported "adverse effects on U.S. workers" that would occur if Haiti's TPS designation were *extended*, and asserts that people who overstay nonimmigrant visas "can place an added strain on local communities by . . . competing in an already limited job market."  90 Fed. Reg. at 54735–36.  The Termination Notice, however, does not make any factual findings in support of these determinations with regard to Haiti TPS holders.[2]  Instead, it appears to imply that the mere presence of lawfully-authorized Haitian immigrant workers in the workforce *per se* harms their non-immigrant colleagues.  That assumption is baseless and contradicted by a bevy of economic data relating to Haitian immigrants generally, and TPS

---

[2] As explained by the District Court, the analysis regarding individuals who "overstay their visas" has nothing to do with Haiti TPS holders. Haiti TPS holders, who are lawfully present in the U.S., "do not fall into this cohort." Accordingly, any effect that people who overstay their visas has on the job market is irrelevant to the issue of termination of Haiti's TPS designation. *See* Op. at 59–60 ("Nothing about the overstay rates requires TPS termination, and TPS termination would not address overstay rates.").

holders specifically, as well as by *amici*'s experience across a wide variety of sectors of the economy.

This has two implications for this case. First, even if the Government demonstrates a likelihood of success on the merits on any of their statutory and constitutional claims and irreparable harm, this Court must still weigh the relevant equitable considerations and whether a stay pending appeal is in the public interest. *See District of Columbia v. Trump*, No. 25-5418, 2025 WL 3673674 at *6, *11 (D.C. Cir. Dec. 17, 2025) ("[T]he stay applicant must (1) make a 'strong showing that [it] is likely to succeed on the merits' of the appeal; (2) demonstrate that it will be 'irreparably injured' before the appeal concludes; (3) show that issuing a stay will not 'substantially injure the other parties interested in the proceeding'; and (4) establish that 'the public interest' favors a stay." (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)). Preventing harm to other U.S. workers—as well as to the consumers and patients who benefit from Haitian TPS holders' labor—is clearly within the public interest for the purpose of the stay analysis, as the District Court recognized.

14

And, second, to the extent that any portion of Secretary Noem's "national interest" determination relies on unsubstantiated assertions about harms that would befall U.S. workers as a result of an *extension* of Haiti's TPS designation, such a determination is arbitrary and capricious in the most literal sense of the term. It is based on no evidence at all and contradicted by both abundant evidence in the public record and by *amici*'s experiences as the leading representatives of U.S. workers in a whole host of sectors where Haitian TPS holders are employed.

What *does* harm U.S. workers is the Administration's unprecedented decisions to remove large numbers of their immigrant colleagues from the workforce, particularly in strategic economic sectors that are experiencing labor shortages. Last year, DHS issued TPS termination notices for 11 out of the 17 countries that had active TPS designations at the beginning of 2025,[3] and has since added Somalia

---

[3] Sari M. Long & Helena Wasey Abebe, "Temporary Protected Status (TPS): Where Things Stand at the Close of 2025." Faegre Drinker (Dec. 17, 2025), https://www.faegredrinker.com/en/insights/publications/2025/12/temporary-protected-status-where-things-stand-at-the-close-of-2025.

and Yemen to its running list.  *See* DHS, "Termination of Designation of Somalia for Temporary Protected Status," 91 Fed. Reg. 1547 (Jan. 14, 2026); DHS, "DHS Terminates Temporary Protected Status for Yemen" (Feb. 13, 2026), https://www.uscis.gov/newsroom/news-releases/dhs-terminates-temporary-protected-status-for-yemen.  Absent judicial intervention, over one million TPS holders will lose work authorization—a "totally unprecedented" and "huge event that has ripple effects for employers and communities and families and our economy as well."[4]  Indeed, removing immigrants from Haiti and Venezuela alone, who "make up a majority of recipients set to lose their TPS protections, at nearly 935,000 people," would "cause the entire economy to contract by more than $14 billion."[5]

The District Court recognized the seriousness of these consequences and determined that a stay is in the public interest given "the critical roles that Haitian TPS holders play in workplaces across

---

[4] Ariana Figueroa, "Trump canceled temporary legal status for more than 1.5 million immigrants in 2025," WLRN (Dec. 29, 2025), https://www.wlrn.org/immigration/2025-12-29/trump-canceled-temporary-legal-status-for-more-than-1-5-million-immigrants-in-2025.

