APPEAL,TYPE–E

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: <u>1:25–cv–02471–ACR</u>

LESLY MIOT et al v. TRUMP et al
Assigned to: Judge Ana C. Reyes
Cause: 05:551 Administrative Procedure Act

Date Filed: 07/30/2025
Jury Demand: None
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**FRITZ EMMANUEL LESLY MIOT**

represented by **Alexa Jane Thein**
BRYAN CAVE LEIGHTON PAISNER
161 N Clark St
Ste 4300
Chicago, IL 60601
312–602–5164
Email: alexa.thein@bclplaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Paul Mach**
BRYAN CAVE LEIGHTON PAISNER LLP
1290 Avenue of the Americas
New York, NY 10104
212–541–1146
Email: daniel.mach@bclplaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah Katelyn Harrell**
BRYAN CAVE LEIGHTON PAISNER LLP
1201 W. Peachtree Street, NW
One Atlantic Center
14th Floor
Atlanta, GA 30309
404–572–6668
Fax: 404–572–6999
Email: katelyn.harrell@bclplaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brooke Valerie Ingoglia**
BRYAN CAVE LEIGHTON PAISNER

161 North Clark Street
Suite 4300
Chicago, IL 60601
515–720–7212
Email: brooke.ingoglia@bclplaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Geoffrey Pipoly**
BRYAN CAVE LEIGHTON PAISNER,
LLP
161 N. Clark Street
Suite 4300
Chicago, IL 60601
312–602–5078
Email: geoff.pipoly@bclplaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ira J Kurzban**
KURZBAN, KURZBAN, TETZELI, &
PRATT, P.A.
131 Maderia Avenue
Coral Gables, FL 33134
(305) 444–0060
Fax: (305) 444–3503
Email: ira@kktplaw.com
*ATTORNEY TO BE NOTICED*

**Kevin A. Gregg**
KURZBAN, KURZBAN, TETZELI &
PRATT, P.A.
131 Madeira Avenue
Coral Gables, FL 33134
305–444–0060
Email: kgregg@kktplaw.com
*ATTORNEY TO BE NOTICED*

**Madisen Hursey**
BRYAN CAVE LEIGHTON PAISNER,
LLP
161 N Clark St
Suite 4300
Chicago, IL 60607
312–602–5149
Email: madisen.hursey@bclplaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew James Stanford**
BRYAN CAVE LEIGHTON PAISNER,
LLP

Two N. Central Ave.
Suite 2100
Phoenix, AZ 85004
602–364–7068
Email: matt.stanford@bclplaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Raymond Audain**
GISKAN SOLOTAROFF & ANDERSON
LLP
1 Rockefeller Plaza
8th Floor
New York, NY 10020
646–835–0773
Email: raudain@gslawny.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sejal Zota**
JUST FUTURES LAW
1629 K Street N.W.
Suite 300
District of Columbia, DC 20006
919–698–5015
Email: sejal@justfutureslaw.org
*ATTORNEY TO BE NOTICED*

**Andrew Tauber**
BRYAN CAVE LEIGHTON PAISNER,
LLP
1155 F Street, NW
Washington, DC 20004
202–508–6111
Email: andrew.tauber@bclplaw.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**RUDOLPH CIVIL**                     represented by **Alexa Jane Thein**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Paul Mach**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah Katelyn Harrell**
(See above for address)

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brooke Valerie Ingoglia**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Geoffrey Pipoly**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ira J Kurzban**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin A. Gregg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Madisen Hursey**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew James Stanford**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Raymond Audain**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sejal Zota**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Andrew Tauber**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**MARLENE GAIL NOBLE**                     represented by  **Alexa Jane Thein**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Paul Mach**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah Katelyn Harrell**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brooke Valerie Ingoglia**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Geoffrey Pipoly**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ira J Kurzban**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin A. Gregg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Madisen Hursey**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew James Stanford**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Raymond Audain**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sejal Zota**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Andrew Tauber**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MARICA MERLINE LAGUERRE**          represented by  **Alexa Jane Thein**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Paul Mach**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah Katelyn Harrell**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brooke Valerie Ingoglia**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Geoffrey Pipoly**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ira J Kurzban**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin A. Gregg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Madisen Hursey**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew James Stanford**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Raymond Audain**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Sejal Zota
(See above for address)
*ATTORNEY TO BE NOTICED*

**Andrew Tauber**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

**VILBRUN DORSAINVIL**                    represented by    **Alexa Jane Thein**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Paul Mach**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah Katelyn Harrell**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brooke Valerie Ingoglia**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Geoffrey Pipoly**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ira J Kurzban**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin A. Gregg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Madisen Hursey**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew James Stanford**

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Raymond Audain**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sejal Zota**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Andrew Tauber**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**DONALD J. TRUMP**             represented by  **Dhruman Y. Sampat**
*President of the United States of America*        DOJ–USAO
                                 Civil Division
                                 601 D St. NW
                                 Washington DC, DC 20530
                                 202–252–2525
                                 Email: dhruman.sampat@usdoj.gov
                                 *LEAD ATTORNEY*
                                 *ATTORNEY TO BE NOTICED*

                                 **Kaitlin Kerry Eckrote**
                                 DOJ–USAO
                                 Civil Division
                                 601 D Street NW
                                 Room 7.1525
                                 Washington DC, DC 20530
                                 202–252–2485
                                 Email: kaitlin.eckrote@usdoj.gov
                                 *TERMINATED: 09/28/2025*
                                 *LEAD ATTORNEY*
                                 *ATTORNEY TO BE NOTICED*

                                 **Amanda Torres**
                                 OFFICE OF THE ATTORNEY
                                 GENERAL FOR THE DISTRICT OF
                                 COLUMBIA
                                 400 6th Street NW
                                 Washington, DC 20001
                                 202–807–0368
                                 Email: amanda.torres@usdoj.gov
                                 *ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

**UNITED STATES OF AMERICA**                                    represented by   **Dhruman Y. Sampat**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kaitlin Kerry Eckrote**
(See above for address)
*TERMINATED: 09/28/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amanda Torres**
(See above for address)
*ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

**DEPARTMENT OF HOMELAND
SECURITY**                                                     represented by   **Dhruman Y. Sampat**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kaitlin Kerry Eckrote**
(See above for address)
*TERMINATED: 09/28/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amanda Torres**
(See above for address)
*ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

**KRISTI L. NOEM**                                             represented by   **Dhruman Y. Sampat**
*Secretary of Homeland Security*                                               (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kaitlin Kerry Eckrote**
(See above for address)
*TERMINATED: 09/28/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amanda Torres**
(See above for address)
*ATTORNEY TO BE NOTICED*

**<u>Amicus</u>**

represented by

**AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS (AFL–CIO)**

Matthew Ginsburg
815 Sixteenth Street, NW
Washington, DC 20006
202–637–5397
Email: mginsburg@aflcio.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Andrew Lyubarsky
AFL–CIO
815 16th Street, NW
Washington, DC 20006
202–227–8969
Email: alyubarsky@aflcio.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Amicus

**SERVICE EMPLOYEES INTERNATIONAL UNION**                represented by    Matthew Ginsburg
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Andrew Lyubarsky
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Amicus

**AMERICAN FEDERATION OF TEACHERS**                represented by    Matthew Ginsburg
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Andrew Lyubarsky
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Amicus

**UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION**                represented by    Matthew Ginsburg
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Andrew Lyubarsky
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Amicus

| | | |
|---|---|---|
| **UNITE HERE** | represented by | **Matthew Ginsburg**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Andrew Lyubarsky**<br>(See above for address)<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |

<u>Amicus</u>

| | | |
|---|---|---|
| **NATIONAL NURSES UNITED** | represented by | **Matthew Ginsburg**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Andrew Lyubarsky**<br>(See above for address)<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |

<u>Amicus</u>

| | | |
|---|---|---|
| **IUE–CWA** | represented by | **Matthew Ginsburg**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Andrew Lyubarsky**<br>(See above for address)<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |

<u>Amicus</u>

| | | |
|---|---|---|
| **INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTSWORKERS** | represented by | **Matthew Ginsburg**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Andrew Lyubarsky**<br>(See above for address)<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |

<u>Amicus</u>

| | | |
|---|---|---|
| **COMMONWEALTH OF MASSACHUSETTS** | represented by | **Tasha J Bahal**<br>ATTORNEY GENERAL, MASSACHUSEETTS<br>One Ashburton Place<br>Boston, MA 02108<br>617–963–2066 |

Email: tasha.bahal@mass.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**STATE OF CALIFORNIA**

**Amicus**

**STATE OF NEW YORK**

**Amicus**

**STATE OF CONNECTICUT**

**Amicus**

**STATE OF DELAWARE**

**Amicus**

**STATE OF HAWAI'I**

**Amicus**

**STATE OF ILLINOIS**

**Amicus**

**STATE OF MAINE**

**Amicus**

**STATE OF MARYLAND**

**Amicus**

**STATE OF MICHIGAN**

**Amicus**

**STATE OF MINNESOTA**

**Amicus**

**STATE OF NEW JERSEY**

**Amicus**

**STATE OF NEVADA**

**Amicus**

**STATE OF OREGON**

**Amicus**

**STATE OF RHODE ISLAND**

<u>Amicus</u>

**STATE OF VERMONT**

<u>Amicus</u>

**STATE OF WASHINGTON**

<u>Amicus</u>

**DISTRICT OF COLUMBIA**

<u>Amicus</u>

**MEMBERS OF CONGRESS**                represented by    **Justin A. Redd**
KRAMON & GRAHAM, P.A.
750 E. Pratt Street
Suite 1100
Baltimore, MD 21202
410–752–6030
Email: <u>jredd@kg–law.com</u>
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen J. Van Stempvoort**
MILLER JOHNSON
45 Ottawa Ave SW Ste 1100
Grand Rapids, MI 49503
616–831–1700
Email: <u>vanstempvoorts@millerjohnson.com</u>
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amanda Rauh–Bieri**
MILLER JOHNSON
45 Ottawa Ave SW Ste 1100
Grand Rapids, MI 49503
616–831–1786
Email: <u>rauhbieria@millerjohnson.com</u>
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amy Elizabeth Murphy**
MILLER JOHNSON
45 Ottawa Ave SW Ste 1100
Grand Rapids, MI 49503
616–831–1742
Email: <u>murphya@millerjohnson.com</u>
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**D. Andrew Portinga**
MILLER JOHNSON

45 Ottawa Ave SW Ste 1100
Grand Rapids, MI 49503
616–831–1700
Email: portingaa@millerjohnson.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**JAMES REARDON**                    represented by  **JAMES REARDON**
Haitian Legal Defense and Education Fund
1834 Centre Street
#320060
West Roxbury, MA 02132
PRO SE

| Date Filed | # | Docket Text |
|---|---|---|
| 07/30/2025 | 1 | COMPLAINT against KRISTI NOEM, THE DEPARTMENT OF HOMELAND SECURITY, DONALD J. TRUM UNITED STATES OF AMERICA ( Filing fee $ 405 receipt number ADCDC–11854036) filed by MARLENE GA NOBLE, RUDOLPH CIVIL, MARICA MERLINE LAGUERRE, FRITZ EMMANUEL LESLY MIOT, VILBRUN DORSAINVIL. (Attachments: # 1 Civil Cover Sheet)(Tauber, Andrew) (Entered: 07/30/2025) |
| 07/31/2025 | | RESOLVED.....NOTICE of Provisional/Government Not Certified Status re 1 COMPLAINT against KRISTI NOE DEPARTMENT OF HOMELAND SECURITY, DONALD J. TRUMP, UNITED STATES OF AMERICA ( Filing 405 receipt number ADCDC–11854036) filed by MARLENE GAIL NOBLE, RUDOLPH CIVIL, MARICA MERI LAGUERRE, FRITZ EMMANUEL LESLY MIOT, VILBRUN DORSAINVIL. (Attachments: # 1 Civil Cover Sheet)(Tauber, Andrew). <br><br> Your attorney renewal/government certification has not been received. As a result, your membership with the U.S. I & Bankruptcy Courts for the District of Columbia is not in good standing, and you are not permitted to file. Pursuar Local Civil Rule 83.9, you must immediately correct your membership status by following the appropriate instructic this page of our website: https://www.dcd.uscourts.gov/attorney–renewal. <br><br> Please be advised that the presiding judge in this case has been notified that you are currently not in good standing t this court. Renewal Due by 8/6/2025. (zhcn) Modified on 8/13/2025 (zhcn). (Entered: 07/31/2025) |
| 07/31/2025 | 2 | NOTICE of Appearance by Sejal Zota on behalf of All Plaintiffs (Zota, Sejal) (Entered: 07/31/2025) |
| 07/31/2025 | | NOTICE OF NEW CASE ERROR regarding 1 Complaint,. The following error(s) need correction: Noncompliance LCvR 5.1(c). Please file a Notice of Errata stating the error and attach the corrected initiating pleading to include the & full residence address of each party and file using the event Errata. Attorney is not an Active bar member. Please the court website for Bar Status Lookup, Attorney Admissions, and Renewal Information at www.dcd.uscourts.gov/attorneys. **COMPLIANCE DEADLINE is by close of business today. This case will not proceed any further until all errors are satisfied.** (zmbs) (Entered: 07/31/2025) |
| 07/31/2025 | 3 | ERRATA by RUDOLPH CIVIL, VILBRUN DORSAINVIL, MARICA MERLINE LAGUERRE, FRITZ EMMAN LESLY MIOT, MARLENE GAIL NOBLE re Notice of Error– New Case,,. (Attachments: # 1 Exhibit A, # 2 Exhib B)(Tauber, Andrew) (Entered: 07/31/2025) |
| 07/31/2025 | 4 | SEALED DOCUMENT filed by RUDOLPH CIVIL, VILBRUN DORSAINVIL, MARICA MERLINE LAGUERR FRITZ EMMANUEL LESLY MIOT, MARLENE GAIL NOBLE re Notice of Error– New Case,, (This document i SEALED and only available to authorized persons.)(Tauber, Andrew) (Entered: 07/31/2025) |

| 08/01/2025 | | Case Assigned to Judge Amy Berman Jackson. (zmbs) (Entered: 08/01/2025) |
|---|---|---|
| 08/01/2025 | | NOTICE OF NEW CASE ERROR regarding 1 Complaint,. The following error(s) need correction: Missing summo Please locate the summons applicable to your case at www.dcd.uscourts.gov/new–case–forms and file using the eve Request for Summons to issue. (zmbs) (Entered: 08/01/2025) |
| 08/01/2025 | 5 | REQUEST FOR SUMMONS TO ISSUE *to United States of America* filed by MARLENE GAIL NOBLE, RUDOL CIVIL, MARICA MERLINE LAGUERRE, FRITZ EMMANUEL LESLY MIOT, VILBRUN DORSAINVIL. Rela document: 1 Complaint, filed by MARICA MERLINE LAGUERRE, MARLENE GAIL NOBLE, VILBRUN DORSAINVIL, FRITZ EMMANUEL LESLY MIOT, RUDOLPH CIVIL.(Tauber, Andrew) (Entered: 08/01/2025) |
| 08/01/2025 | 6 | REQUEST FOR SUMMONS TO ISSUE *to Kristi Lynn Arnold Noem* filed by MARLENE GAIL NOBLE, RUDOL CIVIL, MARICA MERLINE LAGUERRE, FRITZ EMMANUEL LESLY MIOT, VILBRUN DORSAINVIL. Rela document: 1 Complaint, filed by MARICA MERLINE LAGUERRE, MARLENE GAIL NOBLE, VILBRUN DORSAINVIL, FRITZ EMMANUEL LESLY MIOT, RUDOLPH CIVIL.(Tauber, Andrew) (Entered: 08/01/2025) |
| 08/01/2025 | 7 | REQUEST FOR SUMMONS TO ISSUE *to U.S. Department of Homeland Security* filed by MARLENE GAIL NO RUDOLPH CIVIL, MARICA MERLINE LAGUERRE, FRITZ EMMANUEL LESLY MIOT, VILBRUN DORSA Related document: 1 Complaint, filed by MARICA MERLINE LAGUERRE, MARLENE GAIL NOBLE, VILBRU DORSAINVIL, FRITZ EMMANUEL LESLY MIOT, RUDOLPH CIVIL.(Tauber, Andrew) (Entered: 08/01/2025) |
| 08/01/2025 | 8 | REQUEST FOR SUMMONS TO ISSUE *to Donald J. Trump* filed by MARLENE GAIL NOBLE, RUDOLPH CIV MARICA MERLINE LAGUERRE, FRITZ EMMANUEL LESLY MIOT, VILBRUN DORSAINVIL. Related doc 1 Complaint, filed by MARICA MERLINE LAGUERRE, MARLENE GAIL NOBLE, VILBRUN DORSAINVIL, EMMANUEL LESLY MIOT, RUDOLPH CIVIL.(Tauber, Andrew) (Entered: 08/01/2025) |
| 08/01/2025 | 9 | SUMMONS (4) Issued Electronically as to All Defendants. (Attachments: # 1 Summons, # 2 Summons, # 3 Summo Notice and Consent)(zmbs) (Entered: 08/01/2025) |
| 08/01/2025 | | NOTICE OF NEW CASE ERROR regarding 1 Complaint,. The following error(s) need correction: Missing summo U.S. government. When naming a U.S. government agent or agency as a defendant, you must supply a summons for defendant & two additional summonses for the U.S. Attorney & U.S. Attorney General. Please submit using the eve Request for Summons to Issue. (zmbs) (Entered: 08/01/2025) |
| 08/01/2025 | 10 | REQUEST FOR SUMMONS TO ISSUE filed by MARLENE GAIL NOBLE, RUDOLPH CIVIL, MARICA MER LAGUERRE, FRITZ EMMANUEL LESLY MIOT, VILBRUN DORSAINVIL. Related document: 1 Complaint, fi MARICA MERLINE LAGUERRE, MARLENE GAIL NOBLE, VILBRUN DORSAINVIL, FRITZ EMMANUEL LESLY MIOT, RUDOLPH CIVIL.(Tauber, Andrew) (Entered: 08/01/2025) |
| 08/05/2025 | 11 | SUMMONS (1) Issued Electronically as to U.S. Attorney General (Attachments: # 1 Notice and Consent)(zdp) (Ent 08/05/2025) |
| 08/06/2025 | 12 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Geoffrey M. Pipoly, Filing fee $ 100, receipt numbe ADCDC–11871250. Fee Status: Fee Paid. by RUDOLPH CIVIL, VILBRUN DORSAINVIL, MARICA MERLINE LAGUERRE, FRITZ EMMANUEL LESLY MIOT, MARLENE GAIL NOBLE. (Attachments: # 1 Declaration, # 2 Exhibit 2, # 3 Text of Proposed Order)(Tauber, Andrew) (Entered: 08/06/2025) |
| 08/07/2025 | | MINUTE ORDER granting 12 Motion for Leave of Geoffrey M. Pipoly to Appear Pro Hac Vice only upon conditio the lawyer admitted, or at least one member of the lawyer's firm, undergo CM/ECF training, obtain a CM/ECF user and password, and agree to file papers electronically. No court papers will be mailed to any lawyer. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instruction Signed by Judge Amy Berman Jackson on 8/7/25. (DMK) (Entered: 08/07/2025) |
| 08/08/2025 | 13 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Madisen Hursey, Filing fee $ 100, receipt number ADCDC–11877540. Fee Status: Fee Paid. by RUDOLPH CIVIL, VILBRUN DORSAINVIL, MARICA MERLINE LAGUERRE, FRITZ EMMANUEL LESLY MIOT, MARLENE GAIL NOBLE. (Attachments: # 1 Declaration of |

| | | |
|---|---|---|
| | | Madisen Hursey, # 2 Exhibit 1 M. Hursey Certificate of Good Standing, # 3 Text of Proposed Order)(Tauber, Andr... (Entered: 08/08/2025) |
| 08/08/2025 | 14 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Alexa Thein, Filing fee $ 100, receipt number ADCDC–11877675. Fee Status: Fee Paid. by RUDOLPH CIVIL, VILBRUN DORSAINVIL, MARICA MERLINE LAGUERRE, FRITZ EMMANUEL LESLY MIOT, MARLENE GAIL NOBLE. (Attachments: # 1 Declaration of Jane Thein, # 2 Exhibit 1 A. Thein Certificate of Good Standing, # 3 Text of Proposed Order)(Tauber, Andrew) (En... 08/08/2025) |
| 08/08/2025 | 15 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Matthew Stanford, Filing fee $ 100, receipt number ADCDC–11877771. Fee Status: Fee Paid. by RUDOLPH CIVIL, VILBRUN DORSAINVIL, MARICA MERLINE LAGUERRE, FRITZ EMMANUEL LESLY MIOT, MARLENE GAIL NOBLE. (Attachments: # 1 Declaration, # 2 of Proposed Order)(Tauber, Andrew) (Entered: 08/08/2025) |
| 08/11/2025 | 16 | NOTICE of Appearance by Geoffrey Pipoly on behalf of RUDOLPH CIVIL, VILBRUN DORSAINVIL, MARICA MERLINE LAGUERRE, FRITZ EMMANUEL LESLY MIOT, MARLENE GAIL NOBLE (Pipoly, Geoffrey) (En... 08/11/2025) |
| 08/12/2025 | | MINUTE ORDER granting 13 14 15 Motions for Leave of Madisen Hursey, Alexa Thein, and Matthew Stanford to Pro Hac Vice only upon condition that the lawyers admitted, or at least one member of the lawyers' firm, undergo C training, obtain a CM/ECF username and password, and agree to file papers electronically. No court papers will be r to any lawyer. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LC 83.6(a)** Click for instructions. Signed by Judge Amy Berman Jackson on 08/12/2025. (DMK) (Entered: 08/12/2025) |
| 08/18/2025 | 17 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. KRISTI NOEM served on 8/8/2025 ( Andrew) (Entered: 08/18/2025) |
| 08/18/2025 | 18 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. THE DEPARTMENT OF HOMELA SECURITY served on 8/8/2025 (Tauber, Andrew) (Entered: 08/18/2025) |
| 08/18/2025 | 19 | AFFIDAVIT of Mailing re DONALD J. TRUMP (Tauber, Andrew) Modified docket text on 8/19/2025 (znmw). (E... 08/18/2025) |
| 08/18/2025 | 20 | AFFIDAVIT of Mailing re U.S. Attorney (Tauber, Andrew) Modified docket text on 8/19/2025 (znmw). (Entered: 08/18/2025) |
| 08/18/2025 | 21 | ENTERED IN ERROR.....AFFIDAVIT re 1 Complaint, *Affidavit of Mailing upon United States of America c/o Pa... Jo Bondi, U.S. Attorney General* by RUDOLPH CIVIL, VILBRUN DORSAINVIL, MARICA MERLINE LAGUE... FRITZ EMMANUEL LESLY MIOT, MARLENE GAIL NOBLE. (Tauber, Andrew) Modified on 8/19/2025; refile... docket entry 22 (znmw). (Entered: 08/18/2025) |
| 08/18/2025 | 22 | AFFIDAVIT of Mailing re U.S. Attorney General. (Tauber, Andrew) Modified event title on 8/19/2025 (znmw). (E... 08/18/2025) |
| 08/19/2025 | 23 | ENTERED IN ERROR.....RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the Di... Columbia Attorney General. Date of Service Upon District of Columbia Attorney General 8/4/2025. Answer due fo... D.C. DEFENDANTS by 8/25/2025. (Tauber, Andrew) Modified on 8/20/2025; refiled as docket entry 24 (znmw). (Entered: 08/19/2025) |
| 08/19/2025 | 24 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date... Service Upon United States Attorney on 8/4/2025. Answer due for ALL FEDERAL DEFENDANTS by 10/3/2025. (Tauber, Andrew) (Entered: 08/19/2025) |
| 08/20/2025 | 25 | NOTICE of Appearance by Matthew James Stanford on behalf of All Plaintiffs (Stanford, Matthew) (Entered: 08/20... |
| 08/20/2025 | 26 | MOTION to Stay *–– Plaintiffs' Motion and Memorandum of Law in support of Motion for a Stay Under 5 U.S.C. §...* RUDOLPH CIVIL, VILBRUN DORSAINVIL, MARICA MERLINE LAGUERRE, FRITZ EMMANUEL LESLY... |

| | | |
|---|---|---|
| | | MARLENE GAIL NOBLE. (Attachments: # <u>1</u> Exhibit 1 Expert Report of Happel, # <u>2</u> Exhibit 2 Miot Declaration, # Exhibit 3 Civil Declaration, # <u>4</u> Exhibit 4 Noble Declaration, # <u>5</u> Exhibit 5 Laguerre Declaration, # <u>6</u> Exhibit 6 Dors Declaration, # <u>7</u> Exhibit 7 Reichlin–Melnick Declaration)(Pipoly, Geoffrey) (Entered: 08/20/2025) |
| 08/21/2025 | 27 | NOTICE of Appearance by Kevin A. Gregg on behalf of All Plaintiffs (Gregg, Kevin) (Main Document 27 replaced 8/22/2025) (znmw). (Entered: 08/21/2025) |
| 08/22/2025 | | RESOLVED.....NOTICE of Provisional/Government Not Certified Status re <u>27</u> NOTICE of Appearance by Kevin A Gregg on behalf of All Plaintiffs (Gregg, Kevin).<br><br>Your attorney renewal/government certification has not been received. As a result, your membership with the U.S. I & Bankruptcy Courts for the District of Columbia is not in good standing, and you are not permitted to file. Pursua Local Civil Rule 83.9, you must immediately correct your membership status by following the appropriate instructi this page of our website: https://www.dcd.uscourts.gov/attorney–renewal.<br><br>Please be advised that the presiding judge in this case has been notified that you are currently not in good standing t this court. Renewal Due by 8/29/2025. (zapb) Modified on 8/22/2025 (zhcn). (Entered: 08/22/2025) |
| 08/25/2025 | | MINUTE ORDER. The Court ORDERS the parties to appear for a motion hearing re: <u>26</u> MOTION to stay on Augu 2025, at 12 p.m. Signed by Judge Ana C. Reyes on 08/25/2025. (lcacr2) (Entered: 08/25/2025) |
| 08/25/2025 | | MINUTE ORDER. The Court ORDERS the Defendants to inform the Court by 9:30 a.m. on August 26, 2025, whet they agree with Plaintiffs assertion in <u>26</u> MOTION to Stay (at p. 2 n.3) that Haiti's TPS designation will not expire u February 3, 2026. Signed by Judge Ana C. Reyes on 08/25/2025. (lcacr2) (Entered: 08/25/2025) |
| 08/25/2025 | 28 | Case directly reassigned to Judge Ana C. Reyes as the case was transferred by consent. Judge Amy Berman Jackson longer assigned to the case. (rj) (Entered: 08/25/2025) |
| 08/25/2025 | 29 | NOTICE of Appearance by Kaitlin Kerry Eckrote on behalf of All Defendants (Eckrote, Kaitlin) (Entered: 08/25/20 |
| 08/25/2025 | 30 | STANDING ORDER. The Court orders the parties to comply with the Court's Standing Order. See Order for details Signed by Judge Ana C. Reyes on 08/25/2025. (lcacr2) (Entered: 08/25/2025) |
| 08/26/2025 | 31 | RESPONSE TO ORDER OF THE COURT re Order, filed by KRISTI NOEM, DONALD J. TRUMP, UNITED ST OF AMERICA. (Attachments: # <u>1</u> Exhibit, # <u>2</u> Exhibit)(Eckrote, Kaitlin) (Entered: 08/26/2025) |
| 08/26/2025 | | MINUTE ORDER. The Court VACATES the hearing scheduled for August 26, 2025, at 12 p.m. The Court ORDEF briefing on <u>26</u> MOTION to Stay on the following schedule: Defendants shall file their opposition on or before Septe 2025, and Plaintiffs shall file their reply on or before September 10, 2025. The parties shall address the effects of the Defendants' <u>31</u> RESPONSE TO ORDER OF THE COURT on this litigation. The Court further ORDERS the partie reach out to the Courtroom Deputy (Chashawn_White@dcd.uscourts.gov) to schedule a motion hearing the week of September 15, 2025. Signed by Judge Ana C. Reyes on 08/26/2025. (lcacr2) (Entered: 08/26/2025) |
| 08/27/2025 | | Set/Reset Deadlines/Hearings: Response to <u>26</u> due by 9/3/2025. Reply due by 9/10/2025. (zcdw) (Entered: 08/27/20 |
| 08/27/2025 | 32 | NOTICE of Appearance by Alexa Jane Thein on behalf of All Plaintiffs (Thein, Alexa) (Entered: 08/27/2025) |
| 08/27/2025 | 33 | NOTICE of Appearance by Madisen Hursey on behalf of All Plaintiffs (Hursey, Madisen) (Entered: 08/27/2025) |
| 08/27/2025 | 34 | NOTICE of Appearance by Matthew Ginsburg on behalf of AMERICAN FEDERATION OF LABOR AND CONC OF INDUSTRIAL ORGANIZATIONS (AFL–CIO), SERVICE EMPLOYEES INTERNATIONAL UNION, AME FEDERATION OF TEACHERS, UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION UNITE HERE, NATIONAL NURSES UNITED, IUE–CWA, INTERNATIONAL UNION OF BRICKLAYERS A ALLIED CRAFTSWORKERS (Ginsburg, Matthew) (Entered: 08/27/2025) |
| 08/27/2025 | 35 | Unopposed MOTION for Leave to File Amicus Brief by AMERICAN FEDERATION OF LABOR AND CONGRI INDUSTRIAL ORGANIZATIONS (AFL–CIO), AMERICAN FEDERATION OF TEACHERS, INTERNATIONA |

