USCA Case #26-5050      Document #2180489      Filed: 06/25/2026      Page 1 of 49

(Slip Opinion)              OCTOBER  TERM,  2025                    1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MULLIN, SECRETARY, DEPARTMENT OF HOMELAND SECURITY, ET AL. *v.* DOE ET AL.

### CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 25–1083.   Argued April 29, 2026—Decided June 25, 2026*

The question presented is whether respondents, who challenge the termination of Temporary Protected Status (TPS) for aliens from Syria and Haiti, are entitled to orders postponing the terminations during litigation.  Congress created TPS in 1990 to provide short-term humanitarian relief for aliens who cannot safely return to their home countries.  Although designed to afford temporary relief, TPS designations in practice have often lasted for decades.

   Syria received a TPS designation in 2012 because of "extraordinary and temporary conditions" related to the repressive regime of Bashar al-Assad, 77 Fed. Reg. 19027, and in September 2025, the Secretary of Homeland Security provided public notice that Syria's TPS designation would terminate, 90 Fed. Reg. 45402.  Seven Syrian nationals sued in the Southern District of New York asserting claims under the Administrative Procedure Act (APA) to stop the termination.  The District Court concluded that the plaintiffs were entitled to interim relief under 5 U. S. C. §705.  The Second Circuit denied the Government's request for a stay.

   Haiti received a TPS designation in 2010 after a devastating earthquake, 75 Fed. Reg. 3477, and in November 2025, the Secretary provided public notice that Haiti's TPS designation would terminate, 90 Fed. Reg. 54739.  Five Haitian nationals sued in the District Court for the District of Columbia asserting claims under the APA and charging

──────────

   *Together with No. 25–1084, *Trump*, *President of the United States, et al.* v. *Miot et al.*, on certiorari before judgment to the United States Court of Appeals for the District of Columbia Circuit.

2                          MULLIN *v.* DOE

Syllabus

that the termination of Haiti's TPS designation violated the constitu-tional right to equal protection because it was motivated by race. The District Court granted interim relief, and a divided D. C. Circuit panel declined to issue a stay. The Government sought a stay and a writ of certiorari before judgment in both cases. This Court granted review, consolidated the cases, and deferred ruling on the stay applications.

*Held*:

1. The TPS statute bars judicial review of non-constitutional claims. Pp. 12–18.

(a) Section 1254a(b)(5)(A) provides that "[t]here is no judicial review of any determination of the [Secretary of Homeland Security] with re-spect to the designation, or termination or extension of a designation, of a foreign state." The term "determination" may mean either an in-dividual decision or the process leading to a decision. Under either understanding, §1254a(b)(5)(A) bars all of respondents' non-constitu-tional claims. Further, the phrase "with respect to" "generally has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *Patel* v. *Gar-land*, 596 U. S. 328, 339 (internal quotation marks omitted). Pp. 12–13.

(b) Respondents and the courts below offer no sound theories to over-come the plain meaning of the judicial-review bar. Pp. 13–18.

(1) Respondents' argument that §1254a(b)(5)(A) applies only to substantive claims, not those based on alleged procedural errors, finds no support in the statutory language because a "determination" may concern procedural or substantive questions. Respondents' reliance on *McNary* v. *Haitian Refugee Center, Inc.*, 498 U. S. 479, and *Bowen* v. *Michigan Academy of Family Physicians*, 476 U. S. 667, is misplaced because those decisions turned on the specific wording of different pro-visions and did not adopt the broad principle that the term "determi-nation" applies only to substantive matters. Pp. 13–15.

(2) *Doe* respondents' argument that "determination" refers only to an assessment of country conditions finds no support in the statute's text or context and contravenes the principle that we give common terms their ordinary meaning. See *Yellen* v. *Confederated Tribes of Chehalis Reservation*, 594 U. S. 338, 353. Pp. 15–17.

(3) Respondents' attempt to limit the judicial-review bar to the Secretary's ultimate "determination"—not any subsidiary decision—is inconsistent with the plain meaning of the statutory text and contra-dicts the administrative-law principle that subsidiary decisions merge into final agency action. See *Army Corps of Engineers* v. *Hawkes Co.*, 578 U. S. 590, 597–598. Pp. 17–18.

2. *Miot* respondents' equal protection claim—that Haiti's TPS desig-nation was terminated because of race—is unlikely to succeed.

Cite as: 609 U. S. ___ (2026)          3

Syllabus

Ironically, respondents themselves offer a race-neutral explanation for the Government's action: namely, that the current administration, which has terminated every TPS designation that has come up for renewal, simply opposes the TPS program as it has been implemented in the past.

The Court assumes for the sake of argument that heightened scrutiny applies and that it must determine whether a "discriminatory purpose [was] a motivating factor in the decision" to terminate Haiti's TPS designation, *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U. S. 252, 265–266. Because application of that standard calls for consideration of the context in which a challenged statement was made, *id.*, at 267–268, the immigration context is an important factor.

None of the cited statements by either the President or the Secretary was overtly racial, and in substance all expressed policy views that could rest on race-neutral justifications. Viewing all the relevant evidence, *Miot* respondents are unlikely to prove that race was a motivating factor in the decision to terminate Haiti's TPS designation, and it follows that they are not entitled to interim relief on their equal protection claim. Pp. 20–24.

Reversed and remanded.

ALITO, J., announced the judgment of the Court and delivered the opinion of the Court except as to Part III–A. ROBERTS, C. J., and THOMAS and KAVANAUGH, JJ., joined that opinion in full, and GORSUCH and BARRETT, JJ., joined except for Part III–A. THOMAS, J., filed a concurring opinion. KAGAN, J., filed a dissenting opinion, in which SOTOMAYOR and JACKSON, JJ., joined.

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

————————

Nos. 25–1083 and 25–1084

————————

## MARKWAYNE MULLIN, SECRETARY, DEPARTMENT OF HOMELAND SECURITY, ET AL., PETITIONERS

25–1083            *v.*

### DAHLIA DOE, ET AL.

*ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT*

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL., PETITIONERS

25–1084            *v.*

### FRITZ EMMANUEL LESLY MIOT, ET AL.

*ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT*

[June 25, 2026]

JUSTICE ALITO announced the judgment of the Court and delivered the opinion of the Court with respect to all but Part III–A, and an opinion with respect to Part III–A, in which THE CHIEF JUSTICE, JUSTICE THOMAS, and JUSTICE KAVANAUGH join.

In these cases, we consider whether respondents, who challenge the termination of Temporary Protected Status (TPS) for aliens from Syria and Haiti, are entitled to orders postponing the terminations during litigation. We hold that they are not.

The TPS statute plainly bars consideration of respondents' non-constitutional claims. It allows "no judicial review of any determination . . . with respect to the . . . termination" of a TPS designation. 8 U. S. C. §1254a(b)(5)(A). The term "determination" can be used to describe either an

2                    MULLIN *v*. DOE

Opinion of the Court

individual decision or the whole process leading to a final decision, and under either understanding of the term, §1254a(b)(5)(A) squarely bars all of respondents' non-constitutional claims.

The sole constitutional claim before us will likely fail. Citing statements made by President Trump and former Secretary of Homeland Security Kristi Noem, one set of respondents advances an equal protection claim that Haiti's TPS designation was terminated because of the racial makeup of that country's population. But, ironically, one of respondents' other arguments undermines the equal protection claim by offering a strong, race-neutral explanation for Haiti's termination: namely, that the current administration, which has terminated every TPS designation that has come up for renewal, simply opposes the TPS program, at least as it has been implemented in the past.

For these reasons, the District Courts erred in granting interim relief.

I

A

Congress created TPS in 1990 to provide short-term humanitarian relief for aliens who cannot safely return to their home countries due to events such as armed conflict or natural disaster. Before then, the Executive Branch sometimes provided similar relief as a matter of discretion without any express statutory authorization. Then, as now, the Immigration and Nationality Act (INA) permitted the Executive to defer the removal of an alien who agrees to leave this country voluntarily. See 8 U. S. C. §1229c(a)(1); §1252(b) (1958 ed.). Before Congress created TPS, aliens had 30 days to depart voluntarily, but the Government claimed discretionary authority to extend that deadline

Opinion of the Court

indefinitely.[1]  Beginning in 1960, the Government used this mechanism to provide humanitarian relief similar to that now furnished by TPS.  Under a program that came to be known as "Extended Voluntary Departure" (EVD), the Government authorized deferred departure for nationals from countries where living conditions had become unsafe.  EVD allowed aliens from those countries to remain in the United States until the Government concluded that conditions had improved.  The Government granted EVD to nationals of at least 14 countries.  H. R. Rep. No. 98–1142, p. 4 (1984).

Under this regime, the grant and termination of humanitarian relief was purely a matter of executive discretion, and judges on the Court of Appeals for the District of Columbia Circuit concluded that the Executive's decision to withhold such relief was an unreviewable exercise of prosecutorial discretion.  *Hotel & Restaurant Employees Union, Local 25* v. *Smith*, 846 F. 2d 1499, 1519–1520 (CADC 1988) (opinion of Silberman, J.); see also *id.*, at 1510 (opinion of Mikva, J.) ("[T]he court has no meaningful standard against which to judge the agency's exercise of discretion to deny EVD status in this case").  Judge Silberman, joined by three other judges, observed that review of an EVD decision would raise separation-of-powers concerns because "[c]ontrol of the country's policy toward aliens is 'inherent in the executive power to control the foreign affairs of the nation,'" *id.*, at 1520 (quoting *United States ex rel. Knauff* v. *Shaughnessy*, 338 U. S. 537, 542 (1950)), and "'[m]atters relating "to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference,"'" *Hotel & Restaurant Employees Union*, 846 F. 3d, at 1520.  Judge Silberman therefore concluded that judicial review

——————

[1] See H. R. Rep. No. 98–1142, p. 4 (1984); L. Oswald, Note, Extended Voluntary Departure: Limiting the Attorney General's Discretion in Immigration Matters, 85 Mich. L. Rev. 152, 155–156 (1986).