[5] *Id.*

the country." Op. at 79. The court acknowledged that these workers "fill labor shortages in essential industries" like healthcare, hospitality, food service, education, and manufacturing—sectors "that already face labor shortages and would be further destabilized by the loss of this workforce." *Id.* at 79–80. It also recognized the "drastic impact" that removing Haiti TPS holders would have "on co-workers' workload and patient care quality." *Id.* at 80. In part because of the "indispensable roles" that Haiti TPS holders play in the U.S. economy, and without any contrary support provided by the Government, the court correctly determined that the public interest warrants a stay. *Id.*

### B. Insight from Amici show that granting a stay pending appeal would cause significant harm to U.S. workers and the economy.

The experience of *amici* demonstrates the ways that the mass expiration of Haiti TPS will touch almost all aspects of our economy and all strata of our workforce. *Amici* provide the Court with insight regarding five particular sectors—healthcare, hospitality, food production, manufacturing, and construction—to show how allowing for the termination of Haiti TPS while the Government's appeal is pending would significantly harm U.S. workers and the public interest.

Haitian immigrants work across our nation in a variety of occupations, but have made particular contributions in the healthcare sector. As of 2021, the 103,000 Haitian healthcare workers comprised the sixth-largest immigrant group in this field,[6] where the demand for labor is high and understaffing and overwork is already the norm. And, because Haitian immigrants are highly concentrated, with almost 66% residing in just three metropolitan areas—Miami, New York City, and Boston[7]—suddenly removing Haitian TPS holders would have a drastic impact on co-workers' workload and patient care quality.

In the hospital setting, registered nurses who are members of **NNU** work alongside other hospital workers who are vital to the safe delivery of patient care. If thousands of hospital workers were suddenly unavailable to work because their work authorization was terminated, RNs, their patients, and their communities would be severely impacted.

---

[6] Beatrice Dain & Jeanne Batalova, "Haitian Immigrants in the United States," Migration Policy Institute (Nov. 8, 2023), https://www.migrationpolicy.org/article/haitian-immigrants-united-states-2022.

[7] *Id.*

18

When the number of ancillary staff such as certified nursing assistants, licensed vocational nurses, technicians, environmental service workers, and food service workers is reduced, then RNs are left to pick up the slack, putting an increased burden on an already understaffed and overworked RN workforce throughout Florida and New York.  Instead of caring for patients, RNs will be forced out of necessity to distribute meal trays, answer phones, perform housekeeping duties, transport patients, and spend additional time assisting patients with daily living activities like bathing, dressing, grooming and toileting that would otherwise be performed by nursing assistants.  This in turn will lead to extended wait times for emergency room admissions, delayed blood draws, delays in administering medications and in responding to call lights when patients need immediate assistance.

**SEIU** represents thousands of healthcare workers across New Jersey, New York, and Boston, and confirms that termination of Haiti TPS would create a crisis in the already understaffed hospital and home healthcare industries.  This would include the loss of an estimated 500 members who are nurses in New York and Boston, and 3,000 or more

members who are home healthcare workers in New York. The sudden loss of these workers would have a particularly significant impact in home healthcare, where understaffing is especially severe and Haiti TPS holders make up 5% of SEIU's 60,000 New York home healthcare members. Employers would be forced to mandate overtime which, in home healthcare, means working two 8-hour back-to-back shifts, seven days in a row, risking heightened fatigue, injury, burnout, and further loss of staff. Across the healthcare sector, patient care would suffer: staffing shortages are closely linked with slower response times, reduced assistance with daily needs, and weaker infection control. These consequences would have a noticeable effect in home healthcare, where the provider is sometimes the only person the patient ever sees. Reduced staffing would drastically impair the relationships and consistency that are critical to the care of home healthcare patients.