| | | |
|---|---|---|
| | | UNION OF BRICKLAYERS AND ALLIED CRAFTSWORKERS, IUE–CWA, NATIONAL NURSES UNITED, SERVICE EMPLOYEES INTERNATIONAL UNION, UNITE HERE, UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION. (Attachments: # 1 Proposed Amicus Brief, # 2 Text of Proposed Order)(Ginsburg, Matthew) (Entered: 08/27/2025) |
| 08/27/2025 | | MINUTE ORDER granting 35 Motion for Leave to File Amicus Brief. The Court GRANTS this unopposed Motion Signed by Judge Ana C. Reyes on 08/27/2025. (lcacr2) (Entered: 08/27/2025) |
| 08/27/2025 | 36 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Andrew Lyubarsky, Filing fee $ 100, receipt number ADCDC–11916747. Fee Status: Fee Paid. by AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS (AFL–CIO), AMERICAN FEDERATION OF TEACHERS, INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTSWORKERS, IUE–CWA, NATIONAL NURSES UNITED, SERVICE EMPLOYEES INTERNATIONAL UNION, UNITE HERE, UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION. (Attachments: # 1 Declaration, # 2 Certificate of Good Standing, # 3 Text Proposed Order)(Ginsburg, Matthew) (Entered: 08/27/2025) |
| 08/27/2025 | | MINUTE ORDER granting 36 Motion for Leave to Appear Pro Hac Vice. Attorney Andrew Lyubarsky is admitted vice. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a** Click for instructions. Signed by Judge Ana C. Reyes on 08/27/2025. (lcacr2) Modified on 8/27/2025 to update orde and type (zcdw). (Entered: 08/27/2025) |
| 08/27/2025 | 37 | AMICUS BRIEF by AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZA (AFL–CIO), AMERICAN FEDERATION OF TEACHERS, INTERNATIONAL UNION OF BRICKLAYERS AN ALLIED CRAFTSWORKERS, IUE–CWA, NATIONAL NURSES UNITED, SERVICE EMPLOYEES INTERNATIONAL UNION, UNITE HERE, UNITED FOOD AND COMMERCIAL WORKERS INTERNATION UNION. (Ginsburg, Matthew) (Entered: 08/27/2025) |
| 08/28/2025 | 38 | NOTICE of Appearance by Andrew Lyubarsky on behalf of AMERICAN FEDERATION OF LABOR AND CONG OF INDUSTRIAL ORGANIZATIONS (AFL–CIO), AMERICAN FEDERATION OF TEACHERS, INTERNATIO UNION OF BRICKLAYERS AND ALLIED CRAFTSWORKERS, IUE–CWA, NATIONAL NURSES UNITED, SERVICE EMPLOYEES INTERNATIONAL UNION, UNITE HERE, UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION (Lyubarsky, Andrew) (Entered: 08/28/2025) |
| 08/28/2025 | 39 | MOTION for Extension of Time to File Response/Reply as to 26 MOTION to Stay – – *Plaintiffs' Motion and Memorandum of Law in support of Motion for a Stay Under 5 U.S.C. § 705* by DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM, DONALD J. TRUMP, UNITED STATES OF AMERICA. (Attachments: # 1 Text of Proposed Order)(Eckrote, Kaitlin) (Entered: 08/28/2025) |
| 08/28/2025 | | MINUTE ORDER granting 39 Motion for Extension of Time to File Response/Reply. The Court ORDERS briefing MOTION to Stay on the following schedule: Defendants shall file their opposition on or before September 10, 2025 Plaintiffs shall file their reply on or before September 17, 2025. The Court further ORDERS the parties to reach out Courtroom Deputy (Chashawn_White@dcd.uscourts.gov) to schedule a motion hearing the week of September 22, Signed by Judge Ana C. Reyes on 08/28/2025. (lcacr2) (Entered: 08/28/2025) |
| 08/28/2025 | | Set/Reset Deadlines/Hearings: Response to 26 due by 9/10/2025. Reply due by 9/17/2025. (zcdw) (Entered: 08/28/2 |
| 08/28/2025 | 40 | ENTERED IN ERROR..... MOTION for Briefing Schedule – – *Motion to Waive Pre–Motion Conference Requirem and to Set Briefing Schedule* by VILBRUN DORSAINVIL, MARICA MERLINE LAGUERRE, FRITZ EMMANU LESLY MIOT, MARLENE GAIL NOBLE. (Attachments: # 1 Exhibit A)(Pipoly, Geoffrey) Modified on 8/29/2025 refiled as docket entry 41 (znmw). (Entered: 08/28/2025) |
| 08/28/2025 | 41 | MOTION for Briefing Schedule – – *Corrected Motion to Waive Pre–Motion Conference Requirements and to Set B Schedule* by RUDOLPH CIVIL, VILBRUN DORSAINVIL, MARICA MERLINE LAGUERRE, FRITZ EMMANU LESLY MIOT, MARLENE GAIL NOBLE. (Attachments: # 1 Exhibit A)(Pipoly, Geoffrey) (Entered: 08/28/2025) |
| 08/29/2025 | | |

| | | |
|---|---|---|
| | | MINUTE ORDER. The Court ORDERS the parties to appear for a joint status conference at 2 p.m. on August 29, 2 Zoom. Signed by Judge Ana C. Reyes on 08/29/2025. (lcacr2) (Entered: 08/29/2025) |
| 08/29/2025 | | Set/Reset Deadlines/Hearings: Status Conference set for 8/29/2025 at 2:00 PM via videoconference before Judge Ar Reyes. (zcdw) (Entered: 08/29/2025) |
| 08/29/2025 | 42 | Memorandum in opposition to re 41 MOTION for Briefing Schedule −− *Corrected Motion to Waive Pre−Motion Conference Requirements and to Set Briefing Schedule* filed by DEPARTMENT OF HOMELAND SECURITY, DONALD J. TRUMP, UNITED STATES OF AMERICA. (Attachments: # 1 Text of Proposed Order)(Eckrote, Kai (Entered: 08/29/2025) |
| 08/29/2025 | 43 | NOTICE of Appearance by Ira J Kurzban on behalf of All Plaintiffs (Kurzban, Ira) (Main Document 43 replaced on 8/29/2025) (znmw). (Entered: 08/29/2025) |
| 08/29/2025 | | MINUTE ORDER. The Court is aware of Remarks that Ambassador Dorothy C. Shea, Acting U.S. Representative t United Nations, delivered at the U.N. Security Council on August 28, 2025 (available at https://usun.usmission.gov/remarks−at−a−un−security−council−briefing−on−haiti−7/). The Court will require the pa at the appropriate time, to address their relevance to this litigation. Signed by Judge Ana C. Reyes on 08/29/2025. (l (Entered: 08/29/2025) |
| 08/29/2025 | | Minute Entry for proceedings held before Judge Ana C. Reyes: Status Conference held on 8/29/2025. For the reason on the record, defendant directed to submit a response to the Court's inquiry by 9/17/2025. (Court Reporter: William Zaremba) (zcdw) (Entered: 08/29/2025) |
| 09/02/2025 | 44 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Daniel P. Mach, Filing fee $ 100, receipt number ADCDC−11927697. Fee Status: Fee Paid. by VILBRUN DORSAINVIL, MARICA MERLINE LAGUERRE, FRIT EMMANUEL LESLY MIOT, MARLENE GAIL NOBLE. (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(Tauber, Andrew) (Entered: 09/02/2025) |
| 09/02/2025 | | MINUTE ORDER granting 44 Motion for Leave to Appear Pro Hac Vice. Attorney Daniel P. Mach is admitted pro vice. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(** Click for instructions. Signed by Judge Ana C. Reyes on 09/02/2025. (lcacr2) Modified on 9/3/2025 to update order (zcdw). (Entered: 09/02/2025) |
| 09/03/2025 | 45 | TRANSCRIPT OF STATUS CONFERENCE VIA ZOOM PROCEEDINGS before Judge Ana C. Reyes held on Au 29, 2025; Page Numbers: 1−52. Court Reporter/Transcriber: William Zaremba; Email: William_Zaremba@dcd.uscourts.gov. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purc from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcrip formats, (multi−page, condensed, PDF or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript wil made available to the public via PACER without redaction after 90 days. The policy, which includes the five person identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 9/24/2025. Redacted Transcript Deadline set for 10/4/2025. Release of Transcript Restriction 12/2/2025.(Zaremba, William) (Entered: 09/03/2025) |
| 09/03/2025 | | MINUTE ORDER. The Court ORDERS that on or before September 17, 2025, Defendants shall inform the Court, i writing, of the Secretary's intention regarding the issuance of a new Federal Register notice regarding Haiti's current designation. On September 19, 2025, the parties shall file a joint status report with their proposals for next steps and dates based on Defendants' September 17 filing. Signed by Judge Ana C. Reyes on 09/03/2025. (lcacr2) (Entered: 09/03/2025) |

| | | |
|---|---|---|
| 09/03/2025 | | Set/Reset Deadlines/Hearings: Defendant's notice of intention due by 9/17/2025. Joint Status Report due by 9/19/20 (zcdw) (Entered: 09/03/2025) |
| 09/03/2025 | 46 | NOTICE of Appearance by Tasha J Bahal on behalf of COMMONWEALTH OF MASSACHUSETTS (Bahal, Tasl (Entered: 09/03/2025) |
| 09/03/2025 | 47 | AMICUS BRIEF *of the Commonwealth of Massachusetts, States of New York, California, and 15 other states* by COMMONWEALTH OF MASSACHUSETTS, STATE OF CALIFORNIA, STATE OF NEW YORK, STATE OF CONNECTICUT, STATE OF DELAWARE, STATE OF HAWAI'I, STATE OF ILLINOIS, STATE OF MAINE, S OF MARYLAND, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEW JERSEY, STATE OF NEVADA, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT, STATE OF WASHING DISTRICT OF COLUMBIA. (Bahal, Tasha) Modified to add filers on 9/10/2025 (znmw). (Entered: 09/03/2025) |
| 09/10/2025 | 48 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Raymond Audain, Filing fee $ 100, receipt number ADCDC–11948182. Fee Status: Fee Paid. by RUDOLPH CIVIL, VILBRUN DORSAINVIL, MARICA MERLINE LAGUERRE, FRITZ EMMANUEL LESLY MIOT, MARLENE GAIL NOBLE. (Attachments: # 1 Declaration, # 2 of Proposed Order)(Tauber, Andrew) (Entered: 09/10/2025) |
| 09/10/2025 | | MINUTE ORDER granting 48 Motion for Leave to Appear Pro Hac Vice. Attorney Raymond Audain is admitted p vice. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a** Click for instructions. Signed by Judge Ana C. Reyes on 09/10/2025. (lcacr2) (Entered: 09/10/2025) |
| 09/12/2025 | 49 | MOTION for Leave to File Amicus Brief by MEMBERS OF CONGRESS. (Attachments: # 1 Exhibit, # 2 Text of Proposed Order)(Redd, Justin) (Entered: 09/12/2025) |
| 09/12/2025 | | MINUTE ORDER granting 49 Motion for Leave to File Amicus Brief. The Court GRANTS this Motion. Signed by Ana C. Reyes on 09/12/2025. (lcacr2) (Entered: 09/12/2025) |
| 09/12/2025 | 50 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Stephen J. van Stempvoort, Filing fee $ 100, receipt ADCDC–11954405. Fee Status: Fee Paid. by MEMBERS OF CONGRESS. (Attachments: # 1 Exhibit, # 2 Exhibit, Text of Proposed Order)(Redd, Justin) (Entered: 09/12/2025) |
| 09/12/2025 | 51 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Amanda L. Rauh–Bieri, Filing fee $ 100, receipt nu ADCDC–11954420. Fee Status: Fee Paid. by MEMBERS OF CONGRESS. (Attachments: # 1 Exhibit, # 2 Exhibit, Text of Proposed Order)(Redd, Justin) (Entered: 09/12/2025) |
| 09/12/2025 | | MINUTE ORDER granting 50 Motion for Leave to Appear Pro Hac Vice. Attorney Stephen J. van Stempvoort is ac pro hac vice. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCv 83.6(a).** Click for instructions. Signed by Judge Ana C. Reyes on 09/12/2025. (lcacr2) Modified on 9/12/2025 to up order type (zcdw). (Entered: 09/12/2025) |
| 09/12/2025 | 52 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Amy E. Murphy, Filing fee $ 100, receipt number ADCDC–11954435. Fee Status: Fee Paid. by MEMBERS OF CONGRESS. (Attachments: # 1 Exhibit, # 2 Exhibit, Text of Proposed Order)(Redd, Justin) (Entered: 09/12/2025) |
| 09/12/2025 | | MINUTE ORDER granting 51 Motion for Leave to Appear Pro Hac Vice. Attorney Amanda L. Rauh–Bieri is admi hac vice. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 8:** Click for instructions. Signed by Judge Ana C. Reyes on 09/12/2025. (lcacr2) (Entered: 09/12/2025) |
| 09/12/2025 | 53 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– D. Andrew Portinga, Filing fee $ 100, receipt numbe ADCDC–11954455. Fee Status: Fee Paid. by MEMBERS OF CONGRESS. (Attachments: # 1 Errata, # 2 Exhibit, # of Proposed Order)(Redd, Justin) (Entered: 09/12/2025) |
| 09/12/2025 | | MINUTE ORDER granting 52 Motion for Leave to Appear Pro Hac Vice. Attorney Amy E. Murphy is admitted pr vice. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a** Click for instructions. Signed by Judge Ana C. Reyes on 09/12/2025. (lcacr2) (Entered: 09/12/2025) |

| | | |
|---|---|---|
| 09/12/2025 | | MINUTE ORDER granting <u>53</u> Motion for Leave to Appear Pro Hac Vice. Attorney D. Andrew Portinga is admitted hac vice. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83** Click for instructions. Signed by Judge Ana C. Reyes on 09/12/2025. (lcacr2) (Entered: 09/12/2025) |
| 09/12/2025 | <u>54</u> | AMICUS BRIEF by MEMBERS OF CONGRESS. (mg) (Entered: 09/15/2025) |
| 09/16/2025 | <u>55</u> | NOTICE of Appearance by Stephen J. Van Stempvoort on behalf of MEMBERS OF CONGRESS (Van Stempvoor Stephen) (Entered: 09/16/2025) |
| 09/16/2025 | <u>56</u> | NOTICE of Appearance by D. Andrew Portinga on behalf of MEMBERS OF CONGRESS (Portinga, D.) (Entered: 09/16/2025) |
| 09/16/2025 | <u>57</u> | NOTICE of Appearance by Amanda Rauh–Bieri on behalf of MEMBERS OF CONGRESS (Rauh–Bieri, Amanda) (Entered: 09/16/2025) |
| 09/16/2025 | <u>58</u> | NOTICE of Appearance by Amy Elizabeth Murphy on behalf of MEMBERS OF CONGRESS (Murphy, Amy) (Ent 09/16/2025) |
| 09/17/2025 | <u>59</u> | STATUS REPORT by KRISTI NOEM, DONALD J. TRUMP, UNITED STATES OF AMERICA. (Eckrote, Kaitli (Entered: 09/17/2025) |
| 09/19/2025 | <u>60</u> | Joint STATUS REPORT by RUDOLPH CIVIL, VILBRUN DORSAINVIL, MARICA MERLINE LAGUERRE, F EMMANUEL LESLY MIOT, MARLENE GAIL NOBLE. (Pipoly, Geoffrey) (Entered: 09/19/2025) |
| 09/22/2025 | | MINUTE ORDER denying without prejudice <u>26</u> Motion to Stay as moot; and <u>41</u> Motion for Briefing Schedule. In l (1) the parties' "agree[ment] that Secretary Noem's partial vacatur has been set aside," *see* Mem. Decision & Order, *Evangelical Clergy Ass'n v. Trump*, No. 25–cv–1464 (E.D.N.Y. July 28, 2025), Dkt. 70 at 5; (2) the government's w indicating that Haiti's current TPS designation lasts through February 3, 2026 (https://www.uscis.gov/humanitarian/temporary–protected–status/temporary–protected–status–designated–country and (3) the government's representation in <u>60</u> Joint Status Report that the Secretary will publish notice of new agend action regarding Haiti's TPS status by December 5, 2025, the Court DENIES these Motions without prejudice. Shou Defendants reinstate the Secretary's partial vacatur in the interim, this Court is prepared to adjudicate a renewed Mo Stay on an expedited basis and stay the partial vacatur in the interim if appropriate.<br><br>The Court ORDERS the parties to file a joint status report within two business days of publication of the Secretary's decision proposing next steps. Signed by Judge Ana C. Reyes on 09/22/2025. (lcacr2) (Entered: 09/22/2025) |
| 09/26/2025 | <u>61</u> | NOTICE of Appearance by Raymond Audain on behalf of RUDOLPH CIVIL, VILBRUN DORSAINVIL, MARIC MERLINE LAGUERRE, FRITZ EMMANUEL LESLY MIOT, MARLENE GAIL NOBLE (Audain, Raymond) (E 09/26/2025) |
| 09/26/2025 | <u>62</u> | MOTION for Reconsideration re Order on Motion to Stay,,,,,, Order on Motion for Briefing Schedule,,,,, by RUDO CIVIL, VILBRUN DORSAINVIL, MARICA MERLINE LAGUERRE, FRITZ EMMANUEL LESLY MIOT, MA GAIL NOBLE. (Attachments: # <u>1</u> Exhibit HECA Notice of Appeal)(Pipoly, Geoffrey). Added MOTION for Briefin Schedule on 9/29/2025 (znmw). (Entered: 09/26/2025) |
| 09/26/2025 | | MINUTE ORDER. The Court ORDERS the parties to appear for a status conference on September 29, 2025, at 2 p. discuss <u>62</u> Motion for Reconsideration. Signed by Judge Ana C. Reyes on 09/26/2025. (lcacr2) (Entered: 09/26/202 |
| 09/28/2025 | <u>63</u> | NOTICE OF SUBSTITUTION OF COUNSEL by Dhruman Y. Sampat on behalf of All Defendants Substituting fo attorney Kaitlin K. Eckrote (Sampat, Dhruman) (Entered: 09/28/2025) |
| 09/28/2025 | <u>64</u> | NOTICE OF SUBSTITUTION OF COUNSEL by Dhruman Y. Sampat on behalf of All Defendants Substituting fo attorney Kaitlin K. Eckrote (Sampat, Dhruman) (Entered: 09/28/2025) |
| 09/29/2025 | | Minute Entry for proceedings held before Judge Ana C. Reyes: Motion Hearing held on 9/29/2025 re <u>62</u> MOTION Reconsideration re Order on Motion to Stay, Order on Motion for Briefing Schedule MOTION for Briefing Schedul |

| | | |
|---|---|---|
| | | by MARICA MERLINE LAGUERRE, MARLENE GAIL NOBLE, VILBRUN DORSAINVIL, FRITZ EMMANU LESLY MIOT, RUDOLPH CIVIL. The Court hears argument from both sides. ECF <u>62</u> is hereby DENIED for reaso forth on the record. Order forthcoming via Chambers. (Court Reporter Christine Asif.) (zcll) (Entered: 09/29/2025) |
| 09/29/2025 | | MINUTE ORDER. As stated at today's status conference, the Court ORDERS the Defendants to file a response on o before September 30, 2025, at 2 p.m., informing the Court whether Haiti's TPS designation will remain in effect thro February 3, 2026, for all putative class members in this case. The Court additionally ORDERS that insofar as the administrative record will be relevant to this litigation in the next few months, the Government expeditiously and contemporaneously compile such a record. Signed by Judge Ana C. Reyes on 09/25/2025. (lcacr2) (Entered: 09/29/2 |
| 09/30/2025 | 65 | RESPONSE TO ORDER OF THE COURT re Order,, filed by DEPARTMENT OF HOMELAND SECURITY, KR NOEM, DONALD J. TRUMP, UNITED STATES OF AMERICA. (Sampat, Dhruman) (Entered: 09/30/2025) |
| 10/23/2025 | 66 | NOTICE of Appearance by Daniel Paul Mach on behalf of All Plaintiffs (Mach, Daniel) (Entered: 10/23/2025) |
| 10/28/2025 | 67 | MOTION to Certify Class – – *Plaintiffs' Motion for Class Certification and Appointment of Class Counsel* by RUD CIVIL, VILBRUN DORSAINVIL, MARICA MERLINE LAGUERRE, FRITZ EMMANUEL LESLY MIOT, MA GAIL NOBLE. (Pipoly, Geoffrey). Added MOTION to Appoint Lead Counsel on 10/29/2025 (znmw). (Entered: 10/28/2025) |
| 10/29/2025 | | MINUTE ORDER. The Court ORDERS the Government to respond to <u>67</u> Motion for Class Certification by Novem 2025. Plaintiffs may reply by November 12, 2025. The Court will not toll deadlines in this case according to the Chi Judge's Standing Order No. 25–55 (JEB) during the lapse of appropriations. The Court will hold a hearing on the m November 17, 2025, at 3:30 p.m. in Courtroom 12. Signed by Judge Ana C. Reyes on 10/29/2025. (lcacr2) Modifie 10/29/2025 to correct typo. (zcdw). (Entered: 10/29/2025) |
| 10/29/2025 | | MINUTE ORDER. The Court ORDERS the parties to appear for a status conference on December 9, 2025, at 11 a.r courtroom 12. Signed by Judge Ana C. Reyes on 10/29/2025. (lcacr2) (Entered: 10/29/2025) |
| 10/29/2025 | | Set/Reset Deadlines/Hearings: Response to <u>67</u> due by 11/7/2025. Reply due by 11/12/2025. Motion Hearing set for 11/17/2025 at 3:30 PM in Courtroom 12 before Judge Ana C. Reyes. Status Conference set for 12/9/2025 at 11:00 A Courtroom 12 before Judge Ana C. Reyes. (zcdw) (Entered: 10/29/2025) |
| 11/07/2025 | 68 | Memorandum in opposition to re <u>67</u> MOTION to Certify Class – – *Plaintiffs' Motion for Class Certification and Appointment of Class Counsel* MOTION to Appoint Lead Counsel filed by DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM, DONALD J. TRUMP, UNITED STATES OF AMERICA. (Attachments: # <u>1</u> Declara Daniel Andrade)(Sampat, Dhruman) (Entered: 11/07/2025) |
| 11/12/2025 | 69 | REPLY to opposition to motion re <u>67</u> Motion to Certify Class,, Motion to Appoint Lead Counsel, filed by VILBRU DORSAINVIL, MARICA MERLINE LAGUERRE, FRITZ EMMANUEL LESLY MIOT, MARLENE GAIL NOE (Attachments: # <u>1</u> Exhibit A)(Pipoly, Geoffrey) (Entered: 11/12/2025) |
| 11/17/2025 | | MINUTE ORDER. The hearing scheduled for November 17, 2025, at 3:30 p.m. will be made accessible to the publi telephonically via the Courtroom Public Access Line. The Public Access telephone number is 1–833–990–9400, an meeting ID is 787605272. Persons remotely accessing court proceedings are reminded of the general prohibition aga photographing, recording, and rebroadcasting any court proceedings (including those held by telephone or videoconference). Violation of these prohibitions may result in sanctions, including removal of court–issued media credentials, restricted entry/denial of entry to future hearings, or any other sanctions the Court deems necessary. Sig Judge Ana C. Reyes on 11/17/2025. (lcacr2) (Entered: 11/17/2025) |
| 11/17/2025 | | MINUTE ORDER. As stated at today's motion hearing, Defendants may file a 5–page sur–reply with respect to <u>67</u> to Certify Class by December 1, 2025, at 12 p.m. Signed by Judge Ana C. Reyes on 11/17/2025. (lcacr2) (Entered: 11/17/2025) |
| 11/17/2025 | | Minute Entry for proceedings held before Judge Ana C. Reyes: Motion Hearing held on 11/17/2025 re <u>67</u> Plaintiffs' for Class Certification and Appointment of Class Counsel. Motion heard and taken under advisement. (Court Repor |

| | | Edwards) (zcdw) (Entered: 11/18/2025) |
|---|---|---|
| 11/18/2025 | 70 | NOTICE of Appearance by Amanda Torres on behalf of All Defendants (Torres, Amanda) (Entered: 11/18/2025) |
| 11/19/2025 | | Set/Reset Deadlines/Hearings: Defendants' sur–reply due by 12/1/2025. (zcdw) (Entered: 11/19/2025) |
| 11/26/2025 | 71 | TRANSCRIPT OF MOTION HEARING before Judge Ana C. Reyes held on November 17, 2025; Page Numbers: Date of Issuance: November 26, 2025. Court Reporter/Transcriber Lisa Edwards, Telephone number (202) 354–326 Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purch from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcrip formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will made available to the public via PACER without redaction after 90 days. The policy, which includes the five person identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 12/17/2025. Redacted Transcript Deadline set for 12/27/2025. Release of Transcript Restrict for 2/24/2026.(Edwards, Lisa) (Entered: 11/26/2025) |
| 11/26/2025 | | MINUTE ORDER. The Court ORDERS the parties to appear for a joint status conference on December 1, 2025, at in light of the release of the unpublished version of the Secretary's Notice regarding the termination of Haiti's TPS s The parties may appear by video. Signed by Judge Ana C. Reyes on 11/26/2025. (lcacr3) (Entered: 11/26/2025) |
| 11/30/2025 | | Set/Reset Deadlines/Hearings: Status Conference set for 12/1/2025 at 11:00 AM via videoconference before Judge A Reyes. (zcdw) (Entered: 11/30/2025) |
| 12/01/2025 | 72 | SURREPLY to RE 67 MOTION to Certify Class *Class Certification* filed by DEPARTMENT OF HOMELAND SECURITY, DONALD J. TRUMP, UNITED STATES OF AMERICA. (Attachments: # 1 Exhibit A)(Sampat, Dhr Modified to add link on 12/2/2025 (znmw). (Entered: 12/01/2025) |
| 12/01/2025 | | MINUTE ORDER. As discussed at today's status conference, Plaintiffs shall file their amended complaint on or bef December 5, 2025. Defendants shall file, on or before December 10, 2025, a certified administrative record for the a decisions at issue in this action.<br><br>The parties shall submit a joint status report on the need for additional discovery on or before December 15, 2025, a p.m. The Court will hold a hearing regarding discovery issues on December 18, 2025, at 2 p.m.<br><br>The Court will hold a motion hearing on January 6, 2026, at 10:30 a.m. The parties shall submit a proposed briefing schedule with respect to the papers the Court should consider at that hearing on or before December 8, 2025.<br><br>The Court VACATES the status conference previously set for December 9, 2025. Signed by Judge Ana C. Reyes or 12/1/2025. (lcacr2) (Entered: 12/01/2025) |
| 12/01/2025 | | Minute Entry for hybrid proceedings held before Judge Ana C. Reyes: Status Conference held on 12/1/2025. (Court Reporter: Christine Asif) (zcdw) (Entered: 12/01/2025) |
| 12/05/2025 | 73 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Sarah Katelyn Wear Harrell, Filing fee $ 100, receip number ADCDC–12118438. Fee Status: Fee Paid. by RUDOLPH CIVIL, VILBRUN DORSAINVIL, MARICA MERLINE LAGUERRE, FRITZ EMMANUEL LESLY MIOT, MARLENE GAIL NOBLE. (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(Tauber, Andrew) (Entered: 12/05/2025) |
| 12/05/2025 | 74 | |

| | | |
|---|---|---|
| | | AMENDED COMPLAINT –– *Amended Class Action Complaint* against All Defendants filed by RUDOLPH CIVIL, FRITZ EMMANUEL LESLY MIOT, MARLENE GAIL NOBLE, MARICA MERLINE LAGUERRE, VILBRUN DORSAINVIL.(Pipoly, Geoffrey) (Entered: 12/05/2025) |
| 12/07/2025 | 75 | NOTICE *of Filing of Redlined Complaint* by RUDOLPH CIVIL, VILBRUN DORSAINVIL, MARICA MERLINE LAGUERRE, FRITZ EMMANUEL LESLY MIOT, MARLENE GAIL NOBLE re 74 Amended Complaint (Attach # 1 Redline of Complaint and Amended Complaint)(Pipoly, Geoffrey) (Entered: 12/07/2025) |
| 12/08/2025 | | NOTICE OF ERROR regarding 73 MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Sarah Katelyn W Harrell, Filing fee $ 100, receipt number ADCDC–12118438. Fee Status: Fee Paid.. The following error(s) need con Pro Hac Vice motion must be accompanied by a Certificate of Good Standing issued within the last 30 days (LCvR 83.2(c)(2)). Please file certificate as an Errata (znmw) (Entered: 12/08/2025) |
| 12/08/2025 | 76 | PROPOSED BRIEFING SCHEDULE re Order,,, by DEPARTMENT OF HOMELAND SECURITY, KRISTI NOE DONALD J. TRUMP, UNITED STATES OF AMERICA. (Sampat, Dhruman) (Entered: 12/08/2025) |
| 12/09/2025 | | MINUTE ORDER. The Court ORDERS the parties to brief their motions according to the timeline set forth in their Proposed Briefing Schedule. Signed by Judge Ana C. Reyes on 12/9/2025. (lcacr2) (Entered: 12/09/2025) |
| 12/09/2025 | | Set/Reset Deadlines/Hearings: Motion to Dismiss due by 12/12/2025. Response to Motion to Dismiss due by 12/24/ Reply to Motion to Dismiss due by 1/2/2026. Motion for Interim Relief under § 705 due by 12/12/2025. Response to Motion for Interim Relief due by 12/24/2025. Reply for Interim Relief due by 1/2/2026. (zcdw) (Entered: 12/09/2025) |
| 12/09/2025 | 77 | ERRATA *to Motion for Admission of Attorney Sarah Katelyn Wear Harrell Pro Hac Vice* by RUDOLPH CIVIL, VILBRUN DORSAINVIL, MARICA MERLINE LAGUERRE, FRITZ EMMANUEL LESLY MIOT, MARLENE NOBLE re 73 Motion for Leave to Appear Pro Hac Vice,. (Tauber, Andrew) (Entered: 12/09/2025) |
| 12/10/2025 | | MINUTE ORDER granting 73 Motion for Leave to Appear Pro Hac Vice. Attorney Sarah Katelyn Wear Harrell is admitted pro hac vice. **Counsel should register for e–filing via PACER and file a notice of appearance pursuan LCvR 83.6(a).** Click for instructions. Signed by Judge Ana C. Reyes on 12/10/2025. (lcacr2) (Entered: 12/10/2025) |
| 12/10/2025 | 78 | ADMINISTRATIVE RECORD by DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM, DONALD J. TRUMP. (Attachments: # 1 Index, # 2 Certification, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit) Amanda) (Entered: 12/10/2025) |
| 12/11/2025 | 79 | ADMINISTRATIVE RECORD by DEPARTMENT OF HOMELAND SECURITY, KRISTI L. NOEM, DONALD TRUMP. (Attachments: # 1 Exhibit)(Torres, Amanda) (Entered: 12/11/2025) |
| 12/12/2025 | 80 | MOTION to Dismiss *Amended Complaint* by DEPARTMENT OF HOMELAND SECURITY, KRISTI L. NOEM, DONALD J. TRUMP, UNITED STATES OF AMERICA. (Sampat, Dhruman) (Entered: 12/12/2025) |
| 12/12/2025 | 81 | MOTION to Stay –– *Plaintiffs' Renewed Motion and Memorandum of Law in support of Renewed Motion to Stay U U.S.C. § 705* by RUDOLPH CIVIL, VILBRUN DORSAINVIL, MARICA MERLINE LAGUERRE, FRITZ EMMANUEL LESLY MIOT, MARLENE GAIL NOBLE. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8)(Tauber, Andrew) (Entered: 12/12/2025) |
| 12/14/2025 | 82 | Joint STATUS REPORT *Regarding the Parties' Papers on Discovery* by DEPARTMENT OF HOMELAND SECU KRISTI L. NOEM, DONALD J. TRUMP, UNITED STATES OF AMERICA. (Sampat, Dhruman) (Entered: 12/14 |
| 12/15/2025 | 83 | NOTICE of Appearance by Sarah Katelyn Harrell on behalf of All Plaintiffs (Harrell, Sarah) (Entered: 12/15/2025) |
| 12/15/2025 | 84 | STATUS REPORT *Regarding Plaintiffs' Position on Discovery* by RUDOLPH CIVIL, VILBRUN DORSAINVIL, MARICA MERLINE LAGUERRE, FRITZ EMMANUEL LESLY MIOT, MARLENE GAIL NOBLE. (Attachmen Exhibit Redacted Decision Memo, # 2 Exhibit 2017 El Salvador Decision Memo, # 3 Exhibit 2017 Haiti Decision M 4 Exhibit 2017 Nicaragua Decision Memo, # 5 Exhibit 2017 Sudan Decision Memo, # 6 Exhibit OP & S Memo Exc |