4                              MULLIN *v.* DOE

Opinion of the Court

would be impermissible "in the absence of an extraordinarily precise statutory standard against which to measure the conduct in question." *Ibid.*

B

After critics objected that the Extended Voluntary Departure program lacked "'proper guidelines or standards,'"[2] Congress created TPS. This new regime provided standards to govern the grant and termination of TPS but maintained core features of the old EVD program. Three aspects of the new regime are noteworthy.

First, as with EVD, the Executive Branch retains discretion over whether to designate a country for TPS. Responsibility for TPS decisions rests with the Secretary of Homeland Security, 6 U. S. C. §§552(d), 557, and the statute provides that the Secretary "*may* designate" a country for TPS "after consultation with appropriate agencies of the Government" if certain conditions are met. 8 U. S. C. §1254a(b)(1) (emphasis added). These are:

1. "[T]here is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state (or to the part of the state) would pose a serious threat to their personal safety;"

2. "[T]here has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions," "the foreign state is unable, temporarily, to handle adequately" the return of its nationals, and the state requests TPS designation; or

3. "[T]here exist extraordinary and temporary conditions in the foreign state that prevent aliens who are

―――――――――
[2] Congressional Research Service, J. Wilson, Temporary Protected Status and Deferred Enforced Departure 4 (2025).

Opinion of the Court

nationals of the state from returning to the state in safety, unless the [Secretary] finds that permitting the aliens to remain temporarily is contrary to the national interest." *Ibid.*

Once a country receives a TPS designation, certain nationals of that country living in the United States without another lawful immigration status qualify for work authorization and immunity from removal. See §§1254a(a)(1), (c).

The second notable feature of TPS is that the statute requires the Government to terminate a country's TPS designation if the Secretary determines that the country "no longer continues to meet the conditions for designation." §1254a(b)(3)(B). The Secretary generally makes such determinations as part of an ongoing review of all TPS designations. The Secretary is instructed to review each TPS designation at least every 18 months. §§1254a(b)(2)–(3). During this review, the Secretary must "consul[t] with appropriate agencies of the Government" and "determine whether the conditions for such designation under this subsection continue to be met." §1254a(b)(3)(A). If the Secretary takes no action, a TPS designation automatically extends for another six months. See §§1254a(b)(2)(B), (3)(C). These extensions continue until the Secretary publishes a termination notice. *Ibid.* Terminations take effect at least 60 days after the notice appears in the Federal Register. §1254a(b)(3)(B).

Finally, the Secretary's TPS designation decisions are not subject to judicial review. The relevant provision bars "judicial review of any determination of the [Secretary of Homeland Security] with respect to the designation, or termination or extension of a designation, of a foreign state." §1254a(b)(5)(A).

C

Although designed to afford "temporary" relief, TPS designations in practice have often lasted for decades. For

6                                  MULLIN *v.* DOE

Opinion of the Court

example, the Secretary designated Somalia in 1991, and that designation remains in effect 35 years later. See 56 Fed. Reg. 46805 (1991); *African Communities Together* v. *Noem*, No. 26–cv–11201, 2026 WL 710666 (D Mass., Mar. 13, 2026). Three other countries retain designations that are more than 25 years old. See 64 Fed. Reg. 526 (1999) (Nicaragua); *id.*, at 524 (Honduras); 66 Fed. Reg. 14214 (2001) (El Salvador).[3]

The current administration objects to lengthy TPS designations and adopted a new, restricted approach shortly after the beginning of President Trump's second term in office. In Executive Order 14159, titled "Protecting the American People Against Invasion," the President directed Cabinet officers to "ensur[e] that designations of Temporary Protected Status are consistent with the provisions of" the TPS statute and that such designations "are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute." 90 Fed. Reg. 8446 (2025). Under this approach, the Secretary of Homeland Security has terminated every TPS designation that has come up for renewal, 13 in all. See *infra*, at 22–23.

Legal challenges to these decisions began almost immediately. In opposing those challenges, the Government's front line of defense has been the judicial-review bar in §1254a(b)(5)(A), but the lower courts have consistently rebuffed that argument. The Government once again led with that jurisdictional argument in asking us to stay two

_____

[3] Not all TPS designations have lasted so long. Presidents Clinton, George W. Bush, and Obama terminated some TPS designations much more promptly. See, *e.g.*, 58 Fed. Reg. 7582 (1993) (Lebanon, terminated two years after initial designation); 62 Fed. Reg. 33442 (1997) (Rwanda, terminated three years after initial designation); 69 Fed. Reg. 40643 (2004) (Montserrat, terminated less than eight years after initial designation); 81 Fed. Reg. 66064 (2016) (Guinea, terminated less than three years after initial designation). None of these terminations were challenged in court.

Opinion of the Court

District Court orders that postponed the termination of Venezuela's TPS designation, and we granted those requests. *Noem* v. *National TPS Alliance*, 605 U. S. 909 (2025) (*NTPSA I*); *Noem* v. *National TPS Alliance*, 606 U. S. 1062 (2025) (*NTPSA II*). Nevertheless, lower courts, including those in the cases now before us, have continued to block the Secretary's attempted terminations of other TPS designations. *E.g.*, 1 App. 33 (Syria); *id.*, at 40 (Syria); 818 F. Supp. 3d 126, 186 (DC 2026) (Haiti); 2 App. 719 (Haiti); *Doe* v. *Noem*, 822 F. Supp. 3d 893, 901 (ND Ill. 2026) (Burma); *African Communities Together* v. *Noem*, ___ F. Supp. 3d ___, 2026 WL 948591, *16 (D Mass., Apr. 8, 2026) (Ethiopia).

1

The Secretary designated Syria for TPS in 2012 because of "extraordinary and temporary conditions" related to the repressive regime of Bashar al-Assad. 77 Fed. Reg. 19027 (2012). The initial designation notice recounted horrific conditions in that country, including use of "excessive force against civilians, arbitrary executions, killing and persecution of protestors and members of the media, arbitrary detention, disappearances, torture, and ill-treatment." *Ibid.* The notice recounted that Syrian military units and mercenaries had "terrorized the population, targeting and killing small children, women, and other unarmed civilians." *Ibid.* These actions led military defectors and members of the population into armed resistance and, eventually, civil war. *Ibid.* For these reasons, the Secretary concluded that "Syrian nationals cannot return to Syria in safety due to extraordinary and temporary conditions." *Id.*, at 19028. The Secretary designated Syria for TPS for an initial period of 18 months. *Ibid.* In the 14 years since then, Syria has maintained its TPS designation through a series of extensions and re-designations. See 90 Fed. Reg. 45399 (2025).

8                                MULLIN *v.* DOE

Opinion of the Court

In September 2025—several months after we stayed the District Court order in *NTPSA I*, the first case involving Venezuela—the Secretary provided public notice that Syria's TPS designation would terminate in 60 days. 90 Fed. Reg. 45402. She stated that she had "consult[ed] with appropriate U. S. Government agencies" and had "reviewed country conditions in Syria." *Id.*, at 45399. She recognized that between 2011 and 2024 the Syrian civil war had caused more than 500,000 deaths, the displacement of millions, and extensive damage to infrastructure. *Id.*, at 45400. But in 2024, the Assad regime fell, and a transitional government took its place. *Ibid.* The notice recounted that the United States had normalized relations with Syria's new government and had revoked sanctions. *Ibid.*

Even so, the termination notice acknowledged that serious problems remained. It noted that localized violence had replaced "nationwide hostilities" and that "insurgent flareups" continued. *Ibid.* The Secretary also recognized that "most Syrians require some form of humanitarian assistance," but she found that "this does not prevent nationals from returning in safety, as evidenced by the U. N. High Commissioner for Refugees' estimate that 'since 2024, over 1.2 million Syrians have returned to Syria.'" *Ibid.* In short, the termination notice described improved conditions in Syria but by no means painted a rosy picture. Based on her review, the Secretary determined that "termination of the Syria Temporary Protected Status designation [was] required." *Ibid.*

Asserting claims under the Administrative Procedure Act (APA), seven Syrian nationals who benefit from TPS sued in the Southern District of New York to stop the termination of Syria's TPS designation. The District Court concluded that these plaintiffs (respondents in No. 25–1083) were entitled to interim relief under 5 U. S. C. §705, which authorizes a reviewing court in appropriate circumstances

Opinion of the Court

to postpone the effective date of agency action. See 1 App. 6. The court rejected the Government's jurisdictional argument because of the "restrictive manner in which jurisdiction-stripping provisions are construed." *Id.*, at 9. It then held that the plaintiffs were likely to succeed on their APA claims that the termination of Syria's TPS designation was contrary to law and arbitrary and capricious. See §706.

The court claimed not to "opin[e] on the substance of the Secretary's termination decision or on her authority to make such a decision," but it proceeded to criticize the Secretary for "taking a hatchet to the TPS system." *Id.*, at 15–16. The court found that the Secretary's decision to terminate Syria's TPS designation constituted one aspect of the current administration's "anti-immigrant agenda." *Id.*, at 25. The court then indefinitely postponed the effective date of the termination of Syria's TPS designation and declined to stay its own order.

The Second Circuit also denied the Government's request for a stay. It concluded that it likely had jurisdiction, that the challengers had at least one strong APA claim (namely, that the Secretary acted contrary to law by failing to engage in adequate consultation with other agencies before terminating TPS), and that the other stay factors were not met. *Id.*, at 38–40.

Following the Second Circuit's ruling, the Government turned to this Court for relief. We granted certiorari before judgment and deferred ruling on the Government's request for a stay. 607 U. S. ___ (2026).