The nursing home industry that serves our nation's seniors will be affected even more directly. Even with Haitian TPS holders present in the nursing home workforce, where they make up a substantial portion

of entire departments,[8] the industry continues to experience significant

challenges, including short-staffing, high turnover, and staff burnout.[9]

In addition to contributing to exacting working conditions for

healthcare workers, this leads to negative outcomes for patient care.

Evidently, removing tens of thousands of qualified workers with

Haitian TPS from this crucial sector will exacerbate the situation,

further overburdening the workers that remain, compromising care for

existing patients, and reducing capacity to admit additional patients.[10]

---

[8] SEIU reports that, in some nursing homes where it has members, Haiti TPS holders make up a substantial portion of entire departments, particularly in housekeeping, dietary, laundry, and direct care.

[9] *See* Dee Gill, "Codifying the Nursing Home Industry's Elusive, Alarming Turnover Rates," UCLA Anderson Rev. (2021), https://anderson-review.ucla.edu/codifying-the-nursing-home-industrys-elusive-alarming-turnover-rates/ ("Averages . . . for turnover at nursing homes are . . . 140.7% for RNs, 114.1% for LPNs, 129.1% for CNAs— because some nursing homes have annual turnover exceeding 300%."); Elizabeth Trovall, "Trump administration's ending of TPS for Haitians accelerates staffing crunch in elder care," Marketplace (Jan. 15, 2026), https://www.marketplace.org/story/2026/01/15/end-of-tps-for-haitians-could-devastate-elder-care ("[The] industry depends on Haitian and other foreign-born workers as it faces a deficit of caregivers and other workers.  This year, more U.S. elder care facilities have had to downsize due to staffing shortages despite growing demand … .").

[10] UFCW, which represents more than 11,000 nursing home and assisted-living workers nationwide, confirms the same.  It notes that

Those representing the industry—who are often adverse to *amici* on a host of issues—whole-heartedly agree on this point. For instance, LeadingAge, which represents over 5,400 non-profit senior care providers nationwide, wrote a letter to Secretary Noem in April 2025 emphasizing the effects that the termination of Haiti's TPS designation would have on their sector.[11] Canvassing its members, LeadingAge reported that many providers expected to suffer significant job loss. One senior living community in South Florida noted a likely loss of 35

---

strict credential and eligibility requirements in the industry make it difficult to quickly hire replacement workers. One UFCW business representative in Florida warns that ending TPS would cause longer response times to call lights and would therefore increase the risk of injuries and falls among patients. Local unions in the Greater New York region expressed concern that employers may lower their hiring standards to find new staff, potentially compromising the quality of care and patient safety.

[11] Letter from Katie Smith Sloan, President & CEO of LeadingAge, to DHS Secretary Kristi Noem (Apr. 30, 2025), *available at* https://leadingage.org/wp-content/uploads/2025/04/LeadingAge-to-DHS-re-TPS-and-Parole-4.30.25.pdf ("LeadingAge Letter"). At that time, Secretary Noem had issued a "partial vacatur" of DHS's 2024 designation of TPS, purporting to shorten the length of that designation from February 2026 to August 2025, DHS, "Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti," 90 Fed. Reg. 10511 (Feb. 24, 2025). All of the points in LeadingAge's letter are equally applicable to the November 28, 2025, Termination Notice.

employees, including "skilled and difficult to replace staff members such as certified nursing assistants and dietary aides."[12]  In Pennsylvania, a provider reported the likely loss of 30 Haitian employees; for a Virginia provider, that number climbed to 60.[13]  Noting that "[s]ome of the affected employees have been in their roles for a decade or more," LeadingAge concluded that "[t]he sudden loss of these individuals risks unsettling care routines, diminishing quality of care, and causing distress among residents who depend on familiar, stable support in their daily lives."[14] Additional senior care providers in Florida and Massachusetts have gone on the record to emphasize the similar strain that the loss of Haiti TPS workers would have on their facilities.[15]

---

[12] LeadingAge Letter, *supra* n.11.