| | | |
|---|---|---|
| | | 7 Exhibit GAO Report, # 8 Exhibit El Salvador Cable, # 9 Exhibit Honduras Cable, # 10 Exhibit State Dept. Email, Exhibit Clearance and Approval, # 12 Exhibit Clearance and Approval, # 13 Exhibit Plaintiff RFPs)(Pipoly, Geoffre (Entered: 12/15/2025) |
| 12/15/2025 | 85 | RESPONSE re 74 Answer by DEPARTMENT OF HOMELAND SECURITY, KRISTI L. NOEM, DONALD J. TR (Torres, Amanda) Modified event title on 12/16/2025 (znmw). (Entered: 12/15/2025) |
| 12/15/2025 | | MINUTE ORDER. In advance of the December 18, 2025, hearing, the Court ORDERS the parties to provide additi information enumerated below.<br><br>The parties shall submit a joint status report on or before December 17, 2025, at 12 p.m., containing the following information. (1) The parties shall identify cases supporting or rejecting the proposition that the Court may consider comments that the President and other administration officials made on the campaign trail or otherwise outside the a record when the Court evaluates Plaintiffs' APA and Equal Protection claims. At this stage, the parties need only pro case names and citations, without additional discussion. (2) Plaintiffs shall identify by Bates number the approximat pages of the CAR containing documents they believe "were not already available to the public." Dkt. 84 at 3. (3) Defendants shall identify by Bates number all portions of the CAR that constitute "consultation with appropriate age of the Government." 8 U.S.C. § 1254a(b)(3)(A). (4) Defendants shall additionally provide the Court with a complet agencies Defendants consulted in their decision−making process. Defendants shall identify by date each instance of consultation and by name and title each individual with whom they consulted on those dates.<br><br>In addition, Defendants shall convey to the Court on or before December 16, 2025, at 2 p.m., copies of the unredact Decision Memorandum (CAR 195−206) and OP & S Memorandum (CAR 182−194) for in camera review.<br><br>At the December 18, 2025, hearing, Defendants shall make available Juliana Blackwell, Deputy Executive Secretar Department of Homeland Security, should the Court have any questions regarding the compilation of the administrat record. Signed by Judge Ana C. Reyes on 12/15/2025. (lcacr2) (Entered: 12/15/2025) |
| 12/16/2025 | | NOTICE OF ERROR regarding 84 Status Report. Please note the following error(s) for future filings: Incorrect for (Letter)− correspondence is not permitted (LCvR 5.1(a)). All documents must be in pleading format. (znmw) (Enter 12/16/2025) |
| 12/16/2025 | 86 | NOTICE of Compliance by DEPARTMENT OF HOMELAND SECURITY, KRISTI L. NOEM, DONALD J. TRU (Attachments: # 1 Exhibit)(Torres, Amanda) (Entered: 12/16/2025) |
| 12/16/2025 | | MINUTE ORDER. The Court has completed in camera review of the two documents from the CAR it requested con to it in its December 15, 2025, Minute Order. The Court sees no basis for the redaction of either the Decision Memo (CAR 195−206) or the OP & S Memorandum (CAR 182−94). However, the Court will permit Defendants to assert privileges they believe attach to these documents and support such assertions with declarations. Defendants, if they do so, shall file those materials on the docket by December 18, 2025, at 11 a.m. Signed by Judge Ana C. Reyes on 12/16/2025. (lcacr2) (Entered: 12/16/2025) |
| 12/17/2025 | 87 | Joint STATUS REPORT Regarding 12.15 Order by RUDOLPH CIVIL, VILBRUN DORSAINVIL, MARICA ME LAGUERRE, FRITZ EMMANUEL LESLY MIOT, MARLENE GAIL NOBLE. (Attachments: # 1 Exhibit Dahlia Transcript, # 2 Exhibit Government Submission)(Pipoly, Geoffrey) (Entered: 12/17/2025) |
| 12/17/2025 | | MINUTE ORDER. The hearing scheduled for December 18, 2025, at 2 p.m., will be made accessible to the public telephonically via the Courtroom Public Access Line. The Public Access telephone number is 1−833−990−9400, an meeting ID is 787605272. Persons remotely accessing court proceedings are reminded of the general prohibition aga photographing, recording, and rebroadcasting any court proceedings (including those held by telephone or videoconference). Violation of these prohibitions may result in sanctions, including removal of court−issued media credentials, restricted entry/denial of entry to future hearings, or any other sanctions the Court deems necessary. Sig Judge Ana C. Reyes on 12/17/2025. (lcacr2) (Entered: 12/17/2025) |
| 12/17/2025 | 88 | |

| | | |
|---|---|---|
| | | ERRATA *to correct missing exhibit* by RUDOLPH CIVIL, VILBRUN DORSAINVIL, MARICA MERLINE LAGUERRE, FRITZ EMMANUEL LESLY MIOT, MARLENE GAIL NOBLE re 84 Status Report,,.. (Attachment Exhibit Haiti Cable)(Pipoly, Geoffrey) (Entered: 12/17/2025) |
| 12/18/2025 | 89 | RESPONSE TO ORDER OF THE COURT re Order,, filed by DEPARTMENT OF HOMELAND SECURITY, KR NOEM, DONALD J. TRUMP, UNITED STATES OF AMERICA. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Sar Dhruman) (Entered: 12/18/2025) |
| 12/18/2025 | | MINUTE ORDER. At today's status conference, the Court ordered the parties to file a response to a number of its questions. The parties shall submit their responses on or before January 2, 2026, at 12 p.m. Signed by Judge Ana C. on 12/18/2025. (lcacr2) (Entered: 12/18/2025) |
| 12/18/2025 | | Minute Entry for proceedings held before Judge Ana C. Reyes: Status Conference held on 12/18/2025. (Court Repo Christine Asif) (zcdw) Modified on 1/5/2026 to correct hearing date (zcdw). (Entered: 12/19/2025) |
| 12/19/2025 | | Set/Reset Deadlines/Hearings: Response to order of the Court due by noon on 1/2/2026. (zcdw) (Entered: 12/19/202 |
| 12/19/2025 | 90 | AMENDED COMPLAINT – – *Second Amended Class Action Complaint* against All Defendants filed by RUDOLF CIVIL, FRITZ EMMANUEL LESLY MIOT, MARLENE GAIL NOBLE, MARICA MERLINE LAGUERRE, VIL DORSAINVIL.(Pipoly, Geoffrey) (Entered: 12/19/2025) |
| 12/19/2025 | 91 | NOTICE *of Filing Redline of Second Amended Complaint* by RUDOLPH CIVIL, VILBRUN DORSAINVIL, MAR MERLINE LAGUERRE, FRITZ EMMANUEL LESLY MIOT, MARLENE GAIL NOBLE re 90 Amended Compl (Attachments: # 1 Exhibit A)(Pipoly, Geoffrey) (Entered: 12/19/2025) |
| 12/24/2025 | 92 | Memorandum in opposition to re 81 MOTION to Stay – – *Plaintiffs' Renewed Motion and Memorandum of Law in of Renewed Motion to Stay Under 5 U.S.C. § 705* filed by DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM, DONALD J. TRUMP, UNITED STATES OF AMERICA. (Sampat, Dhruman) (Entered: 12/24/2025) |
| 12/24/2025 | 93 | Memorandum in opposition to re 80 MOTION to Dismiss *Amended Complaint* filed by RUDOLPH CIVIL, VILBR DORSAINVIL, MARICA MERLINE LAGUERRE, FRITZ EMMANUEL LESLY MIOT, MARLENE GAIL NOE (Tauber, Andrew) (Entered: 12/24/2025) |
| 12/30/2025 | 94 | NOTICE to the Court submitted by Non Parties; "Let this be filed" signed by Judge Ana C. Reyes on 12/30/2025. (z (Entered: 12/30/2025) |
| 12/30/2025 | | MINUTE ORDER. The Court has filed correspondence its chambers received that potentially concerns this ongoing and its response, at 94 Notice. The Court had consulted counsel in this case and obtained their assent that it could re did. It copied counsel in the exchange. Signed by Judge Ana C. Reyes on 12/30/2025. (lcacr2) (Entered: 12/30/2025 |
| 12/30/2025 | 95 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Brooke V. Ingoglia, Filing fee $ 100, receipt number ADCDC–12159549. Fee Status: Fee Paid. by RUDOLPH CIVIL, VILBRUN DORSAINVIL, MARICA MERLINE LAGUERRE, FRITZ EMMANUEL LESLY MIOT, MARLENE GAIL NOBLE. (Attachments: # 1 Declaration, # 2 of Proposed Order)(Tauber, Andrew) (Entered: 12/30/2025) |
| 12/30/2025 | | MINUTE ORDER granting 95 Motion for Leave to Appear Pro Hac Vice. Attorney Brooke V. Ingoglia is admitted vice. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(** Click for instructions. Signed by Judge Ana C. Reyes on 12/30/2025. (lcacr2) (Entered: 12/30/2025) |
| 12/31/2025 | 96 | NOTICE OF SUPPLEMENTAL AUTHORITY by RUDOLPH CIVIL, VILBRUN DORSAINVIL, MARICA MER LAGUERRE, FRITZ EMMANUEL LESLY MIOT, MARLENE GAIL NOBLE (Attachments: # 1 Exhibit NTPSA Decision)(Pipoly, Geoffrey) (Entered: 12/31/2025) |
| 01/02/2026 | 97 | NOTICE of Appearance by Brooke Valerie Ingoglia on behalf of All Plaintiffs (Ingoglia, Brooke) (Entered: 01/02/2 |
| 01/02/2026 | 98 | RESPONSE TO ORDER OF THE COURT re Order, filed by DEPARTMENT OF HOMELAND SECURITY, KR NOEM, DONALD J. TRUMP. (Attachments: # 1 Exhibit)(Torres, Amanda) (Entered: 01/02/2026) |

| 01/02/2026 | 99 | REPLY to opposition to motion re 80 Motion to Dismiss filed by DEPARTMENT OF HOMELAND SECURITY, L. NOEM, DONALD J. TRUMP. (Torres, Amanda) (Entered: 01/02/2026) |
|---|---|---|
| 01/02/2026 | 100 | REPLY re 81 MOTION to Stay –– *Plaintiffs' Renewed Motion and Memorandum of Law in support of Renewed M Stay Under 5 U.S.C. § 705 –– Plaintiffs' Reply in support of Renewed Motion for a Stay Under 5 U.S.C. § 705* filed RUDOLPH CIVIL, VILBRUN DORSAINVIL, MARICA MERLINE LAGUERRE, FRITZ EMMANUEL LESLY MARLENE GAIL NOBLE. (Pipoly, Geoffrey) Modified event title on 1/5/2026 (znmw). (Entered: 01/02/2026) |
| 01/03/2026 | | MINUTE ORDER. At argument on January 6, 2026, the Court ORDERS counsel for the parties to be well–versed i Certified Administrative Record and the relevant Federal Register notices, including, in particular, the sources cited Fed. Reg. 54733 (Termination Notice). Specifically, the Court has numerous questions regarding the sources cited a footnotes 14 to 22, 28, 33 to 35, and 38 to 48 of the Termination Notice. The Court will not consider any version of not familiar with that source" an acceptable response. Further, the URL address provided at footnote 22 of the Term Notice is for the World Bank's home page on Haiti, and not for the specific document that contains the cited stateme cited language appears similar to that in the HAITI MPO, available at https://thedocs.worldbank.org/en/doc/e408a7e21ba62d843bdd90dc37e61b57–0500032021/related/mpo–hti.pdf. If t Termination Notice meant to cite to a different document, the Government's counsel shall provide the correct citatio argument.<br><br>In addition, the Court ORDERS the Government's counsel to provide at argument the basis, including supporting ca for its claim that the communications between the White House and the Department of Homeland Security are "priv *See* Dkt. 98 at 3. Signed by Judge Ana C. Reyes on 1/3/2026. (lcacr2) (Entered: 01/03/2026) |
| 01/05/2026 | | MINUTE ORDER. The Court ORDERS the parties to be prepared for the argument on January 6, 2026, to continue January 7, 2026.<br><br>The Court further advises the parties that its questioning will proceed, generally sequentially, according to the follow outline: (1) the likelihood of Plaintiffs' success on the merits (with particular focus on the Certified Administrative F and citations in the Termination Notice); (2) the open discovery issues in light of the government's 98 Response to t Court's Order; and (3) the jurisdictional questions the government raises. However, the parties should be prepared to address any and all relevant issues throughout the course of argument.<br><br>Further, in addition to the questions the Court previously posed in its Jan. 3, 2026, Min. Order, the Court ORDERS government to be prepared to discuss on January 6:<br><br>(1) The role, if any, of the DHS staffer mentioned at ¶¶ 244–245 of 90 Second Amended Complaint in other TPS determinations for other countries and more generally, the extent to which the same individual(s) advising the Secre regarding Haiti's designation advised the Secretary as to similar decisions for other TPS–designated countries.<br><br>(2) With respect to the communications/meetings with the White House, when those events occurred, who was invo and whether any agendas were made or notes taken (i.e., information that would be available on a privilege log)––o other question that a court might pose in examining the propriety of the privilege asserted.<br><br>If the government needs additional time to answer these questions, the Court can take them up on January 7. Signed Judge Ana C. Reyes on 1/5/2026. (lcacr2) (Entered: 01/05/2026) |
| 01/05/2026 | | MINUTE ORDER. The hearing scheduled for January 6, 2026, and potentially continuing to January 7, 2026, will b accessible to the public telephonically via the Courtroom Public Access Line. The Public Access telephone number 1–833–990–9400, and the meeting ID is 787605272. Persons remotely accessing court proceedings are reminded of general prohibition against photographing, recording, and rebroadcasting any court proceedings (including those hel telephone or videoconference). Violation of these prohibitions may result in sanctions, including removal of court–i media credentials, restricted entry/denial of entry to future hearings, or any other sanctions the Court deems necessa Signed by Judge Ana C. Reyes on 1/5/2026. (lcacr2) (Entered: 01/05/2026) |

| 01/06/2026 | | Minute Entry for proceedings held before Judge Ana C. Reyes: Motion Hearing begun and held on 1/6/2026 re 80 M to Dismiss Amended Complaint, and 81 Motion to Stay–– Plaintiffs' Renewed Motion and Memorandum of Law in support of Renewed Motion to Stay Under 5 U.S.C. § 705. Motion Hearing continued to 1/7/2026 at 10:00 AM in Courtroom 12 before Judge Ana C. Reyes. (Court Reporters: Christine Asif (AM) and Lisa Edwards (PM). (zcdw) (Entered: 01/06/2026) |
|---|---|---|
| 01/07/2026 | | Minute Entry for proceedings held before Judge Ana C. Reyes: Motion Hearing resumed and concluded on 1/7/2026 Motion to Dismiss Amended Complaint, and 81 Motion to Stay–– Plaintiffs' Renewed Motion and Memorandum of in support of Renewed Motion to Stay Under 5 U.S.C. § 705. Motions heard and taken under advisement. (Court Re Christine Asif) (zcdw) (Entered: 01/07/2026) |
| 01/12/2026 | 101 | TRANSCRIPT OF MOTION HEARING (AFTERNOON SESSION) before Judge Ana C. Reyes held on January 6 Page Numbers: 1–163. Date of Issuance: January 12, 2026. Court Reporter/Transcriber Lisa Edwards, Telephone nu (202) 354–3269, Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purc from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcrip formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript wil made available to the public via PACER without redaction after 90 days. The policy, which includes the five person identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 2/2/2026. Redacted Transcript Deadline set for 2/12/2026. Release of Transcript Restriction 4/12/2026.(Edwards, Lisa) (Entered: 01/12/2026) |
| 01/15/2026 | 102 | MOTION for Leave to File Amicus Brief by JAMES REARDON. (Attachments: # 1 Amicus Brief)(znmw) (Entere 01/16/2026) |
| 01/16/2026 | | MINUTE ORDER granting 102 Motion for Leave to File Amicus Brief. The Court DIRECTS the Clerk of Court to Amicus Curiae Brief by Haitian Legal Defense and Education Fund at Dkt. 102–1. Signed by Judge Ana C. Reyes o 1/16/2026. (lcacr2) (Entered: 01/16/2026) |
| 01/16/2026 | | MINUTE ORDER. Pursuant to its finding at the January 7, 2026, hearing that extra–record discovery is warranted i case, the Court ORDERS that on or before January 21, 2026, at 2 p.m., the Government shall convey to Plaintiffs an Court all discovery materials pertinent to Haiti's TPS designation that (1) are not already in the administrative recor 78) and (2) were cited in the briefing or decisions in the Northern District of California case *National TPS Alliance* (25–cv–1766–EMC).

At that time, the parties shall also file a brief joint status report updating the Court on the status of discovery in this Signed by Judge Ana C. Reyes on 1/16/2026. (lcacr2) (Entered: 01/16/2026) |
| 01/16/2026 | 103 | SUPPLEMENTAL MEMORANDUM to re 80 *Support Motion to Dismiss and Opposition to Motion for Interim Re* filed by DEPARTMENT OF HOMELAND SECURITY, KRISTI L. NOEM, DONALD J. TRUMP, UNITED STA OF AMERICA. (Sampat, Dhruman) Modified to add link on 1/20/2026 (znmw). (Entered: 01/16/2026) |
| 01/16/2026 | 114 | AMICUS BRIEF by JAMES REARDON. (znmw) (Entered: 01/28/2026) |
| 01/19/2026 | 104 | MOTION for Reconsideration *of January 16 Minute Order*, MOTION to Clarify *January 16 Minute Order* by DEPARTMENT OF HOMELAND SECURITY, KRISTI L. NOEM, DONALD J. TRUMP, UNITED STATES OF AMERICA. (Sampat, Dhruman) (Entered: 01/19/2026) |
| 01/19/2026 | | MINUTE ORDER. The Court has reviewed the Government's 104 Motion. The Court ORDERS the parties to appea tomorrow, January 20, 2026, at 12:00 p.m. for an initial hearing on it. Out–of–town counsel may appear by video. |

| | | |
|---|---|---|
| | | For future reference, the parties need not expend valuable time and energy briefing an issue before raising it initially the Court. Reaching out to chambers with an indication that the Government wanted to be heard on the January 16, Minute Order would have sufficed for the Court to order a hearing on the next business day. Signed by Judge Ana C on 1/19/2026. (lcacr2) (Entered: 01/19/2026) |
| 01/19/2026 | 105 | NOTICE *In Advance of 1.20.26 Hearing Concerning Government's Motion to Reconsider* by RUDOLPH CIVIL, VILBRUN DORSAINVIL, MARICA MERLINE LAGUERRE, FRITZ EMMANUEL LESLY MIOT, MARLENE NOBLE re 104 Motion for Reconsideration, Motion to Clarify (Attachments: # 1 Exhibit M & C Email Chain, # 2 E Jan 7 Hrg Tr)(Pipoly, Geoffrey) (Entered: 01/19/2026) |
| 01/20/2026 | | Set/Reset Deadlines/Hearings: Status Conference (Hybrid Hearing) set for 1/20/2026 at 12:00 PM in Courtroom 12 Judge Ana C. Reyes. (zcdw) (Entered: 01/20/2026) |
| 01/20/2026 | | Minute Entry for hybrid proceedings held before Judge Ana C. Reyes: Status Conference held on 1/20/2026. (Court Reporter: N/A) (zcdw) (Entered: 01/20/2026) |
| 01/20/2026 | | MINUTE ORDER granting 104 Motion for Reconsideration; Motion to Clarify. The Court GRANTS this Motion a ORDERS the Government to submit to the Court and to Plaintiffs the small number of documents it requested at too status conference that are cited in *Nat'l TPS All. v. Noem*, 798 F. Supp. 3d 1108 (N.D. Cal. 2025), concerning Haiti's designation, but that do not appear in the CAR for this case. The Government shall do so on or before January 23, 2 12 p.m. The Government may also submit any additional filings on this topic at that time.<br><br>The parties shall also submit a brief joint status report regarding discovery on or before January 23, 2026. Signed by Ana C. Reyes on 1/20/2026. (lcacr2) (Entered: 01/20/2026) |
| 01/20/2026 | 106 | TRANSCRIPT OF PROCEEDINGS before Judge Ana C. Reyes held on 1/6/2026; Page Numbers: 1–128. Date of Issuance:1/20/2026. Court Reporter Christine T. Asif, Telephone number 202–354–3247, Transcripts may be order submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purc from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcrip formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript wil made available to the public via PACER without redaction after 90 days. The policy, which includes the five person identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 2/10/2026. Redacted Transcript Deadline set for 2/20/2026. Release of Transcript Restriction 4/20/2026.(Asif, Christine) (Entered: 01/20/2026) |
| 01/20/2026 | 107 | TRANSCRIPT OF PROCEEDINGS before Judge Ana C. Reyes held on 1/7/2026; Page Numbers: 1–231. Date of Issuance:1/20/2026. Court Reporter Christine T. Asif, Telephone number 202–354–3247, Transcripts may be order submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purc from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcrip formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript wil made available to the public via PACER without redaction after 90 days. The policy, which includes the five person identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. |

| | | |
|---|---|---|
| | | Redaction Request due 2/10/2026. Redacted Transcript Deadline set for 2/20/2026. Release of Transcript Restriction 4/20/2026.(Asif, Christine) (Entered: 01/20/2026) |
| 01/21/2026 | 108 | SUPPLEMENTAL MEMORANDUM to 80 and 81 *Plaintiffs' Motion for Interim Relief Under 5 USC 705 (ECF 81 Plaintiffs' Opposition (ECF 93) to Defendants' Motion to Dismiss, and Plaintiffs' Reply in Support of Motion for Int Relief Under 5 USC 705 (ECF 100)* filed by RUDOLPH CIVIL, VILBRUN DORSAINVIL, MARICA MERLINE LAGUERRE, FRITZ EMMANUEL LESLY MIOT, MARLENE GAIL NOBLE. (Tauber, Andrew) Modified to add on 1/26/2026 (znmw). (Entered: 01/21/2026) |
| 01/23/2026 | 109 | RESPONSE TO ORDER OF THE COURT re Order on Motion for Reconsideration,,, Order on Motion to Clarify,, DEPARTMENT OF HOMELAND SECURITY, KRISTI L. NOEM, DONALD J. TRUMP, UNITED STATES OF AMERICA. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Sampat, Dhruman) (Entered: 01/23/2026) |
| 01/23/2026 | | MINUTE ORDER. For the reasons the Court stated on the record at the January 7, 2026, hearing, Dkt. 107 at 18−31 Court GRANTS in part Plaintiffs' 84 Letter Request Re: Discovery. The Court clarified at the January 20, 2026, hea that Plaintiffs may seek discovery on both their APA and constitutional claims. However, the Court has also stresse discovery shall be limited. It warned that it would be considerably "annoyed" if discovery did not proceed "step−by− and narrowly." Dkt. 107 at 23−24. At this initial phase, Plaintiffs are to identify two custodians and narrow search t *Id.* at 21−28.<br><br>This Minute Order memorializes the Court's ruling and instructions. If either party requests it, the Court shall separa and at a later time set forth in a Memorandum Opinion the reasons it gave on the record to support this Minute Orde Signed by Judge Ana C. Reyes on 1/23/2026. (lcacr2) (Entered: 01/23/2026) |
| 01/23/2026 | 110 | Joint STATUS REPORT *Regarding Discovery* by DEPARTMENT OF HOMELAND SECURITY, KRISTI L. NO DONALD J. TRUMP. (Torres, Amanda) (Entered: 01/23/2026) |
| 01/23/2026 | 111 | NOTICE OF SUPPLEMENTAL AUTHORITY by RUDOLPH CIVIL, VILBRUN DORSAINVIL, MARICA MER LAGUERRE, FRITZ EMMANUEL LESLY MIOT, MARLENE GAIL NOBLE (Attachments: # 1 Exhibit Doe Opinion)(Pipoly, Geoffrey) (Entered: 01/23/2026) |
| 01/26/2026 | 112 | NOTICE *Regarding Plaintiffs' Declarations and Alternate Forms of Relief* by RUDOLPH CIVIL, VILBRUN DORSAINVIL, MARICA MERLINE LAGUERRE, FRITZ EMMANUEL LESLY MIOT, MARLENE GAIL NOB (Pipoly, Geoffrey) (Entered: 01/26/2026) |
| 01/27/2026 | | MINUTE ORDER. The Court intends to take judicial notice of the following source in considering Plaintiffs' Equal Protection claim: C−SPAN, President Trump Speaks at CPAC, C−SPAN.org (Feb. 22, 2025 at 22:11), https://www.c−span.org/program/public−affairs−event/president−trump−speaks−at−cpac/656191. The Court invites parties to file any response to its intention to do so on or before January 29, 2026.<br><br>In addition, the Court has reviewed 110 Joint Status Report. The Court directs the parties to file another joint status on or before January 29, 2026, at 5 p.m. If the parties advise in that report that they have still not resolved the issues regarding search terms, or otherwise require the Court's intervention at this time, the Court will hold a video status conference on Friday, January 30, 2026, at 10:30 a.m. The Court has previously warned the parties that it wishes the to resolve discovery disputes among themselves. The Court will be considerably irritated if instead of working cooperatively toward discovery, the parties require the status conference on January 30, 2026. Signed by Judge Ana Reyes on 1/27/2026. (lcacr3) (Entered: 01/27/2026) |
| 01/28/2026 | 113 | RESPONSE TO ORDER OF THE COURT re Order,,, *(TPS Designations and Terminations)* filed by DEPARTME HOMELAND SECURITY, KRISTI L. NOEM, DONALD J. TRUMP, UNITED STATES OF AMERICA. (Sampa Dhruman) (Entered: 01/28/2026) |
| 01/28/2026 | | Set/Reset Deadlines/Hearings: Response to intentions due by 1/29/2026. Joint Status Report due by 5:00 PM on 1/2 Status Conference set for 1/30/2026 at 10:30 AM via videoconference before Judge Ana C. Reyes. (zcdw) (Entered: |

| | | |
|---|---|---|
| | | 01/28/2026) |
| 01/28/2026 | | MINUTE ORDER. The Court received correspondence today indicating that Plaintiffs have not received responses number of discovery–related communications they sent to the Government. The Court has emphasized&mdash;repeatedly&mdash;that the parties should work through discovery cooperatively. The Court no ORDERS the Government to provide direct (and not dilatory) responses to every outstanding question Plaintiffs hav by 8 p.m. today. If the Government does not do so, the Court will enter a show–cause order as to sanctions. Further, every half–hour that the Government delays past the 8 p.m. deadline, the Court will escalate the amount of sanction contemplating imposing. Signed by Judge Ana C. Reyes on 1/28/2026. (lcacr2) (Entered: 01/28/2026) |
| 01/28/2026 | 115 | MOTION for Reconsideration re Order,,, by KRISTI L. NOEM, DONALD J. TRUMP. (Attachments: # 1 Exhibit, Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit)(Torres, Amanda) (E 01/28/2026) |
| 01/28/2026 | 116 | NOTICE OF SUPPLEMENTAL AUTHORITY by RUDOLPH CIVIL, VILBRUN DORSAINVIL, MARICA MER LAGUERRE, FRITZ EMMANUEL LESLY MIOT, MARLENE GAIL NOBLE (Attachments: # 1 Exhibit NTPSA Decision)(Pipoly, Geoffrey) (Entered: 01/28/2026) |
| 01/29/2026 | 117 | NOTICE *Concerning the Government's Motion for Reconsideration* by RUDOLPH CIVIL, VILBRUN DORSAINV MARICA MERLINE LAGUERRE, FRITZ EMMANUEL LESLY MIOT, MARLENE GAIL NOBLE re 115 Moti Reconsideration, (Attachments: # 1 Exhibit Jan. 23 Search Term Counterproposal, # 2 Exhibit Email)(Pipoly, Geoff (Entered: 01/29/2026) |
| 01/29/2026 | | MINUTE ORDER. The Court DENIES the Government's 115 Motion for Reconsideration as moot given that it has responded to Plaintiffs' outstanding discovery questions. Dkt. 115 at 5. The Court does not understand why the Gov felt compelled to submit a nine–page motion to reconsider a directive the Government had already met. The frustrat the Court's January 28, 2026, Minute Order "has served only to require government counsel to spend time away from moving discovery forward in this case," *id.* at 9, is misplaced. The Government has only itself to blame for wasting drafting a motion that was moot from the jump.<br><br>Nor does the Court understand the Motion's indignant tone, given that it took the Government 8 days to provide a hi that can be generated in hours, if not minutes. Snow notwithstanding, the Court and its clerks have worked remotely through the weekend and this week on this matter. Presumably Government counsel likewise had remote access to i computer systems.<br><br>This all said, the Government is correct that the Court has ordered&mdash;and repeatedly emphasized&mdash;narro discovery. Plaintiffs' reliance on overbreadth cases is, as the Government correctly noted, inapposite, as should be o from the Court's repeated admonitions regarding limited discovery.<br><br>Through delay (with both parties at varying degrees of fault), the Court will not have the benefit of any discovery pr the entry of its decision re: 80 Motion to Dismiss; 81 Motion to Stay. The Government's concern seems to be the Co speed; the Court notes its concern is the parties' lack of it. In the future, the Court will move slower if the parties mo faster.<br><br>The Court has now received three separate filings/correspondences about discovery in the last 24 hours, while an impending deadline for it to issue a decision in this action looms. Therefore, should the parties advise the Court that require a status conference tomorrow on such issues, the Court will require that all parties appear in person. No atto will be permitted to attend by Zoom. Signed by Judge Ana C. Reyes on 1/29/2026. (lcacr2) (Entered: 01/29/2026) |
| 01/29/2026 | 118 | RESPONSE TO ORDER OF THE COURT re Order,,,, filed by DEPARTMENT OF HOMELAND SECURITY, K L. NOEM, DONALD J. TRUMP, UNITED STATES OF AMERICA. (Sampat, Dhruman) (Entered: 01/29/2026) |
| 01/29/2026 | 119 | RESPONSE TO ORDER OF THE COURT re Order,,, *(Regarding Information in the Certified Administrative Reco* filed by DEPARTMENT OF HOMELAND SECURITY, KRISTI L. NOEM, DONALD J. TRUMP, UNITED STA |

| | | |
|---|---|---|
| | | OF AMERICA. (Sampat, Dhruman) (Entered: 01/29/2026) |
| 01/29/2026 | | MINUTE ORDER. In light of the parties' correspondence to the Court representing that they do not require the Janu 2026, status conference, the Court VACATES that hearing. Signed by Judge Ana C. Reyes on 1/29/2026. (lcacr2) (E 01/29/2026) |
| 01/29/2026 | 120 | Joint STATUS REPORT *Regarding Discovery* by RUDOLPH CIVIL, VILBRUN DORSAINVIL, MARICA MERI LAGUERRE, FRITZ EMMANUEL LESLY MIOT, MARLENE GAIL NOBLE. (Pipoly, Geoffrey) (Entered: 01/29 |
| 01/30/2026 | 121 | RESPONSE TO ORDER OF THE COURT *Plaintiffs' Response to Court's Request to Take Judicial Notice of Speed* FRITZ EMMANUEL LESLY MIOT (Audain, Raymond) Modified event title on 2/2/2026 (znmw). (Entered: 01/30 |
| 01/31/2026 | 122 | RESPONSE TO ORDER OF THE COURT re Order,,, *(Clarifying Answer Contained at ECF No. 119)* filed by DEPARTMENT OF HOMELAND SECURITY, KRISTI L. NOEM, DONALD J. TRUMP, UNITED STATES OF AMERICA. (Sampat, Dhruman) (Entered: 01/31/2026) |
| 02/01/2026 | | MINUTE ORDER. The Court anticipates lifting the limitations on remote access to electronic files otherwise applic this case. *See* Fed. R. Civ. P. 5.2(c). It further anticipates that all future filings shall be publicly available unless the grants leave to file a document under seal or in redacted form. To the extent the parties object, the Court requests the emailed responses on or before February 2, 2026, at 11 a.m. Signed by Judge Ana C. Reyes on 2/1/2026. (lcacr2) (E 02/01/2026) |
| 02/02/2026 | | MINUTE ORDER. With the consent of both parties, the Court ORDERS the lifting of the limitations on remote acc electronic files otherwise applicable in this case. *See* Fed. R. Civ. P. 5.2(c). Accordingly, the Clerk of Court is direc lift all viewing restrictions on the docket––i.e., to make all prior filings electronically available to the public. All fut filings shall be publicly available unless the Court grants leave to file a document under seal or in redacted form. Sig Judge Ana C. Reyes on 2/2/2026. (lcacr2) (Entered: 02/02/2026) |
| 02/02/2026 | 123 | ORDER granting 81 Renewed Motion for a Stay; denying without prejudice 80 Motion to Dismiss. See document fo details. Signed by Judge Ana C. Reyes on 2/2/2026. (lcacr2) (Entered: 02/02/2026) |
| 02/02/2026 | 124 | MEMORANDUM OPINION regarding Plaintiffs' 81 Renewed Motion for a Stay. See document for details. Signed Judge Ana C. Reyes on 2/2/2026. (lcacr2) (Entered: 02/02/2026) |
| 02/03/2026 | | MINUTE ORDER staying consideration of 67 Motion to Certify a Class. In light of the Court's granting Plaintiffs' Renewed Motion for a Stay, the Court STAYS consideration of the Motion to Certify a Class. Signed by Judge Ana Reyes on 2/3/2026. (lcacr2) (Entered: 02/03/2026) |
| 02/03/2026 | | MINUTE ORDER. The Court thanks all counsel of record for their substantial efforts to date, efforts that have ampl its work. The Court highlights AUSA Dhruman Y. Sampat. His work has been, in a word, exemplary. In a few more been in the very best tradition of AUSAs. Over a two–day motions hearing, he exhibited mastery of an intricate statt regime; three complex doctrinal areas; and a 1,550–page administrative record. And, even with the Court lobbing en questions at him, he did so with good humor throughout. The Court has not before docketed this type of judicial sho but Mr. Sampat's effort demands no less. Signed by Judge Ana C. Reyes on 2/3/2026. (lcacr2) (Entered: 02/03/2026 |
| 02/05/2026 | 125 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 124 Memorandum & Opinion, 123 Order on Motion to Dis Order on Motion to Stay by KRISTI L. NOEM, DONALD J. TRUMP, DEPARTMENT OF HOMELAND SECUR UNITED STATES OF AMERICA. Fee Status: No Fee Paid. (Sampat, Dhruman) (Entered: 02/05/2026) |
| 02/05/2026 | 126 | MOTION to Stay re 123 Order on Motion to Dismiss, Order on Motion to Stay by DEPARTMENT OF HOMELAN SECURITY, KRISTI L. NOEM, DONALD J. TRUMP, UNITED STATES OF AMERICA. (Sampat, Dhruman) (E 02/05/2026) |
| 02/05/2026 | 127 | First MOTION for Briefing Schedule *on Defendant's stay motion (ECF 126)* by RUDOLPH CIVIL, VILBRUN DORSAINVIL, MARICA MERLINE LAGUERRE, FRITZ EMMANUEL LESLY MIOT, MARLENE GAIL NOE (Tauber, Andrew) (Entered: 02/05/2026) |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRITZ EMMANUEL LESLY MIOT, *et al.*,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>DONALD J. TRUMP, President of the United States, *et al.*,<br><br>　　　　　Defendants. | Civil Action No. 25-2471 (ACR) |

## <u>DEFENDANTS' NOTICE OF APPEAL</u>

PLEASE TAKE NOTICE that Defendants hereby appeal to the United States Court of Appeals for the District of Columbia Circuit the Court's February 2, 2026, Order (ECF No. 123), and Memorandum Opinion (ECF No. 124) granting Plaintiffs' motion for relief under 5 U.S.C. § 705.