2

Haiti received a TPS designation in 2010 after a devastating earthquake killed or injured hundreds of thousands of residents, caused massive property damage, and severely worsened living conditions. 75 Fed. Reg. 3477 (2010). The Government re-designated Haiti for TPS and extended that designation several times. See 90 Fed. Reg. 54734 (2025).

10                    MULLIN *v.* DOE

Opinion of the Court

In 2018, the Government attempted to terminate Haiti's TPS designation, but court orders prevented that termination from taking effect. 86 Fed. Reg. 41864 (2021). In 2021, following a change in administration, the Government re-designated Haiti for TPS, citing gang-related violence, human-rights abuses, poverty, inadequate healthcare, and food insecurity. *Id.*, at 41864–41867. Relying on these same grounds, the Government continued to extend Haiti's TPS designation. 90 Fed. Reg. 54734. The net effect was to allow Haitians who benefit from TPS to retain that status for 16 years.

In November 2025, the Secretary provided public notice that Haiti's TPS designation would terminate on February 3, 2026—the last day of the most recent extension. *Id.*, at 54739. Stating that she had "consult[ed] with appropriate U. S. Government agencies," *id.*, at 54735, she explained her assessment of the current situation in Haiti. "Certain conditions," she acknowledged, "remain[ed] concerning," especially gang violence and its "spillover effects." *Ibid.* But she asserted that certain areas "of the country [were] suitable to return to" and that the situation would further improve with the deployment of a multinational gang-suppression force. *Ibid.* Separately, she concluded that the ongoing designation of Haiti contravened the United States' national interests. She noted, among other things, that many Haitians in the United States had entered illegally, that Haitians who came here legally overstayed their visas at an exceptionally high rate, and that the Haitian Government was often unable to provide the information needed to identify its own nationals' criminal records or gang affiliations. *Id.*, at 54736–54737. The notice concluded by noting that the United States' "immigration policy must align with our foreign policy vision of a secure, sovereign, and self-reliant Haiti and not a country that Haitian citizens continue to leave in large numbers to seek opportunities in the United States." *Id.*, at 54738.

Cite as: 609 U. S. ____ (2026)    11

Opinion of the Court

Before the termination took effect, a group of five Haitian nationals with TPS sued in the District Court for the District of Columbia to stop the termination of Haiti's designation. They asserted claims under the APA and charged that the termination of Haiti's designation violated the constitutional right to equal protection because it was motivated by race. The District Court granted interim relief. See *Miot*, 818 F. Supp. 3d, at 186. It found that the TPS judicial-review bar did not apply because plaintiffs challenged "*how* the Secretary went about making her determination," not the ultimate TPS termination decision itself. *Id.*, at 148 (emphasis in original). On the merits, the court ruled that several of the challengers' APA claims were likely to succeed, including the claim that the Secretary had not properly consulted other Government agencies and the claim that she had acted arbitrarily and capriciously by ignoring evidence of Haiti's true country conditions. The court also ruled that the challengers would likely succeed on the merits of their equal protection claim because both President Trump and Secretary Noem made statements that suggested racial animus against "Haitians and other nonwhite foreigners." *Id.*, at 177, 180. The court did not stay its order.

A divided D. C. Circuit panel likewise declined to issue a stay. It noted that many other courts had held that they had jurisdiction to consider similar claims, and it found that the Government had failed to show that it would suffer irreparable harm. According to the majority, the Government's assertion that the District Court had intruded on the Executive Branch's foreign-policy prerogatives was a mere "'generalized assertio[n] of injury'" and insufficient to support a stay. 2 App. 720.

Judge Walker dissented. In his view, the court lacked jurisdiction, and the Government was irreparably harmed by "'an improper intrusion by a federal court into the workings of a coordinate branch of the Government.'" *Id.*, at 726.

12                          MULLIN *v.* DOE

                        Opinion of the Court

After this decision, the Government sought a stay and a writ of certiorari before judgment.  We granted review, consolidated this case with *Doe*, and deferred ruling on the stay application.  607 U. S. ___ (2026).

## II

### A

We first consider respondents' non-constitutional claims and conclude that we are barred from reviewing them.  A provision of the TPS statute, 8 U. S. C. §1254a(b)(5)(A), provides: "There is no judicial review of any determination of the [Secretary of Homeland Security] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection."  This text is clear, and its plain meaning is very broad.

We start with the key term "determination," which may mean several different things.  It may be used as a synonym for "decision."  See, *e.g.*, 4 Oxford English Dictionary 548 (def. 2.b) (2d ed. 1989) (a "decision arrived at or promulgated"); Webster's Third New International Dictionary 616 (def. 4a) (1986) ("the act of deciding definitely and firmly").  The term may also be used to describe the chain of events leading up to a decision.  See, *e.g.*, American Heritage Dictionary 359 (def. 1.a) (1981) (the "act of making or *arriving at* a decision" (emphasis added)); Random House Dictionary of the English Language 541 (def. 1) (2d ed. 1987) (the "act of *coming to* a decision or of fixing or settling a purpose" (emphasis added)).

Not only is it common to use the term "determination" in this broad sense, but other terms in the judicial-review bar—particularly the phrase "with respect to"—support this broad understanding.  That phrase "generally has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *Patel* v. *Garland*, 596 U. S. 328, 339 (2022) (internal quotation marks omitted).

Opinion of the Court

Under either of these definitions, §1254a(b)(5)(A) bars respondents' non-constitutional claims. Each claim concerns a discrete decision made by the Secretary—for example, her decision to consult the State Department in a particular manner and her decision that country conditions in Syria and Haiti justified termination of their TPS designations. And all those steps were part of the process that led to her final decision to terminate these countries' TPS designations. Indeed, the same result would follow if "determination" referred only to that final decision. In that event, all the preceding decisions would be "with respect to" that decision. So, under any dictionary definition of "determination," the judicial-review bar applies to respondents' non-constitutional claims.

We recognize that "when a statutory provision 'is reasonably susceptible to divergent interpretation, we adopt the reading that accords with'" the traditional and basic principle that "'executive determinations generally are subject to judicial review.'" *Guerrero-Lasprilla* v. *Barr*, 589 U. S. 221, 229 (2020). But here, the text of the TPS judicial-review bar very clearly overcomes the general presumption in favor of judicial review.

B

Respondents and the courts below offer several theories to overcome the plain meaning of the judicial-review bar, but none is sound.

1

The most prominent theory is that §1254a(b)(5)(A) applies only to substantive claims, not those based on alleged procedural errors. 1 App. 10–11; 818 F. Supp. 3d, at 148; Brief for Respondents in No. 25–1083, pp. 30–31; Brief for Respondents in No. 25–1084, pp. 15–16. This argument finds no support in the language of §1254a(b)(5)(A) because a "determination" may concern procedural or substantive

14    MULLIN *v.* DOE

Opinion of the Court

questions. Take *Doe* respondents' argument that the Secretary inadequately consulted the State Department about conditions in Syria. In proceeding as she did, the Secretary, either personally or through her subordinates, made a series of procedural determinations: to communicate with the State Department by email, to send a terse and unspecific email, and to proceed to terminate Syria's TPS designation after receiving a laconic answer.

In attempting to limit §1254a(b)(5)(A) to substantive determinations, respondents and lower courts have relied not on the statutory text but on several of our decisions, chiefly *McNary* v. *Haitian Refugee Center*, *Inc.*, 498 U. S. 479 (1991), and *Bowen* v. *Michigan Academy of Family Physicians*, 476 U. S. 667 (1986). But they read far too much into those decisions.

*McNary* concerned the Special Agricultural Farmworker amnesty program. A provision of the governing statute barred "review of a determination respecting *an application* for adjustment of status under" that program except in removal proceedings. §1160(e)(1) (1988 ed.) (emphasis added). Because this provision referred to "a single act," *i.e.*, a ruling on an individual application, the Court held that alien farmworkers' broad claims about the procedures used in implementing the program could proceed. *McNary*, 498 U. S., at 492. Thus, the decision turned on the specific wording of the provision at issue. It did not adopt the broad principle that the term "determination" applies only to substantive matters.

Nor does *Bowen* support respondents' position. There, the Court held that two statutory provisions did not bar judicial review of a regulation that provided disparate Medicare Part B payments to allopathic and other physicians. The first provision did not bar review at all. Instead, it authorized judicial review of benefits awarded in hearings conducted by private insurance carriers. 42 U. S. C. §1395ff(b) (1982 ed.). The Government asked the Court to

Opinion of the Court

infer that this grant of a particular type of review implicitly barred review of the challenged regulation. *Bowen*, 476 U. S., at 673. But based on the language of this provision and its legislative history, the Court rejected that request. *Id.*, at 674–678. The *Bowen* Court's refusal to find an implicit preclusion of review in the specific language and legislative history of a differently worded provision in a particular statutory scheme hardly means that the term "determination" in 8 U. S. C. §1254a(b)(5)(A) is limited in the way respondents contend and lower courts have ruled.

The second statutory provision at issue in *Bowen* is no more helpful to respondents than the first provision. This provision in the Medicare Act incorporated a list of sections of the Social Security Act, and one of those sections prohibited certain actions against the Government or its officers. See 42 U. S. C. §13955ii (1982 ed., Supp. II) (referencing 42 U. S. C. §405(h) (1982 ed., Supp. II)). The Court held that this provision did not bar review of the challenged Medicare regulation because it was "incorporated *mutatis mutandis*," *i.e.*, with necessary and appropriate modifications, and because legislative history showed that the Medicare Act provision was not meant to bar review of important questions like the one at issue. *Bowen*, 476 U. S., at 680.

By contrast, the TPS judicial-review bar expressly restricts review; it is not a string cite that incorporates another provision to a limited degree. And even if we were disposed to consult legislative history to determine the meaning of 8 U. S. C. §1254a(b)(5)(A), the proponents of the substance-only interpretation cite no legislative history that supports their position.