[13] *Id.*

[14] *Id.*

[15] Miriam Jordan, "Haitians Are Vital to U.S. Health Care. Many Are About to Lose Their Right to Work," N.Y. Times (Jan. 29, 2026), https://www.nytimes.com/2026/01/29/us/trump-tps-haitians-health-care-job-losses.html; Simón Rios, "In meeting with members of Congress, Haitians voice fears of losing legal status next month," WBUR (Jan. 21, 2026), https://www.wbur.org/news/2026/01/21/congress-haitians-pressley-boston-tps-trump.

According to an August 2025 report covering the health sector in Massachusetts, nursing home industry groups estimate that nearly 2,000 caregivers across the state would be discharged due to the termination of Haiti's TPS designation, with some facilities bracing to lose up to 20% of their staff.[16] In that month, a rehabilitation and skilled care facility in Boston reported that the facility would lose 40% of its dietary aides and 15% of its certified nursing assistants if termination of Haiti TPS took effect.[17]  This would only exacerbate the impact of an increased number of elder care facilities downsizing in 2025 "due to staffing shortages despite growing demand."[18]  The loss of these valuable union workers would not only affect patient care.  It would also affect the terms and conditions of employment of U.S. workers in the bargaining unit, who would be asked to "do more with

---

[16] Simón Rios, "As Legal Status is Set to End for Many Haitians, Mass. Health Care Sector Braces for Staffing Shortages," WBUR (Aug. 7, 2025), https://www.wbur.org/news/2025/08/07/haitians-tps-massachusetts-trump-health-care.

[17] Rios, *supra*, n.16.

[18] Trovall, *supra*, n.9.

less" in grueling work environments characterized by unsustainable patient-to-caregiver ratios.

The effect of the loss of Haiti TPS holders in the healthcare industry is perhaps most poignantly demonstrated by the stories of individual union members.  During the COVID-19 pandemic, many of SEIU's home healthcare members would continue visiting their clients when no one else would, and these members would often prepare meals for their clients for the days that they weren't there.  SEIU's Haiti TPS holders are also leaders in their workplaces.  A longtime nursing assistant in one facility serves as a shop steward for the union—this member mentors new hires and helps raise patient safety concerns to the facility's management. Another member, a dietary worker, trains new staff and ensures residents with specialized dietary needs receive appropriate meals.  Coworkers rely on these members for technical knowledge and language support.  Losing workers like these would create operational and leadership gaps in a severely understaffed system where this critical knowledge cannot be quickly replaced.

Many Haitian TPS holders are employed in the hospitality sector—a field that has also experienced chronic labor shortages.  For

instance, **UNITE HERE**'s South Florida local reports that Haitian TPS holders are present in all of its bargaining units, with over 100 alone working for concessionaires at the Fort Lauderdale Airport. If they were terminated, this would lead to a serious effect on the local union's members, both in the amount of work distributed among them, as well as the chilling effect on members' willingness to organize and assert their rights at work.

The same is true of UNITE HERE's membership in New Orleans, approximately 100 of whom are Haitian TPS holders, largely at one of two major hotels. UNITE HERE estimates that one of these hotels would stand to lose 75% of its housekeeping staff. As a result, remaining workers will be forced to work overtime as well as increase the number of rooms they are expected to clean. Even with overtime, it is unlikely that the remaining workers will be able to handle the excess workload. If the hotel is unable to meet demand for housekeeping services, it will likely be forced to pause room reservations or severely reduce offering housekeeping services altogether, thus putting it at a major competitive disadvantage in the market.