Dated: February 5, 2026　　　　　　　Respectfully submitted,
　　　　Washington, DC

　　　　　　　　　　　　　　　　　JEANINE FERRIS PIRRO
　　　　　　　　　　　　　　　　　United States Attorney


　　　　　　　　　　　　　　　　　By: _____*/s/ Dhruman Y. Sampat*_____
　　　　　　　　　　　　　　　　　　　DHRUMAN Y. SAMPAT
　　　　　　　　　　　　　　　　　　　Assistant United States Attorney
　　　　　　　　　　　　　　　　　　　601 D Street, NW
　　　　　　　　　　　　　　　　　　　Washington, DC 20530
　　　　　　　　　　　　　　　　　　　(202) 252-2525

　　　　　　　　　　　　　　　　　*Attorneys for the United States of America*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

FRITZ EMMANUEL LESLY MIOT, et al.,

     *Plaintiffs*,

v.                                                                        Case No. 25-cv-02471 (ACR)

DONALD J. TRUMP, et al.,

     *Defendants*.

## ORDER

Having considered the Second Amended Complaint, Dkt. 90, the briefs and arguments of counsel, and the evidence filed in support of and in opposition to Plaintiffs' Renewed Motion for a Stay Under 5 U.S.C. § 705, Dkt. 81, and the Government's Motion to Dismiss, Dkt. 80, and for the reasons detailed in the accompanying Memorandum Opinion, the Court hereby:

**GRANTS** Plaintiffs' Renewed Motion for a Stay Under 5 U.S.C. § 705, Dkt. 81; and so,

**STAYS** (*i.e.*, **POSTPONES**) the effective date of Department of Homeland Security Secretary Kristi Noem's Termination of the Designation of Haiti for Temporary Protected Status, 90 Fed. Reg. 54733 (Nov. 28, 2025) (Termination), pending judicial review. During the stay, the Termination shall be null, void, and of no legal effect. The Termination therefore does not affect the protections and benefits previously conferred by the TPS designation, including work authorization and protection from detention and deportation, and the valid period of work authorization extends during the stay. *See* 8 U.S.C. § 1254a(a)(1)–(2), (d)(4). The Termination also has no effect on the eligibility for work authorization and protection from detention and deportation for individuals, if any, with pending applications. *See id*. § 1254a(a)(4)(B); 8 C.F.R. § 244.10(a), (e).

1

The Court further:

**DENIES** the Government's Motion to Dismiss, Dkt. 80, without prejudice.  The Court's conclusion that it has jurisdiction to hear Plaintiffs' Motion applies equally to the Government's Motion.  The Court's separate conclusion that Plaintiffs are likely to succeed on the merits of their claims necessarily entails its view that they plausibly stated their claims.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  To the extent the Government believes that arguments for dismissal remain outstanding, it may refile a motion to dismiss limited to those issues.

The Government contends that Plaintiffs cannot bring an Administrative Procedure Act claim against the U.S. President.  *See* Dkt. 80 at 36.  The Court need not address this issue, as Plaintiffs have forfeited their APA claim against the President.  *See* Dkt. 93 at 31 n.5.  In any event, nothing in the Memorandum Opinion or this Order, which stays the Secretary's Termination, should be construed as an order constraining the President.

**SO ORDERED.**

Date: February 2, 2026

_____
ANA C. REYES
United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

FRITZ EMMANUEL LESLY MIOT, et al.,

      *Plaintiffs*,

v.

DONALD J. TRUMP, et al.,

      *Defendants*.

Case No. 25-cv-02471 (ACR)

---

## <u>MEMORANDUM OPINION</u>

On December 2, 1783, then-Commander-in-Chief George Washington penned: "America is open to receive not only the Opulent & respected Stranger, but the oppressed & persecuted of all Nations & Religions."[1]  More than two centuries later, Congress reaffirmed President Washington's vision by establishing the Temporary Protected Status (TPS) program.  *See* 8 U.S.C. § 1254a (TPS statute).  It provides humanitarian relief to foreign nationals in the United States who come from disaster-stricken countries.  It also brings in substantial revenue, with TPS holders generating $5.2 billion in taxes annually.  *See* Part VI.

Department of Homeland Security (DHS) Secretary Kristi Noem has a different take.[2]



---

[1] Letter from George Washington to Joshua Holmes (December 2, 1783).

[2] Dkt. 90 (Second Am. Compl.) ¶ 110 n.91. *But see supra* n.1.

1

So says the official responsible for overseeing the TPS program. And one of those (her word) "damn" countries is Haiti.[3] Relevant here, three days before making the above post, Secretary Noem announced she would terminate Haiti's TPS designation as of February 3, 2026. *See* 90 Fed. Reg. 54733 (Nov. 28, 2025) (Termination).

Plaintiffs are five Haitian TPS holders. They are not, it emerges, "killers, leeches, or entitlement junkies." They are instead: Fritz Emmanuel Lesly Miot, a neuroscientist researching Alzheimer's disease, Dkt. 90 (Second Am. Compl. (SAC)) ¶ 1; Rudolph Civil, a software engineer at a national bank, *id.* ¶ 2; Marlene Gail Noble, a laboratory assistant in a toxicology department, *id.* ¶ 3; Marica Merline Laguerre, a college economics major, *id.* ¶ 4; and Vilbrun Dorsainvil, a full-time registered nurse, *id.* ¶ 5. They claim that Secretary Noem's decision violates the Administrative Procedure Act (APA), 5 U.S.C. § 706(2), and the Fifth Amendment of the U.S. Constitution. The Government counters that the Court does not have jurisdiction, and, in any case, the Secretary did not violate the law.

Plaintiffs seek to stay the Secretary's decision under 5 U.S.C. § 705 pending the outcome of this litigation. *See* Dkt. 81 (§ 705 Mot.). To decide their motion, the Court considers first whether it has jurisdiction. It does. *See* Part II. It then considers: whether Plaintiffs have a substantial likelihood of success on the merits; whether they will be irreparably harmed absent a stay; and whether a merged balance of the equities and public interest analysis favors a stay. *See* Part III. Each element favors Plaintiffs. *See* Parts IV, V, and VI.

Plaintiffs charge that Secretary Noem preordained her termination decision and did so because of hostility to nonwhite immigrants. This seems substantially likely. Secretary Noem

---

[3] *See* 90 Fed. Reg. 24497 (June 10, 2025); *see also* USCIS Policy Memorandum, *Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries*, December 2, 2025 (PM-602-0192) (naming Haiti as one of nineteen countries banned from certain immigration relief).

2

has terminated every TPS country designation to have reached her desk—twelve countries up, twelve countries down.  *See* Section IV.A.2.  Her conclusion that Haiti (a majority nonwhite country) faces merely "concerning" conditions cannot be squared with the "perfect storm of suffering" and "staggering" "humanitarian toll" described in page-after-page of the Certified Administrative Record (CAR).  *See* Section IV.A.3.a.  She ignored Congress's requirement that she "review the conditions" in Haiti only "after" consulting "with appropriate agencies." 8 U.S.C. § 1254a(b)(3)(A); *see* Section IV.A.1.  Indeed, she did not consult other agencies at all. *See id*.  Her "national interest" analysis focuses on Haitians outside the United States or here illegally, ignoring that Haitian TPS holders already live here, and legally so.  *See* Section IV.A.3.b.  And though she states that the analysis must include "economic considerations," she ignores altogether the billions Haitian TPS holders contribute to the economy.  *See id*.

The Government's primary response is that the TPS statute gives the Secretary unbounded discretion to make whatever determination she wants, any way she wants.  And, yes, the statute does grant her some discretion.  But not unbounded discretion.  To the contrary, Congress passed the TPS statute to standardize the then *ad hoc* temporary protection system—to replace executive whim with statutory predictability.  *See* Section I.A.

As to irreparable harm, the Government contends that, at most, the harms to Haitian TPS holders are speculative.  But the Department of State (State) warns:



Dkt. 100 (§ 705 Reply) at 20–21.[4]  "Do not travel to Haiti for any reason" does not exactly

scream, as Secretary Noem concluded, suitable for return.  And so, the Government studiously

does not argue that Plaintiffs will suffer no harm if removed to Haiti.  Instead, it argues Plaintiffs

will not certainly suffer irreparable harm because DHS might not remove them.  But this fails to

take Secretary Noem at her word: "WE DON'T WANT THEM.  NOT ONE."  *See* Section

IV.B.2.b.

Finally, the balance of equities and public interest favor a stay.  The Government does not

cite any reason termination must occur post haste.  Secretary Noem complains of strains

unlawful immigrants place on our immigration-enforcement system.  Her answer?  Turn 352,959

lawful immigrants into unlawful immigrants overnight.  She complains of strains to our

economy.  Her answer?  Turn employed lawful immigrants who contribute billions in taxes into

the legally unemployable.  She complains of strains to our healthcare system.  Her answer?  Turn

the insured into the uninsured.  This approach is many things—in the public interest is not one of

them.

For the reasons below, the Court **GRANTS** Plaintiffs' Renewed Motion for a Stay Under

5 U.S.C. § 705, Dkt. 81.

## I.  BACKGROUND

### A.  The TPS Statute

Before Congress passed the TPS Statute, the Executive Branch handled nationality-based

temporary protection through an "ad hoc framework for providing relief to nationals of certain

designated countries."  *Nat'l TPS All. v. Noem* (*NTPSA III*), 150 F.4th 1000, 1010 (9th Cir.

---

[4] Citations to pages in a filing on the docket refer to the page numbers assigned by the Court's CM/ECF system.

4

2025).[5]  This led to haphazard regulations and procedures, resulting in discretionary temporary stays that left recipients uncertain of their immigration status.  In 1990, Congress stepped in to replace chaos with structure by enacting the TPS statute, codified at 8 U.S.C. § 1254a.  Congress wanted "a system of temporary status that was predictable, dependable, and insulated from electoral politics."  *NTPSA III*, 150 F.4th at 1008.  So, it gave first the Attorney General and then the DHS Secretary, *see* 6 U.S.C. § 557, responsibility for the program but prescribed the relevant criteria and applicable process.  It specified the kind of country conditions severe enough to warrant a designation under the statute.  8 U.S.C. § 1254a(b)(1).  It prescribed the specific time frame for any such designation.  *Id.* § 1254a(b)(2).  And it prescribed with specificity the process for periodic review of a TPS designation, which would culminate in either termination or extension of such designation.  *Id.* § 1254a(b)(3).

Before designating a country for TPS, the DHS Secretary must "consult[] with appropriate agencies."  *Id.* § 1254a(b)(1).  And she must find one of three circumstances: that (1) "there is an ongoing armed conflict within the [foreign] state" such that "requiring the return" of nationals "would pose a serious threat to their personal safety"; (2) there has been an "environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions in the area affected" and the foreign state is both "unable, temporarily, to handle adequately the return" of nationals and "has requested [temporary protected status] designation";

---

[5] For the remainder of this Memorandum Opinion, the Court cites the relevant *NTPSA* opinions as follows: *NTPSA I*, 773 F. Supp. 3d 807 (N.D. Cal. 2025) (postponing vacatur/termination decisions on Venezuela's designation); *NTPSA II*, 145 S. Ct. 2728 (May 19, 2025) (staying postponement pending appeal); *NTPSA III*, 150 F.4th 1000 (9th Cir. 2025) (affirming postponement); *NTPSA IV*, 798 F. Supp. 3d 1108 (N.D. Cal. 2025) (setting aside Haiti's partial vacatur decision on summary judgment, and taking related action with respect to Venezuela's designation); *NTPSA V*, 146 S. Ct. 23 (Oct. 3, 2025) (staying district court's summary-judgment order as to the vacatur/termination decisions on Venezuela pending appeal); *NTPSA VI*, No. 25-5724, 2026 WL 226573 (9th Cir. Jan. 28, 2026) (affirming summary-judgment).

or (3) "there exist extraordinary and temporary conditions in the foreign state that prevent [its nationals] from returning to the state in safety, unless the [Secretary] finds that permitting" that country's nationals "to remain temporarily in the United States is contrary to the national interest of the United States." *Id.* § 1254a(b)(1)(A)–(C).

A country's TPS designation does not automatically mean its citizens receive TPS. A foreign national is eligible for TPS only if she meets several criteria, including being otherwise admissible and registering for TPS within a specific time frame. *Id.* § 1254a(c); 8 C.F.R. § 244.2. In addition, a non-citizen waives eligibility for TPS if, among other things, she has been convicted of a felony or two or more misdemeanors in the United States. 8 U.S.C. § 1254a(c)(2)(B).

All initial TPS designations last six to eighteen months. *Id.* § 1254a(b)(2). Before the expiration of a designation, the statute mandates that the Secretary—again, "after consultation with appropriate agencies of the Government"—"review the conditions in the foreign state" and "determine whether the conditions for such designation . . . continue to be met." *Id.* § 1254(a)(b)(3)(A). Following this review, the Secretary determines whether to redesignate, extend, or terminate TPS for the country.

Extension is the default—the designation "shall be extended" unless the Secretary affirmatively determines that conditions are "no longer me[t]." *Id.* § 1254a(b)(3)(C). And Congress did not cap how many times the Secretary can extend the designation. Nor did it set a maximum number of years an individual can hold TPS. The statutory design is straightforward: TPS exists because threats to life exist; when the threat persists, so should TPS protection, unless the Secretary articulates a well-reasoned and well-supported national interest to the contrary.

### B. Factual Background

The Court bases this background on the entire record, including the SAC and the documents the SAC cites, the CAR, exhibits to the parties' pleadings, and party concessions and points of agreement in joint stipulations and at oral argument (altogether, the record).

### 1. *Obama Administration Designates Haiti for TPS*

We begin with an earthquake that registered 7.0 on the Richter scale. 75 Fed. Reg. 3476, 3477 (Jan. 21, 2010). It hit Haiti on January 12, 2010, and precipitated an unprecedented humanitarian crisis. Shortly after, then-DHS Secretary Janet Napolitano, in consultation with State, designated Haiti for TPS due to "extraordinary and temporary conditions." *Id.* at 3476 (citing 8 U.S.C. § 1254a(b)(1)(C)). Haitian nationals in the United States continuously as of January 12, 2010, could thus apply for TPS. *Id.* TPS recipients also obtained the right to remain and work in the United States while Haiti maintained its TPS designation. *Id*. at 3476–77.

Secretary Napolitano set the initial designation for eighteen months. *Id*. at 3476. Unfortunately, repeated environmental and political crises continued to batter the island. Secretary Napolitano and her successor, Jeh Johnson, therefore redesignated Haiti and/or extended its designation on May 19, 2011, 76 Fed. Reg. 29000; October 1, 2012, 77 Fed. Reg. 59943; March 3, 2014, 79 Fed. Reg. 11808; and August 25, 2015, 80 Fed. Red. 51582. "With each of these decisions, DHS outlined conditions arising from the 2010 earthquake in Haiti and its attendant damage to infrastructure, public health, agriculture, transportation, and educational facilities." *Saget v. Trump*, 375 F. Supp. 3d 280, 301 (E.D.N.Y. 2019). "In addition, each extension cited the cholera epidemic and the exacerbation of preexisting vulnerabilities caused by the earthquake, including food insecurity and a housing crisis." *Id.*

7

In the 2015 extension, the Secretary found that conditions prompting the original January 2010 TPS designation, "persist[ed], including a housing shortage, a cholera epidemic, limited access to medical care, damage to the economy, political instability, security risks, limited access to food and water, a heightened vulnerability of women and children, and environmental risks." 80 Fed. Reg. at 51583. The Secretary found that "Haiti lacks sufficient housing units to address its pre-earthquake shortage." *Id*. "Some Haitians have returned to unsafe homes or built houses in informal settlements located in hazardous areas without access to basic services." *Id.* "Even prior to the 2010 earthquake, Haiti had one of the highest rates of hunger and malnutrition in the Western Hemisphere, with 45 percent of the population undernourished and 30 percent of children under 5 suffering from chronic malnutrition." *Id.* Unfortunately, "[d]amage from the 2010 earthquake exacerbated Haiti's historic food security challenges." *Id.*

There was more. Public health, for example, continued to suffer. "The introduction of cholera in Haiti shortly after the earthquake, and its persistence since then, [was] mainly due to the lack of access to clean water and appropriate sanitation facilities." *Id.* And the political situation continued to deteriorate. "The January 2010 earthquake had an immediate impact on governance and the rule of law in Haiti, killing an estimated 18 percent of the country's civil service and destroying key government infrastructure." *Id.* As of 2015, "Haiti was left without a functioning legislative branch or duly elected local authorities. Increasingly, politically and economically motivated protests and demonstrations . . . turned violent." *Id.* at 51584.

### 2.  *First Trump Administration Attempts to Terminate TPS for Haiti*

On January 20, 2017, President Donald J. Trump became the 45th President of the United States.  He expressed little regard for Haiti and Haitians.  He referred to Haiti as a "shithole"[6] country.  *See* § 705 Motion at 46–47.  He also "stated in a June 2017 meeting with then-DHS Secretary Kelly and others that Haitians 'all have AIDS' upon learning 15,000 Haitian people received visas to enter the U.S. that year."  *Saget*, 375 F. Supp. 3d at 371; SAC ¶ 93.  To little surprise, then, his administration attempted to end TPS for Haiti.

Litigation ensued in the Eastern District of New York before Judge William F. Kuntz, II.  *See Saget*, 375 F. Supp. 3d at 280.  In his decision, he laid out the series of events leading to the litigation, which the Court recounts here only for historical context.  In March 2017, career officials at DHS recommended extending TPS for Haiti for eighteen months, through January 22, 2019.  *Id*. at 304–05.  They did so based in large part on United States Citizenship and Immigration Services (USCIS) career analysts' reporting on the effects of Hurricane Matthew, which had made landfall in Haiti in October 2016.  It was "the strongest storm to hit Haiti in more than half a century and caused extensive damage."  *Id.* at 304.  Haiti was "in a state of near total destruction" and "[b]y mid-December 2016 as many as 1.4 million people were in need of

---

[6] Alexander Moritz Frey was the first to use "shithole" as a descriptor of a "wretched place," doing so in his seminal antiwar novel, *The Cross Bearers* (1930).  *See Shithole*, Oxford English Dictionary, https://www.oed.com/search/dictionary/?scope=Entries&q=shithole.

Frey's life story confirms the role democracies can play in welcoming, as George Washington did, "the oppressed and persecuted."  Frey, a prolific author and pacifist, served as a medic in the trenches of World War I alongside Adolf Hitler.  Hitler later tried to convert him to Nazism, but Frey staunchly refused.  He fled Germany in 1933, as Nazis burned his books, raided his apartment, and issued a warrant for his arrest.  He lived his remaining years in exile, first in Austria and then in Switzerland.  *See* Von David Gordon Smith, *Eye-Witness Account of Hitler's WWI Years Found*, Spiegel International (April 30, 2007), https://www.spiegel.de/international/zeitgeist/ rediscovering-alexander-moritz-frey-eye-witness-account-of-hitler-s-wwi-years-found-a-478359.html [https://perma.cc/RU49-2Y4U].

humanitarian assistance." *Id.* Hurricane Matthew "exacerbated" conditions, and career officials highlighted that it would "likely take Haiti years to recover from the damages." *Id.*

Ignoring this information and the recommendation, "new USCIS appointees began to cultivate a record they believed would weigh in favor of termination." *Id.* at 305. These actions leaked to the press. The leaks included that then-DHS Secretary John F. Kelly sought "criminal activity data" of TPS holders, even though no Secretary had before considered that data to assess TPS and even though that data was, in any event, unavailable to USCIS. *Id*. at 305–11.

After substantial public pushback, Secretary Kelly issued a limited six-month extension of TPS to January 22, 2018. *Id*. at 311–12; 82 Fed. Reg. 23830 (May 24, 2017). The Federal Register Notice "cited the effects of more recent natural disasters, such as Hurricane Matthew and extensive flooding in the spring of 2017." *Saget*, 375 F. Supp. 3d at 313. But Secretary Kelly also signaled that the end was near: "[i]t is in the best interest of TPS beneficiaries to prepare for their return to Haiti in the event that Haiti's TPS designation is not extended again." 82 Fed. Reg. at 23832.

The same day that Secretary Kelly granted the six-month extension, "officials at DHS began exploring rationales for terminating TPS for Haiti, recognizing Secretary Kelly—or whoever would be Secretary at the time—would seek termination." *Saget*, 375 F. Supp. 3d at 313. What happened next is a rather long story. *Id.* at 313–28. Bottom line: on November 20, 2017, then-acting-DHS Secretary Elaine C. Duke announced she would terminate TPS for Haiti. *Id*. at 328. The official notice published in January 2018. *See* 83 Fed. Reg. 2648 (Jan. 18, 2018).

After an extensive review of the record and legal analysis, Judge Kuntz found that substantial evidence, "at the very least [raised] serious questions" that the DHS Secretary based the termination decision on "animus toward nonwhite immigrants, including Haitians

10

specifically." *Saget*, 375 F. Supp. 3d at 372.  Based on this and many other legal infirmities, Judge Kuntz held that Plaintiffs were "likely to succeed on and ha[d] raised serious questions going to the merits of their substantive APA claims and equal protection claim." *Id.* at 379.  He enjoined the Government from terminating TPS for Haiti pending a final decision on the merits of the case.  *Id*.  DHS appealed.

Before that appeal concluded, President Joseph R. Biden became the 46th President of the United States.  Subsequently, DHS withdrew the appeal.  *See Saget v. Trump*, No. 18-cv-1599 (E.D.N.Y. Oct. 5, 2021) (Dkt. 164).

### 3.    *The Biden Administration Redesignates Haiti for TPS*

Haiti's deterioration continued.  Gang violence and kidnappings spiked.  86 Fed. Reg. 41863, 41866 (Aug. 3, 2021).  State officials and police became "complicit[] . . . in gang attacks that left hundreds of people dead" and "the government . . . helped to unleash criminal violence on poor neighborhoods, including by providing gangs with money, weapons, police uniforms, and government vehicles."  *Id.*  This support encouraged "gangs to grow to the point where they [could] no longer be reined in, allowing criminality to explode."  *Id.*

On July 7, 2021, an already fragile security situation spiraled when a group of assailants killed Haiti's then-President Jovenel Moïse.  *Id.*  This led to "a deteriorating political crisis, violence, and a staggering increase in human rights abuses."  *Id.* at 41864.  Haiti simultaneously faced "the challenges of 'rising food insecurity and malnutrition, . . . waterborne disease epidemics, and high vulnerability to natural hazards, all of which [were] further exacerbated by the coronavirus disease 2019 (COVID–19) pandemic."  *Id.*

And so, on August 3, 2021, then-DHS Secretary Alejandro N. Mayorkas redesignated and extended Haiti's TPS through February 3, 2023.  *Id.* at 41863.  Just eleven days later, another catastrophic earthquake hit Haiti.  This time, a 7.2-magnitude one "kill[ed] more than 2,200

11

people, injur[ed] 12,700, destroy[ed] 130,000 homes, and le[ft] thousands of people in urgent need of assistance."  88 Fed. Reg. 5022, 5027 (Jan. 26, 2023).  Adding to the environmental crisis, Haitian gangs posed "an increasing threat as they expand[ed] their influence and geographic presence" across the country.  *Id*. at 5025.

Secretary Mayorkas therefore extended and redesignated Haiti, this time effective February 4, 2023, through August 3, 2024.  *Id.* at 5022.  During this period, the situation worsened.  "Haitian law enforcement [was] unable to cope with the level of gang violence," while gangs "expanded their arsenals and upgraded their firepower."  89 Fed. Reg. 54484, 54489 (July 1, 2024).  Extreme weather events continued to pummel the country.  In June 2023, a 4.4 magnitude earthquake and 5.5 magnitude earthquake hit Haiti's west coast only two days apart, causing deaths and destroying homes, blocking roads, and overwhelming healthcare facilities.  *Id*. at 54490.  Simultaneously, Haiti experienced "one of the highest levels of chronic food insecurity in the world with more than half of its total population chronically food insecure and 22 percent of children chronically malnourished."  *Id.*  "Amidst the political, security, and environmental crises, Haiti's economy ha[d] been decimated."  *Id.*

In response to these conditions, on July 1, 2024, Secretary Mayorkas again extended and redesignated Haiti, this time effective from August 4, 2024, through to February 3, 2026.  *Id*. at 54484.  This period—August 4, 2024, to February 3, 2026—is key because the dates bookend the core disputes in this litigation.

12

### *4.  The 2024 Presidential Campaign*

President Trump hit the campaign trail again during the 2024 election cycle.  Time had

not tempered his views on Haiti.  During a presidential debate, he accused Haitians of "eating the

dogs," "eating the cats," and "eating the pets of the people [who] live" in Springfield, Ohio.  *See*

§ 705 Mot. at 36–37; SAC ¶¶ 87–92.  He stated elsewhere that he would

"[a]bsolutely . . . revoke" Haiti's TPS designation and send "them back to their country."  SAC

¶ 60.

### *5.  Second Trump Administration Attempts to End All TPS Designations*

On January 20, 2025, President Trump became the 47th President of the United States.

On January 25, 2025, the Senate confirmed Kristi Noem as the Secretary of DHS.  She

immediately took steps to end Venezuela's TPS designation and, since then, has attempted to

terminate the TPS designation for each country whose periodic review process has come due.

*See infra* Section IV.A.2; Dkt. 113.

On February 24, 2025, Secretary Noem issued a "partial vacatur" of Secretary

Mayorkas's July 2024 extension and redesignation of Haiti for TPS.  She purported to shorten

Haiti's designation period from the existing end date of February 3, 2026, to August 3, 2025.  90

Fed. Reg. 10511, 10511 (Feb. 24, 2025) (Partial Vacatur).  Litigation quickly ensued in the

Eastern District of New York.  In *Haitian Evangelical Clergy Ass'n v. Trump*, Judge Brian M.

Cogan concluded that Secretary Noem lacked statutory authority to issue the Partial Vacatur.  789

F. Supp. 3d 255, 273 (E.D.N.Y. 2025) (*HECA*).  And so, he set aside the Partial Vacatur under the

APA.  *See id.*

Meanwhile, Secretary Noem continued her efforts to terminate TPS for Haiti.  On July 1,

2025, she issued a formal notice purporting to terminate Haiti's TPS designation as of September

2, 2025.  *See* 90 Fed. Reg. 28760 (July 1, 2025) (July Termination).  Other plaintiffs in a

13

different TPS lawsuit in front of Judge Edward M. Chen in the Northern District of California amended their complaint to include a challenge to Secretary Noem's Partial Vacatur and July Termination. *Nat'l TPS All. v. Noem* (*NTPSA*), No. 25-cv-1766 (N.D. Cal. Mar. 20, 2025) (Dkt. 74); *id.* (July 8, 2025) (Dkt. 250). Their initial complaint challenged Secretary Noem's TPS decisions regarding Venezuela.