2

*Doe* respondents, while agreeing that §1254a(b)(5)(A) applies to only substantive determinations, advance another argument that would reduce the reach of that provision even further. In their view, the statutory term

16                    MULLIN *v.* DOE

Opinion of the Court

"determination" in the judicial-review bar applies only to determinations about conditions in the country designated for TPS.

This argument, which gives the commonly used term "determination" a special meaning, runs headlong into our statutory-interpretation precedents. We are wary of giving common terms technical meanings. See *Yellen* v. *Confederated Tribes of Chehalis Reservation*, 594 U. S. 338, 353 (2021). Statutory interpretation proceeds on the assumption that those who draft and enact a provision generally intend its terms to mean what they mean in ordinary usage. Without that assumption, the entire endeavor would break down. Ordinary people could not understand what the law requires of them, and every word in a statute could be an unfathomable puzzle. Of course, a statute may provide expressly, or may signal in some other clear way, that it employs a common term in a way that departs from its ordinary meaning, but without strong proof of such a departure, commonly used terms should be given their common meaning. *Feliciano* v. *Department of Transp.*, 605 U. S. 38, 45 (2025).

Here, "determination" is a commonly used term, and therefore *Doe* respondents bear the burden of showing that, as used in §1254a(b)(5)(A), it carries a technical, TPS-specific meaning. But their effort to show that "statutory context" dictates adoption of their interpretation, *Yellen*, 594 U. S., at 351, falls short because the TPS statute uses "determination" in multiple ways that that have nothing to do with the assessment of country conditions. For example, the very first use of "determination" in the TPS statute refers to a "determination with respect to the alien's eligibility for . . . benefits." §1254a(a)(4)(B). In another provision, the statute refers to the "determination of an alien's admissibility." §1254a(c)(2)(A). Still another provision describes the effect of TPS on discretionary immigration benefits if the Secretary "determines that extreme hardship exists."

Opinion of the Court

§1254a(e). These uses of "determination" or "determines" are plainly not references to country conditions.

*Doe* respondents counter that we need not look to how the TPS statute as a whole uses the term "determination" but can instead limit our examination to the use of the term in subsection (b), which contains the judicial-review bar. And there, they point out, the term refers only to the Secretary's evaluation of country conditions. Brief for Respondents in No. 25–1083, pp. 18–22.

This argument rests on a cramped view of statutory context. When we consider statutory context, we evaluate the provision at issue "with a view to [its] place in the *overall* statutory scheme," not just in a single subsection. *Utility Air Regulatory Group* v. *EPA*, 573 U. S. 302, 320 (2014) (internal quotation marks omitted; emphasis added). While the use of a term in nearby or closely related provisions may be entitled to more weight, there is no justification for limiting our examination as closely as *Doe* respondents urge. Once we expand our aperture, we see that the TPS statute uses "determination" in its ordinary sense, not to denote an assessment of country conditions.

3

Taking a different tack, respondents argue that only the Secretary's ultimate "determination"—not any subsidiary decision, such as whether to consult other agencies—is unreviewable. The dissent makes a similar argument. *Post*, at 4–6 (opinion of KAGAN, J.). For reasons already explained, this argument is inconsistent with the plain meaning of the statutory text. And that is true whether the term "determination" is understood to mean a discrete decision or a process leading up to a final decision.

This argument also contradicts general administrative-law principles. In APA cases, an agency's subsidiary decisions merge into the final agency action, which is then subject to review. See *Army Corps of Engineers* v. *Hawkes Co.*,

Opinion of the Court

578 U. S. 590, 597–598 (2016).  If the final agency action is unreviewable, then so too are subsidiary determinations. See *Amgen, Inc.* v. *Smith*, 357 F. 3d 103, 113 (CADC 2004); *DCH Regional Medical Center* v. *Azar*, 925 F. 3d 503, 506 (CADC 2019).  This important principle ensures that challengers cannot avoid a judicial-review bar by creative pleading or clever lawyering.

Moving beyond the text and precedent, respondents contend that our interpretation of the judicial-review bar could protect many shocking abuses of TPS.  For example, a rogue Secretary in one fell swoop could issue a 50-year TPS designation, contrary to the 18-month statutory cap.  Or a Secretary could terminate a TPS designation based on a coinflip.  The Government responds to each of respondents' farfetched hypotheticals and concludes that some but not all could in fact be redressed by the courts.  See Reply Brief 9–10.  But whether or not that assessment is correct, the fact remains that if a Secretary engaged in the sort of conduct that respondents imagine, Congress would have ample means to stop that abuse, including, for example, through the annual appropriations process.  "Sometimes Congress decides that the political process is the proper forum for remedying improper conduct." *National TPS Alliance* v. *Noem*, 169 F. 4th 796, 807 (CA9 2026) (Bumatay, J., dissenting from denial of reh'g en banc).

\*    \*    \*

In sum, we hold that the TPS statute's judicial-review bar applies to all non-constitutional claims.

### III

We continue with *Miot* respondents' equal protection claim.[4]

---

[4] *Doe* respondents brought a similar claim, but the District Court held that it was not likely to succeed.  So that claim is not before us.

Opinion of ALITO, J.

A

We have held that "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." *Webster* v. *Doe*, 486 U. S. 592, 603 (1988). In this case, we need not resolve whether the TPS statute meets that clear-statement rule because we conclude that *Miot* respondents' constitutional claim is unlikely to succeed on the merits.

Before proceeding further, we briefly explain why we may address the substance of *Miot* respondents' equal protection claim without deciding whether the District Court had jurisdiction to entertain it. It is a cardinal rule that a federal court may not consider the merits of a claim without first making a firm determination that it has jurisdiction. *Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 93–94 (1998).

When interim relief is sought, however, a court does not make a final decision on any matter necessary to the ultimate judgment. Instead, the court makes only a predictive—not a final—decision about the outcome of the case. And the likelihood that the court has jurisdiction over a claim and the likelihood that the claim is meritorious both bear on the claim's ultimate prospects. See *Arizona* v. *Biden*, 31 F. 4th 469, 479 (CA6 2022) (Sutton, C. J.). So in evaluating the likelihood-of-success question for the purpose of ruling on a request for interim relief, courts may consider both the likelihood that they have jurisdiction and the likelihood that the claim will succeed on the merits. If they conclude that a claim fails on either ground, they must deny interim relief. Similarly, a court with appellate jurisdiction may reverse on either jurisdictional or merits grounds a lower court order that granted interim relief. But courts need not always start with the jurisdictional ground if the claim for interim relief would also fail on the merits.

Here, we review the District Court's award of interim relief. Thus, in evaluating *Miot* respondents' likelihood of

20          MULLIN *v.* DOE

Opinion of the Court

success on their equal protection claim, we may reverse the District Court's grant of interim relief on either jurisdictional or merits grounds.

B

We turn now to the merits of *Miot* respondents' equal protection claim. The parties dispute the proper standard for assessing this claim. The Government contends that we should apply the deferential test we used in *Trump* v. *Hawaii*, 585 U. S. 667 (2018), and it claims that many of the factors that informed the Court's identification of the proper standard of review in that case are also present here. Brief for Petitioners 46–47. These factors include the Executive's broad authority over the admission and exclusion of foreign nationals and the connection between immigration policy and foreign relations. *Ibid. Miot* respondents, on the other hand, urge us to apply heightened scrutiny under *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U. S. 252 (1977). In their view, the *Hawaii* standard applies only to the exclusion of aliens seeking to enter the country, not to those who are already here. Brief for Respondents in No. 25–1084, p. 42.

We need not resolve this debate. We will assume for the sake of argument that the *Arlington Heights* standard applies and that we must therefore determine whether a "discriminatory purpose [was] a motivating factor in the decision" to terminate Haiti's TPS designation. 429 U. S., at 265–266. But because application of that standard calls for consideration of the context in which a challenged statement was made, *id.*, at 267–268, the immigration context is an important factor.

In support of their claim that the termination of Haiti's TPS designation was based on race, respondents cite statements made by the President and former Secretary Noem.

The President's comments fall into four main categories. First, many express strong objections to the immigration

Opinion of the Court

that this country has experienced in recent decades and to many of the immigrants who have come here, particularly those who have come to or stayed in the United States illegally. These statements associate these immigrants with crime and other social ills. Second, some statements express great displeasure with TPS. They note, among other things, that TPS designations have often been far from temporary and that aliens who are allowed to stay in the United States under the program are not vetted like other aliens who seek admission. Third, some statements broadly denigrate the countries for which TPS designations have been granted—including Haiti—portraying them as hellish places in which to live. And fourth, some statements malign Haitians who have come to the United States.

*Miot* respondents also cite statements by former Secretary Noem that fall into three categories. Some expressed antipathy toward travelers from countries covered by a renewed travel ban, much like the one that was before us in *Hawaii*, 585 U. S, at 679–680. Others were derogatory comments about immigration and its effects. And still some others promised changes and criticized past implementation of TPS.

None of the cited statements by either the President or the Secretary was overtly racial, and in substance all expressed policy views that could rest on race-neutral justifications. For example, one may oppose TPS and favor tighter restrictions on immigration for economic or other reasons that have nothing to do with race. And a person without racial bias can provide a harshly unfavorable description of living conditions in some of the countries with TPS designations. The criteria for TPS designations guarantee that many, if not most, designated countries have such characteristics.

Haiti is no exception. It is a very poor country, and living conditions there are unquestionably difficult. Many Americans of all races would surely find those conditions

22                    MULLIN *v.* DOE

Opinion of the Court

intolerable. But poverty and deprivation are no reflection on character, and there is no justification for denigrating the character of Haitians who suffer from and bear no responsibility for their country's ills.

Due in large part to the difficult conditions at home, many Haitians have come to this country throughout our history. And beginning with the more than 500 Haitians who fought to support American independence at the Battle of Savannah in 1779,[5] Haitians have made many positive contributions to the United States from the very beginning, and they continue to do so today.