Many Haitian TPS holders have been UNITE HERE union members for over a decade. They are among the most senior and experienced workers on the job. Some are longtime shop stewards or are otherwise regarded as natural leaders among their coworkers. For instance, Haitian housekeepers have played a strong role in UNITE HERE's ongoing campaigns in New Orleans. They have led the fight to raise wages at union properties, have led delegations and cafeteria rallies to demand respect from management and better pay, and are currently organizing in a campaign for a new union contract. The loss of these workers will mean more than just the loss of someone capable of doing the work—it will be the loss of years of experience, acumen, and leadership.

In UNITE HERE's experience, workforce shocks of this magnitude often lead employers to turn to temporary staffing agencies to supply workers. Such labor agencies, in addition to undermining the wages and working conditions for U.S. workers employed by the hotels by paying substandard wages and benefits, often violate immigration law

by hiring undocumented workers.[19]  All in all, UNITE HERE predicts that it will be harmed by a loss of members, subcontracting of work outside the bargaining unit, and harsher working conditions for existing members.

In food production, where **UFCW** represents several hundred thousand workers, the effects of DHS's labor market actions also portends to be dire.  In Delaware and on Maryland's Eastern Shore, Haiti TPS holders make up a significant portion of the poultry processing workforce, especially in sanitation, live hang, and de-boning. Losing these workers would destabilize operations immediately, particularly because positions like live hang are notoriously difficult to staff and are essential to keeping poultry plants running.  Without adequate staffing in live hang, employers are more likely to stop operations entirely rather than rely on mandatory overtime from remaining employees.  The ripple effect of closing these plants would

---

[19] Steve Eder, Danielle Ivory & Marcela Valdes, "The Hidden Truth Linking the Broken Border to Your Online Shopping Cart," N.Y. Times (Nov. 17, 2024), https://www.nytimes.com/2024/11/17/us/immigration-undocumented-migrants-jobs.html.

result in job loss for U.S. workers and economic harm to local farmers and surrounding communities that buy the product.

The effects in meatpacking would be similarly devastating. According to the Meat Institute—the lobby group for meat industry employers—approximately 20% of the country's meat processing workforce stand to lose their jobs as a result of the termination several TPS designations, including that of Haiti, and the Administration's previous determination to end a parole program for Cubans, Haitians, Nicaraguans, and Venezuelans ("CHNV parole").[20]  Large and mid-sized employers expect to lose up to one hundred workers at some facilities, with facilities in Indiana, Iowa, and North Carolina expected to be among those most affected.  As a result, meat production is likely to decrease, disrupting supply chains and ultimately driving up consumer

---

[20] Donnelle Eller, "Beyond Ottumwa: Thousands of Iowa, US Meatpacking Jobs at Risk in Migrant Crackdown," Des Moines Register (Aug. 11, 2025), https://www.desmoinesregister.com/story/money/agriculture/2025/08/11/trump-crackdown-on-immigrants-could-cost-meatpackers-20-of-workers-ice/85441314007.  Notably, many of these same workers had been designated as essential during the COVID-19 pandemic, when President Trump invoked the emergency powers of the Defense Production Act to force meatpacking plants to remain open.  *Id.*

prices.  Meanwhile, the remaining workers will be expected to shoulder increased workloads to keep up with demand. This would include a likely return to exhausting twelve-hour shifts, seven days per week— schedules that had only recently been eliminated.  One union local in Pennsylvania reports that production lines or entire plants could temporarily shut down and unsafe conditions would increase if employers were forced to rapidly hire inexperienced replacements. These conditions increase the risk of fatigue-related injuries, jeopardize worker safety, and disrupt family life.