Enter our Plaintiffs. Independent of the *HECA* and *NTPSA* litigations, on July 30, 2025, Plaintiffs filed this suit to set aside the July Termination. *See* Dkt. 1.

### C. Procedural Background

#### 1. The Parties

Plaintiffs are five Haitian nationals who hold TPS. *See* SAC ¶¶ 1–6. Fritz Emmanuel Lesly Miot is 32 years old and has held TPS since 2011. *Id.* ¶ 1. He is completing his Ph.D. in neuroscience at Loma Linda University in California, where he works on therapies targeting Alzheimer's disease. *Id.* Mr. Miot has Type 1 diabetes and alleges that "[i]n Haiti, neither the insulin nor the specialists" he requires to treat the disease "would be readily accessible, if at all." *Id.*

Rudolph Civil is 23 years old and has held TPS since 2010. *Id.* ¶ 2. He currently works as a software engineer for a major national bank in New York City. *Id.* He financially supports his aunt, her three children, one of whom has Down syndrome, and his grandmother in Haiti. *Id.*

Marlene Gail Noble is 34 years old and has held TPS since 2024. *Id.* ¶ 3. She contracted spinal tuberculosis as a toddler in Haiti, which caused her spinal cord to collapse. *Id.* In 1993, a faith-based organization in Florida brought her to the United States, where she received spinal fusion surgery and obtained temporary humanitarian parole status. *Id.* She currently works as a prep laboratory assistant in a toxicology department. *Id.* She received a second spinal fusion

14

surgery in 2017 and continues to live with kyphosis in spinal tuberculosis.  *Id.*  Ms. Noble plans

to work as a post-mortem forensic toxicologist after pursuing further education.  *Id.*

Marica Merline Laguerre is 21 years old and has held TPS since 2010.  *Id.* ¶ 4.  She

simultaneously obtained a high school and associate degree in biology, along with an Advanced

Regents Diploma, from a New York preparatory high school and the City University of New

York.  *Id.*  She studies economics at Hunter College and aspires to a career in finance.  *Id.*

Finally, Vilbrun Dorsainvil is 34 years old and has held TPS since 2021.  *Id.* ¶ 5.  He

completed medical school and worked as a doctor in Haiti.  *Id.*  He currently works as a

registered nurse at Springfield Regional Medical Center in Ohio.  *Id.*  He financially supports

family members and plans to obtain a Bachelor of Science in Nursing.  *Id.*

Plaintiffs name as Defendants Donald J. Trump in his official capacity as the President of

the United States, Kristi Noem in her capacity as DHS Secretary, DHS, and the United States

(collectively, the Government).  *Id.* ¶¶ 7–10.

### 2.  *The Haiti Litigation Continued*

On August 20, Plaintiffs filed their First § 705 Motion.  Dkt. 26 (First § 705 Mot.).  The

Government confirmed, however, that because of *HECA*, Haiti's TPS designation would expire

no earlier than February 3, 2026, notwithstanding the July Termination.  Dkt. 31; Dkt. 65.

Before briefing concluded on Plaintiffs' First § 705 Motion, Judge Chen in California

entered a final judgment in the *NTPSA* litigation.  *See NTPSA IV*, 798 F. Supp. 3d at 1108.  He

found the Partial Vacatur arbitrary and capricious because it "was preordained without any

meaning[ful] analysis and review."  *Id.* at 1155.  And that the Secretary made it without

consulting government agencies or engaging in a review of country conditions.  *Id.* at 1155–56.

In fact, the only country conditions report in that record "*supported* the Mayorkas

extension/redesignation."  *Id.* at 1156.  Judge Chen found it "ironic, if not disingenuous, for

Secretary Noem to rely on a report which supported the Mayorkas extension/redesignation to *vacate* that extension/redesignation."  *Id.*  He concluded that her decision "was simply driven by her predetermined desire to terminate Haiti's TPS on a hastened timeline."  *Id.*  He granted the *NTPSA* plaintiffs summary judgment and set aside the Secretary's Partial Vacatur under the APA.  *Id*. at 1164.

As for the July Termination, Judge Chen denied the Government's motion to dismiss.  He concluded that "Plaintiffs' APA and Equal Protection claims related to the Haiti termination are . . . plausible as there are allegations in the operative complaint suggesting pretext."  *Id.* at 1159.  These included the following:

> [O]n June 7, 2025, DHS announced in a press release that Haiti's TPS would be terminated, *both* because country conditions had improved and because allowing Haitians to remain temporarily in the United States was against national interest.  However, on July 1, 2025, when the decision to terminate was published in the Federal Register, no mention was made of improved conditions; the decision rested on a national interest assessment alone.  Country conditions were referenced only indirectly in the context of the Secretary's national interest findings—and here there was no mention of any improved conditions; rather, the clear suggestion [was] that there was significant instability in the country.

*Id*.

Anticipating the Government's appeal of his setting aside the Partial Vacatur, however, Judge Chen stayed the July Termination litigation.  *Id*. at 1164–65.

The *HECA* and *NTPSA* decisions impacted this action.  On September 17, 2025, the Government informed the Court that the "[t]he Secretary intends to conduct a review, make a decision regarding Haiti's Temporary Protected Status (TPS) designation, and publish in the Federal Register no later than December 5, 2025."  Dkt. 59 at 1.  Plaintiffs insisted that the Court grant a stay despite the Government's representation.  Dkt. 60 at 2–4.  The Court instead took the

16

Government at its word and denied Plaintiffs' First § 705 Motion as moot and without prejudice. Sept. 22, 2025, Min. Order.

Secretary Noem then issued a decision, published on November 28, 2025, to terminate Haiti's TPS designation as of February 3, 2026. *See* 90 Fed. Reg. at 54733. On December 5, 2025, Plaintiffs filed an amended complaint. Dkt. 74. They renewed their motion to stay on December 12, 2025. *See* § 705 Mot. Also on December 12, the Government filed a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(1) and (b)(6). Dkt. 80 (MTD).

On December 15, 2025, the Court entered an order directing the Government to identify "all portions of the CAR that constitute 'consultation with appropriate agencies of the Government'" under the TPS statute, 8 U.S.C. § 1254a(b)(3)(A). Dec. 15, 2025. Min. Order. The Court also directed the Government to provide "a complete list of agencies" the Secretary "consulted in [her] decision-making process." *Id.*

The Government answered on January 2, 2026. Dkt. 98. It stated that the Secretary had not consulted with the U.S. Ambassador to Haiti, the U.S. Embassy in Haiti, State's regional office or Haiti desk, or Congress in reaching her decision. *Id.* ¶¶ 2–4. She also did not consult with Secretary of State Marco Rubio, though the Government added that "DHS has no reason to believe that information provided by the Department of State to DHS during the consultation process lacks the support of the Secretary of State." *Id.* ¶ 5. The Government also confirmed that of the eleven TPS-designated countries that had by that time come up for periodic review, "[t]he Secretary terminated TPS designations for all eleven countries as required by statute." *Id.* ¶ 12. Another country came up for periodic review afterward, and the Secretary terminated the designation for that country as well. *See* Dkt. 113.

The Court held a two-day hearing on the renewed § 705 Motion on January 6 and 7, 2026. During that hearing, the Court granted in part Plaintiffs' motion for discovery. It ordered, however, that such discovery must be limited and narrowly tailored, in line with the Supreme Court's decision in *Department of Commerce v. New York*, 588 U.S. 752, 781–82 (2019).[7] *See* Dkt. 107 (Jan. 7 Hr'g Tr.) at 18–31; Jan. 23, 2026, Min. Order. It also accepted Plaintiffs' SAC, Dkt. 90, which is the operative complaint here. *See* Dkt. 106 (Jan. 6 A.M. Hr'g Tr.) at 8.

## II. JURISDICTION

Courts have federal-question jurisdiction over APA and constitutional claims, unless a specific statute says otherwise. *See Elgin v. Dep't of Treasury*, 567 U.S. 1, 9 (2012); *Chrysler Corp. v. Brown*, 441 U.S. 281, 317 n.47 (1979). The Government cites four: the TPS statute, 8 U.S.C. § 1254a(b)(5)(A); two subsections of a provision of the Immigration and Nationality Act of 1942 (INA) governing judicial review of removal orders, 8 U.S.C. §§ 1252(f)(1) and (a)(2)(B)(ii); and a provision of the APA, 5 U.S.C. § 701(a)(2).

The Government has made the same jurisdiction challenge in every other current TPS case—and there have been many. To varying degrees, each court has rejected the Government's

---

[7] "[I]n reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." *Dep't of Com.*, 588 U.S. at 780. The Court authorized discovery here based on "a strong showing of bad faith or improper behavior." *Id.* (cleaned up).

rather expansive view that the Secretary's TPS decision making is immune from judicial review.[8] This Court joins the chorus.

### A. The Presumption in Favor of Judicial Review

The Court begins with a "familiar principle of statutory construction: the presumption favoring judicial review of administrative action." *Kucana v. Holder*, 558 U.S. 233, 251 (2010). This presumption is "well-settled" and "strong." *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 229 (2020) (cleaned up); *accord Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020). And relevant here, courts "consistently" apply it "to legislation regarding immigration, and particularly to questions concerning the preservation of federal-court jurisdiction." *Kucana*, 558 U.S. at 251; *see also McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 496 (1991).

The presumption applies with force to claims that an agency exceeded statutory authority, *see Amgen, Inc. v. Smith*, 357 F.3d 103, 111 (D.C. Cir. 2004), or violated the Constitution, *see Webster v. Doe*, 486 U.S. 592, 603 (1988). Not surprising. For it would be "an extreme position" indeed to offer no recourse for action taken outside the bounds of an agency's statutory grant or our constitutional order. *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 680

---

[8] The cases on point from President Trump's second administration include *NTPSA VI*, 2026 WL 226573, at *7–16; *NTPSA III*, 150 F.4th at 1016–18; *CASA, Inc. v. Noem*, 792 F. Supp. 3d 576, 588–94 (D. Md. 2025) (finding jurisdiction as to the termination of Afghanistan's and Cameroon's designations but denying cross-motions for summary judgment and plaintiffs' motion for a stay); *Doe v. Noem*, No. 25 C 15483, 2026 WL 184544 (N.D. Ill. Jan. 23, 2026) (staying termination of Burma's designation); *HECA*, 789 F. Supp. 3d at 269; *Nat'l TPS All. v. Noem*, No. 25-cv-5687, 2025 WL 4058572, at *7–12 (N.D. Cal. Dec. 31, 2025) (granting summary judgment setting aside Honduras', Nepal's, and Nicaragua's designations); *Doe v. Noem*, No. 25 Civ. 8686 (S.D.N.Y. Nov. 18, 2025) (Dkt. 59 at 9–11 (Oral Ruling Tr.) (postponing the termination of Syria's TPS designation)).

The relevant cases from the first Trump administration include *Saget*, 375 F. Supp. 3d at 330–33 and *Centro Presente v. Department of Homeland Security*, 332 F. Supp. 3d 393, 404–05 (D. Mass. 2018).

19

(1986). That noted, when Congress addresses jurisdiction in a statute, courts must determine "whether the challenged action falls within the preclusive scope of the statute." *DCH Reg'l Med. Center v. Avar*, 925 F.3d 503, 506 (D.C. Cir. 2017) (cleaned up).

These principles guide the Court's interpretation of the four provisions the Government raises. For each provision, the presumption against jurisdiction stripping is consistent with the Court's interpretation of the statute's plain text.

## B. The TPS Statute Does Not Strip the Court's Jurisdiction

Perhaps the Government's strongest jurisdictional argument lies within the TPS statute itself. Section 1254a(b)(5)(A) divests courts of jurisdiction to "review . . . any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state" for TPS. Indeed, if Plaintiffs had challenged the Secretary's *determination*, the Court would lack jurisdiction. But they have not. They challenge instead *how* the Secretary went about making her determination.

This distinction between decision and process is the ballgame.

### 1. Plaintiffs Do Not Challenge the Secretary's Substantive Determination

Twice in the immigration context, the Supreme Court has interpreted statutory language constraining review of an agency's "determination." Each case supports that Secretary Noem's "determination" here refers to her act of designating, terminating, or extending TPS. And each contradicts the Government's view that it applies more broadly to how she reached her determination.

In *McNary v. Haitian Refugee Center, Inc.*, the Supreme Court considered the statutory language in 8 U.S.C. § 1160(e)(1): "[t]here shall be no administrative or judicial review of a determination respecting an application for adjustment of status" for certain special agricultural workers. 498 U.S. at 483. The *McNary* Court concluded "the reference to 'a determination'

20

describes a single act *rather than* a group of decisions or a practice or procedure employed in making decisions." *Id*. at 492 (emphasis added). In that case, the "single act" in question was the Secretary's denial of Special Agricultural Worker (SAW) status to plaintiffs. *Id*. Had the Secretary instead, say, flipped a coin to make her decision, that would be a "practice or procedure" subject to review.

The Supreme Court doubled down two years later. In *Reno v. Catholic Social Services, Inc.*, 509 U.S. 43 (1993), it considered a provision of the INA that prohibits "judicial review of a determination respecting an application for adjustment of status" for certain non-citizens, 8 U.S.C. § 1255a(f)(1). The *Reno* Court likewise held that a "determination" does not cover an entire agency regulation but refers only to the "'single act'" of adjudicating individual adjustment-of-status applications. 509 U.S. at 56 (quoting *McNary*, 498 U.S. at 492).

So too here. The Secretary has exclusive authority to engage in the "single act" of designating a country or terminating or extending its designation thereafter. *McNary*, 498 U.S. at 492. As all agree, the Court cannot override one of these "substantive" determinations. *See* Dkt. 93 (MTD Opp'n) at 22; Dkt. 99 (MTD Reply) at 4–6. But Plaintiffs do not ask for that. They instead assert that the Secretary failed to consult; engaged in a pattern or practice of terminating TPS writ large; preordained the outcome of her review; engaged in both unreasoned and unsupported decision making; and, among other failures, acted with discriminatory animus. These claims challenge purported deficiencies in Secretary Noem's "group of decisions," "practice," and "procedure" in reviewing Haiti's TPS designation. *McNary*, 498 U.S. at 492.

The Government counters that a stay or "set aside" of the Secretary's Termination under the APA would inhibit the *substance* of that termination decision. To be sure, *McNary* does warn that a process decision can have "the practical effect of also deciding . . . claims for benefits on

21

the merits."  498 U.S. at 495 (distinguishing *Heckler v. Ringer*, 466 U.S. 602 (1984)).[9]  But here,

at most, the Court can order the Secretary to restart the periodic review process under lawful

criteria, not to arrive at a particular substantive outcome.  *See* 5 U.S.C. § 706(2); *see also infra*

Section II.C.1 (explaining that a "set aside" does not impact the TPS statute's "operation" or

"enjoin" or "restrain" the Government).[10]

Indeed, most of Plaintiffs' claims also do not assail the Secretary's "single act" of

terminating Haiti's TPS designation at all.  The APA claim that the Secretary exceeded her

"statutory authority" presents a "first order question" unrelated to her final determination.

*NTPSA III*, 150 F.4th at 1017.  Likewise, the APA claim that the Secretary engaged in a "general

pattern and practice" of unlawful terminations is "not unique to the Secretary's decision on

[Haiti's] status."  *Doe v. Noem*, 25 C 15483, 2026 WL 184544, at *8–9 (N.D. Ill. Jan. 23, 2026);

*cf.* Dkt. 103 (Gov't's Suppl. Br.) at 9.  Finally, the Equal Protection claim presents a "general

collateral challenge[] to unconstitutional practices and policies."  *McNary*, 498 U.S. at 492.

Even the Government's best case (a vacated Ninth Circuit decision) acknowledges that plaintiffs

can bring constitutional challenges to TPS determinations.  *See Ramos v. Wolf*, 975 F.3d 872, 892

(9th Cir. 2020), *vacated*, 59 F.4th 1010 (9th Cir. 2023); MTD at 20–21 & n.4.  At the very least,

claims of these types all escape the TPS statute's jurisdictional bar under the plain meaning of

"determination."

---

[9] The *McNary* Court distinguished *Heckler*.  Unlike in *Heckler*, the *McNary* plaintiffs "d[id] not seek a substantive declaration that they are entitled to SAW status" and if they prevailed on their procedural claims, they would not have "establish[ed] their entitlement to SAW status." *McNary*, 498 U.S. at 495.

[10] The Government's reliance on *Federal Law Enforcement Officers Ass'n v. Ahuja*, 62 F.4th 551 (D.C. Cir. 2023), fails for the same reason.  *See* Dkt. 103 (Gov't's Suppl. Br.) at 9; Jan. 7 Hr'g Tr. at 82–84.  There, the plaintiff sought a "permanent injunction barring" the agency from pursuing a particular course.  *Ahuja*, 62 F.4th at 561.

Confronted with *McNary*'s "single act" language, the Government falls back to the position that "at a minimum, § 1254a(b)(5)(A) bars claims that an agency's decision was arbitrary and capricious," unlike, for example, claims that the Secretary exceeded her authority. MTD at 21. That is not an unfair point. The garden-variety arbitrary-and-capricious claim presents the closest call. Still, even they fall on the procedural side of *McNary*'s line since they each implicate failures in how she came to her decision. *See infra* Section IV.A.3.

### 2. The TPS Statute's Jurisdiction-Stripping Provision Is Narrow

The Government claims that the words "any" and "with respect to" in the TPS statute's jurisdiction-stripping provision—"*any* determination of the [Secretary] *with respect to*" (emphasis added)—suggest that courts should read "determination" broadly enough to encompass the Secretary's decision-making process. *See* MTD at 19–20. That argument misreads the statute. Grammatically, both phrases modify the noun "determination." They do not invite in other nouns, nouns such as group of decisions, practice, or procedure.

To be sure, the word "any," as the Government contends, "indicates a broad sweep." *Id.* at 19. But, however broad, "[t]he adjective 'any' . . . cannot expand the reach of the noun it modifies." *City & Cnty. of San Francisco v. EPA*, 604 U.S. 334, 348 (2025). So the word "any determination" captures all determinations the Secretary may make—whether to expand, designate, or terminate—but it does not capture the process by which she reaches that determination.

Similarly, the interpretive canon "that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme . . . carries particular force when construing phrases that govern conceptual relationships—like 'with respect to'—whose meanings inherently depend on their surrounding context." *United States v. Miller*, 604 U.S.

518, 533 (2025) (cleaned up).  Here, "determination" is the jurisdiction-stripping provision's key word.  And "determination" means a "single act."  *See supra* Section II.B.1.[11]

The Government cites *Patel v. Garland* for the proposition that a "statute barring review of 'any judgment regarding the granting of relief' covers 'any authoritative decision' on the matter."  MTD at 19 (quoting 596 U.S. 328, 337–40 (2022)).  *Patel* involved a statute that barred review of "any judgment regarding the granting of relief" concerning a non-citizen's eligibility for adjustment of status.  596 U.S. at 335 (quoting 8 U.S.C. § 1255).  There, "any judgment" encompasses an immigration judge's (IJ's) "factual findings."  *Id*. at 339.  Even if the Court accepts that an IJ's "judgment" (in a quasi-judicial proceeding) and the DHS Secretary's TPS "determination" are similar enough statutory terms to compare directly, *Patel* does not help the Government.  A factual finding is a constituent "authoritative *decision*" in an IJ's "judgment."  *Id.* at 337–39 (emphasis added).  But procedural and constitutional defects in the Secretary's periodic review and consultation process are not decision-like at all.  The Secretary's path to the substantive "determination" is not part of the determination itself—for the reasons *McNary* sets out.  *See supra* Section II.B.1.

The Government cites only one case interpreting the same TPS provision that arguably supports its view, *Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020).  *See* MTD at 20.  But, again, the Government honestly concedes that the Ninth Circuit vacated this panel opinion on rehearing

---

[11] The TPS statute's phrasing does not appear as expansive as other jurisdiction-stripping provisions within the same Title of the U.S. Code.  *See, e.g.*, *Gebhardt v. Nielsen*, 879 F.3d 980, 987–89 (9th Cir. 2018) (discussing 8 U.S.C. § 1154(a)(1)(A)(viii)(I) endowing the Secretary with "sole and unreviewable discretion" to determine whether a citizen convicted of certain offenses poses a risk to a non-citizen for whom the citizen seeks to file an I-130 petition); *Saget*, 375 F. Supp. 3d at 331 (discussing statutory language, as in 8 U.S.C. § 1252(b)(9), that references review of "all questions of law and fact, including interpretation and application of constitutional and statutory provisions").  The Government itself recognizes this contrasting language (albeit for a different purpose).  *See* Gov't's Supp. Br. at 10.

and the case later became moot. *Id*. at n.4. The Government claims that, even a vacated decision "still carries persuasive value." *Id*. Maybe. But not *Ramos*—not least because the Ninth Circuit has twice since *Ramos* taken a more expansive view of jurisdiction under the TPS statute. *See supra* n.5. Indeed, the citation backfires—it speaks volumes that a vacated decision from a sister circuit is the best authority the Government can muster.

### 3. *Jurisdiction Here Does Not Eviscerate the Statutory Bar*

Quoting the D.C. Circuit's decision in *DCH Regional Medical Center v. Azar*, the Government separately suggests that permitting review of Plaintiffs' claims "would eviscerate the statutory bar, for almost any challenge to [a determination] could be recast as a challenge to its underlying methodology." MTD at 21 (alteration in original) (quoting 925 F.3d 503, 506 (D.C. Cir. 2019)). But the Government replaced the original case language "estimates" with "determination." This was no small change. *DCH* involved a bar on judicial review of Medicare "estimate" payments to hospitals. The D.C. Circuit held that "a challenge to the methodology for estimating uncompensated care is unavoidably a challenge to the estimates themselves." *Id*. at 506. Change the methodology, necessarily change the estimates. Not so here. After changing her process to comport with the APA, the Secretary can determine to keep or end Haiti's TPS designation.

The Government's evisceration concern contains another flaw. In several jurisdictional statutes, Congress expressly permits a court to "modify" the substantive decision an agency makes. *See, e.g.*, *Solondz v. FAA*, 141 F.4th 268, 276 (D.C. Cir. 2025) (appellate jurisdiction to "modify" a final order of the FAA regarding a pilot's medical clearance); *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 181 (2023) (appellate jurisdiction to "modify" an SEC order "in whole or in part"). The TPS statute's language here bars the Court from modifying the Secretary's determination—and so at a minimum, is not superfluous on this score.

25

#### 4.  *Plaintiffs Have No Other Avenue to Challenge the Termination*

The Government claims that the TPS statute directs any judicial challenge exclusively to removal proceedings in immigration court, from which Plaintiffs can appeal to the applicable Federal Circuit.  *See* Gov't's Suppl. Br. at 9–11; Jan. 7 Hr'g Tr. at 82–84, 95–102.  Federal district courts, it argues, have no role.

But the Government does not explain, as it must, *see Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 208–16 (1994), what in the TPS statute makes it "fairly discernible" that Congress intended to channel the "type" of claims here *exclusively* to an IJ through the "comprehensive review process" for orders of removal for which the INA provides.  Indeed, it ignores altogether the proper analysis, which asks the following three questions:

> First, could precluding district court jurisdiction "foreclose all meaningful judicial review" of the claim?  Next, is the claim "wholly collateral to [the] statute's review provisions"?  And last, is the claim "outside the agency's expertise"?  When the answer to all three questions is yes, "we presume that Congress does not intend to limit jurisdiction."

*Axon Enter.*, 598 U.S. at 186 (citations omitted).

Here, the answer to all three questions is yes.  *McNary*, and common sense, readily provide an affirmative answer to the first factor.  Consider that non-citizens who lose TPS must depart voluntarily, and those who do can have no judicial review.  *See* Jan. 7 Hr'g Tr. at 92–102.  To see the inside of an immigration court, a former TPS holder must first break the law—*i.e.*, not depart.  Then, she must either go about her day in fear of being detained by Immigration and Customs Enforcement (ICE) or affirmatively self-surrender.  But asking non-citizens to "voluntarily surrender themselves for deportation" to obtain review "is tantamount to a complete denial of judicial review."  *McNary*, 498 U.S. at 496–97; *accord Reich*, 510 U.S. at 212–13.

As to the second question, the APA and constitutional claims Plaintiffs raise are "wholly collateral" to 8 U.S.C. § 1252(b)(9).  Section 1252(b)(9) provides for "[j]udicial review of all

26

questions of law and fact . . . arising from any action take or proceeding brought to remove" a

non-citizen. 8 U.S.C. § 1252(b)(9); *see id*. § 1252(a)(5) (channeling review of an order of

removal to a circuit court). But the claims raised here "do not relate to the subject of the

enforcement actions" that that provision covers—*i.e.*, orders of removal. *Axon Enter.*, 598 U.S.

at 193. Finally, the "standard questions of administrative and constitutional law" at play here are

outside the bread-and-butter determinations an IJ makes in everyday removal proceedings. *Id*. at

194 (cleaned up).

* * *

In sum, the Government cannot bear its "heavy burden" of showing that the TPS statute

displaces the strong presumption in favor of judicial review of the Secretary's Termination.

*Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015).

### C.  The INA's Bars on Judicial Review of Removal Decisions Do Not Apply

The Court next examines the two subsections of the INA that the Government also argues

precludes judicial review of Plaintiffs' claims—Subsection (f)(1) and Subsection (a)(2)(B)(ii).

Straight away, the Government encounters a roadblock. Section 1252 is titled "[j]udicial review

of *orders of removal*." 8 U.S.C. § 1252 (emphasis added). In fact, the text of § 1252 mentions

some permutation of "order" forty-eight times and "remove" or "removal" thirty-one times. *See*

*id*. The Secretary's Termination is decidedly not an order of removal.

But of course, a statute's title is not dispositive. *See Yates v. United States*, 574 U.S. 528,

540 (2015). The Government's greater problem is that the text of Subsection (f)(1) and

Subsection (a)(2)(B)(ii) "points in the same direction as [the] title." *Dubin v. United States*, 599

U.S. 110, 124 (2023). Both Subsections apply only to individualized immigration adjudications.

They do not prevent judicial review of a generally-applicable agency action.

27

### 1.  Subsection (f)(1)

Defendants first point to Subsection (f)(1).  It provides:

> Regardless of the nature of the action or the claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of [subchapter II of Title 8], as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

*Id*. § 1252(f)(1).

But for good reason, "[n]o court" to consider the question has adopted the view that Subsection (f)(1) prevents a court from reviewing the Secretary's action on a country's TPS designation.  *NTPSA I*, 773 F. Supp. 3d at 826; *accord HECA*, 789 F. Supp. 3d at 270.

### a.  Subsection (f)(1) does not cover the TPS statute

Subsection (f)(1) on its face applies only to "provisions of part IV" of subchapter II of Title 8 of the U.S. Code.  The TPS statute appears in part V of that subchapter, not part IV. [12] The Government has conceded as much elsewhere.  *See NTPSA I*, 773 F. Supp. 3d at 824.  The Government counters that the relevant public law, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), contradicts this categorization.  *See* Dkt. 72 at 5.  True, where a public law conflicts with the codified language, the enacted version controls.  *See U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 448 (1993).  But on closer study, IIRIRA's language is not the slam dunk the Government contends.

IIRIRA describes Subsection (f)(1)'s coverage as encompassing "chapter 4 of title II" of the INA.  *See* IIRIRA, Pub. L. No. 104-208 § 306(a)(2), 110 Stat 3009-611–12 (Sept. 30, 1996).

---

[12] This organization is logical, as the TPS statute more readily concerns "Adjustment and Change of Status" (part V) than "Inspection, Apprehension, Examination, Exclusion, and Removal" (part IV).  *See* 8 U.S.C. ch. 12, subch. II.

28

That is, the enacted text, unlike the codified version, refers to its own numbering system (one different from the U.S. Code's numbering system). IIRIRA does place the TPS statute within chapter 4 of Title II of the enacted INA. *See id*. § 308, 110 Stat. at 3009-614–15. So far, so good for the Government—but there is more. The enacted text of Subsection (f)(1) itself falls under the heading labeled "Appeals from Orders of Removal" and the Subsection concerns orders of removal—which just about mirrors the title of § 1252 in the U.S. Code. *See* 8 U.S.C. § 1252 ("Judicial review of orders of removal"). So, the public-law version of Subsection (f)(1) counsels that this provision applies to every statute that both (1) appears under "chapter 4 of title II" of the INA as amended in the enacted law; *and* (2) concerns an order of removal. The TPS statute meets only the first criteria.

In English: the Government relies on a statute, Subsection (f)(1), that it claims tells lower courts not to stick their judicial noses into agency actions falling within a range of statutes. But the range differs based on whether one consults the enacted version of Subsection (f)(1) or the U.S. Code version. Because the TPS statute falls inside the range described in the enacted text, but outside the range identified in the U.S. Code, the Government claims the Court must mind its own business.[13] The Government's problem is that it does not matter either way. Even if the TPS statute falls initially inside the statutory range that Subsection (f)(1) identifies, both the enacted and codified versions of Subsection (f)(1)'s text concern orders of removal and TPS decision-making is not an order of removal. So, Subsection (f)(1) does not cover TPS-related claims.

---

[13] For a surprisingly engaging explanation of the history and structure of the United States Code, the Court commends the aptly titled, *Detailed Guide to the U.S. Code Content and Features*, created by the U.S. House of Representatives Office of the Legal Revision Counsel. It is available at https://uscode.house.gov/detailed_guide.xhtml [https://perma.cc/MC98-58CQ].

Hence, when the Supreme Court has described Subsection (f)(1)'s scope, it has repeatedly excluded the TPS statute (which is codified at § 1254a). It instead refers to Subsection (f)(1)'s coverage as extending to either "§§ 1221–1232" or "part IV of subchapter II" of Title 8 of the U.S. Code. *See Biden v. Texas*, 597 U.S. 785, 798 (2022); *Garland v. Aleman Gonzalez*, 596 U.S. 543, 549 (2022); *Jennings v. Rodriguez*, 583 U.S. 281, 312–13 (2018); *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999); *see also Gonzalez v. Immigr. & Customs Enf't*, 975 F.3d 788, 812 (9th Cir. 2020). The agency actions in this covered group all relate to "immigration laws governing the inspection, apprehension, examination, and removal of aliens." *Aleman Gonzalez*, 596 U.S. at 544.[14] The TPS statute, which governs wholesale designation of foreign states for TPS, rather than enforcement of immigration laws on individual non-citizens, is of a different ilk.

### b. The relief sought does not affect the "operation of" the TPS statute

Helpfully, other statutory terms in Subsection (f)(1) independently confirm that it does not cover judicial review of the Secretary's Termination. That is because even if the Court affords Plaintiffs the full relief they request, the Court will not (1) "enjoin" or "restrain" (2) the "operation of" the TPS statute. 8 U.S.C. § 1252(f)(1).

Start with "the operation of" language. The Government relies on an applicable Supreme Court case, but, unfortunately for it, the case contradicts its position. In *Garland v. Aleman Gonzalez*, the Supreme Court interpreted "to enjoin," "to restrain," and "operation of" in Subsection (f)(1). 596 U.S. at 550. It held that "[p]utting these terms together, § 1252(f)(1) generally prohibits lower courts from entering injunctions that order federal officials to *take or to*

---

[14] The listed exception in Subsection (f)(1), too, concerns an individualized immigration determination. *See* § 1252(f)(1) (excepting from the jurisdiction-stripping language "the application of such provisions [of part IV] to an individual alien against whom proceedings under such part have been initiated").