In offering the cited statements as proof that the termination of Haiti's TPS termination was motivated by race, *Miot* respondents seek to capitalize on the statements' heated language. Political discourse by prominent public figures is increasingly couched in terms that would have scandalized the public just a short time ago, and the statements cited by *Miot* respondents—especially those concerning Haiti and Haitian immigrants to this country—exemplify this development.

But whatever one may think of the cited statements, they are insufficient to show that the termination of Haiti's TPS designation was based on the race of the Haitian people. Ironically, both *Doe* and *Miot* respondents identify a strong, race-neutral explanation of these officials' statements: the present administration's general stance on immigration and its obvious antipathy toward past administrations' TPS policies. Respondents argue that the Secretary made a "preordained decision" to end TPS for all countries, Brief for Respondents in No. 25–1083, p. 49, and they stress that she terminated the TPS designations for every country that came up for review, 13 in all. *Id.*, at 9–10; Brief for Respondents in No. 25–1084, p. 10. Included are nations in

─────────

[5] See G. Clark, The Role of the Haitian Volunteers at Savannah in 1779: An Attempt at an Objective View, 41 Phylon 356 (1980).

Opinion of the Court

East Asia (Nepal and Burma), Central Asia (Afghanistan), the Middle East (Syria and Yemen), Africa (Somalia, Ethiopia, South Sudan, and Cameroon), Central America (Nicaragua and Honduras), South America (Venezuela), and the Caribbean (Haiti).

Most would regard this as a racially diverse group of countries, but *Miot* respondents see them all as "non-white" nations. *Ibid.* They claim that TPS has not been terminated for any predominantly white nation, and they therefore infer that the reason for the termination of the TPS designation for Haiti was having a predominantly non-white population.

Respondents' definition of a predominantly non-white nation is broad, apparently encompassing major European countries. See Tr. of Oral Arg. 106–108. It may be that only the termination of a TPS designation for a Nordic or Germanic country would be sufficient in their judgment to show that the Secretary's unbroken record of TPS terminations was race-neutral. However, no such test case has come up during the present administration. Only one European nation—Ukraine—had a TPS designation when the President began his second term, and that country's TPS designation has not yet come up for review. See 90 Fed. Reg. 5936 (2025) (extending Ukraine TPS designation through October 19, 2026). The only other European states ever designated for TPS were the war-torn provinces of Kosovo and Bosnia-Herzegovina.[6] The great majority of countries granted TPS have ranked among the poorest nations of the world, and no European nation falls into that category.

Viewing all the relevant evidence, we conclude that *Miot* respondents are unlikely to prove that race was a motivating factor in the decision to terminate Haiti's TPS

—————

[6] 63 Fed. Reg. 31527 (1998) (designating Kosovo for TPS); 65 Fed. Reg. 33356 (2000) (terminating Kosovo's TPS designation); 57 Fed. Reg. 35604 (1992) (designating Bosnia-Herzegovina for TPS); 65 Fed. Reg. 52789–52790 (2000) (terminating Bosnia-Herzegovina's TPS designation).

24                          MULLIN *v.* DOE

Opinion of the Court

designation.  It follows that they are not entitled to interim relief on their equal protection claim.[7]

*    *    *

The judgments of the United States District Courts for the Southern District of New York and the District of Columbia are reversed.  The cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

--------

[7] On June 16, *Miot* respondents filed a motion to dismiss the writ of certiorari as improvidently granted.  They claim that newly discovered evidence provides further support for their equal protection claim.  This evidence is cumulative of other evidence in the record, and the motion is denied.

Cite as: 609 U. S. ____ (2026)    1

THOMAS, J., concurring

# SUPREME COURT OF THE UNITED STATES

————

Nos. 25–1083 and 25–1084

————

MARKWAYNE MULLIN, SECRETARY, DEPARTMENT OF HOMELAND SECURITY, ET AL., PETITIONERS

25–1083    *v.*

DAHLIA DOE, ET AL.

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL., PETITIONERS

25–1084    *v.*

FRITZ EMMANUEL LESLY MIOT, ET AL.

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 25, 2026]

JUSTICE THOMAS, concurring.

I join the opinion of the Court in full. I write separately to address two more fundamental problems with the *Miot* respondents' suit. First, their equal protection claim, while meritless under the Court's precedents, was also beyond the District Court's jurisdiction. Second, even assuming jurisdiction, the equal protection claim fails for the additional reason that aliens have no equal protection rights against the Federal Government.

I

Title 8 U. S. C. §1254a(b)(5)(A) precludes district courts from reviewing terminations of Temporary Protected Status (TPS) designations. It provides that "[t]here is no

2                          MULLIN *v.* DOE

THOMAS, J., concurring

judicial review of any determination of" the Secretary of Homeland Security "with respect to the . . . termination" of a designation of a foreign country for purposes of Temporary Protected Status. See *ante,* at 12. As the Court explains, this bar precludes the statutory claims challenging the Secretary's "determination" that the TPS designations for Syria and Haiti should be terminated because they challenge "the process that led to [the Secretary's] final decision." *Ante,* at 13. The Court does not decide whether the *Miot* respondents' equal protection claim is barred as well.

In my view, this equal protection claim is barred by the statute. It falls within the plain text of §1254a(b)(5)(A)'s judicial-review bar. Respondents asked a federal court to "[s]et aside the termination of Haiti's . . . designation as . . . unconstitutional" because it "was, at least in part, improperly motivated by animus and discriminatory intent based on race and ethnicity." Amended Complaint in No. 25–cv–2471 (D DC), ECF Doc. 74, pp. 84–86. By asking for a court order invalidating the Secretary's decision to terminate Haiti's designation, respondents sought precisely what Congress barred: "judicial review of" the Secretary's determination "with respect to the . . . termination . . . of a designation . . . of a foreign state." §1254a(b)(5)(A). The statutory text does not distinguish statutory and constitutional claims; it bars all "judicial review." Judicial review, of course, means "a court's power to review the actions of other branches or levels of government," and it "esp[ecially]" refers to the "power to invalidate legislative and executive actions as being unconstitutional." Black's Law Dictionary 1011 (12th ed. 2024). Therefore, for the same reasons that their statutory claims are barred, their constitutional claim is also barred: It challenges "the process that led to" the "decision to terminate [Haiti's] TPS designatio[n]" at a minimum, and it likely is barred even under respondents' narrower view that the bar applies "only to substantive claims" respecting a termination. *Ante,* at 13.

THOMAS, J., concurring

Respondents suggest that the plain language of the statute should not apply. Brief for Respondents in No. 25–1084, p. 15. According to this Court's modern precedent, constitutional avoidance requires a clear statement to bar judicial review of constitutional claims. See *Webster* v. *Doe*, 486 U. S. 592, 603 (1988). Barring all judicial consideration of a constitutional challenge to the Secretary's TPS determination could, these precedents say, "rais[e] a serious constitutional question of the validity of the statute as so construed." *Weinberger* v. *Salfi*, 422 U. S. 749, 762 (1975). Accordingly, the argument goes, courts should avoid interpreting the statute to have barred such review unless its intent to do so was clear, which respondents appear to doubt. *Ibid.*

I am unconvinced for two reasons.

## A

First, the statute makes Congress's intent to preclude judicial review clear. The canon of constitutional avoidance applies only if the statute is ambiguous. *Coney Island Auto Parts Unlimited, Inc.* v. *Burton Tr. for Vista-Pro Automotive, LLC*, 607 U. S. 155, 161 (2026). Congress's language—"no judicial review"—is not ambiguous. See *ante,* at 12–13. There is no indication in the text that reviewability may turn on the source of law for the underlying claim. It follows that constitutional avoidance has no role.

## B

Second, even if §1254a(b)(5)(A) were ambiguous, a judicial-review bar would raise no "serious constitutional question" in the first place. *Weinberger*, 422 U. S., at 762. Because inferior federal courts are creatures of statute, U. S. Const., Art. I, §8, cl. 9, they "possess no jurisdiction but what is given them by the power that creates them," *United States* v. *Hudson*, 7 Cranch 32, 33 (1812); accord, *Trainmen* v. *Toledo, P. & W. R. Co.*, 321 U. S. 50, 63–64 (1944)

THOMAS, J., concurring

(explaining that Congress has "plenary control over the jurisdiction of the federal courts"). So, Congress has the authority to deprive district courts of jurisdiction to decide particular kinds of claims.

It makes no difference that the *Miot* respondents alleged a violation of the Constitution. As Justice Scalia put it, "What could possibly be the basis for" doubting Congress's authority to bar judicial review of constitutional claims? *Webster*, 486 U. S., at 612 (dissenting opinion). "The very text of the Constitution refutes th[e] principle" that "*all* constitutional violations must be remediable in the courts." *Ibid.* In some cases, a question of constitutional law is "textually committed" to adjudication solely by another branch. *Nixon* v. *United States*, 506 U. S. 224, 228 (1993); see, *e.g.*, Art. I, §2, cl. 2 (setting the qualifications for House Members); §3, cl. 3 (setting qualifications for Senators); §5, cl. 1 (establishing that "[e]ach House shall be the Judge of the . . . Qualifications of its own Members," not any court). In other contexts, the "lack of judicially discoverable and manageable standards" has been taken to show that a claim of a constitutional violation cannot be addressed on the merits by federal courts. *Nixon*, 506 U. S., at 228.

Other familiar principles likewise bar judicial review of constitutional claims. An obvious one is sovereign immunity, "a monument to the principle that some constitutional claims can go unheard." *Webster*, 486 U. S., at 613 (Scalia, J., dissenting). Because of sovereign immunity, no one can sue the Federal Government for damages without a waiver, even if he brings a constitutional claim and even if damages are his only possible remedy. Likewise, "courts cannot examine" "the President's actions on subjects within his 'conclusive and preclusive' constitutional authority," regardless of whether he violates the Constitution in exercising that authority. *Trump* v. *United States*, 603 U. S. 593, 609 (2024). The Constitution thus does not require that courts be able to hear all constitutional claims.