UFCW can reasonably predict the effect that the loss of Haitian members with TPS will have on its remaining members and communities based on the effects suffered by its bargaining units following the rescission of CHNV parole.  UFCW locals surveyed in the Midwest reported over 500 terminations across ten bargaining units in three states with 175 of these occurring in one facility alone.  As a result, UFCW-represented plants implemented enhanced mandatory overtime requirements as companies struggled to keep up with production demands while operating with a reduced workforce. Short-staffing on the meat line also means greater safety concerns for

workers in an already dangerous industry; remaining workers at these plants experienced increased injuries from excessive overtime.  Finally, U.S. workers at nearby businesses—particularly those dependent on hide production—faced reduced hours and layoffs due to the downstream effects of the decrease in production in one rural town. Several local retail stores ultimately closed, and community leaders reported a noticeable decline in cash flow following the loss of Haitian and other immigrant workers.  The loss of Haitian TPS holders from the poultry and meatpacking workforce will only exacerbate these conditions.

**IUE-CWA** presents a window into the effect that DHS's termination is likely to have in the manufacturing sector.  IUE-CWA represents 40,000 manufacturing workers across the country, including approximately 6,000 employees at a home appliance manufacturer in the Midwest.  Even before DHS's decisions to abruptly terminate the Haiti TPS designation at issue in this case, IUE-CWA reports that this facility had approximately 150 unfilled positions, and had eliminated a shift due to lack of labor.  As a result, the employer announced that it was imposing mandatory overtime on all remaining workers, requiring

31

them to work 9 hours per day, until further notice, in order to meet its production needs. Following the rescission of CHNV parole, the employer discharged almost 150 employees, causing the Union's other workers to see their working conditions further degraded by the need to meet the company's production needs with an ever-decreasing pool of workers.

As a result of the Termination Notice, IUE-CWA fears that a similar story will unfold at two other plants where it has members. One manufacturing plant in the Mid-Atlantic employs over 1,000 people that produce products for the residential energy market. Haitian TPS holders are a large part of the workforce at this plant, which is also experiencing a labor shortage and high turnover rates. Every other week, current bargaining unit employees are compelled to work mandatory overtime. Bargaining unit employees who are authorized to work through temporary protected status for Haitians are scattered throughout the facility. If those workers suddenly lose employment authorization, the employer will likely need to reduce production, which could lead to product shortages, price increases, and supply chain disruption for the residential energy market.

Another plant in Southwest Ohio has over 800 employees helping produce automotive parts.  Currently, around thirty bargaining unit members at this facility have TPS under Haiti's designation.  This plant is also facing a labor shortage and high turnover rates, with new employees hired on a weekly basis.  The sudden loss of thirty employees would cause significant disruption to the employer's operations, affecting the other hundreds of employees at the plant. Moreover, **SEIU** predicts a similar fate at a car part manufacturing plant in Ohio where it has members.   Haitian workers make up three quarters of this plant's workforce.  This plant is likely to face a temporary shutdown or a complete closure if Haiti TPS is terminated.

Lastly, **LIUNA**'s experience demonstrates the snowballing effects of the loss of Haiti TPS holders in the construction industry.  LIUNA represents members with Haiti TPS who work in construction in several states, including New York, Florida, Ohio, and Tennessee.  One bargaining unit consists of members who work as landscapers, arborists, general laborers, and those who do construction, demolition and concrete, for a large entertainment venue in Florida.  More than 20 out of 900–1,000 members of this local union would be lost because of

33

termination of Haiti TPS, and in construction, the loss of this many

workers at once has rapidly escalating effects.  Certain laborer projects

are time sensitive; for example, concrete must be ripped up and poured

in the same day for it to dry overnight and cure properly, and it must be

ripped up and re-poured if not properly completed.  When other workers

have to step in and do the jobs of two or three people because of the loss

of co-workers, these types of tasks are harder to finish on time.  This

creates a situatuion where scheduled inspections cannot occur, and

other craft laborers—ironworkers, electricians, plumbers, etc.—cannot

start their work until the construction workers finish their part of the

project.  Such delays impede consumer access to high-traffic areas of the

entertainment venue, making the company lose money.  Not to mention,

the crew loses critical skills and training from workers who have been

working alongside each other for many years.