*refrain from taking actions to enforce, implement, or otherwise carry out* the specified statutory provisions." *Id.* (emphasis added).

Applying this standard, the Supreme Court held that Subsection (f)(1) prohibited the district court's order enjoining the Government from detaining, beyond a certain number of days without a bond hearing, a class of non-citizens "ordered removed," when a statute explicitly permits such detention. *See id.* at 546 (cleaned up). The district court impermissibly "require[d] officials to take actions" that the statute does not require and "to refrain from actions" the statute allows. *Id.* at 551. In so doing, it impeded the "operation" of that detention statute. *Id.* Consistent with this approach, in *N.S. v. Dixon*, the D.C. Circuit recently held that an injunction that "prevents the Marshals from arresting and detaining any criminal defendant in the D.C. Superior Court for a suspected civil immigration violation" falls within Subsection (f)(1)'s ambit because a statute, 8 U.S.C. § 1226(a), permits such arrest and detention. 141 F.4th 279, 289 (D.C. Cir. 2025).

In contrast, a "set aside" of the Termination (and an accompanying declaration), 5 U.S.C. § 706(2), does not impact the TPS statute's "operation." Unlike in *Aleman Gonzalez*, Plaintiffs do not ask this Court to impose limitations that the TPS statute itself does not contain. *See* 596 U.S. at 551. They ask the Court only to hold that the Secretary did not follow the process the APA and the Constitution require and to set aside her decision while she begins anew. Even with the set aside, she remains free to "carry out" the TPS statute's full range of provisions—*i.e.*, to make discretionary decisions to designate countries or extend and terminate such designations following periodic review. *Id.* at 543; *cf.* Dkt. 68 at 21–22.

And the subset of Plaintiffs' allegations that the Secretary exceeded her statutory authority fall outside of Subsection (f)(1)'s ambit for another reason. Any relief the Court could

31

order against "conduct that allegedly is not even authorized by the statute" could not, by definition, enjoin "the operation" of that statute. *NTPSA III*, 150 F.4th at 1018–19.

### c.  The relief sought would not "enjoin" or "restrain" operation of the TPS statute

Subsection (f)(1)'s verbs pose yet another problem for the Government.  Plaintiffs request two forms of relief: APA vacatur of the Termination and an accompanying declaration that the Secretary's action violated the APA and the Equal Protection Clause.  *See* SAC ¶ 90.  If granted, neither would "enjoin" or "restrain" operation of the TPS statute.

First, APA vacatur.  The *Aleman Gonzalez* Court applied Subsection (f)(1) proscription's against "enjoin[ing]" or "restrain[ing]" operation of certain statutes to a district court's *injunction*, as described *supra* Section II.C.1.b.  It "d[id] not purport to hold that § 1252(f)(1) affects courts' ability to 'hold unlawful and set aside agency action, findings, and conclusions'" under the APA.  *Aleman Gonzalez*, 596 U.S. at 571 (Sotomayor, J., concurring and dissenting in part) (citing 5 U.S.C. § 706(2)).

This Court concurs with the Fifth Circuit that Subsection (f)(1) does not extend to APA vacaturs, because they are unlike injunctions.  *See Texas v. United States*, 40 F.4th 205 (5th Cir. 2022).[15]  Via injunction, a court can "compel[] or restrain[] further agency decision-making."  *Id.* at 220; *see Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 846 F.3d 1235, 1242 (D.C. Cir. 2017) (explaining that "breadth and flexibility are inherent in equitable remedies").  An APA vacatur, meanwhile, is neither forward-looking nor coercive.  It accomplishes "nothing but re-establish[ment] [of] the status quo absent the unlawful agency action."  *Texas v. United States*, 40

---

[15] While the D.C. Circuit has yet to decide the question, it has held that § 1252(f)(1) does not cover declaratory relief.  *See N.S.*, 141 F.4th at 290 n.7.  And it has recognized the Fifth Circuit holding "that § 1252(f)(1) does not bar vacatur under the APA."  *Id.*

F.4th at 220.  So, while an injunction "enjoins" or "restrains" an actor under Subsection (f)(1),

vacatur of past agency action does not.

Statements across three Supreme Court cases, two of which post-date *Aleman Gonzalez*,

confirm this interpretation.  In *Reno v. Am.-Arab Anti-Discrimination Comm.*, the Supreme Court

explained that § 1252(f) is "nothing more or less than a limit on injunctive relief."  525 U.S. at

481.  Then, in *Biden v. Texas*, it stated that § 1252's "title—'Limit on injunctive relief'—makes

clear the narrowness of its scope."  597 U.S. at 798.  Finally, in its landmark decision prohibiting

district courts from issuing nationwide injunctions, the Supreme Court distinguished APA

vacaturs as a form of relief.  It explained that "[n]othing" in its opinion "resolves the distinct

question [of] whether the Administrative Procedure Act authorizes federal courts to vacate

federal agency action."  *Trump v. CASA, Inc.*, 606 U.S. 831, 847 n.10 (2025); *accord id.* at 869

(Kavanaugh, J., concurring).  The limited purview of Subsection (f)(1) does not include a "set

aside" under the APA.

Second, declaratory relief.  On this point, the Court applies D.C. Circuit precedent.

Subsection (f)(1) "does not proscribe issuance of a declaratory judgment."  *N.S.*, 141 F.4th at 290

n.7; *accord Brito v. Garland*, 22 F.4th 240, 252 (1st Cir. 2021); *Rodriguez v. Marin*, 909 F.3d

252, 256 (9th Cir. 2018).

Neither the setting aside of the Termination nor a declaration that it issued unlawfully

falls within Subsection (f)(1)'s proscription.

### d.  The posture of this case does not alter the Court's analysis of Subsection (f)(1)'s scope

The Government tries yet another tack.  An APA stay, it claims, requires an evaluation of

the same factors that a court would consider when issuing a preliminary injunction.  *See* § 705

Opp'n at 18–20.  So, it infers, a stay is the type of injunctive relief covered by Subsection (f)(1).

And, yes, the factors are the same.  But the similarities end there.

To begin, Subsection (f)(1)'s text "expressly identifies injunctive relief but makes no

mention of stays nor other forms of relief under the APA."  *Immigrant Defs. L. Ctr. v. Noem*, 145

F.4th 972, 990 (9th Cir. 2025); *accord NTPSA VI*, 2026 WL 226573, at *9–11.  Congress,

however, knows "how to limit relief under the APA in other statutory schemes such as the

Magnuson-Stevens Act and the Clean Air Act."  *Id*.  So, the omission here must be intentional.[16]

Moreover, an APA stay and a preliminary injunction are fundamentally different

remedies.  While there is some "functional overlap," a stay is not "a coercive order."  *Nken v.

Holder*, 556 U.S. 418, 428 (2009).  Its effect (like that of a vacatur) is merely to return

circumstances to the status quo.  *Id*.  And a stay does not operate *in personam*.  So, here, an APA

stay would not "direct[] the conduct of" the Secretary.  *Id*.  It would merely "temporarily

divest[]" her Termination "of enforceability."  *Id*.  Finally, it would be odd indeed, given the

Court's determination that Subsection (f)(1) permits APA vacatur, if it did not also allow the far

less drastic APA stay.

Subsection (f)(1) does not strip the Court of jurisdiction in this case.

### 2.  *Subsection (a)(2)(B)(ii)*

Undeterred, the Government tries a different provision of § 1252 next.

Subsection (a)(2)(B)(ii) bars judicial review of "any other decision or action [not enumerated in

§ 1252(a)(2)(B)(i)] of . . . the Secretary of Homeland Security the authority for which is

specified under [subchapter 12 of Title 8] to be in the discretion" of the Secretary.  Subchapter 12

---

[16] Section 1252(f)(1) was enacted in 1996, a half-century after the APA.  *See Gonzalez*, 596 U.S.
at 562.  It "may not be held to supersede or modify [the APA] . . . except to the extent that it does
so expressly."  5 U.S.C. § 559; *cf. Marcello v. Bonds*, 349 U.S. 302, 309 (1955).

of Title 8 includes the TPS statute.  But as with Subsection (f)(1), Subsection (a)(2)(B)(ii)'s text supports its application only to individual immigration adjudications.

Section 1252(a)(2)(B) contains a clause (i) and clause (ii).  Clause (i) bars review of "judgment[s] regarding the granting of relief" under certain statutes—*e.g.*, cancellation of removal, adjustment of status, etc.  8 U.S.C. § 1252(a)(2)(B)(i).  Clause (ii), meanwhile, is "a catchall provision" that applies to "decisions of the same genre" as in clause (i).  *Kucana*, 558 U.S. at 246; *see RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (explaining the canon of "avoid[ing] . . . the superfluity of a specific provision that is swallowed by the general one").  That genre encompasses "orders denying discretionary relief in *individual cases*."  *Make the Rd. New York v. Wolf*, 962 F.3d 612, 630–31 (D.C. Cir. 2020) (emphasis added); *see Nasrallah v. Barr*, 590 U.S. 573, 586 (2020) (explaining the two clauses cover "cancellation of removal, voluntary departure, adjustment of status, certain inadmissibility waivers," and the like).

The Government asserts that various cases broaden the scope of Subsection (a)(2)(B)(ii) to all manner of immigration-related decisions entailing some discretion.  *See* MTD at 21–25; Gov't's Suppl. Br. at 6.  Those cases, however, all apply Subsection (a)(2)(B)(ii) in a manner that fits comfortably with this Court's interpretation.  In *Bouarfa v. Mayorkas*, 604 U.S. 6, 14 (2024), the Supreme Court precluded review of the Secretary's revoked approval of an individual visa petition.  In *iTech U.S., Inc. v. Renaud*, 5 F.4th 59, 68 (D.C. Cir. 2021), the D.C. Circuit prohibited review of USCIS's revoked approval of a non-citizen's I-140 immigration visa petition.  And in *Zhu v. Gonzales*, 411 F.3d 292, 293 (D.C. Cir. 2005), it precluded review of the Attorney General's refusal to waive the requirement that four non-citizens obtain a labor certification to petition for a work visa.

35

Subsection (a)(2)(B)(ii) poses no barrier to the Court's review here.

**D.  The Administrative Procedure Act Does Not Bar Review**

The Government makes one last statutory stand.  The APA excludes from its own purview cases where the "agency action is committed to agency discretion by law."  5 U.S.C. § 701(a)(2).[17]  This exception, however, applies only where a statute offers "absolutely no guidance as to how [an agency's] discretion is to be exercised."  *Make the Rd. N.Y.*, 962 F.3d at 632.  For the reasons described below, the TPS statute is not (by a long shot) drawn so broadly. *Accord HECA*, 789 F. Supp. 3d at 275; *Nat'l TPS Alliance v. Noem*, No. 25-cv-05687, 2025 WL 4058572 (N.D. Cal. Dec. 31, 2025) (Dkt. 197).

To begin, the Government aims its § 701(a)(2) argument at only Plaintiffs' APA claim (Count One), and not their Equal Protection claim (Count Two).  *See* MTD at 28.  The latter does not implicate APA review, which is all § 701(a)(2) covers.  *See* 5 U.S.C. § 701(a)(2); *Make the Rd. N.Y.*, 962 F.3d at 632.

As to the APA claim, time and again, the Supreme Court has counseled that § 701(a)(2)'s scope is "narrow."  *E.g.*, *Heckler v. Chaney*, 470 U.S. 821, 838 (1985).  It precludes review only of action "traditionally left to agency discretion," *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993), and "where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," *Dep't of Com.*, 588 U.S. at 772 (cleaned up).

The quintessential example is an agency's exercise of enforcement discretion.  *See, e.g.*, *Heckler*, 470 U.S. at 837–38; *Schieber v. United States*, 77 F.4th 806, 813 (D.C. Cir. 2023); *Baltimore Gas & Elec. Co. v. FERC*, 252 F.3d 456, 459–60 (D.C. Cir. 2001).  So, in the immigration context, there is no APA review of the Government's policy of prioritizing for

---

[17] The APA also provides a court may not review agency action where a "statute[] preclude[s] judicial review."  5 U.S.C. § 701(a)(1).  The Court has already explained why that provision is inapplicable here.  *Cf.* MTD at 27–28.

removal certain categories of non-citizens over others.  *See United States v. Texas*, 599 U.S. 670, 682–83 (2023).  In such cases, the agency's discretion is so expansive that there is no "law to apply."  *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971).

This action is not that.  It instead resembles *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9 (2018), where the Supreme Court found § 701(a)(2) inapplicable.  In *Weyerhaeuser*, a group of landowners challenged the designation of their property as a critical habitat.  *Id.* at 13.  The Endangered Species Act mandates such designation after the Secretary of the Interior "tak[es] into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat."  16 U.S.C. § 1533(b)(2).  The Secretary of the Interior "may" still thereafter choose not to designate an area if he determines that the costs of doing so outweigh the benefits—"unless he determines, based on the best scientific and commercial data available, that failure to designate such area as critical habitat will result in the extinction of the species concerned."  *Id*. (emphasis added).  Plaintiffs challenge that the agency did not follow "a standard set forth in the statute" (*i.e.*, the mandatory part), which the Supreme Court held is a garden-variety APA claims subject to review.  *Weyerhaeuser*, 586 U.S. at 23–24.

Our statutory scheme is symmetrical.  Under both the Endangered Species Act and the TPS statute, the decisionmaker is required to conduct a study weighing certain enumerated factors—in the TPS context, "country conditions" against "national interest," in "consultation with appropriate agencies," 8 U.S.C. § 1254a(b)(1), (3).  In both statutory schemes, the discretionary part of the statute kicks in only *after* the Secretary has properly weighed these factors.  The statute hardly offers "absolutely no guidance" to either the agency or this Court.

*Make The Rd. New York*, 962 F.3d at 632 (cleaned up).[18]  And so it is subject to APA review.  *See Weyerhaeuser*, 586 U.S. at 23–24.

Section 701(a)(2) does not preclude APA review here.

### E.  The *NTPSA* Litigation Does Not Compel a Different Result

The Court ends its exhaustive (arguably exhausting) survey of subject-matter jurisdiction by addressing the Government's non-statutory argument.  It contends that two recent Supreme Court orders from its emergency docket concerning the TPS statute confirm this Court lacks jurisdiction.  *See* MTD at 21.  They do not.

Yes, the Supreme Court's interim orders, while not "conclusive as to the merits," "inform how a court should exercise its equitable discretion in like cases." *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025).  But the cited interim orders never discuss jurisdiction.  And given the presumption of judicial review discussed earlier, the Court cannot conclude that the Supreme Court implicitly intended for every court handling every TPS case to find it likely has no jurisdiction.

Recall that in 2025, different plaintiffs challenged Secretary Noem's vacatur of the previous administration's extension of a 2023 designation of Venezuela for TPS and then her later decision to terminate that designation.  *See NTPSA I*, 773 F. Supp. 3d 807.  Judge Chen granted plaintiffs' motion to postpone the Venezuela TPS actions pending litigation.  *See id*. at 868.  Without statement or opinion, the Supreme Court stayed that order pending appeal in May 2025.  *See NTPSA II*, 145 S. Ct. 2728.  After the district court entered final judgment for

---

[18] The Government also analogizes this case to *Webster v. Doe*, 486 U.S. 592 (1988).  There the Supreme Court considered a statute permitting the Central Intelligence Agency's (CIA's) Director to terminate an employee when he "shall deem such termination necessary or advisable in the interests of the United States." *Webster*, 486 U.S. at 600 (quoting 50 U.S.C. § 403(c)).  "Necessary or advisable," without additional clarifying language, allocates great discretion to the CIA.  Such unrestricted terminology is absent from the TPS statute.

plaintiffs, the Supreme Court again stayed the decision pending appeal.  *See NTPSA V*, 146 S.

Ct. 23 (2025).[19]  This time, it said more, but not much more: "[a]lthough the posture of the case

has changed, the parties' legal arguments and relative harms generally have not.  The same

result that we reached in May is appropriate here."  *Id*.

 From this, the Governmnent claims the Supreme Court agrees with its jurisdiction

argument.  Since its "only argument" on appeal, it says, was that the TPS statute's jurisdiction-

stripping provision bars arbitrary-and-capricious claims, that must be the "legal argument" the

Supreme Court telegraphed has merit.  *See* MTD at 21 (cleaned up).  But the Government

undersells its argumentative thoroughness.  Its stay application *also* contended, jurisdiction

aside, that the Secretary had authority to "vacate the outgoing administration's extension" of

Venezuela's TPS designation.  *Noem v. Nat'l TPS All.*, No. 25A326, Appl. for Stay at 19–22

(U.S. Sept. 19, 2025).

 If this is what intrigued the Supreme Court, its order would not inform, much less

resolve, this case.  The Court is adjudicating the legality of a TPS termination, not a vacatur of a

previous Secretary's TPS designation.  In fact, if the Supreme Court agreed with the

Government on the merits—that the Secretary has authority to vacate a previous designation

before its expiration, *id.*, or, as the Government's first stay application asserted, that the

Government did not violate the Equal Protection Clause, *Noem v. Nat'l TPS All.*, No. 24A1059,

Appl. for Stay at 59–75 (U.S. May 1, 2025)—that would have presumably entailed an

antecedent finding of district-court jurisdiction for at least some TPS-related claims.

 In any event, this Court declines the invitation to try its hand at divination.

---

[19] The district court also set aside the Partial Vacatur of Haiti's designation made in 2024.  The
Government did not petition for a stay of that portion of district court's opinion.  *See NTPSA V*,
146 S. Ct. at 24.

\* \* \*

The TPS statute preserves the Secretary's discretion to make designation, extension, and termination decisions according to her "value judgments."  MTD at 23–25.  But the Court retains jurisdiction—and indeed has a positive duty—to ensure that the Secretary adheres to the APA and the U.S. Constitution when the Secretary takes TPS-related action.  It turns to that responsibility next.

### III.  LEGAL STANDARD

Section 705 is the APA's "general stay provision."  *Mexichem Specialty Resins, Inc. v. E.P.A.*, 787 F.3d 544, 558 (D.C. Cir. 2015).  It authorizes courts to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."  5 U.S.C. § 705.  A court may do so "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury."  *Id.*

The factors governing issuance of a section 705 stay are the same as those that govern the grant of a preliminary injunction.  *See Dist. of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020).  To prevail on such a motion, the movant "must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the [stay] were not granted, (3) that a[] [stay] would not substantially injure other interested parties, and (4) that the public interest would be furthered by the [stay]."  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  In a case like this one, where the Government is the non-movant, the third and fourth factors merge.  *Nken*, 556 U.S. at 435.

40

## IV.  LIKELIHOOD OF SUCCESS

### A.  APA Claim

#### 1.  *The Secretary Likely Acted Contrary to Law in Failing to "Consult[]" Properly with "Appropriate Agencies"*

We begin with the APA's familiar requirement that courts "hold unlawful and set aside agency action, findings, and conclusions" that are "in excess of statutory jurisdiction, authority, or limitations" or are "without observance of procedure required by law."  5 U.S.C. § 706(2)(C)– (D).  Plaintiffs are likely to succeed on their claim that Secretary Noem acted contrary to law and in excess of her statutory authority by failing to consult appropriate agencies as required by the TPS statute.

The statutory text is unambiguous.  Congress vested the DHS Secretary with the decision of whether to extend a country's TPS designation upon "review [of] the conditions in the foreign state."  8 U.S.C. § 1254a(b)(3)(A).  But, among other limitations, she can terminate a TPS designation only "after consultation with appropriate agencies of the Government."  *Id.*  That did not occur.

Recall that on February 24, 2025, Secretary Noem issued the Partial Vacatur of Haiti's TPS designation.  On September 5, 2025, the court in the *NTPSA* litigation found that the Partial Vacatur violated the APA, in part because the Secretary made the decision "without consultation with government agencies or country conditions review."  *NTPSA IV*, 798 F. Supp. 3d at 1155. Although the court did not formally invalidate DHS's July Termination of Haiti's TPS designation, it noted that the July Termination would be unlawful if the Vacatur is unlawful.  *Id.* at 1164 & n.24.  Presumably accepting that "the better part of valour is discretion,"[20] DHS

---

[20] William Shakespeare, *Henry IV, Part I*, in *The Complete Works of William Shakespeare— Comprising His Plays and Poems* 385, 411 (1979).

41

decided to re-issue its periodic review decision on November 28, 2025, when it again terminated Haiti's TPS designation (the operative Termination here).  *See* 90 Fed. Reg. at 54733.

On Friday, September 5, 2025—that is, the same day that the *NTPSA* court set aside the Partial Vacatur of Haiti's TPS designation—a DHS staffer emailed a State staffer at 4:55 p.m.: "Due to the litigation, we are re-reviewing country conditions in Haiti based on the original TPS deadline.  Can you advise on State's views on the matter?"  CAR 78-7 at 9–10 (HaitiTPSAR 409–10).  The State staffer responded within 53 minutes: "State believes that there would be no foreign policy concerns with respect to a change in the TPS statue of Haiti."  *Id.*

This was it.  The full extent of the supposed "consultation with appropriate agencies." Believing it must be missing something, the Court questioned Government counsel about this:

> **Court:**  So in the Federal Register notice, the Secretary wrote, "After reviewing country conditions and consulting with appropriate U.S. Government agencies, the Secretary determined that Haiti no longer meets the conditions for the designating as TPS"; right?
>
> **Government Counsel:**  Yes.
>
> **Court:**  What were the appropriate agencies that the Secretary consulted? . . .
>
> **Government Counsel:**  So, Your Honor, it's the Department of State email found at 409 and 410. That is what we have.
>
> . . .
>
> **Court:**  No other agency was consulted?
>
> **Government Counsel:**  No other agency was consulted.
>
> . . .
>
> **Court:**  And the extent of the Department of State consultation was the email exchange at 409 and 410.
>
> **Government Counsel:**  That is my understanding.

42

Jan. 6 A.M. Hr'g Tr. at 19:14–21:6.

Was this "consultation"?  The Court "look[s] first to [the statute's] language, giving the words used their ordinary meaning."  *Lawson v. FMR LLC*, 571 U.S. 429, 440 (2014).  The ordinary meaning of "consultation" is "[t]he act of asking the advice or opinion of someone (such as a lawyer)" or "[a] meeting in which parties consult or confer."  *Consultation*, *Black's Law Dictionary* (12th ed. 2024).  To consult is to "seek information or advice from (someone with expertise in a particular area)" or to "have discussions or confer with (someone), typically before undertaking a course of action."  *Consult*, *The New Oxford Dictionary* (3d ed. 2015).

The Government contends that the email exchange suffices as consultation because "the statute leaves each Secretary with substantial discretion to determine when, where, how, and with whom to consult as appropriate in each instance."  Gov't's Suppl. Br. at 6.  But Congress did not vest the Secretary with Humpty Dumpty-like power to make the word "consultation" mean "just what [she] chooses it to mean—neither more nor less."[21]  And the above exchange cannot suffice if the word "consultation" is to play any role in the TPS designation process.  Instead, some "meaningful exchange of information" must occur.  *Cal. Wilderness Coalition v. U.S. DOE*, 631 F.3d 1072, 1086 (9th Cir. 2011); *Nat'l TPS All.*, 2025 WL 4058572 at *14; *Doe*, 2026 WL 184544 at *13–14.

The statutory text supports this view.  To start, the Government is wrong about the level of the Secretary's discretion.  Congress *did* tell the Secretary "when" and "with whom" to consult.  When: the Secretary "*shall* review the conditions in the foreign state" only "*after* consultation."  8 U.S.C. § 1254a(b)(3)(A) (emphasis added).  And only after consulting and

---

[21] Lewis Carroll, *Alice's Adventures in Wonderland and Through the Looking-Glass* 198 (Messner 1982); *cf. Lopez v. Gonzales*, 549 U.S. 47, 54 (2006).

reviewing country conditions can she make her "determin[ation]." *Id.* With whom: "appropriate agencies of the Government." *Id.* And recall that Congress passed the TPS program to *curb* the Executive's discretion, not expand it. *See supra* Section I.A.

Consider further that Congress requires "consultation with appropriate agencies" three times: before making the initial designation, 8 U.S.C. § 1254a(b)(1); before undertaking a periodic review, *id.* § 1254a(b)(3); and before issuing an annual report to Congress about the operation of the TPS program, *id.* § 1254a(i). And each time, the DHS Secretary can act, again, only "*after* consultation." *Id.* (emphasis added). And only after consultation with agen*cies*—plural, not singular. *Id.* Plainly, Congress's consultation requirement was not an afterthought, but instead an integral mechanism to ensure the DHS Secretary understands country conditions before acting.

The Government more specifically contends that "[w]hat constitutes sufficient consultation is *nothing more* than the Secretary's 'determination' 'with respect to the termination' of a country's designation." Gov't's Suppl. Br. at 5–6 (citing 8 U.S.C. § 1254a(b)(5) (citation modified)) (emphasis added). That cannot be. Given that, as just noted, the Secretary can make a "determination" only "after consultation," consultation must mean something different than determination.

The Government cites Government Accountability Office Report 20-134, titled, *Temporary Protected Status: Steps Taken to Inform and Communicate Secretary of Homeland Security's Decision* (GAO TPS Report). *See* Gov't's Suppl. Br. at 5. Relying on it, the Government contends that "the INA does not prescribe the other agencies that must be consulted"; that "State . . . generally has a role in providing input for the Secretary['s] . . . TPS

reviews"; and that "DHS generally consults with State on TPS decisions, although it is not specifically required to do so under the statute." *Id.* (citing GAO TPS Report at 2, 18–19). Fair.

But the consultation detailed in the GAO TPS Report puts the inadequacy of the email exchange here into stark relief. Typically, State's Bureau of Population, Refugees, and Migration (PRM) compiles a "joint action memo" by reaching out to the regional bureau, which in turn reaches out to the overseas post (*e.g.*, the embassy), which in turns fills out and returns a detailed questionnaire about country conditions. *See* GAO Report at 23. Other agencies (*e.g.*, the U.S. Agency for International Development) may also provide information. *See id.* The Secretary of State then reviews PRM's memorandum and sends a recommendation letter and final country conditions report to the DHS Secretary. *See id.* at 22–23.[22] Compare this with the late Friday afternoon, three-sentence email exchange between staffers that occurred here.

The most the Government can muster as to the Secretary of State's position is that there is "no reason to believe" that the "information provided by the Department of State to DHS"—in its one-sentence email—lacks the Secretary of State's support. Dkt. 98 ¶ 5. Maybe as to foreign policy.[23] But as to Haiti's *country conditions*, Secretary Rubio—as recently as October 1, 2025—raised the concern that Haiti continues to face, "immediate security challenges." CAR 78-7 at 32. And earlier in 2025, he warned that criminal elements in Haiti seek to create "a gang-controlled state where illicit trafficking and other criminal activities operate freely and terrorize Haitian citizens." *Id.* at 46.

---

[22] For a detailed review of this process, see *NTPSA IV*, 798 F. Supp. 3d at 1120–22, and *Saget*, 375 F. Supp. 3d at 298–300.

[23] The Government contends that "foreign policy" covers "country conditions." Jan. 6 A.M. Hr'g Tr. at 34:21–36:6. Not according to Secretary Noem. In the Termination, she listed "foreign policy" as part of the national interest analysis, not the country conditions analysis. *See* 90 Fed. Reg. at 54735 ("'National interest' is an expansive standard that may encompass an array of broad considerations, including foreign policy . . . .").

45

The Court makes the following observation:  The State Travel Advisory for Haiti in the CAR is dated September 18, 2024.  *See* CAR 78-7 at 17.  Secretary Noem published her initial termination notice for Haiti on July 1, 2025.  Two weeks later, on July 15, 2025, State "[r]eissued" its travel advisory because conditions had *worsened* since the previous September.  It added a "terrorism indicator," and the language "[d]o not travel to Haiti for any reason."  § 705 Reply at 20–21.  This July reissue was State's operative travel advisory on November 28, 2025, when Secretary Noem issued the Termination, and it remains in effect today.  But it does not appear in the CAR.  So?  The Secretary did not even consider updated information from State freely available to the public.

Perhaps every government agency would have agreed with Secretary Noem's Termination decision.  Perhaps none of them would.  We do not know.  Because the Secretary did not consult.  In terminating Haiti's TPS designation without consulting, she acted contrary to law and in excess of statutory authority.

### 2.  *The Secretary Engaged in a Pattern and Practice of Terminating All TPS Designations Without the Requisite Periodic Review*

As of the publication of this Memorandum Opinion, the Secretary has terminated the TPS designations of all twelve countries, including Haiti, that "have come up for . . . period[ic] review" since President Trump took office in January 2025.  Dkt. 98 at 4; Dkt. 113.  This alone strongly suggests that the Secretary engaged in a pattern and practice of terminating all TPS designations without the country specific statutorily-mandated periodic review.

The Supreme Court has recognized that when agency action "appl[ies] some particular measure across the board," a person adversely affected may challenge "the entire  . . . program, insofar as the content of that particular [contested] action is concerned."  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 n.2 (1990) (cleaned up).  The D.C. Circuit describes such a claim as

assailing an agency's alleged wholesale "practice of shrugging off . . . statutory . . . limitations." *Hisp. Affs. Project v. Acosta*, 901 F.3d 378, 387 (D.C. Cir. 2018).

Plaintiffs' pattern-and-practice allegations, *see* SAC ¶¶ 240–43; Dkt. 108 at 10–13, claim just that. They assert that "[t]he fact that the administration has terminated every TPS designation that it has reviewed despite the disparate conditions in those countries is evidence that the administration is terminating TPS designations, including Haiti's TPS designation, based on a predetermined agenda rather than a good-faith, fact-based, country-specific review as required by 8 U.S.C. § 1254a(b)(3)(A)." SAC ¶ 241. In fewer words, they allege that the Secretary impermissibly engaged in a "habitual[]" "practice" or "*de facto* policy" of terminations across the board. *Hisp. Affairs Project*, 901 F.3d at 386–88.

The Government concedes that twelve designated countries have come up for periodic review since January 20, 2025, and Secretary Noem has terminated all twelve.