Cite as: 609 U. S. ____ (2026)           5

THOMAS, J., concurring

\*    \*    \*

Congress barred all judicial review of TPS termination decisions, including constitutional claims. Since nothing in the Constitution prohibits Congress from doing so, courts are obliged to simply "giv[e] effect to [§1254a's] ordinary meaning." *Guerrero-Lasprilla* v. *Barr*, 589 U. S. 221, 244 (2020) (THOMAS, J., dissenting).[1]

## II

Respondents' equal protection claim also has no basis in the Constitution. The Constitution has only one Equal Protection Clause, and it applies only to the "State[s]," not the Federal Government. Amdt. 14, §1. Respondents, of course, sued the Federal Government. When asked at argument how the Equal Protection Clause could have anything to do with a suit against the Federal Government, respondents' counsel, drawing on precedents of this Court, stated that the claim "arises under . . . the Fifth Amendment's equal protection guarantee" because "the Fifth Amendment constrains the federal government in the same way that the Fourteenth Amendment constrains states." Tr. of Oral Arg. 118. Because the Fifth Amendment has no Equal Protection Clause, this Court was wrong to read equal protection into it in *Bolling* v. *Sharpe*, 347 U. S. 497 (1954). And, even if the Due Process Clause does prohibit some discrimination, it would not do so in a case about immigration status.

## A

There is little evidence for the Court's modern assumption that "the Due Process Clause of the Fifth Amendment contains an equal protection component whose substance is

---

[1] Although I would rule against respondents based on the judicial-review bar, I also agree with the Court that they are unlikely to succeed on the merits. Cf. *Jennings* v. *Rodriguez*, 583 U. S. 281, 314 (2018) (THOMAS, J., concurring in part and concurring in judgment).

6                          MULLIN *v.* DOE

THOMAS, J., concurring

'precisely the same' as the Equal Protection Clause of the Fourteenth Amendment." *United States* v. *Vaello Madero*, 596 U. S. 159, 166–167 (2022) (THOMAS, J., concurring) (quoting *Weinberger* v. *Wiesenfeld*, 420 U. S. 636, 638, n. 2 (1975)). The Clause says nothing about equal protection or discrimination. Reading an implicit "equal protection component" into the Fifth Amendment's language renders incomprehensible the Fourteenth Amendment's inclusion of both an identical Due Process Clause and the Equal Protection Clause. *Vaello Madero*, 596 U. S., at 170–171 (opinion of THOMAS, J.). History provides no basis for this atextual reading, either.[2] See *id.*, at 167–171.

Even if the Due Process Clause did include some nondiscrimination principle, it would have no application here. The Due Process Clause restricts the Federal Government's ability to "depriv[e]" people of "life, liberty, or property." U. S. Const., Amdt. 5. "The Due Process Clause protects rights, not privileges." *Learning Resources, Inc.* v. *Trump*, 607 U. S. 229, 323 (2026) (THOMAS, J., dissenting) (internal quotation marks omitted). "The founding generation understood the phrase 'life, liberty, or property' to refer to a relatively narrow set of core private rights that did not depend on the will of the government." *Sessions* v. *Dimaya*, 584 U. S. 148, 213 (2018) (THOMAS, J., dissenting).

The termination of Haiti's TPS designation does not deprive respondents of "life, liberty, or property," so they have no claim even if the words "due process" implicitly forbid discriminatory animus. The discretionary and limited status that a TPS designation provides, like any immigration status for aliens, is a government-created privilege, not a core private right. See *United States ex rel. Knauff* v.

———————

[2] As I have explained, there is "substantial support for the proposition that . . . the Citizenship Clause guarantees citizens equal treatment by the Federal Government with respect to civil rights." *Vaello Madero*, 596 U. S., at 179 (THOMAS, J., concurring). But, respondents are not citizens, so the Citizenship Clause cannot guarantee them any rights.

THOMAS, J., concurring

*Shaughnessy*, 338 U. S. 537, 542 (1950) ("Admission of aliens to the United States is a privilege granted by the sovereign United States Government"); *Harisiades* v. *Shaughnessy*, 342 U. S. 580, 586–587 (1952) (explaining that even permanent residence is not a "right" but "a matter of permission and tolerance"); *United States ex rel. Turner* v. *Williams*, 194 U. S. 279, 290 (1904) ("[T]he deportation of an alien who is found to be here in violation of law is not a deprivation of liberty without due process of law"). So, a TPS determination does not implicate the Due Process Clause even if a discriminatory motive is inconsistent with "due process" in other contexts.

B

Perhaps for these reasons, this Court has never subjected even express racial classifications in immigration laws to scrutiny under the Due Process Clause. While foreigners have long been able to claim constitutional protection from racial discrimination by States, see *Yick Wo* v. *Hopkins*, 118 U. S. 356, 368–369 (1886), they have never been guaranteed a right to immigration status or citizenship based on equal protection principles, even when these laws were openly discriminatory, see Act of May 6, 1882, ch. 126, 22 Stat. 58–59 (severely restricting Chinese immigration); *Takao Ozawa* v. *United States*, 260 U. S. 178, 192–193 (1922) ("In all of the Naturalization acts from 1790 to 1906 the privilege of naturalization was confined to white persons (with the addition in 1870 of those of African nativity and descent)," and legislation up to 1922 had not changed that restriction). Congress only amended these laws to eliminate such discrimination in the middle of the 20th century,[3]

_____

[3] The racial restrictions for naturalization were gradually removed from 1940 onward. See *Oyama* v. *California*, 332 U. S. 633, 635, n. 3 (1948). The last restrictions, however, were not removed until 1952. See *ibid.* (explaining that persons of Japanese descent were still ineligible in 1948); Immigration and Nationality Act of 1952, §311, 66 Stat. 239.

8                          MULLIN *v.* DOE

THOMAS, J., concurring

but not because the meaning of the Fifth Amendment has
changed.  See 8 U. S. C. §1427(a) (present naturalization
statute).

   If equal protection principles applied to immigration de-
cisions, much of even our current immigration law would
conflict with this Court's modern equal protection doctrine.
This Court has interpreted the Equal Protection Clause to
bar discrimination based on "country of origin."  *Oyama* v.
*California*, 332 U. S. 633, 640 (1948).  But, our immigration
laws have distinguished among aliens based on their na-
tional origin from the beginning.  See, *e.g.*, Act of July 6,
1798, §1, 1 Stat. 577 (authorizing deportation of those who
are subjects of hostile nations).  Today, applicants for im-
migration are treated differently based on their nationality
as a matter of course.  8 U. S. C. §1152(a)(2).  And, respond-
ents themselves seek a protection from deportation for peo-
ple from Haiti, but not the neighboring Dominican Repub-
lic.  If they are correct that the Court should apply equal
protection precedents to immigration decisions, then the
program that they benefit from may, ironically, be uncon-
stitutional.

Cite as: 609 U. S. \_\_\_\_ (2026)  1

KAGAN, J., dissenting

# SUPREME COURT OF THE UNITED STATES

————

Nos. 25–1083 and 25–1084

————

MARKWAYNE MULLIN, SECRETARY, DEPARTMENT
OF HOMELAND SECURITY, ET AL., PETITIONERS
25–1083            *v.*
DAHLIA DOE, ET AL.

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED
STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

DONALD J. TRUMP, PRESIDENT OF THE UNITED
STATES, ET AL., PETITIONERS
25–1084            *v.*
FRITZ EMMANUEL LESLY MIOT, ET AL.

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE
UNITED STATES COURT OF APPEALS FOR THE
DISTRICT OF COLUMBIA CIRCUIT

[June 25, 2026]

JUSTICE KAGAN, with whom JUSTICE SOTOMAYOR and
JUSTICE JACKSON join, dissenting.

For over a decade, the Government has provided humanitarian relief to Haitian and Syrian nationals in the United States through the Temporary Protected Status (TPS) program. The Secretary of Homeland Security first designated Haiti for the program in 2010 after an earthquake devastated the country; the Secretary designated Syria in 2012 because of the government and military's brutal repression of the country's civilian population. Since those initial designations, Secretaries have repeatedly examined the conditions in the two countries, and have repeatedly determined that they remain too dangerous to permit safe return. As a result, those countries' TPS designations have been

2                                MULLIN *v.* DOE

KAGAN, J., dissenting

extended year after year, and hundreds of thousands of Haitians and Syrians have been able to live and work here.

But that is no longer so, and the suits before us challenge that change. Last year, then-Secretary Kristi Noem, at the instigation of President Trump, terminated Haiti's and Syria's TPS designations, declaring the countries now safe. Haitian and Syrian TPS holders brought these cases, and sought interim relief allowing them to stay here while the litigation progressed. The District Courts granted that relief, finding (among other things) that the terminations were likely unlawful. Both courts concluded that the Secretary probably violated the TPS statute by ordering the terminations without first consulting with other agencies about current country conditions. And the District Court in the Haiti litigation found as well that the plaintiffs had a likely successful equal protection claim, in part because statements made by the President showed that a racially discriminatory purpose had entered into the TPS termination.

Today the Court undoes that preliminary relief—insisting that the terminations take effect now—based on two mistakes about the plaintiffs' likelihood of success. First, the majority asserts that the Secretary's compliance with the TPS statute is in every respect unreviewable by the courts. But in fact the statute allows judicial review of whether the Secretary adhered to the procedures it mandates—which is what the plaintiffs dispute here. Second, the majority claims to see *no* evidence that race played *any* role in the Haiti decision. But the evidence is there, plain to see, in the President's statements, which the majority (and for that matter, his own lawyers) cannot even bear to repeat. Once that much is established, the case for interim relief is made: There is no dispute that the plaintiffs will suffer irreparable harm absent postponement of the TPS decisions. So the plaintiffs are entitled to stay in this country while these suits go forward. Respectfully, I dissent

KAGAN, J., dissenting

from the Court's decision that they may instead be put on the next plane.