The foregoing sectors are perhaps the most affected, but they are

not the only ones—TPS holders are 5.4 times more likely than U.S. born

workers to work in building and grounds cleaning and maintenance,

twice as likely as U.S. born workers to work in transportation and

material moving, and play significant roles in a range of other

industries including sales, business management, and administrative support.[21] *Amici* represent many more Haiti TPS holders who work in these other sectors: **AFSCME** represents a Pennsylvania Department of Transportation employee, a Haiti TPS holder, who provides essential emergency accident response and road maintenance services for the state. This member volunteers to travel outside his home county to work overtime when roads need snow plowing to ensure all commuters can drive safely. UFCW represents hundreds of members who work at industrial laundries that service hospitals and hotels in New England. One local union president reports that these laundries stand to lose more than 200 workers if Haiti TPS ends.

In synthesis, DHS's termination of Haiti's TPS designation is but one more action that threatens to generate a mass exodus of qualified, lawful, employment-authorized immigrant workers from the workforce. *Amici*'s experience across a variety of economic sectors demonstrates

---

[21] Jesús Villero, Brendan Warshauer & Youran Wu, Brief*: 550,000 Workers Lose Status By End of 2025: Potential Impact By State And Industry*, Penn Wharton (Nov. 19, 2025), https://budgetmodel.wharton.upenn.edu/issues/2025/11/19/demographic-and-labor-market-profile-of-tps-beneficiaries.

that this is *not* a boon for U.S. workers or for the unions who represent their interests.  First, unions shall lose dedicated worker-leaders whose engagement and solidarity has led to the improvement of working conditions for all.  And the secondary effects shall be stark. As a direct result of DHS's actions, nurses and other healthcare workers will feel pressure to work longer hours to attend to more patients, exacerbating the turnover and burnout that is endemic to the industry. Manufacturing and food production workers will face forced overtime that degrades their quality of life and renders them more susceptible to injury as employers struggle to keep production afloat.  Hospitality employers will be incentivized to turn to staffing agencies known to pay substandard wages and benefits to meet their workforce needs.  And construction crews will have too few workers to meet critical deadlines, delaying large-scale projects and forcing companies to pay more and rapidly hire inexperienced workers for hazardous projects that require high levels of skill.

The public interest thus weighs strongly in favor maintaining the District Court's stay of DHS's termination of Haiti TPS, and therefore in favor of denying the Government's motion for a stay pending appeal.

And, to the extent that workforce considerations played any role in Secretary Noem's determination of where the "national interest" lies, her failure to consider the real-world impact of terminating Haiti's TPS designation on U.S. workers renders it arbitrary and capricious.

## CONCLUSION

The Court should deny Defendants-Appellants' emergency motion for a stay pending appeal.

Dated: February 17, 2026

Respectfully submitted,

/s/ Matthew Ginsburg
Matthew Ginsburg (DC Bar No. 1001159)
Andrew Lyubarsky* (DC Bar No. 888304116)
AFL-CIO
815 Sixteenth Street, N.W
Washington, DC 20006
mginsburg@aflcio.org
(202) 637-5397

*Attorneys for Labor Amici*

*Application for admission to D.C. Circuit bar pending

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), counsel hereby certifies that the foregoing *Amicus Curiae* Brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,764 words, as counted by counsel's word processing system.

Further, this document complies with the typeface and type-style requirements of the Federal Rules of Appellate Procedure, 32(a)(5) and (a)(6), because this document has been prepared in a proportionally spaced typeface using Microsoft Word using size 14 Century Schoolbook font.

Dated: February 17, 2026

/s/ <u>Matthew Ginsburg</u>

## CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2026, I electronically filed the foregoing *Amicus Curiae* Brief using the appellate CM/ECF system. The participants in this case are registered CM/ECF users and will be served by the appellate CM/ECF system.

Dated: February 17, 2026

/s/ <u>Matthew Ginsburg</u>