**Table of TPS Actions**

| Date of Publication | TPS Action Taken | Country | Federal Register Citation |
|---|---|---|---|
| 2/3/2025 | Vacatur | Venezuela | 90 Fed. Reg. 8805 |
| 2/5/2025 | Termination | Venezuela | 90 Fed. Reg. 9040 |
| 2/24/2025 | Partial Vacatur | Haiti | 90 Fed. Reg. 10511 |
| 5/13/2025 | Termination | Afghanistan | 90 Fed. Reg. 20309 |
| 6/4/2025 | Termination | Cameroon | 90 Fed. Reg. 23697 |
| 6/6/2025 | Termination | Nepal | 90 Fed. Reg. 24151 |
| 7/1/2025 | Termination | Haiti | 90 Fed. Reg. 28760 |
| 7/8/2025 | Termination | Nicaragua | 90 Fed. Reg. 30086 |
| 7/8/2025 | Termination | Honduras | 90 Fed. Reg. 30089 |
| 9/8/2025 | Termination | Venezuela | 90 Fed. Reg. 43225 |
| 9/22/2025 | Termination | Syria | 90 Fed. Reg. 45398 |
| 11/6/2025 | Termination | South Sudan | 90 Fed. Reg. 50484 |
| 11/25/2025 | Termination | Burma | 90 Fed. Reg. 53378 |
| 11/28/2025 | Termination | Haiti | 90 Fed. Reg. 54733 |
| 12/15/2025 | Termination | Ethiopia | 90 Fed. Reg. 58028 |
| 1/14/2026 | Termination | Somalia | 91 Fed. Reg. 1547 |

Dkt. 113.[24] It is, to the Court's knowledge, unprecedented in the thirty-five years since the establishment of the TPS program for a DHS Secretary to terminate every TPS designation that

---

[24] This chart omits one extension. South Sudan's TPS automatically extended six months in May 2025 because Secretary Noem failed to conduct the required periodic review. *See* Dkt. 113. At the next opportunity, she terminated its designation. *See* 90 Fed. Reg. 5084 (Nov. 6, 2025).

crosses her desk for review. *See* Jan. 7 Hr'g Tr. at 11–15, 60–68. This unprecedented, across-the-board nature of the Secretary's terminations strongly suggests that each decision sprang from a "*de facto* policy" and "shrug[ed] off" the "statutory command" that she engage in an individualized review of the conditions of each country. *Hisp. Affairs Project*, 901 F.3d at 386–88.

This is not only educated speculation. Secretary Noem has failed to consult, as required, appropriate agencies in making other termination decisions. As this Court does with Haiti, courts have concluded that she failed to consult before terminating the TPS designations for Burma, Honduras, Nepal, Nicaragua, and Venezuela, despite her statutory obligation to do so. *See Doe*, 2026 WL 184544 at *14 (Burma); *Nat'l TPS Alliance*, 2025 WL 4058572 at *22–23 (Honduras, Nepal, and Nicaragua); *NTPSA IV*, 798 F.Supp.3d at 1118 (Venezuela). These consistent judicial findings support a broader pattern of terminating TPS designations writ large.

Whatever the "Administration's priorities," *Dep't of Com.*, 588 U.S. at 781, the Secretary has no authority to contravene an act of Congress. A pattern and practice of doing so is "arbitrary, capricious, and contrary to law, in violation of the APA." *Hisp. Affairs Project*, 901 F.3d at 386. Plaintiffs are likely to succeed on the merits of their pattern-and-practice APA claim.

### 3. The Secretary's Actions Were Arbitrary and Capricious

Agency action is arbitrary and capricious if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Id.* But a court must ensure

48

that the agency "remained within the bounds of reasoned decisionmaking." *Dep't of Com.*, 588 U.S. at 773 (cleaned up).  It does so by considering whether the record confirms that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (cleaned up).

Plaintiffs contend that Secretary Noem's explanation for terminating Haiti's TPS designation is "implausible and contrary to the evidence." § 705 Mot. at 37.  The Government does not meaningfully dispute this.  Instead, it urges the Court not to "second-guess" the Secretary's decision-making or "reweigh the conflicting evidence." § 705 Opp'n at 33–34 (cleaned up).  The Court accedes—as it must—to that request.  The Court instead "determine[s] whether the [Secretary's] decision-making was reasoned, principled, and based upon the record." *Louisville Gas & El. Co. v. FERC*, 149 F.4th 693, 701 (D.C. Cir. 2025).  It was not.

The Secretary offered two reasons for terminating Haiti's TPS designation.  First, because "there are no extraordinary and temporary conditions in Haiti that prevent Haitian" TPS holders "from returning [to] safety."  90 Fed. Reg. at 54735.  And second, because permitting Haitian TPS holders to remain in the United States "is contrary to the national interest." *Id.* Neither justification withstands APA scrutiny.

### a.  Conditions in Haiti

Secretary Noem's determination that conditions in Haiti permit safe return "runs counter to the evidence before [her]." *State Farm*, 463 U.S. at 43.

The Certified Administrative Record contains over 1,450 pages, and it speaks with remarkable consistency.  Every document describing conditions in Haiti in 2025 describes the country as a nation deep in crisis.

49

| Date | Statement | Source | CAR Cite |
|------|-----------|--------|----------|
| Jan. 16 | "Haiti's crisis has reached catastrophic levels, with allied criminal groups intensifying large-scale, coordinated attacks on the population and key state infrastructure, nearly paralyzing much of the country and worsening the already dire human rights and humanitarian situation." | News Release Summarizing Human Rights Watch Report | 78-11 at 34–35 |
| Jan. 23 | "The violence [in Haiti] has increased dramatically in 2024, as armed groups attacked new parts of the city including police stations, hospitals, and residential neighborhoods.  This surge in conflict, occurring frequently in residential zones, has deeply affected communities and seriously disrupted the health care system, which is struggling to remain functional amid supply shortages and attacks on patients and medical staff.  The instability has severely disrupted the operations of Doctors Without Borders . . . teams, at times forcing the temporary closure of facilities and suspensions of activities." | Doctors Without Borders Report | 78-11 at 279 |
| Feb. 19 | "Haiti is paralyzed.  Early hope that an inclusive transitional government would quickly tackle the country's rampant insecurity with help from an international force has faded. . . . [G]angs have seized the opportunity to occupy more territory, where they are lording it over the population with increasing ruthlessness.  With almost one in ten people living in Haiti displaced, and almost half the population facing acute food insecurity, humanitarian conditions are desperate.  In such circumstances, the transitional administration's determination to hold a vote on a new constitution and a new government by the end of 2025 seems unrealistic."[25] | Crisis Group Report | 78-11 at 126 |

---

[25] It was; the elections did not take place.  *See* § 705 Mot. at 26.

| Feb. 26 | "Gang violence in Haiti continued to surge in 2024, following a trend that began with the assassination of President Jovenel Moïse in 2021.  The country reported a record number of homicides in 2024. . . .  In a scenario where the state is largely absent and criminal actors enjoy undisputed social control, gangs carry out massacres and force residents to leave their homes to exploit the political turmoil and expand their control over the country." | InSight Crime's 2024 Homicide Round-Up | 78-11 at 70–71 |
| Mar. 11 | Doctors Without Borders reported "cholera on the rise in Haiti."  It "expressed concerns about the trend as Haitians have less access to clean water." | Voice of America Article | 78-7 at 130 |
| Mar. 12 | The Federal Aviation Administration (FAA) "has extended its ban on U.S. flights to Port-au-Prince until Sept. 8, 2025. . . . The FAA first imposed the ban in November 2024 after gunfire hit three U.S. planes attempting to land." | The Haitian Times Article | 78-10 at 127 |
| Mar. 18 | "Overall, more than 1 million people are displaced across the country, a number that has tripled in the past year.  Yet, as suffering reaches new extremes, Haiti's crisis continues to struggle for the world's attention.  Resources are stretched thin, and humanitarian needs far exceed the current response capacity.  Additionally, insecurity keeps growing." | International Organization for Migration Article | 78-11 at 240 |
| Apr. 7 | "'Human rights violations and abuses have reached a scale and intensity that I have never seen before in Haiti,' said William O'Neill, the [UN] High Commissioner's Designated Expert on Haiti." | United Nations (UN) Human Rights Office of the High Commissioner Article | 78-12 at 49 |

51

| Apr. 21 | "The situation in Haiti has reached a pivotal moment and is further deteriorating and approaching what is likely to become 'a point of no return,' requiring urgent international attention and political will to address the rapid erosion of that country's statehood, briefers told the [UN] Security Council today." | Meetings Coverage, UN Security Council (UNSC) | 78-13 at 129 |
|---------|------|------|------|
| June 24 | "A wave of drones strikes has reportedly killed hundreds of alleged gang members in Port-au-Prince and temporarily shaken Haiti's criminal landscape, but legal concerns and mounting civilian casualties have raised questions about the strategy's long-term effectiveness." <br><br> The drone strikes while temporarily putting gangs on the defensive, "are unlikely to offer a long-term solution to Hait's security crisis, as these groups continue to adapt to shifts in the government's anti-gang strategy.  Haiti's gangs are extremely well-armed and resilient.  Each time authorities have altered their approach, the gangs quickly found ways to respond." | InSight Crime Article | 78-11 at 54, 58 |
| June 27 | "Haiti is one of only five countries worldwide with people in famine-like conditions.  Internal displacement is at its highest since the earthquake of 2010.  Hospitals, health centres and schools are routinely attacked and at the brink of collapse.  Years of underfunding of humanitarian response, amid growing needs and rising violence, have eroded fundamental coping mechanisms and left millions of Haitians without essential support." | UN Integrated Office in Haiti, Report of the Secretary-General | 78-13 at 149 |
| July 2 | "Top United Nations Officials Urge Swift Global Action as Haiti Nears Collapse." | Meetings Coverage, UNSC | 78-13 at 95 |

| Aug. 7 | "Threats of violence have forced essential services to shut down, including hospitals and roadways, and nearly 1.3 million people have been displaced from their homes. . . . The humanitarian situation in Haiti is considered among the most dire in the world." | Aljazeera Article | 78-7 at 150 |
|---|---|---|---|
| Aug. 9 | "Haiti's government announced . . . that it is implementing a three-month state of emergency in the country's central region as gang violence surges." | AP News Article | 78-8 at 31 |
| Sept. 8 | "Federal Aviation Administration ban on U.S. commercial flights to Haiti's capital that expired Monday has been extended to March 7, 2026 because of the risk that powerful gangs might attack flights with drones and small arms.  The FAA noted that Haitian gangs now control 90% of Port-au-Prince as well as nearby strategic routes and border areas." | AP News Article | 78-8 at 17 |
| Sept. 11 | "Escalating terrorist and insurgent gang violence is devastating Haiti: more than 1.3 million people—half of them children—are displaced, communities are under siege, and children are being forcibly recruited and subjected to sexual violence.  The territorial expansion of these criminals and murderers threatens to erase the hard-fought battles for national sovereignty by the under-resourced Haitian security forces." | U.S. Mission to the Organization of American States, U.S. Remarks | 78-7 at 91 |

| Sept. 13 | "In 2025, Haiti continues to face a deepening humanitarian emergency marked by widespread insecurity, displacement, and limited access to essential services.  Armed violence and gang control have severely disrupted daily life, forcing hundreds of thousands to flee their homes and straining the delivery of food, water, sanitation, and health care.  The resurgence of cholera in late 2022, after a three-year absence, has further complicated the crisis, with conditions in displacement cites heightening the risk of disease transmission." | Pan American Health Organization (PAHO) Health Cluster Situation Report No. 26, Humanitarian Situation in Haiti | 78-12 at 71 |

Against this record of a country in chaos and crisis, Secretary Noem concluded that "there are no extraordinary and temporary conditions in Haiti that prevent Haitian" TPS holders "from returning [to] safety."  90 Fed. Reg. at 54735.  In doing so, she did not identify a single *present* condition in Haiti that indicates the many crises Secretary Mayorkas identified in July 2024, *see supra* Section I.B.3, have subsided, much less been resolved.

According to Secretary Noem, "data surrounding internal relocation does indicate parts of the country are suitable to return to."  90 Fed. Reg. at 54735.  But the Secretary cited no data to support this proposition and failed to identify a single safe location.  In response to an inquiry from the Court, the Government cited an October 29, 2025, USCIS memo in the administrative record as the supporting analysis.  *See* Dkt. 119 at 2–3; Dkt. 89-2 at 4.[26]  "The memo," it noted,

---

[26] This memorandum appears to have served as a template for the Termination and contains the same flaws.  *See* Dkt. 89-2.  For example, highlighting overstay of immigrant visas as a concern, it also ignores that current Haitian TPS holders are not in this category.  *See id.* at 8–9.  It is also equally atonal.  It claims that because Immigration & Customs Enforcement (ICE) has removed 4,140 individuals to Haiti since 2020, conditions there "have been sufficiently stable for the safe removal of Haitian nationals."  *Id.* at 9.  With respect, this borders on the absurd.  The latter has zero relation to the former or reality.  And, if anything, that ICE is actively removing Haitians not here lawfully helps Plaintiffs.  It proves that terminating TPS for the hundreds of thousands of Haitians here lawfully is not necessary to address the unlawful immigration concerns Secretary Noem cites in her national interest analysis.

"reflects that individuals have been internally displaced, thereby indicating that Haitian residents found certain areas in Haiti that could be suitable for return." Dkt. 119 at 3. But the memo also fails to identify a single safe location by name or even geographic area. And the fact that, as the memo notes, 1.3 million Haitians—around twelve percent of the population—have been "internally displaced due to escalating violence" says nothing about whether they escaped to suitable areas. Dkt. 89-2 at 4. If anything, those areas are presumptively now *less suitable* for return, having been inundated with internal refugees.

Another USCIS memo from October 1, 2025, stated that "[w]hile country conditions in Haiti *may* still[27] be challenging . . . there have been improvements." Dkt. 89-1 at 2 (emphasis added). "The Haitian government," it notes, "has committed substantial investments to strengthen security, governance, and the judicial system." *Id.* at 5. That sounds promising; it would be, if one ignored that the cited source is a UNSC warning that Haiti "is a country in full-blown conflict," and that "any effort by the Haitian Government will not be enough to significantly reduce the intensity and violence of criminal groups."[28] This USCIS memorandum is riddled with other such verifiably misleading statements.

Unable to identify present conditions supporting her conclusion, Secretary Noem turns instead to speculation about future improvement. Each source she cited speaks to how Haiti *might* improve *in the future*. She quoted a UN article referencing Secretary-General António Guterres's statement that despite ongoing violence in Haiti, "'there are emerging signals of

---

[27] *May* still be? The country is in the midst of "famine," CAR 78-13 at 149, and a "humanitarian emergency," CAR 78-12 at 71, and is quickly approaching "a point of no return," CAR 78-13 at 129.

[28] Security Council Meetings Coverage, *Haiti 'Running Out of Time', Delegate Warns Security Council, Noting Possible Fall of Capital to Gangs Cannot Be Allowed*, United Nations (Apr. 21, 2025), https://press.un.org/en/2025/sc16047.doc.htm [https://perma.cc/2QYZ-49Q8] (cleaned up).

hope.'" 90 Fed. Reg. at 54735 & n.19. He cautioned that "these fragile gains" depend on "more decisive international support."[29] Emerging signals of hope, of course, are not actual change.[30] Secretary-General Guterres's full remarks to the UNSC underscore this point. *See* CAR 78-13 at 174, 179–83. They do not describe a nation on the brink of recovery. Rather, they describe a nation in crisis, whose future hinges on internal "unity" and "resolve from [the UNSC]." *Id.* at 183.

Secretary-General Guterres began his August 2025 remarks by stating that "[t]he people of Haiti are in a perfect storm of suffering." *Id.* at 179. He reported that the "State authority is crumbling," the "humanitarian toll is staggering," "[c]ivilians are under siege with appalling reports of rape and sexual violence," "[h]ospitals and schools are under repeated attack," and "[t]he rule of law has collapsed." *Id.* Among other things, Guterres also described that "[c]hildren are being abducted and killed," Haitians are facing "[m]ass displacement," and "[s]ix million people need humanitarian assistance." *Id.* at 179–81. It is hardly surprising that State advises, notwithstanding "emerging signals of hope," against travel to Haiti *for any reason*. *See* § 705 Reply at 20–21. Canada's travel advisory echoes that warning, explaining that "[a] countrywide state of emergency [is] in effect in response to ongoing gang violence." CAR 78-10 at 100–01.

Secretary Noem also highlighted the new UNSC Gang Suppression Force (GSF) which plans to "work in close coordination with the Haitian National Police (HNP) and the Haitian armed forces to conduct intelligence-led operations to neutrali[z]e gangs, provide security for

---

[29] *'The People of Haiti are in a Perfect Storm of Suffering,' Warns UN Chief*, United Nations News (Aug. 28, 2025), https://news.un.org/en/story/2025/08/1165738 [https://perma.cc/BB3T-BDGK].

[30] Secretary-General Guterres's statement is, the Government agrees, a prospective-looking statement. *See* Jan. 6 A.M Hr'g Tr. at 78:1–:5.

critical infrastructure and support humanitarian access."  90 Fed. Reg. at 54735.  The UNSC

approved the GSF in September 2025, about two months before Secretary Noem announced her

termination decision.  *Id*. at 54735 n.20.  It did so because Haiti "*faces an unprecedented crisis*,"

CAR 78-7 at 94 (emphasis added), and to replace its earlier, failed effort, the Multinational

Security Support (MSS) Mission, *id.* at 58–59.  Secretary Noem did not explain—and the record

does not reflect—whether the GSF had deployed to Haiti by the time Secretary Noem terminated

the country's TPS designation (only two months after the GSF was authorized).  Jan. 6 A.M Hr'g

Tr. at 84:10–85:10.

        And there is no evidence or reason to believe that the GSF will succeed anytime soon

given the failed prior interventions.  A December 2024 Congressional Research Service (CRS)

report (which appears in the CAR) found that notwithstanding the MSS's deployment, "Haiti's

political and security situation continued to deteriorate in 2024."  CAR 78-7 at 55.  The updated

June 2025 report found the same conclusion for 2025.  It explained that "Haiti's political and

security situation has continued to deteriorate in 2025 despite the 2024 deployment of a Kenya-

led, UN-authorized [MSS mission] that the U.S. government has helped train and equip."  *Id.* at

58.  Indeed, when the U.S. Mission to the Organization of American States announced the

UNSC's approval of the GSF, it explained that "the continued existence of the Haitian state

remains *more imperiled today* than when the Security Council first envisioned a way to support

[with the MSS mission]."  *Id.* at 91 (emphasis added).

        Finally, Secretary Noem asserts that "according to the World Bank, 'modest GDP growth

is projected by 2026 as investment increases from a low baseline, assuming improvements on the

political and security fronts.'"  90 Fed. Reg. at 54735.  That same World Bank article explains

that Haiti's economy "contracted by 4.2 percent . . . [for] a sixth consecutive year" in 2024 and

57

would likely continue contracting absent improvements in security and governance.  CAR 78-14 at 19.  The article goes on to explain that "[d]espite some signs of progress, Haiti continues to face critical security challenges."  *Id.*

An agency may rely on reasoned projections of future conditions to justify its actions. *See N.Y. State Pub. Serv. Comm'n v. FERC*, 104 F.4th 886, 893 (D.C. Cir. 2024).  But not here. The TPS statute requires periodic review, which focuses the inquiry on present conditions rather than future change, and Secretary Noem failed to explain why speculative future improvement outweighed overwhelming evidence of present danger.  Because her explanation runs counter to the record before her, the Court finds Plaintiffs will likely show that Secretary Noem's decision to terminate Haiti's TPS designation is arbitrary and capricious.

### b. *National Interest*

Secretary Noem also claimed to terminate Haiti's TPS designation because permitting Haitian TPS holders to remain in the United States "is contrary to the national interest."  90 Fed. Reg. at 54735.  The Court has no role in second-guessing this analysis.  The Court must, however, assess whether the Secretary's analysis considered "important aspects of the issue" and included "a rational connection between the facts found and the choice made."  *State Farm*, 463 U.S. at 43 (cleaned up).  She appears to have done neither.

Secretary Noem defined "national interest" as "an expansive standard that may encompass an array of broad considerations, including foreign policy, public safety (*e.g.,* potential nexus to criminal gang membership), national security, migration factors (*e.g.,* pull factors), immigration policy (*e.g.,* enforcement prerogatives), and economic considerations (*e.g.,* adverse effects on U.S. workers, impact on U.S. communities)."  90 Fed. Reg. at 54735.  Yet, having articulated this framework, she failed to apply the standard to the relevant population: Haitian TPS holders.

58

###### i.    Failure to Focus on Haitian TPS Holders

Secretary Noem premised her national interest analysis on Haiti's lack of reliable law-enforcement infrastructure.  Because of that, she said, "federal officials" have problems "reliably assess[ing] the criminal histories or national security threats posed by aliens attempting to enter the U.S. illegally."  90 Fed. Reg. at 54736.  But TPS holders are already in the country.  So problems attendant with individuals attempting to enter the U.S. unlawfully are as applicable here as are problems attendant with power outages—which is to say, not at all.

Secretary Noem's analysis also focused on those who "overstay their visas" and so remain in the country unlawfully.  *Id*.  She claimed that these overstayers "may be harder to locate and monitor," increasing vulnerabilities in immigration enforcement systems.  *See id*.  She also said they "place an added strain on local communities by increasing demand for public resources, contributing to housing and healthcare pressures, and competing in an already limited job market."  *Id*.  But Haitian TPS holders are not in this cohort either.  They are in the U.S. lawfully.  *See* Jan. 6 P.M. Hr'g Tr. at 85:15–87:12.  Indeed, TPS holders are easy to locate because they regularly update their address information with DHS to maintain that status and their work authorization.  *See id*. at 94:25–95:6.  And Secretary Noem provides no data to support the overgeneralization that those who overstay their visas are a strain on their local communities.  *See* Dkt. 122.  They may well cause a strain, but terminating Haiti's TPS termination not alleviate it because, again, Haitian TPS holders do not fall into this cohort.

The Government responds by speculating that maybe some Haitians overstayed their visas before obtaining TPS status.  *See* Dkt. 119.  Maybe.  Who knows?  Not Secretary Noem.  The Court asked the Government: "[w]here in the [CAR] can the Court find the percentage of TPS holders represented in the overstay rates?"  Dkt. 119 at 4.  The response: "The [CAR] does not contain data that is this finely dissected."  *Id.*  Which is to say, not enough people to even

59

bother counting.  And so, the problems attendant with individuals who overstay their visas are also as apt as are the problems attendant with power outages.  "Regardless, Defendants maintain that the high visa overstay rate for Haitians is contrary to the national interest and thus requires termination of Haiti's TPS designation."  *Id.*  But the latter does not logically, much less necessarily, follow from the former.  Nothing about the overstay rates requires TPS termination, and TPS termination would not address overstay rates.

Secretary Noem also cited "pull" migration factors to justify terminating Haiti's TPS designation.  *See* 90 Fed. Reg. at 54737.  Yet TPS eligibility is limited to individuals who are already physically present in the United States at the time of designation.  *See* 8 U.S.C. § 1254a(c)(1)(A).  No one who arrives later—lawfully or unlawfully—can obtain TPS.  Little wonder, then, that the Secretary never explained what role, if any, TPS holders play in creating a migration pull.  How could they, given the statutory constraint?  In any case, both President Trump and Secretary Noem have rather thoroughly addressed any pull migration possibility by banning individuals from Haiti entering the country.  *See supra* n.3.

The CAR, moreover, disproves any migration pull.  "Between 2018 and 2025, [nonimmigrant visa] issuances for Haitian nationals decreased significantly, from 26,389 in 2018 to 5,515 in 2025."  CAR 78-5 at 116.  "I-94 admissions have overall decreased between 2018 and 2023, from 95,160 in 2018 to 47,660 in 2023.  Like nonimmigrant visa (NIV) issuances, this pattern is likely reflective of measures aimed to restrict visa eligibility criteria resulting in limited access to NIVs for Haitian nationals."  *Id.* at 117.  Ignoring this current data, Secretary Noem relied instead on a 2013 report.  90 Fed. Reg. at 54737 n.35.  But that decade-old report sheds no light on current migration dynamics or processing backlogs.  *See* Jan. 6 P.M. Hr'g Tr. at 131:9–:12.

Secretary Noem highlighted that some Haitian TPS holders "have been the subject of administrative investigations."  90 Fed. Reg. at 54736.  But the underlying database that DHS searched identified that such people comprised only 0.4% of the total dataset, and it does not even detail how many of these people in fact made false statements.  *See* CAR 78-5 at 195.  And yet again, DHS cannot say whether any of those individuals are current TPS holders.  This is a relevant question given that the database contained information on 568,545 individuals, but there are only about 353,000 current Haitian TPS holders.  *See* 90 Fed. Reg. at 54738; *see also* Jan. 7 Hr'g Tr. at 37:8, 39:5–40:5.  More importantly, Secretary Noem offered no comparative baseline to show whether the 0.4% statistic—whoever it covers—is high, low, or unremarkable.

Secretary Noem noted that "Haitian gang members have already been identified among those who have entered the United States and, in some cases, have been apprehended by law enforcement for committing serious and violent crimes."  90 Fed. Reg. at 54737.  She referenced ICE's January 2025 apprehension of Wisteguens Jean Quely Charles.  *Id.*  But neither the Termination nor the CAR states whether Charles is or was a TPS holder.  The Termination does mention one TPS holder, Dimitri Vobre.  *Id*. at 54738; SAC ¶ 226.  Mr. Vobre has denied any involvement with Haitian gangs, and "U.S. authorities have not offered any proof to back up their claim that he has fomented violence in Haiti."  SAC ¶ 226 (cleaned up).  Even assuming he was involved with Haitian gangs, it says something that DHS was able to cite all of *one* TPS holder as allegedly being a public menace.  It says more that the Termination says nothing about the criminality rate of Haitian TPS holders.  Secretary Noem's silence here speaks volumes, especially considering that TPS eligibility excludes individuals with disqualifying criminal histories.  *See* 8 U.S.C. §§ 1254a(c)(2)(B), (3)(A); 1182(a)(2)–(3).

To recap, Secretary Noem's national interest analysis involved cohorts that she cannot say include any current Haitian TPS holders: individuals who are not in the country, individuals in the country unlawfully, individuals in an over-inclusive database, and individuals already subject to exclusion from the TPS statute. This is not a minor detail. Because her national interest analysis focuses only on cohorts that do not involve Haitian TPS holders, there is no reasoned basis to believe that terminating Haiti's TPS designation will address any of the concerns she raised. Quite the opposite, since turning around 353,000 lawful immigrants into unlawful ones overnight will further burden the very immigration-enforcement system she claims is already over-burdened. This is the type of irrational decision-making the APA prohibits. *See State Farm*, 463 U.S. at 43.

The careful, perhaps even the casual, reader by now also realizes something important is missing from Secretary Noem's analysis: the cohort of current Haitian TPS holders. Let us turn to that cohort next.

### ii. Failure to Consider Economics

Did Secretary Noem's failure to consider this cohort potentially affect her analysis? Consider one example. She failed to consider the impact Haitian TPS holders have on our economy. Hence, she did not account for the $1.3 billion they pay annually in taxes, among their many other contributions. *See infra* Part VI. This failure "is problematic, given that the [Secretary] specifically determined that," *Am. Clinical Lab'y Ass'n v. Becerra*, 40 F.4th 616, 625 (D.C. Cir. 2022), national interest includes "economic considerations (*e.g.*, adverse effects on U.S. workers, impact on U.S. communities)," 90 Fed. Reg. at 54735.

Another example. Secretary Noem also failed to analyze the "impact on U.S. communities" of the loss of work authorization for all Haitian TPS holders and the resulting effects on employers, industries, and local economies. Amici representing states, labor

organizations, and members of Congress explain that TPS holders are highly employed, pay taxes, and work in industries with labor shortages. *See infra* Part VI. The so-called adverse effects on U.S. workers? As a group, 14.5% of TPS holders are entrepreneurs—compared with 9.3% of the U.S.-born workforce. *See id.* One need not even credit those figures to recognize the defect here—the Secretary never considered whether such benefits exist at all. The Secretary "fail[ed] to show that [she] considered the issue, much less that [she] reached a reasoned conclusion." *Nat. Res. Def. Council, Inc. v. Rauch*, 244 F. Supp. 3d 66, 97 (D.D.C. 2017).

* * *

The Court is sensitive that its role is not to weigh the record itself. If it was, this Memorandum Opinion would be considerably shorter. Secretary Noem is the decision-maker. But the Secretary cannot just throw *verifiably* inapposite or false assertion after inapposite or false assertion—no matter how inflammatory—against the wall and hope that something sticks. Nor can she lawfully fail to consider the very factors, such as economic considerations, that she herself has determined are relevant simply because they do not support her preferred outcome.

Which brings us to yet another APA violation, predetermining the outcome.

### c. *Preordained Result*

Plaintiffs contend that the Trump administration preordained the decision to terminate Haiti's TPS designation. *See* SAC ¶ 64. Defendants argue that Plaintiffs mischaracterize the record. *See* § 705 Opp'n at 26. Not so. Plaintiffs have shown that there is no "rational connection between the facts found and the choice [the Secretary] made." *State Farm*, 463 U.S. at 43. Accordingly, they are likely to succeed in their claim that the Secretary's decision to terminate Haiti's TPS designation was preordained.

63

The Court will not regurgitate all it has detailed above.  Suffice it to say, nearly everything the Court has already discussed supports that the Secretary preordained the result. This includes Secretary Noem: (1) following the President's direction to terminate before conducting any analysis; (2) terminating every TPS designation to come before her; (3) failing to consult appropriate agencies; (4) making gross generalizations without any supporting data; and, among other things, (5) ignoring key aspects of the analysis.  *See passim*.

As does Secretary Noem joining President Trump in insisting that nonwhite immigrants be forced to leave the United States, the subject to which the Court next turns.

**B. Equal Protection Claim**

The Due Process Clause of the Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V. Although it is "not as explicit a guarantee of equal treatment as the Fourteenth Amendment," *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 213 (1995), the Clause "contains an equal protection component prohibiting" the federal government from engaging in invidious discrimination against persons in the United States, *Washington v. Davis*, 426 U.S. 229, 239 (1976).  These protections "are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality."  *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886).  They apply to citizens and foreign nationals alike, even when a person's "presence in this country is unlawful, involuntary, or transitory."  *Mathews v. Diaz*, 426 U.S. 67, 77 (1976).

Though subject to judicial review, the Government may treat people differently if it has sufficient justification.  *See id.* at 78.  Here, the Parties dispute the appropriate standard of review for Plaintiffs' Equal Protection claim.   Plaintiffs contend that the standard in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), applies because the

64

Secretary's decision to terminate Haiti's TPS was "motivated, at least in part, by racial animus."
§ 705 Mot. at 13, 45–47.  In the Government's view, the more deferential standard in *Trump v. Hawaii*, 585 U.S. 667 (2018), governs because the Secretary's decision arises in the context of immigration and involves issues related to national security.  *See* § 705 Opp'n at 35–37.

For the reasons discussed below, the Court finds that *Arlington Heights* applies to this case.  That noted, the Court would find Plaintiffs likely to succeed even if it applied the *Trump v. Hawaii* standard.

### 1.  Arlington Heights *Governs Plaintiffs' Equal Protection Claim*

The Government argues that "[t]he Supreme Court has specifically foreclosed [the *Arlington Heights*] standard in the context of immigration."  § 705 Opp'n at 35.  It has not.

The Supreme Court has not announced a categorical rule for the standard of review in immigration cases.  Nor has it declined to apply *Arlington Heights* in immigration cases.
Consider *Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1 (2020).  A case the Supreme Court decided two years after *Hawaii*, and on which Defendants rely, *Regents* involved the DHS's efforts to rescind the Deferred Action for Childhood Arrivals (DACA) program.  As here, the plaintiffs in *Regents* were foreign nationals present in the United States who alleged that animus motivated DHS's actions.  *See Regents of the Univ. of Cal.*, 591 U.S. at 9, 33–35.  The Court applied the *Arlington Heights* standard.  *Id.* at 34–35; *see also Ramos v. Nielsen*, 321 F. Supp. 3d 1083, 1129–31 (N.D. Cal. 2018); *Saget*, 375 F. Supp. 3d at 368 (collecting cases).