## I

Start with how the TPS program works—or, at least, is supposed to. The governing statute authorizes the Secretary to "designate" a country for the program if it is suffering from specified dangerous or harmful conditions, such as may arise from armed conflicts or natural disasters. 8 U. S. C. §1254a(b)(1). When the Secretary makes a designation, she also announces how long it will last—anywhere from six to eighteen months. At the end of that period, the designation does not just go away; nor is its fate left to the Secretary's unfettered discretion. Rather, the statute mandates a "[p]eriodic review" process: "At least 60 days before [the] end" of the chosen period, the Secretary, "after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state" and "shall determine whether the conditions for such designation under this subsection continue to be met." §1254a(b)(3)(A). If the Secretary determines the statutory criteria are no longer met, she "shall" terminate the designation; otherwise, the designation "is extended." §§1254a(b)(3)(B), (C). Either way, "[t]he [Secretary] shall provide on a timely basis for the publication of notice" in the Federal Register. §1254a(b)(3)(A). So in all, the statute tells the Secretary to complete four steps to terminate a TPS designation: (1) consult with appropriate agencies about the country's conditions, (2) review those conditions, (3) determine whether those conditions are still bad enough to meet the statutory criteria, and (4) publish a notice in the Federal Register. All agree those steps are mandatory. See *ante*, at 5.

The first question in these cases is whether a federal court can review a claim that the Secretary failed to take one of the four mandated steps—here, that before terminating TPS for Haiti and Syria, she failed to consult with

4                          MULLIN *v.* DOE

KAGAN, J., dissenting

appropriate agencies about country conditions. The plaintiffs' failure-to-consult claims are brought under the Administrative Procedure Act, which means judicial review is available unless "a relevant statute precludes it" or the challenged "action is committed to agency discretion by law." *Department of Commerce* v. *New York*, 588 U. S. 752, 771 (2019); see 5 U. S. C. §701(a). Neither the Government nor the majority contends that the actions in dispute are committed to the agency's discretion, so the issue here is whether the TPS statute prevents courts from reviewing the Secretary's compliance with its mandatory procedures.

The statute does no such thing. Its judicial-review bar applies not to everything the Secretary does under the law, but only to her "determination" "with respect to the designation, or termination or extension of a designation, of a foreign state." 8 U. S. C. §1254a(b)(5)(A). To preclude review of those determinations is of course to insulate critical matters from judicial scrutiny. Suppose the Secretary determines that a country no longer qualifies for a TPS designation even though the record shows the opposite—that country conditions are as dire as ever. Under the statute, no court may second-guess that determination. But still, the review bar has limits. It does nothing to stop courts from reviewing things *other* than the Secretary's "determination[s]" concerning TPS designations. *Ibid.* And those other things include the procedural steps the Secretary must undertake prior to making any determination about country conditions.

For that reason, the judicial-review bar does not preclude the plaintiffs' failure-to-consult claims. Those claims are narrow. They do not assert that the Secretary made the wrong call when she determined that Haiti and Syria no longer meet the criteria for TPS (although the plaintiffs surely think that too). Instead, the claims are that the Secretary failed to comply with a pre-determination procedural mandate—more specifically, that she failed to consult with

KAGAN, J., dissenting

appropriate agencies about country conditions. A court can adjudicate those claims without reviewing—or even thinking about—the Secretary's later "determination[s]" concerning (*i.e.*, "with respect to") the "termination" of Haiti's and Syria's TPS "designation[s]." *Ibid.* That is because the claims concern a distinct matter—whether the Secretary did what the statute demands before she made her unreviewable decision.

The majority's contrary conclusion rests on what it self-describes as a "very broad" view of the term "determination." *Ante*, at 12. According to the majority, that term can "be used as a synonym for 'decision'" *or* "to describe the chain of events leading up to a decision." *Ibid.* So when the judicial-review bar refers to a "determination," the majority posits, it means not only the actual determination of whether a country still qualifies for TPS, but also the "chain of events leading up to" that decision. *Ibid.* And the latter includes, the majority says, the statutorily required consultations—which (*voila*!) brings them within the judicial-review bar.

"[V]ery broad" might be one description for that reading of the term "determination"; very strange is another. Just last Term, this Court observed that the word "determination" is a "term[] of everyday usage," and then said what it means: the "settling and ending of a controversy"; "the resolving of a question by argument or reasoning"; "[t]he decision arrived at or promulgated"; or "a determinate sentence, conclusion, or opinion." *EPA* v. *Calumet Shreveport Refining, L.L.C.*, 605 U. S. 627, 643 (2025). Missing from those definitions (or any other you, as an English speaker, would naturally come up with) is any suggestion that events preceding a determination—including required procedural steps—are properly referred to as the "determination" itself. See *McNary* v. *Haitian Refugee Center, Inc.*, 498 U. S. 479, 492 (1991) (construing the word "determination" in another judicial-review bar as "describ[ing] a single act,"

6                                MULLIN *v.* DOE

KAGAN, J., dissenting

rather than the "procedure employed in making decisions"). In ordinary English, a "determination" means, well, a determination—not a determination plus anything and everything the decisionmaker does or is required to do beforehand. And then, so too in this statute—which even the majority does not think uses the word "determination" as some special term of art. See *ante*, at 16.[1]

And even if the matter is less certain than I think, the "strong presumption" in favor of judicial review should decide it the plaintiffs' way. *Mach Mining, LLC* v. *EEOC*, 575 U. S. 480, 486 (2015). That presumption applies even when we interpret the scope, rather than the existence, of a judicial-review bar. See *Cuozzo Speed Technologies, LLC* v. *Lee*, 579 U. S. 261, 273 (2016). In that context, as in all others, we "presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command." *Bowen* v. *Michigan Academy of Family Physicians*, 476 U. S. 667, 681 (1986). The majority concedes as much, mouthing all the right words: "[W]hen a statutory provision is reasonably susceptible to divergent interpretation, we adopt the reading that accords with the traditional and basic principle that executive determinations generally are subject to judicial review." *Ante*, at 13

—————

[1] The majority briefly states that it would reach the same conclusion if "determination" means only the "final decision" to terminate TPS because (it says) all the prior consultative steps—which, somewhat confusingly, it also labels "decisions"—would be "with respect to" that ultimate TPS determination. *Ante*, at 12–13. The problem with that argument is that it jumbles the order of the words in the statute. The statute does not speak of decisions (or steps) "with respect to" a determination—whatever that would mean. Instead, the statute speaks of a determination "with respect to" "the designation, or termination or extension of a designation, of a foreign state." 8 U. S. C. §1254a(b)(5)(A). So if a "determination" is indeed only the Secretary's "final decision," as the majority here accepts, then the phrase "with respect to," however broad, does it no good.

KAGAN, J., dissenting

(quoting *Guerrero-Lasprilla* v. *Barr*, 589 U. S. 221, 229 (2020)). And then the principle gets ignored. If the meaning of "determination" is *not* "reasonably susceptible to divergent interpretations," it is only because, as I maintain, a "determination" is a determination. But the majority's view that a "determination" includes as well all the steps and processes and actions in "the chain" leading up to the determination? *Ante*, at 12. That is reasonably contestable by any measure.

Indeed, the consequences of today's holding could be Exhibit A in the case for why we have adopted a presumption favoring judicial review. The TPS statute makes plain that Congress insulated the Secretary's designation determinations from review—that it did not want judges overriding secretarial decisions (made with proper consultation) about conditions in foreign countries. But the majority's holding makes *everything* in the statute precatory, including procedural requisites whose enforcement would seem to fall smack in the middle of the judicial wheelhouse. After today, a Secretary can announce to the world that she didn't consult with anyone—more, that she didn't evaluate country conditions at all—before making, extending, or terminating a TPS designation. And the courts will be powerless to intervene, even though Congress loaded up the TPS statute with requirements about the (altogether different) way the Secretary is supposed to make her decision. If it means anything to "presume that Congress intends the executive to obey its statutory commands," *Bowen*, 476 U. S., at 681— to think that Congress does not want all its work to go for naught—then the majority has gone wrong.

And the claims that the majority refuses to review are in fact meritorious, because the Secretary did not consult (as the statute demands) with "appropriate agencies of the Government" about "the conditions" in Haiti and Syria. §1254a(b)(3)(A). As everyone agrees, the only relevant communications here were brief email exchanges between an

8                          MULLIN *v.* DOE

KAGAN, J., dissenting

aide to the Secretary and an official at the State Department (a clearly "appropriate" agency). The aide stated (in two separate emails) that Haiti's and Syria's TPS designations were up for review; the official then replied as to each that the State Department had "no foreign policy concerns" with a termination of TPS. 2 App. 763; Administrative Record in No. 25–cv–8686 (SDNY), ECF Doc. 72–2, p. 156. The problem with those exchanges is that they were not about the right thing. The statute insists on consultations about whether country conditions are safe, not about whether ending TPS raises "foreign policy concerns." While there might be overlap between the two subjects, they are hardly coextensive. It could well be that terminating TPS for even an unsafe country raises no foreign policy concerns because it does not threaten U. S. relations with any significant foreign nation. Of course, the State Department is free to opine on that matter, as part of its job of overseeing foreign affairs. But the TPS statute mandates that it also advise on something else: whether, since an earlier TPS designation, the conditions in a country (here, Haiti and Syria) have become safe. The State Department did not do that here, so the Secretary did not fulfill her consultation requirement.[2]

The Government's opposing argument—that the required consultation occurs whenever the Secretary *asks* about country conditions—is underwhelming. According to

_____

    [2] One might wonder why a State Department official asked about TPS would weigh in on "foreign policy concerns" when the statute insists on consultations about country conditions. Perhaps it was just a miscommunication or mistake. But perhaps it was purposeful avoidance of an inconvenient topic. At the relevant time, the Department's travel advisories stated that Haiti was unsafe due to "kidnapping, crime, terrorist activity, civil unrest, and limited health care," and that "[n]o part of Syria [was] safe from violence" due to "terrorism, civil unrest, kidnapping, hostage taking, and armed conflict." 2 App. 771; 1 *id.*, at 447. So it would have been hard for a State Department official to provide the Secretary with the relevant country-condition assurances.