*Hawaii* is different.  It concerned President Trump's executive order barring foreign nationals from seven majority-Muslim countries from entering the United States.  *Hawaii*, 585 U.S. at 676.  Unlike in *Regents*, and this case, the *Hawaii* plaintiffs "challenged the application of those *entry* restrictions to certain [foreign nationals] *abroad*."  *Id.* at 675 (emphasis added).

This distinction is key because courts are most deferential in cases involving "foreign nationals seeking admission" into the United States. *Id.* at 703. But when the Government seeks to withdraw lawful status from individuals it has vetted, its authority is subject to greater constitutional constraints. TPS recipients fall squarely within the latter category.

The Government also contends that *Hawaii* applies because it is an immigration case that involves national security concerns. Mere invocation of "national security," however, does not serve as a talismanic shield against an Equal Protection violation. If that were the case, then the Government could label anything it does as a national security measure to insulate discriminatory decision-making from judicial scrutiny. National security may justify differential treatment, but only where there is "'a rational connection between the facts found and the choice made.'" *Dep't of Com.*, 588 U.S. at 773 (quoting *State Farm*, 463 U.S. at 43). No such connection appears here.

Even when judicial "review is deferential," the Court is "not required to exhibit a naiveté from which ordinary citizens are free." *Id.* at 785 (cleaned up). Secretary Noem's decision to terminate Haiti's TPS designation "was not supported by the evidence before [her], and [her] stated rationale was pretextual." *Id.* at 773–74; *see supra passim*. When the record fails to support the Government's stated rationale—and where Plaintiffs claim that discriminatory animus played a motivating role in the Government's decision—*Arlington Heights* requires courts to look behind the proffered explanation and assess whether it is pretextual. *See Arlington Heights*, 429 U.S. at 266. The Court now turns to that analysis.

### 2. *Plaintiffs Are Likely to Succeed Under* Arlington Heights

"[O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact." *Arlington Heights*, 429 U.S. at 264–65. Courts must engage in a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.*

66

at 266.  In doing so, courts may consider "the historical background of the decision"; "the specific sequence of events leading up to the challenged decision"; departures from normal procedural or substantive standards; and the legislative or administrative history, including "contemporary statements by members of the decisionmaking body."  *Id.* at 267–68.  Applying these factors, the Court finds that Plaintiffs are likely to succeed on their claim that anti-black and anti-Haitian animus motivated Secretary Noem's decision to terminate Haiti's TPS designation.

### a.  President Trump has expressed racially motivated animus

President Trump has made—freely, at times even boastfully—several derogatory statements about Haitians and other nonwhite foreigners.  To start, he has repeatedly invoked racist tropes of national purity, declaring that "illegal immigrants"—a category he wrongly assigns to Haitian TPS holders—are "poisoning the blood" of America.  § 705 Mot. at 47.  He has, Plaintiffs allege, complained that recently admitted nonwhite Africans would "never 'go back to their huts' in Africa."  SAC 90 ¶ 66.  He has complained further that nonwhite immigration is an "invasion," creating a "dumping ground" that is "destroying our country."  *Id.* ¶¶ 94, 101.  He has described immigrants as "not people," *id.* ¶ 86, "snakes," *id.* ¶ 84, and "garbage," *id.* ¶ 107, who have "bad genes," *id.* ¶ 98.  He has also stated that he prefers immigrants from "nice"—predominantly white—countries like Norway, Sweden, and Denmark over immigrants from "shithole countries," *id.* ¶¶ 102, 108.

President Trump has referred to Haiti as a "shithole country," suggested Haitians "probably have AIDS," and complained that Haitian immigration is "like a death wish for our country."  § 705 Mot. at 47.  He has also promoted the false conspiracy theory that Haitian immigrants were "eating the pets of the people" in Springfield, Ohio.  Even after that (ridiculous) claim was debunked, he claimed they were eating "other things too that they're not supposed to

be." *Id.* at 47–48.  About two weeks after the Termination, he again described Haiti as a "filthy, dirty, [and] disgusting" "shithole country." *Id.* at 48.  He stated: "I have also announced a permanent pause on Third World migration, including from hellholes like Afghanistan, Haiti, Somalia and many other countries." *Id.* at 48 n.53.  Then continued, "Why is it we only take people from shithole countries, right?  Why cannot we have some people from Norway, Sweden, just a few, let us have a few, from Denmark." *Id.*  It is not a coincidence that Haiti's population is ninety-five percent black while Norway's is over ninety percent white.  SAC 90 ¶ 70.

Plaintiffs allege that after taking office, putting words to practice, "President Trump made his preference for white immigrants the official policy of the United States." *Id.* ¶ 103.  On the one hand, his administration eliminated "the lawful immigration status not only of Haitians but of immigrants from other predominantly nonwhite countries." *Id.*  On the other, it "gave special priority" to white South African immigrants, admitting them into the United States as refugees. *Id.*  And, of course, Plaintiffs further allege that President Trump targeted the TPS designations of nonwhite countries.  He described utilizing the TPS program as "a certain little trick," and groused that TPS recipients "are illegal immigrants as far as [he is] concerned." *Id.* ¶ 91.[31]

To its credit, the Government does not defend President Trump's derogatory statements.  No one rationally could.[32]  Instead, it argues that the Supreme Court's decision in *Regents* prohibits the Court from considering them.  *See* MTD at 42 (citing *Regents of the Univ. of Cal.*, 591 U.S. at 34–35).  To be sure, the *Regents* Court found that President Trump's statements at issue there—derogatory statements about Hispanics—were too remote on the facts presented to

---

[31] They are not.  *See* 8 U.S.C. § 1254a.

[32] Which is not to say that Americans cannot rationally debate immigration policy.  They can, of course.  They can even do so without calling fellow human beings "garbage" and "leeches."

68

influence the decision-making of the relevant government actors.  *See Regents of the Univ. of Cal.*, 591 U.S. at 35.

But the Supreme Court did not place any categorical bar on considering a President's statement in the Equal Protection context.  And so, courts since have relied on President Trump's campaign and post-election statements as probative of intent where, as here, they are closely connected in time and substance to the challenged action.  *See, e.g.*, *Perkins Coie LLP v. Dep't of Just.*, 783 F. Supp. 3d 105, 162–64 (D.D.C. 2025); *Am. Ass'n of Univ. Professors v. Rubio*, 802 F. Supp. 3d 120, 187 (D. Mass. 2025).

Plaintiffs claim President Trump made numerous derogatory statements about nonwhite immigrants, and Haitians particularly, close in time to Secretary Noem's three TPS decisions about Haiti.  In February 2025, the same month that Secretary Noem first acted, President Trump falsely alleged that "some of these countries allowed [in] every single prisoner," specifically calling out "countries . . . from Africa, from Asia, not just South America, a lot, a lot from South America, but not even the most."  SAC ¶ 95.  Notably missing from the list of continents are Europe and Australia.  In June 2025, the same month as Secretary Noem's second action, President Trump instituted a travel ban that imposed visa restrictions on 19 countries—including Haiti—each of which is predominantly nonwhite.  *Id.* ¶ 109.  On December 16, 2025, shortly after Secretary Noem's third action, President Trump issued a new and expanded travel Proclamation that built on the travel Proclamation he issued on June 4th.  *Id.* at n.88.  That same month, he allegedly "called nonwhite Somali immigrants—and Somalian U.S. Rep. Ilhan Omar, an American citizen—'garbage.'"  *Id.* at ¶ 107.  Echoing his previous comments that Haitians are undesirable because they come from a "shithole country," President Trump said that Somali

immigrants "come from hell and they complain and do nothing but bitch, we don't want them in our country." *Id.* These are just a few of many examples.

The Government contends that Plaintiffs take the derogatory statements out of context. To be sure, "outright admissions of impermissible racial motivation are infrequent." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). This is why *Arlington Heights* directs courts to conduct a "sensitive inquiry" into the evidence to determine whether discriminatory animus played a motivating factor in the Government's actions. *Arlington Heights*, 429 U.S. at 266–68. But, whatever the context and at whatever level of sensitivity one considers them, the statements are what they are: unmitigated expressions of animus towards nonwhite foreigners.

Finally, it bears highlighting that during his first administration, President Trump also attempted to terminate Haiti's TPS designation. Several courts enjoined his actions, finding the Government's decisions to be "preordained" and motivated by the "discriminatory purpose of removing nonwhite immigrants from the United States." *Saget*, 375 F. Supp. 3d at 346–47, 374; *Ramos*, 336 F. Supp. 3d at 1100–05; *Centro Presente v. Dep't of Homeland Sec.*, 332 F. Supp. 3d 393, 415 (D. Mass. 2018). The Court has no trouble concluding that Plaintiffs are likely to succeed on their claim that that discriminatory intent continues through today.

### b. President Trump influenced Secretary Noem's decision

Further relying on *Regents*, the Government also argues that President Trump's statements are irrelevant because the DHS Secretary makes TPS termination determinations.[33] *See* § 705 Opp'n at 35. But when a superior's animus "influenced or manipulated the decision-making process," government action "may violate the equal protection" guarantee "[e]ven if it

---

[33] The Court requested that the Government submit certain documents referenced in *NTPSA IV*, 798 F. Supp. 3d 1108. *See* Dkt. 109. Finding that they do not add to the analysis, however, the Court does not rely on them.

cannot be proven that" the subordinate "personally harbor[s] animus."  *NAACP v. Dep't of Homeland Sec.*, 364 F. Supp. 3d 568, 577 (D. Md. 2019); *Saget*, 375 F. Supp. 3d at 369–72. "Even if the Secretary had taken every formal step required by every applicable statutory provision, reversal would be required . . . [where] extraneous pressure intruded into the calculus of considerations on which the Secretary's decision was based."  *D.C. Fed'n of Civic Assocs. v. Volpe*, 459 F.2d 1231, 1245–46 (D.C. Cir. 1971).

Yes, Secretary Noem is supposed to make the decision.  But here is what occurred instead:

| | |
|---|---|
| **January 29**: | Secretary Noem explained that "[w]hen the President gives a directive, the Department of Homeland Security will follow it." § 705 Mot. at 34. |
| **February 22**: | President Trump stated that "[t]his week *I* also cancelled temporary protective status for migrants from Haiti, they are pouring into our country, pouring in."[34] (emphasis added). |
| **February 24**: | Secretary Noem published the decision of the partial vacatur of then-Secretary Mayorkas's July 2024 extension of Haiti's TPS designation.  *See* 90 Fed. Reg. at 10511. |

The Court need do nothing more than take the President and Secretary at their word in concluding that Secretary Noem only followed orders.  At a minimum, President Trump influenced Secretary Noem's decision through his many public statements, which Secretary

---

[34] *President Trump Speaks at CPAC*, C-SPAN (Feb. 22, 2025 at 22:11), https://www.c-span.org/program/public-affairs-event/president-trump-speaks-at-cpac/656191.  While the Government objects to the Court taking judicial notice of this speech, *see* Dkt. 118, Plaintiffs correctly note that courts routinely take judicial notice of televised speeches under Federal Rule of Evidence 201(b)(2), *see* Dkt. 121.

Noem has acknowledged.  *See supra* Section IV.B.2.a.  Indeed, the Government concedes that

DHS communicated and met with White House officials to discuss Haiti's TPS designation.[35]

In any event, Plaintiffs also identify statements and actions by Secretary Noem that

reinforce the inference of racial animus.  Secretary Noem has described Haitians—and people

from eighteen other nonwhite countries—as "leeches," "entitlement junkies," and "foreign

invaders" who "suck dry our hard-earned tax dollars," and has expressly claimed that "WE

DON'T WANT THEM. NOT ONE."  *See* SAC ¶¶ 109–10.  And recall that that X post and her

recommendation that President Trump ban anyone from Haiti coming into the U.S. occurred a

mere three days after she made the Termination decision.  *See supra* n.2.[36]  Plaintiffs allege that

she separately accused TPS holders of being "poorly vetted migrants" who include "MS-13 gang

members to known terrorists and murderers."  SAC ¶ 111.

Though a closer call, even if the Court ignored President Trump's statements altogether,

Secretary Noem's expressed animus towards nonwhite foreigners would support a stay.

\* \* \*

Taken together, the record strongly suggests that Secretary Noem's decision to terminate

Haiti's TPS designation was motivated, at least in part, by racial animus.  The mismatch between

what the Secretary said in the Termination and what the evidence shows confirms that the

termination of Haiti's TPS designation was not the product of reasoned decision-making, but of a

---

[35] "[The Government] represent[s] that the communications were not in writing and the substance of the communications is privileged."  Dkt. 98 at 3.  The Government also "represent[s] that the substance of those meetings is privileged."  *Id.*  The Court has not yet had opportunity to consider those privilege assertions.

[36] Courts properly consider statements of animus even when officials make them after they issue their formal decisions.  *See N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 229 n.7 (4th Cir. 2016).

preordained outcome justified by pretextual reasons. Plaintiffs are likely to prevail on their Equal Protection claim.

## V. IRREPARABLE HARM

To establish irreparable harm, the party seeking a stay must make two showings. *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016). "First, the harm must be certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* at 7–8 (cleaned up). "Second the harm must be beyond remediation." *Id.* at 8. Plaintiffs satisfy both requirements.[37]

In support of their irreparable harm showing, each Plaintiff submitted a declaration. *See* Dkt. 81-2 (Miot Decl.); 81-3 (Civil Decl.); 81-4 (Noble Decl.); 81-5 (Laguerre Decl.); 81-6 (Dorsainvil Decl.). These declarations describe the actual and imminent harms Plaintiffs will face if their TPS is terminated, including risk of deportation and detention, separation from family members, and loss of work authorization. The Court addresses each of these harms in turn.

Removal from the United States to Haiti constitutes irreparable harm.[38] TPS is the only avenue for legal status in the United States for many TPS holders, and so "[r]emoval is a concrete reality" if Haiti's TPS designation is terminated. *NTPSA I*, 773 F. Supp. 3d at 836. It would cause Plaintiffs great harm given the "perfect storm of suffering" and the collapsing rule

---

[37] The named Plaintiffs alone establish irreparable harm sufficient to warrant a stay. The Court references the similar harm that would affect similarly situated Haitian TPS-holders to illustrate the injury's scope, uniformity, and immediacy, even though it does not address Plaintiffs' Motion for Class Certification (Dkt. 67) in this Memorandum Opinion.

[38] Considering removal and removal-related detention as potential harms does not invite the Court to decide questions of law or fact arising from actions to remove non-citizens—matters over which Congress has divested this Court of jurisdiction. *See* 8 U.S.C. § 1252(a)(5), (b)(9), (g). The Court's inquiry is limited to whether removal or detention would cause irreparable harm; it is not weighing in on the lawfulness of removal or detention itself.

of law in Haiti.  CAR 78-13 at 179–80.  And while the Termination indicates "parts of" Haiti are suitable to return to, 90 Fed. Reg. at 54735, it does not identify a single safe location.  *See supra* Section IV.A.3.a.  Even after the Court gave it additional time to do so.  *See id.*

For many Plaintiffs, removal to Haiti would be devastating because they have no meaningful ties to the country.  Ms. Noble came to the United States when she was 2 years old and has lived here continuously for the past thirty-four years.  Noble Decl. ¶¶ 5, 17.  Aside from being born in Haiti, she has no connection to the country whatsoever—she does not know the identity of her biological family and she cannot speak French or Haitian Creole, the official languages of Haiti.  *Id.* ¶ 18.  In fact, she cannot even name one person she knows in Haiti.  *Id.* Mr. Civil's circumstances are similar.  He has not been to Haiti since 2010, when he was seven years old.  Civil Decl. ¶ 7.  He speaks Creole only infrequently and with an American accent, making him a vulnerable target for gangs.  *Id.*  Removal would return these individuals to what is essentially a foreign country, without language skills, a support network, or any realistic means of safe reintegration.

In addition, removal to Haiti would pose serious medical risks for many Plaintiffs. Several have ongoing medical conditions that require consistent treatment and prescription medication, which may be unavailable or difficult to access in Haiti.  *See, e.g.*, Miot Decl. ¶ 8; Noble Decl. ¶ 20.  For example, Mr. Miot has Type 1 Diabetes and must inject himself with insulin multiple times per day.  Miot Decl. ¶ 7.  He also requires regular care from specialists, including an endocrinologist and an ophthalmologist, to prevent complications from his diabetes. *Id.*  In Haiti, Mr. Miot may be unable to obtain the insulin he needs to survive.  *Id.* ¶ 8.  And even if it were available, the cost of managing his diabetes in Haiti would likely be prohibitively high. *Id.*

Another Plaintiff, Ms. Noble, contracted spinal tuberculosis as a toddler in Haiti. Noble Decl. ¶ 4. Although she initially received treatment in Haiti, her spinal cord collapsed during that treatment. *Id.* So, when she was two years old, a faith-based organization in the United States brought her to this country for further medical care. *Id.* ¶ 5. She has since undergone two spinal fusion surgeries in the United States following her diagnosis. *Id.* ¶¶ 5, 15. Returning Ms. Noble to Haiti would effectively put her life in jeopardy, as she likely would not have access to the medical care she needs. *See supra* Section I.C.1. The combination of Haiti's inadequate medical infrastructure and the country's ongoing instability and violence places Plaintiffs at serious risk of life-threatening interruptions in medical care.

Finally, removal would result in irreparable harm through forced family separation. If removed, Mr. Dorsainvil would be separated from his cousin, who has diabetes and relies on Mr. Dorsainvil for financial support to obtain necessary medical care. Dorsainvil Decl. ¶ 7. Mr. Miot would have to leave his sister, a physician with whom he lives and to whom he contributes financially by helping to pay her mortgage. Miot Decl. ¶ 6. And Ms. Laguerre would be forced to physically leave her husband, a commercial banker employed by one of the United States' largest banks. Laguerre Decl. ¶ 17. Such separations would inflict great and lasting harm on both Plaintiffs and their U.S.-based family members—harm that cannot be remedied by a later favorable ruling.

Notwithstanding the daily news barrage of aggressive ICE raids throughout the country, the Government argues that Plaintiffs' fears of removal amount to nothing more than "remote conjecture." § 705 Opp'n at 42. But the Government's reliance on *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d at 298, is misplaced. In *Chaplaincy*, the alleged harm depended on a chain of speculative contingencies. Here, termination of Plaintiffs' TPS would

instantaneously strip them of lawful immigration status.  Plaintiffs would be forced to either self-deport immediately[39] or remain in the United States unlawfully and face the ever-present risk of detention and removal.[40]  Hence, the harm Plaintiffs would suffer due to loss of their TPS is not "theoretical," but constitutes an actual and imminent injury.  The likelihood that Plaintiffs who remain in the United States will be subject to removal or detention after the loss of their TPS rises beyond a mere possibility.

The Government contends that Plaintiffs could seek relief from removal through the immigration process.  § 705 Opp'n at 42–43.  But this alternative is illusory.  The theoretical availability of such relief provides no assurance that Plaintiffs' applications for relief would be processed, let alone granted, before removal.  Indeed, the current administration is making it *more* difficult for those few Haitians who may have other immigration options.  For example, USCIS has placed a hold on asylum applications and other immigration benefit requests filed by individuals from Haiti.[41]

The Court does not suggest that removal categorically constitutes irreparable harm.  It does not.  *See Nken*, 556 U.S. at 435.  Here, however, it may not be possible to restore Plaintiffs to the status quo once they are removed—even if they later prevail on the merits—because TPS is a vehicle to *remain* in the country, not to enter it.  *Cf. Sanchez v. Mayorkas*, 593 U.S. 409, 414 (2021) (finding that TPS does not constitute an "admission" into the United States for the

---

[39] Failing to self-deport should, according to the Government, result in a hefty penalty.  It seeks over $900,000 in civil penalties for one woman's failure to depart pursuant to a final order of removal.  *See United States v. Veliz*, 3:26-cv-61 (E.D. Va. Jan. 23, 2026) (Dkt. 1).

[40] Courts have recognized that detention is "the sort of actual and imminent injur[y] that constitute[s] irreparable harm." *Arecely R. v. Nielsen*, 319 F. Supp. 3d 110, 155 (D.D.C. 2018) (collecting cases).

[41] USCIS Policy Memorandum, *Hold and Review of All Pending Asylum Applications and All USCIS Benefit Applications Filed by Aliens from High-Risk Countries*.

purpose of an adjustment to permanent status). Thus, this case is different from those in which removal can later be undone through immigration proceedings that permit reinstatement of status or return to the United States. In effect, then, denying a stay may prevent Plaintiffs from obtaining any relief at all, even if the Court later sets aside the Secretary's decision.

The loss of work authorization is also irreparable in this context. TPS holders participate in the U.S. workforce at exceptionally high rates. *See* Dkt. 54 (Rep. Amici) at 17. In 2021, 94.6% of TPS holders nationwide were employed. *See id.* at 17–18. If TPS is terminated, Plaintiffs will automatically lose their work authorization, resulting in immediate job loss, and attendant health insurance loss, that cannot be remedied retroactively. *See* Miot Decl. ¶ 6; Dorsainvil Decl. ¶ 4; Laguerre Decl. ¶ 16. Although economic harm is generally insufficient to establish irreparable injury, *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009), the harm here extends beyond ordinary economic injury. Plaintiffs would not only suffer lost wages. They would lose the legal ability to work at all. It would implicate Plaintiffs' fundamental ability to earn a livelihood, support their families, and remain self-sufficient. Plaintiffs could not simply find another job, as they would be categorically barred from lawful employment. The loss of work authorization therefore constitutes irreparable harm.

The Government's contention that "Plaintiffs' claimed irreparable harms . . . are inherent in the statutory scheme" because of the "temporary" nature of TPS is unavailing. § 705 Opp'n at 41. That it is temporary does not mean the Government can terminate the program summarily once a designation occurs. For instance, "temporary" may well refer to the duration of *each* designation/extension period (which can be no more than 18 months at a time under 8 U.S.C. § 1254a(b)(2)(B), (b)(3)(C)).

77

Assuming that "temporary" instead refers to the entire program's duration for a designated country does not help the Government. "Temporary" is any amount of time short of "permanent."[42] That does not tell us that a designation should last any length—short, medium, or long—even if we had a yardstick to measure time against (which we do not). Congress permitted repeated extensions of a country's TPS designation. *See* 8 U.S.C. § 1254a(b)(3)(A), (C). More than that, Congress chose to have the program automatically default to a six-month extension absent the Secretary's review. *See id.* § 1254a(b)(3)(C). If Congress meant the period to be "short," instead of "temporary," it would have said so. At a minimum, it would have signaled its intent, for example, by cabining the number of extensions or defaulting to termination instead of extension. True, "nothing requires that there be countries designated for TPS at any given moment." Gov't's Suppl. Br. at 12. But neither does the statute authorize, let alone mandate, the end of a country's designation merely because the Secretary believes it has gone on for some time.

Indeed, Congress perceived that some crises could last years, maybe even decades. And it ensured that TPS holders' stay would still be temporary. How? The answer lies in Title 8, Section 1254a(f)(4) of the United States Code: "[A]n alien provided temporary protected status under this section . . . shall not be considered to be . . . permanently residing in the United States under color of law." While the recipient is entitled to work authorization, 8 U.S.C. § 1254a(a)(2), TPS holders do not accrue time toward a green card or gain permanent residence credit, *id.* § 1254a(f)(1).

---

[42] The version of Black's Law Dictionary in circulation at the time Congress established the TPS program defines "temporary" as "[t]hat which is to last for a limited time only, as distinguished from that which is perpetual, or indefinite, in its duration" or the "[o]pposite of permanent." *Temporary, Black's Law Dictionary* (6th ed. 1990).

For these reasons, Plaintiffs have established that the harm they face is certain, imminent, and beyond remediation absent a stay. The irreparable-harm factor therefore weighs in Plaintiffs' favor.

## VI.  BALANCE OF EQUITIES AND PUBLIC INTEREST

The balance of the equities and the public interest factors merge where, as here, the Government is the opposing party. *Nken*, 556 U.S. at 435. In considering these factors, courts "explore the relative harms" to plaintiffs and defendants, "as well as the interests of the public at large." *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991). For the reasons discussed below, these factors favor Plaintiffs.

A stay is in the public interest. Consider the economy first. Haitian TPS holders substantially benefit the U.S. economy, contributing approximately $3.4 billion to it annually. *See* Rep. Amici at 20. These economic contributions reflect the critical roles that Haitian TPS holders play in workplaces across the country. Employers actively rely on Haitian TPS holders, who are far from expendable. *See id*. at 21. This is, in part, because they fill labor shortages in essential industries. *See* Dkt. 47 (State Amici) at 22–24. According to State Amici, a "recent estimate found that 75,000 TPS-eligible Haitians work in labor-short industries, defined as those with openings for at least four percent of their workforce." *Id*. at 23.

Take healthcare, for example—a "labor-starved sector." Rep. Amici at 20. Haitian workers constitute a considerable segment of this workforce. Recall that Mr. Dorsainvil is a registered nurse. *See* Dorsainvil Decl. ¶ 2. He is not alone among Haitians in the United States. "As of 2021, the 103,000 Haitian healthcare workers comprised the sixth-largest immigrant group in this field, where the demand for labor is high and understaffing and overwork is already the norm." Dkt. 37 (Labor Amici) at 18. Direct care services provide another example: seven percent of all direct care professionals in the United States are Haitian. *See* Rep. Amici at 21. In

Massachusetts alone, approximately 2,000 long-term caregivers will lose work authorization if Haiti's TPS designation is terminated.  *See* Rep. Amici at 21.  "[B]ecause Haitian immigrants are highly concentrated, with almost 66% residing in just three metropolitan areas—Miami, New York City, and Boston—suddenly removing Haitian TPS holders would have a drastic impact on co-workers' workload and patient care quality."  Labor Amici at 37.  These are not isolated examples.  Haitian TPS holders also play indispensable roles in hospitality, food service, education, and manufacturing—industries that already face labor shortages and would be further destabilized by the loss of this workforce.  *See* Rep. Amici at 20, 22–23; State Amici at 22–23; Labor Amici at 17–24.

TPS holders also make substantial contributions as entrepreneurs and taxpayers.  As a group, 14.5% of TPS holders are entrepreneurs—compared with 9.3% of the U.S.-born workforce.  *See* State Amici at 23.  In 2021, more than 38,100 self-employed TPS holders generated $1.5 billion in business income.  *See id*.  This translates into significant tax revenue: in 2023, TPS holders from all countries paid $3.1 billion in federal taxes and $2.1 billion in state and local taxes, supporting programs such as Social Security and Medicare.  *See* State Amici at 23–24.  And these contributions come despite TPS holders remaining largely ineligible for nearly all federal public benefits.  *See* Rep. Amici at 19.  Because Haitian TPS holders make up "nearly one quarter of all TPS holders nationwide," State Amici at 12, they paid about $1.3 billion in federal, state, and local taxes.[43]  Thus, without Haitian TPS holders, the United States would lose not only a vital segment of its workforce but also a significant source of tax revenue.

---

[43] To reach this number, the Court took $5.2 billion—the total federal ($3.1 billion) and state and local ($2.1 billion) taxes TPS holders paid—and multiplied it by twenty-five percent, the approximate percent of TPS holders who are Haitian.  *See* State Amici at 12.

The public interest in maintaining Haiti's TPS designation extends beyond economics. Many Haitian TPS holders are homeowners and long-term residents who have lived in the United States for more than a decade and are deeply embedded into their local communities. *See* State Amici at 24–25; Rep. Amici at 25; *see also* Miot Decl.; Civil Decl.; Noble Decl.; Laguerre Decl.; Dorsainvil Decl. Without jobs, Haitian TPS holders and their families would lose employer-sponsored health insurance—coverage held by fifty five percent of TPS holders. *See* State Amici at 25.

Moreover, hundreds of thousands of U.S. citizens, many of them children, live in mixed-status households with Haitian TPS holders. *See id.* at 17. As State Amici explain, termination of Haiti's TPS designation would force TPS-holder parents into an "agonizing" choice among untenable options: "(1) returning to Haiti alone, leaving their children behind; (2) taking their U.S. citizen children with them to a dangerous country that the children do not know; or (3) staying in the United States without authorization." *Id.* at 18–19. None of these options is acceptable. Unsurprisingly, the fear that a family member will be deported is profoundly anxiety inducing for children, and studies have shown the obvious—that parental deportation is deeply traumatic and disruptive for children. *See id.* at 19–21. The emotional and developmental harms associated with forced family separation cannot be undone by a later favorable ruling.

Continued TPS also supports public safety and public health. Individuals with lawful immigration status are more likely to report crimes, helping to keep communities safer. *See id.* at 28. Conversely, stripping TPS holders of their lawful status may discourage them from reporting crimes or seeking medical care due to fear of detention or deportation. *See id.* at 27–29.

The Government asserts that termination serves the public interest by advancing national security. § 705 Opp'n at 46. But they offer no evidence that Haitian TPS holders pose any threat

to the United States.  In fact, Haitian immigrants are overwhelmingly law-abiding, with incarceration rates lower than those of native-born Americans.  *See* Rep. Amici at 24.  The Government neither rebuts Plaintiffs' evidence nor identifies any national security interest in terminating Haiti's TPS designation pending the resolution of this litigation.

The Government also invokes the public interest in enforcing immigration laws.  But there is no public interest in allowing an unlawful immigration policy to take effect.  To the contrary, the public interest is served when agencies comply with statutory and constitutional constraints.  *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020); *Newby*, 838 F.3d at 12.  In any event, the immigration laws are being properly enforced; Haitian TPS holders are treated as they are—lawful immigrants.  Turning them into unlawful immigrants overnight will make enforcing immigration laws more, not less, difficult.

The Government next contends that there is a public interest in the efficient administration of immigration laws at the border.  But its analysis is misplaced.  This case does not concern new arrivals of Haitians at the border.  Rather, it concerns Haitians who have been granted lawful TPS and authorization to live and work in the United States.  Maintaining that status pending the outcome of this litigation does nothing to undermine border administration of immigration laws.

Lastly, the balance of the equities favors a stay.  Maintaining Haiti's TPS designation pending resolution of this case will prevent harm to Plaintiffs and their families, employers, and communities.  By contrast, the Government identifies no harm that would result from continued TPS during the pendency of this litigation.

The balance of the equities and public interest factors together favor a stay, which maintains the status quo while this litigation proceeds.

## VII.  CONCLUSION

There is an old adage among lawyers.  If you have the facts on your side, pound the facts.  If you have the law on your side, pound the law.  If you have neither, pound the table.  Secretary Noem, the record to-date shows, does not have the facts on her side—or at least has ignored them.  Does not have the law on her side—or at least has ignored it.  Having neither and bringing the adage into the 21st century, she pounds X (f/k/a Twitter).

Kristi Noem has a First Amendment right to call immigrants killers, leeches, entitlement junkies, and any other inapt name she wants.  *Secretary* Noem, however, is constrained by both our Constitution and the APA to apply faithfully the facts to the law in implementing the TPS program.  The record to-date shows she has yet to do that.

By accompanying Order, the Court **GRANTS** Plaintiffs' Renewed Motion for a Stay Under 5 U.S.C. § 705.

Date: February 2, 2026

_____
ANA C. REYES
United States District Judge

83