KAGAN, J., dissenting

the Government, "consultation" just means "[t]o seek advice or input," not to receive it. Tr. of Oral Arg. 41; see *id.*, at 38 ("[I]f you've asked, you've consulted"). So once the Secretary reaches out to an appropriate agency, the statute is satisfied, even if a response never comes back, or if the one that does is "completely unresponsive" like "wasn't that baseball game tonight great?" *Id.*, at 38–39. But sorry, that is not what "consultation" means. See, *e.g.*, Black's Law Dictionary 316 (6th ed. 1990) (defining "[c]onsultation" as "[d]eliberation of persons on some subject"). If your doctor tells you, "After consulting with a specialist, I've determined that you should have this procedure," you would think he had an exchange with an expert about your condition. If it turned out the doctor emailed a specialist but never heard back, or the specialist's reply was about a baseball game, you would think the doctor had lied. The emails here are in the same vein. The consultation required by law never took place because there was no two-way communication about the right subject.

## II

The Haiti plaintiffs have yet another claim that is likely to succeed: that race entered into the decision to terminate Haiti's TPS designation, in violation of equal protection.

Our decision in *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U. S. 252 (1977), supplies the standard for assessing that claim. The Haiti plaintiffs must show (here, must show as a likelihood) that a racially "discriminatory purpose" was "a motivating factor" in the termination of Haiti's TPS designation.[3]  *Id.*, at 265–266.

---

[3] The majority assumes without deciding that *Arlington Heights* provides the right framework. See *ante*, at 20. But of course it does. *Arlington Heights* is the framework we have always used to examine discriminatory purpose in equal-protection cases—including six years ago in another lawsuit involving a challenge to immigration policy. See *Department of Homeland Security* v. *Regents of Univ. of Cal.*, 591 U. S. 1, 34 (2020) (plurality opinion). The Government's argument that we

10    MULLIN *v.* DOE

KAGAN, J., dissenting

Critically, "a motivating factor" does not mean the sole factor, or even "the dominant or primary one." *Id*., at 265. One factor among many is enough when the factor is racial to presumptively establish an equal protection violation. See *ibid*. And in determining whether such a factor exists, a court must undertake a "sensitive inquiry" into whatever "circumstantial and direct evidence of intent" is available. *Id*., at 266. It should consider "[t]he historical background of the decision"; the "sequence of events leading up" to it; and, most relevant here, "contemporary statements" by decisionmakers. *Id*., at 267–268.

This Court must also take account of a deferential standard of appellate review. The discriminatory-purpose inquiry is predominantly factual, so a lower court's conclusion must stand unless clearly erroneous. See *Anderson* v. *Bessemer City*, 470 U. S. 564, 573 (1985). Here, the District Court found that the existing record (which future discovery could supplement) "strongly suggests that [the] decision to terminate Haiti's TPS designation was motivated, at least in part, by racial animus." 2 App. 703; see *id*., at 698 (observing that the President's statements "repeatedly invoked racist tropes of national purity," and evinced "anti-black" animus). Under clear-error review, that finding governs so long as it is "plausible." *Anderson*, 470 U. S., at 574.

It is more than plausible: Even putting the clear-error standard aside, the Haiti plaintiffs have carried their burden. The evidence they have offered includes statements by the President so repellent and racially inflected that the majority declines to put them in print. (Indeed, one measure of the President's way of speaking about Haitians is to compare it with the majority's, which is unfailingly

———————

should apply the deferential test the Court used in *Trump* v. *Hawaii*, 585 U. S. 667 (2018), seeks both a significant extension of *Hawaii* and a massive change in equal-protection law—neither of which is warranted.

KAGAN, J., dissenting

respectful.[4])  So here are some of those statements.  Haitians are "eating the dogs . . . .  They're eating the cats.  They're eating—they're eating the pets of the people that live [in Springfield, Ohio]."  2 App. 802; see *id.*, at 644.  And: Haitians are also eating "other things too that they're not supposed to be."  *Id.*, at 698–699.  And: Haitians in the United States "probably have AIDS."  *Id.*, at 698.  And: Haiti is a "shithole country," which is "filthy, dirty, [and] disgusting."  *Id.*, at 698–699.  And: Haitian immigration is "like a death wish for our country."  *Id.*, at 698.  And: Haitians, along with some others, are "poisoning the blood" of our country.  *Id.*, at 698.  And: "Why is it we only take people from shithole countries" like "Haiti [and] Somalia"?  "Why cannot we have some people from Norway [and] Sweden?"  *Id.*, at 699.  The majority briefly replies that those remarks are not "overtly racial," *ante,* at 21, but it is hard to know what that means.  Haitians are Black.  (Norwegians and Swedes not so much.)  The references—of filth, disease, and primitiveness—are shot through with racial stereotypes and tropes.  It is hard to imagine the statements being made today of any White community.  No very "sensitive inquiry," of the kind *Arlington Heights* compels, is needed to see them for what they are, 429 U. S., at 266; judges, as we often say, are "not required to exhibit a naiveté from which ordinary citizens are free," *Department of Commerce*, 588 U. S., at 785.  The statements fairly shout, in their racial undertones and overtones alike, that race entered into the President's resolve to remove Haitians from this country.

The majority's opposing argument is at odds with the *Arlington Heights* standard.  On the majority's view, there is a more plausible "race-neutral explanation[]" of the

————————
[4] For example: "[P]overty and deprivation are no reflection on character, and there is no justification for denigrating the character of Haitians who suffer from and bear no responsibility for their country's ills." *Ante*, at 22.

12                    MULLIN *v.* DOE

KAGAN, J., dissenting

termination of Haiti's TPS designation: "the present admin-
istration's general stance on immigration and its obvious
antipathy toward past administrations' TPS policies."
*Ante*, at 22; see *ante,* at 2.  But the *Arlington Heights* test is
not in the nature of an "either/or" inquiry.  It does not ask
a court to identify which is the single cause, or even the pri-
mary cause, of an official action.  To the contrary, that test
recognizes a "both/and" world: that causes are usually mul-
tiple (and often intertwined).  I have no doubt that, as the
majority says, the current administration is generally hos-
tile toward immigration and prior TPS policies.  I also have
no doubt, again with the majority, that those views may be
held for reasons "hav[ing] nothing to do with race."  *Ante*,
at 21.  But under *Arlington Heights*, that is not the end of
the matter.  If in addition to race-neutral reasons, race en-
tered into the picture—even as a subsidiary factor—the
Haiti TPS decision is irretrievably tainted.  And here, the
President's own statements show that race did enter in—
that, within what was surely a multi-cause decision, it was
*a* motivating factor.  Because that is all the Haiti plaintiffs
need to show on their equal protection claim, the District
Court was right to find that it is likely to succeed.

III

Once the merits are thus established, the requested in-
terim relief must follow, given the harm the plaintiffs will
otherwise suffer.  See *Nken* v. *Holder*, 556 U. S. 418, 426
(2009) (considering "whether the applicant will be irrepara-
bly injured").  Indeed, neither the Government, in its brief-
ing here, nor the majority contests the point.  Without a
postponement of the TPS terminations, hundreds of thou-
sands of Haitians and Syrians living in this country will
lose their legal status and work authorization.  Most will
have no legal option except to leave the country, even at the
price of leaving family behind; otherwise, they will likely be
detained or removed.  Some may be eligible to apply for

KAGAN, J., dissenting

asylum, but they will not be able to work here, so as a practical matter may also have to relocate. And where will any of those individuals go? Haiti and Syria are countries that the State Department continues to list as too dangerous for travel; they may be yet more perilous for a former inhabitant. Nor would there be much hope for an eventual return to this country, given statutory bars on reentry and TPS requirements of continuous presence. Hundreds of thousands of lives will be uprooted, most permanently, while this litigation to annul the Secretary's (likely illegal) termination orders proceeds.

Take as examples two of the individual plaintiffs here. Fritz Emmanuel Lesly Miot is a Haitian national who has held TPS for fifteen years. He lives in California where he works in a laboratory researching Alzheimer's, a job he can hold only because of his TPS work authorization. Miot suffers from Type 1 diabetes, which is easily treated in the United States. But in Haiti, the same disease can be a death sentence, given that country's collapsed health-care infrastructure (attributable to both natural disasters and political conditions). And beyond those health issues, Miot believes his long-term residency in the United States would make him a prime target in Haiti for a kidnapping. Or consider Laila Doe, who fled Syria with her daughter in 2013 after her neighborhood was bombed. Today, Doe lives in Illinois where she works as a behavioral technician for individuals with disabilities and cares for her elderly mother, a U. S. citizen. Without TPS, she will have to leave her mother and return to a still ravaged, violent, and dangerous country. Doe fears that as a single woman living alone, she will be robbed or even killed there. And she is afraid that her now 17-year-old daughter, who has lived in this country almost all her life, will have no future in Syria because she speaks little Arabic.

Miot, Doe, and the other plaintiffs before us deserve better than today's decision. True enough that TPS is a

14                          MULLIN *v.* DOE

KAGAN, J., dissenting

temporary program, and that it did not promise the plaintiffs never-ending humanitarian protection. But the law prevents the program from ending as it likely did here—without the required consultations about country conditions and, as to Haiti, with impermissible race-based considerations tainting the decision. At this juncture, both sets of plaintiffs ask for only one thing: that they may stay in this country while they continue to litigate their claims. For all the reasons given, they are entitled to that relief, and should not instead be consigned to devastating, and indeed life-threatening, injury.